**Kelly Simon**, OSB No. 154213
ksimon@aclu-or.org
**Eri Andriola**, OSB No. 246500
eandriola@aclu-or.org
ACLU FOUNDATION OF OREGON
PO Box 40585
Portland, OR 97240

**J. Ashlee Albies**, OSB No. 051846
ashlee@albiesstark.com
ALBIES & STARK LLC
1500 SW First Ave., Ste. 1000
Portland OR 97201
Facsimile: 503.427.9292

**Jane L Moisan**, OSB No. 181864
jane@pdxplp.com
PEOPLE'S LAW PROJECT
1500 SW First Ave., Ste. 1000
Portland OR 97201
Facsimile: 503.558.2025

**Alexander M. Tinker**, OSB No. 144939
alex.tinker@tonkon.com
Direct: 503.802.5734
**Daniel H. Skerritt**, OSB No. 681519
Direct: 503.802.2024
daniel.skerritt@tonkon.com
**Maureen S. Bayer**, OSB No. 214905
Direct: 503.802.2115
maureen.bayer@tonkon.com
**Olivia Ashé**, OSB No. 225796
Direct: 503.802.2081
olivia.ashe@tonkon.com
TONKON TORP LLP
1300 SW Fifth Ave., Ste. 2400
Portland, OR 97201
Facsimile: 503.274.8779

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(PORTLAND DIVISION)

| | |
|---|---|
| JACK DICKINSON (a.k.a. "the Portland Chicken"), LAURIE ECKMAN, RICHARD ECKMAN, MASON LAKE, HUGO RIOS, *on behalf of themselves and those similarly situated* | Civil No. 3:25-cv-02170 (SB) |
| Plaintiffs, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| DONALD J. TRUMP, President of the United States, *in his official capacity*; KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS), *in her official capacity*; U.S. Department of Homeland Security | |
| Defendants. | |

**INTRODUCTION**

1.     Plaintiffs are journalists and peaceful protesters. They bring this class action on behalf of themselves, and others similarly situated, to stop Defendants' pattern and practice of violating Plaintiffs' First Amendment rights while they are attending protests outside of the one-block building located at the corner of South Bancroft Street and South Macadam Avenue ("Portland ICE building"). Peaceful protest, and the free press covering it, is a cornerstone of our democracy that enjoys a proud history in the City of Portland. [1]

---

[1] *See*, *e.g.*, John Killen, *Portland Protests through the Years: A Decade of Free Speech in the Rose City*, Oregon Live (Dec. 1, 2014) (documenting history of protests in Portland from 2004 to 2014), https://www.oregonlive.com/multimedia/2014/12/portland_protests_through_the.html.

2.      When she was attending a protest at the Portland ICE Building, Defendants shot 84-year-old Plaintiff Laurie Eckman in the head without warning when she posed no threat. They choked her war veteran husband, Plaintiff Richard Eckman, with tear gas and shot a munition at his walker, when he, too, posed no threat. They shot Plaintiff Jack Dickinson in the face respirator. They have assaulted him repeatedly by aiming directly at him, shoving him, bombarding him and others with chemical munitions, including as recently as November 14, 2025. At the time of these events, Mr. Dickinson was dressed in his iconic chicken suit and wrapped in an American flag. He posed no threat to anyone.

3.      At a protest at the Portland ICE Building, Defendants riddled Plaintiff Hugo Rios with an estimated 20 pepper balls when he was off to the side filming them, while he was clearly marked as press. They teargassed Plaintiff Mason Lake when he was clearly marked as press. Three days later, they shined a spotlight on him to prevent him from recording them, then shot him with pepper balls. Two weeks later, they shot at him with scat rounds. Then they teargassed him. Then they shot him in the groin. When he went back to work two months later, they again used a spotlight to interfere with his ability to record, an agent pointed a rifle at him, and then a different agent sprayed him with law enforcement-grade mace when he was trying to record officers shoving protesters.

4.      Defendants' gratuitous violence is not an accident. Defendants are repeatedly deploying unnecessary, excessive and indiscriminate force against Plaintiffs and class members to retaliate against them for protesting against Defendants' immigration policies and trying to report on their violence against those who speak out. At the same time, they are allowing people who favor the administration's frightening and violent tactics behind their lines to record events.

5.      Defendants' conduct is part of an officially-condoned pattern of retaliating against people who protest the Trump administration's militarized incursions into democratic cities to fuel a false narrative that such cities are lawless and violent. DHS posted a false video claiming

that "antifa terrorists" had stormed the Portland ICE building using video footage from Chicago.[2] On September 27, 2025, President Trump used this false narrative to authorize "full force" against protesters in "war-ravaged" Portland. The protests in Portland, however, are small, and overwhelmingly non-violent.

6.      Notwithstanding the cruel nature of Defendants' immigration policies and response to protest, people have responded with art, humor, music, dancing, inflatable costumes, fleece animal onesies, semi-naked bike rides, neon-clad aerobics classes, prayer, pizza delivery, and even knitting.



Photo Credit: Mark Graves, Oregonian, https://www.oregonlive.com/galleries/PYSB3B7K XBAE7BN2OJJGGBBL7Y/



Credit: Michele lee Berns, Oregonian, https://www.oregonlive.com/portland/2025/10/ craftivism-draws-knitters-crocheters-to-portland-ice-protests.html



Photo Credit: Mathieu Lewis-Rolland, https://www.bizjournals.com/portland/news/2025 /11/18/cortright-carlson-column.html



Photo Credit: Mathieu Lewis-Rolland, Getty Images, https://www.aol.com/articles/naked-bike-riders-flood-portland-185212542.html

---

[2] Drew Harwell and Joyce Sohyun Lee, *We checked DHS's videos of chaos and protests. Here's what they leave out*, Wash. Post (Oct. 29, 2025) https://www.washingtonpost.com/investigations/2025/10/29/trump-administration-misleading-videos/.

7.      Defendants' pattern of forceful retaliation against protesters and press in Portland had to be restrained in 2020. For example, in 2020, the Court enjoined DHS from engaging in an identical course of retaliation against journalists covering the protests arising from George Floyd's murder. *See, e.g., Index Newspapers, LLC v. U.S. Marshals Service,* 977 F.3d 817, 837 (9th Cir. 2020). Judicial intervention is once again necessary because Plaintiffs intend to keep protesting and doing their jobs to report on these important events. Each day they do so, Plaintiffs risk death, brain damage, disfigurement and serious physical injury, and their First Amendment rights are being chilled. At the same time, Defendants creep closer to taking over the marketplace of ideas and the narrative about what's really going on in America.

8.      There is no war in Portland. Defendants must be enjoined from gassing, shooting, hitting and arresting peaceful Portlanders and journalists willing to document federal abuses as if they are enemy combatants.  Our democracy increasingly depends on such restraints.

**THE PARTIES**

**PLAINTIFFS**

9.      **Plaintiff Jack Dickinson** is a Portland resident who has for months engaged, and continues to regularly engage, in nonviolent protest at the Portland ICE building.  Jack Dickinson has come to be known as "the Portland Chicken" after he started regularly attending protests in a yellow fleece chicken costume with an American flag draped over his shoulders like a cape.



Photo Credit: AP Photo, Ethan Swope, *available at* https://www.chicagotribune.com/2025/10/06/trump-national-guard-legal/

10.    **Plaintiff Laurie Eckman** is an 84-year-old woman who lives with her husband, Richard Eckman, in Portland, Oregon.  Mrs. Eckman lives just a few blocks from the Portland ICE building. Mrs. Eckman spontaneously decided to attend a protest that marched to the Portland ICE building where federal agents gassed her and shot her in the head with an impact munition covered in chemical irritant.

11.    **Plaintiff Richard Eckman** is an 83-year-old Vietnam War Veteran from the United States Navy and a retired Major in the U.S. Army Reserve. Mr. Eckman lives with his wife, Laurie Eckman, in Portland, Oregon.  Mr. Eckman spontaneously decided to attend a protest that marched to the Portland ICE building where federal agents gassed him, hit his walker with a munition, rammed him, and shot his wife in the head.

12.    **Plaintiff Hugo Rios** is an Oregon resident who lives in the City of Portland. He is a U.S Air Force veteran who has worked as a freelance photojournalist for the last seven years, and previously worked as a law enforcement specialist overseas. Mr. Rios trained in combat readiness and had crowd control and emergency response team training.

13.    **Plaintiff Mason Lake** is an Oregon resident who lives in the City of Portland. He is a freelance video journalist and filmmaker who has covered protests in Portland since approximately 2020. He specializes in documenting protests in Portland through high-quality visual media. He extensively covered the George Floyd protests in 2020 and has attended approximately 8-9 nights of protests at the Portland ICE Building since June 2025.

**DEFENDANTS**

14.    **Defendant Donald Trump** is the current President of the United States since January 20, 2025. He also served a term as President from January 20, 2017 until January 20, 2021. He was President during the Black Lives Matter protests in 2020. Then and now he establishes the priorities and can direct policies of executive agencies through the agency heads that he appoints, including Kristi Noem and the Department of Homeland Security. President Trump is sued in his official capacity.

15.    **Defendant Kristi Noem** is Secretary of U.S. Department of Homeland Security (DHS) and a member of Defendant Trump's Cabinet. Since at least the beginning of June 2025, Noem has directed ICE, CBP, FPS, and their subordinate agencies and subcomponents, to collectively carry out or support the ongoing DHS operation at the Portland ICE Building.  Noem has sanctioned, ratified, and encouraged DHS agents' sweeping use of chemical and projectile weapons and flash-bang grenades against protesters and journalists assembled at protests against DHS immigration actions and accompanying military support. Noem has also established, sanctioned, and ratified an agency policy of treating videorecording of DHS agents in public as a threat that may be responded to with force and addressed as a crime. Defendant Noem is sued in her official capacity.

16.    **Defendant U.S. Department of Homeland Security ("DHS")** is a cabinet-level department of the executive branch of the United States Government, responsible for border security, anti-terrorism, immigration, and customs.  It was created in 2002, combining 22 different federal departments and agencies into a single Cabinet agency.  Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), and the DHS Management Directorate are component agencies within the Department of Homeland Security. Homeland Security Investigations ("HSI") and Enforcement and Removal Operations ("ERO"), including their respective Special Response Teams, are component subagencies within ICE. Border Patrol and the Office of Field Operations (including its Special Response Team ("CBP-SRT")) are components of CBP. The Federal Protective Service ("FPS") is a subordinate agency housed within the DHS Management Directorate. DHS and its sub-components carry out their mission through a wide variety of federal agents employed by DHS, and sometimes other agencies, that are assigned to, act at the direction of, with the authority of, or with the deputization of DHS and/or its components ("DHS officers"). Since at least the beginning of June 2025, DHS has coordinated a multi-agency operation that integrates various DHS components, including ERO, HSI, Border Patrol, CBP-SRT, and FPS, as well as officers from

other federal agencies to engage in law enforcement and building security at the Portland ICE Building.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over Plaintiffs' claims of violation of federal constitutional rights under 28 U.S.C. §§ 1331 and because Plaintiffs' causes of action arise under the United States Constitution and 28 U.S.C. §§ 2201–2202, 5 U.S.C. §§ 702 and 706.

18.    Venue is proper in the District of Oregon under 28 U.S.C. §§ 1391(b)(2), (e)(1) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Oregon and because Defendants are officers or employees of a U.S. agency acting in their official capacities or under color of the legal authority of those agencies.

## FACTUAL ALLEGATIONS

**1.  Defendants are driving an escalating false narrative about Portland protesters that animates their distinct hostility toward Protester Plaintiffs.**

19.    Long before the ICE protests began in June of 2025, President Trump signaled his antipathy towards Portland and other sanctuary jurisdictions, clearly telegraphing his intent to send the military into America's Democratic-led cities.

20.    This came as no surprise. Leading up to the 2020 racial justice protests in Portland, President Trump took to social media saying "Portland is being watched very closely" and threatening to dub "ANTIFA" an "ORGANIZATION OF TERROR."[3] Less than a year later, when large-scale protests broke out nationwide, Trump took to social media and begged Oregon officials to let him bring in the military.[4]

---

[3] Donald Trump (@realDonaldTrump), X (Aug. 17, 2019 at 7:04 AM) https://x.com/realDonaldTrump/status/1162726857231544320.

[4] Donald Trump (@realDonaldTrump), X (Aug. 22, 2020 at 4:14 AM) https://x.com/realDonaldTrump/status/1297130026857627649.

21.     Oregon declined the invitation to lend its National Guard to Trump's agenda, so instead Portland protesters were attacked with false narratives and extreme levels of violence directed by White House cabinet members and carried out by DHS.

22.     Since his 2024 campaign for a second term, President Trump has claimed in hyperbolic terms that cities run by Democrats are crime-ridden.  This is far from the truth.[5]

23.     However, one of President Trump's first acts in office was to grant clemency to several prominent members of the Proud Boys and Oathkeepers who had been duly convicted of crimes for their actions to storm the U.S. Capitol on January 6, 2021, while the election of President Biden over Trump was being certified inside. In granting the January 6 rioters clemency, President Trump referred to the convictions as "a grave national injustice" and referred to the people convicted of crimes for actions at the January 6 incident as "patriots" and "political prisoners."  President Trump's pardons of January 6 related convictions have been ongoing.

24.     On September 4, 2025, Fox News aired a report about protests in Portland which included clips from the 2020 Portland protests near the federal courthouse.  The next day, President Trump appeared to reference this misleading news report, relying on reporting from 2020 rather than current circumstances when telling a reporter he was considering targeting Portland troop deployment.[6]

---

[5] Phillip Bump, *Trump's Claims About Violent Crime Increasingly Diverge from Reality*, Wash. Post (Aug. 21, 2024) https://www.washingtonpost.com/politics/2024/08/21/trump-crime-fear/; see Press Release, *City of Portland, Portland Sees Decline in Violent Crime; Homicides Down 51% in First Half of 2025* (Aug. 8, 2025), https://www.portland.gov/mayor/keith-wilson/news/2025/8/8/portland-sees-decline-violent-crime-homicides-down-51-first-half; see Brett Samuels, *Trump Steps Up Clash with DC, Democratic-Led Cities*, The Hill (Aug. 12, 2025, at 6:00 AM ET) https://thehill.com/homenews/administration/5447093-trump-dc-democratic-cities-chicago/ ("Trump has long picked fights with Democratic cities, attacking mayors in Chicago, New York, Los Angeles, Baltimore and other areas and using them to boost his own image as a tough-on-crime president.").
[6] The Oregonian, "*It Is Like Living in Hell": Trump Discusses Portland as He Considers Sending the National Guard*, YouTube (Sept. 5, 2025), https://www.youtube.com/watch?v=6tP9QqDmu74.

25.     Then on September 19, 2025, President Trump described a plan to insert federal personnel in cities such as Chicago, Memphis, and Portland.[7]  And on September 25, 2025, the President included Portland on a list of cities he wanted to "save" by stopping people who are "out of control."[8]

26.     On September 22, 2025, the White House published a fact sheet which included a quote from President Trump saying he was "pleased to inform our many U.S.A. Patriots that I am designating ANTIFA, A SICK, DANGEROUS, RADICAL LEFT DISASTER, AS A MAJOR TERRORIST ORGANIZATION."[9]  Portland was specifically mentioned by name in the fact sheet.

27.     On September 25, 2025, President Trump issued a national security presidential memorandum, "NSMP-7," that refers again to the desire mentioned in the domestic terrorism fact sheet, and again specifically names Portland.[10]

28.     On September 27, 2025, President Trump, purportedly acting at the request of Defendant Noem, ordered Secretary of War Pete Hegseth, "to protect War ravaged Portland and any of our ICE facilities under siege from attack by Antifa, and other domestic terrorists.  I am also authorizing Full Force if necessary," despite citing no evidence of any such siege or attack in Portland.

---

[7] The Oregonian, *Trump Mentions Portland at White House: 'Just People Out of Control and Crazy'*, at 0:10, YouTube (Sept. 19, 2025) https://www.youtube.com/watch?v=cisl1y10YRw&t=10s.

[8] *Id.*

[9] The White House, Fact Sheet, *President Donald J. Trump Designates Antifa as a Domestic Terrorist Organization* (Sept. 22, 2025) https://www.whitehouse.gov/fact-sheets/2025/09/fact-sheet-president-donald-j-trump-designates-antifa-as-a-domestic-terrorist-organization/#:~:text=Antifa%20has%20engaged,must%20be%20stopped.

[10] The White House, Presidential Actions, *Countering Domestic Terrorism and Organized Political Violence* (Sept. 25, 2025) https://www.whitehouse.gov/presidential-actions/2025/09/countering-domestic-terrorism-and-organized-political-violence/.

29.     On September 29, 2025, United States Attorney General, Pamela Bondi issued her own memorandum to sub-components of the U.S. Department of Justice, with the subject of "Ending Political Violence Against ICE." Attorney General Bondi specifically named Portland in her memorandum and included a quote that "rioters" in Portland have "laid siege" to the Portland ICE building.[11] In the memo, Attorney General Bondi directs federal agents to "suppress all unlawful rioting" in Portland and Chicago. Bondi additionally charged U.S. Attorney's Offices in the District of Oregon and the Northern District of Illinois to escalate charging practices.

30.     On October 7, 2025, Defendant Noem travelled to Portland and visited the Portland ICE building. She observed the scene from the roof. She invited well-known right-aligned live streamers to join her inside, including Nick Sortor who days before had been arrested by PPB for disorderly conduct after an altercation with a protester at the Portland ICE Building, an act which the Trump Administration railed against as viewpoint discrimination.[12]

31.     Before leaving Portland, Defendant Noem met with Portland Mayor Keith Wilson. During that meeting she threatened to send "four times the amount of federal officers" to Portland if the city did not acquiesce to her demands for how they policed around the Portland ICE building.[13]

32.     On October 8, 2025, Mayor Wilson responded with his own statement, emphasizing his concern that Defendants were "increasingly using tear gas and force against

---

[11] United States Department of Justice, *Attorney General's Memorandum Ending Political Violence Against ICE* (Sept. 29, 2025) https://www.justice.gov/ag/media/1415691/dl.

[12] Letter from Harmeet K. Dhillon to Robert Taylor (Oct. 3, 2025) https://www.portland.gov/federal/documents/letter-us-dept-justice-portland-re-viewpoint-discrimination/download.

[13] John Tanet and Katherine Cook, *DHS Secretary Kristi Noem ends Portland visit threatening to send 'four times' as many federal officers if mayor doesn't make changes*, KGW (Oct. 8, 2025 10:46 AM)  https://www.kgw.com/article/news/politics/national-politics/dhs-secretary-kristi-noem-ends-portland-visit-threatening-to-send-four-times-as-many-federal-officers/283-373c3761-70cc-42b8-a92e-0a2db5c5e63a.

protesters—the majority of whom were peaceful.[14]  He also told at least one news agency that he "continue[s] to maintain that the tactics used by federal agencies at the ICE facility are troubling and likely unconstitutional."[15]

33.    After Mayor Wilson's statement, Defendant Noem committed to "double down" in Portland, including by seeking additional facilities and federal officers in the city.  Defendant Noem called Oregon officials "lying and disingenuous and dishonest people."[16]

34.    The White House also put out a press release with the opening salvo being: "For years, an Antifa-led hellfire has turned Portland into a wasteland of firebombs, beatings, and brazen attacks on federal officers and property—yet the Fake News remains in shameful denial about the Radical Left's reign of terror."

35.    On October 18, 2025, mass nationwide peaceful protests took place that promoted the message that there are "No Kings" in the United States.  Defendant Trump responded with a social media post on Truth Social that depicted an AI video of himself wearing a crown and flying a military jet with the phrase "King Trump" on the side while he flew over city protest crowds and dumped a brown substance on protesters from the jet.[17]  That evening, DHS officers gassed and shot protesters from the roof of the Portland ICE building.  Sparks from DHS

---

[14] City of Portland, Oregon, *Mayor Wilson to feds: Your actions are 'deeply disturbing'* (Oct. 8, 2025) https://www.portland.gov/mayor-keith-wilson/news/2025/10/8/mayor-wilson-feds-your-actions-are-deeply-disturbing.

[15] John Tanet and Katherine Cook, DHS Secretary Kristi Noem ends Portland visit threatening to send 'four times' as many federal officers if mayor doesn't make changes, KGW (Oct. 8, 2025) https://www.kgw.com/article/news/politics/national-politics/dhs-secretary-kristi-noem-ends-portland-visit-threatening-to-send-four-times-as-many-federal-officers/283-373c3761-70cc-42b8-a92e-0a2db5c5e63a.

[16] Shane Dixon Kavanaugh, *Kristi Noem calls Oregon leaders liars, says feds will 'double down' in Portland*, The Oregonian, (Oct. 9, 2025 1:18 PM, updated Oct. 10, 2025 10:44 AM) https://www.oregonlive.com/politics/2025/10/kristi-noem-calls-oregon-leaders-liars-says-feds-will-double-down-in-portland.html.

[17] Donald Trump, (@realDonald Trump), Truth Social, https://truthsocial.com/@realDonaldTrump/posts/115398251623299921.

officers' tear gas cannisters started a few small fires outside that building that were quickly put out.

36.    On October 23, 2025, President Trump, speaking from the White House, said about the October 18 scene in Portland, "The whole place is burning to the ground.  So we'll take care of that one.  That's like an insurrection more than it is anything else.  That's crazy. Portland's crazy."[18]

37.    Also on October 23, 2025, CBP Chief Commander Gregory Bovino, a lead officer for CBP in charge of Operation Midway Blitz (an operation similar to Operation Skipjack in Portland), threw a tear gas cannister into a protest crowd outside of the Broadview, Illinois ICE facility.  When asked later about that decision, he told CBS, "If someone strays into a pepper ball, then that's on them.  Don't protest and don't trespass." [19] A federal court in Illinois later found the administration's evidence "simply not credible," pointing out that Cmdr. Bovino had admitted to lying about a rock being thrown at him prior to gassing a protest crowd.[20] The court entered a preliminary injunction against Defendants so that protesters, press, and clergy could continue exercising their First Amendment rights without reprisal. *Chicago Headline Club, et al. v. Noem, et al.,* No. 25-cv-12173, ECF No. 252 (N.D. Ill. Oct. 6, 2025).

---

[18] Betsy Hammond, *Trump vows to 'take care' of Portland, calls protests 'insurrection',* The Oregonian (Oct. 23, 2025 4:45 PM updated Oct. 24, 2025 10:00 AM) https://www.oregonlive.com/politics/2025/10/trump-vows-to-take-care-of-portland-calls-protests-insurrection.html.

[19] Amanda Musa, *Top Border Patrol official accused of violating judge's use-of-force order by throwing tear gas at Chicago protester*, CNN (Oct. 24, 2025 3:29 AM, updated Oct. 26, 2025 8:42 PM) https://www.cnn.com/2025/10/24/us/gregory-bovino-chicago-immigration-tear-gas-hnk.

[20] Sarah Tenenbaum, *Judge grants preliminary injunction against Bovino, federal agents over use of force: "Shocks the conscience"*, CBS News (Oct. 6, 2025 4:59 PM) https://www.cbsnews.com/chicago/news/chicago-immigration-gregory-bovino-preliminary-injunction-judge-sara-ellis/.

38.     On November 5, 2025, Defendant DHS claimed to publish a final rule that accelerated the implementation date of a rule that signals the DHS is aggressively interpreting their policing authority under 40 U.S.C. § 1315. *See* 6 C.F.R. pt. 139 (90 Fed. Reg. 24217). DHS moved the effective date from January 1, 2026, up to November 5, 2025 without notice or comment based on a purported "rise in civil unrest." 90 Fed. Reg. 49247. On November 5, 2025, DHS also issued a press release about the new rule that described "rampant violence" and in which a DHS official stated, "Under President Trump and Secretary Noem, we will not tolerate violence perpetuated by Antifa and other domestic extremists who are targeting federal property and law enforcement. Law and order will prevail."[21]

**2.    Defendants have also used escalated rhetoric aimed at the press who are willing to tell the truth about Defendants' actions and the reality in Portland.**

39.     On June 14, 2025, DHS issued an internal bulletin titled, "Recent Anti-Law Enforcement Tactics Used in Unlawful Civil Arrest." That official bulletin identified "use of cameras", "livestreaming . . . interactions [with officers]", and videorecording at protests as "unlawful civil unrest" tactics and "threats." *L.A. Press Club, et al. v. Noem, et al.,* No. 25-cv-5563 (C.D. Cal. July 18, 2025), ECF No. 34-19 (Declaration of R. Shapiro).

40.     On July 1, 2025, DHS Secretary Noem made public statements threatening legal action against CNN for its reporting on ICE enforcement activities.[22] In response to a CNN report on the development of an information-sharing app called "ICEBlock," Secretary Noem stated, "We're working with the Department of Justice to see if we can prosecute them for that,

---

[21] United States Department of Homeland Security, Press Release, *DHS Announces Advanced Charging Authority to Address Rioter Violence at Federal Buildings, Protecting Law Enforcement and Taxpayer Property* (Nov. 5, 2025) https://www.dhs.gov/news/2025/11/05/dhs-announces-advanced-charging-authority-address-rioter-violence-federal-buildings.

[22] Giselle Ruhiyyih, *Trump administration threats CNN with prosecution*, Politico (Jul. 1, 2025 1:43 PM, updated Jul. 1, 2025 2:50 PM) https://www.politico.com/news/2025/07/01/kristi-noem-cnn-prosecution-00435445.

because what they're doing is actively encouraging people to avoid law enforcement activities, operations and we're going to actually go after them and prosecute them."

41.    At a press conference on July 12, DHS held a press conference where Secretary Noem stated, "videotaping [ICE agents] . . . when they're out on operations" is "violence."[23]

42.    On September 9, 2025, DHS Assistant Secretary for Public Affairs Tricia McLaughlin stated to a news outlet that "videotaping ICE law enforcement and posting photos and videos of them online is doxing our agents," adding, "[w]e will prosecute those who illegally harass ICE agents to the fullest extent of the law."[24]

43.    On October 8, 2025, the White House published an article of its own, titled "PORTLAND: Fake News Ignores Antifa Violence, Residents' Pleas for Help." In the article, the White House states "the Fake News remains in shameful denial about the Radical Left's reign of terror" and asserts that "the Fake News" is turning a "blind eye" to the purported war in Portland.[25] The proper nouns plainly name their targets.[26]

---

[23] United States Department of Homeland Security, Event, *Secretary Noem to Expose "Worst of the Worst" Criminal Illegal Aliens Arrested by ICE* (July 12, 2025 at 2:30 PM ET to 3:00 PM ET) "https://www.dhs.gov/news/2025/07/11/secretary-noem-expose-worst-worst-criminal-illegal-aliens-arrested-ice.

[24] Matthew Cunningham-Cook, *DHS Claims Videotaping ICE Raids Is "Violence"*, The American Prospect (Sept. 9, 2025) https://prospect.org/2025/09/09/2025-09-09-dhs-claims-videotaping-ice-raids-is-violence/#:~:text=videos%20of%20them%20online%20is%20doxing%20our,agents%20to%20the%20fullest%20extent%20of%20the.

[25] The White House, *PORTLAND: Fake News Ignores Antifa Violence, Residents' Pleas for Help* (Oct. 8, 2025) https://www.whitehouse.gov/articles/2025/10/portland-fake-news-ignores-antifa-violence-residents-pleas-for-help/.

[26] *Id.*

**3. Defendants' escalating, false narratives about protesters and press go hand-in-hand with their escalating policies and patterns of violence toward the same.**

44.      Since at least June, Defendants have maintained a policy of and/or permitted patterns of:

(a)      Permitting the use of large volumes of chemical munitions, including tear gas, munitions covered with other chemical substances, and impact munitions on nonviolent protest crowds to relocate crowds away from ingress/egress on federal property.

(b)      Permitting the use of less lethal munitions and other physical force without warnings, directives, and an opportunity to comply.

(c)      Permitting officers to shoot less lethal munitions at crowds from rooftops even at steep angles that do not allow for the safe use of the munitions.

(d)      Responding with force only to protesters who oppose Defendants' actions or policies, not those who are in favor of Defendants' actions or policies

(e)      Responding with force only to journalists who document Defendants' abuses or disagree with Defendants' narratives, not journalists who obscure Defendants' abuses or agree with Defendants' narratives.

(f)      Dispersing, interfering with, or otherwise blocking journalists when they are attempting to document Defendants' violence against or moving of protesters.

(g)      Permitting investigatory arrests, including tackling, handcuffing and forced photographing, without cause.

(h)      Permitting surveillance without cause of all persons within a half mile radius of the Portland ICE Building.

(i)      Engaging in policing activities while obscuring their agency affiliation and individual identities.

(j)      Not requiring that officers be trained in crowd-control or deescalation prior to being permitted to police protest crowds.

(k)    Permitting the cross-designation and deployment of officers to conduct FPS duties without proper training.

(l)    Treating documentation of federal agency actions as an attempted "doxxing" that presents a threat justifying the use of significant force, including tear gas, impact munitions, and shoving to prevent documentation.

45.    On information and belief, Defendants have also been using cell-site simulators and facial recognition technology, among other things, to identify and build profiles of the members of the protesters.[27] A similar tactic was utilized in Defendants' 2020 Operation Diligent Valor wherein intelligence agents created "baseball card" style profiles of Portland protesters.[28]

46.    In August 2025, a charter school next door to the Portland ICE building was forced to relocate. The school cited the impacts of the Defendants' use of chemicals "on a regular basis and munitions being found on our playground" as the reason for their need to move. An official for the school described the playground being "enveloped in gases one evening."[29]

47.    On information and belief, residents in a low-income housing complex across the street from the Portland ICE Building have also been repeatedly subjected to tear gas in their homes. Impacted residents include young children and people with medical vulnerabilities.

48.    On the afternoon of October 4, 2025, Defendant DHS shot, gassed, and shoved a protest crowd, including Plaintiffs Laurie and Richard Eckman, a retired parks and media

---

[27] Rolando Hernandez, *Protesters near Portland's ICE facility could have been surveilled by fake cell tower, new reporting finds*, OPB (Oct. 15, 2025 6:00 AM, updated Oct. 15, 2025 1:11 PM) https://www.opb.org/article/2025/10/15/portland-ice-protesters-reported-fake-cell-tower/.

[28] Jonathan Levinson, *Newly un-redacted report shows how feds politicized response to 2020 Portland protests*, OPB (Oct. 27, 2022 6:00 AM) https://www.opb.org/article/2022/10/27/newly-un-redacted-report-shows-how-feds-politicized-response-to-2020-portland-protests/.

[29] Celine Stevens, *Portland school relocates after unrest at neighboring ICE facility raises safety issues*, KGW (Aug. 20, 2025 8:08 PM, updated Aug. 21, 2025 4:05 PM) https://www.kgw.com/article/news/local/protests/cottonwood-school-relocates-consistent-protests-outside-ice-facility/283-ca0ae70c-05c5-41c0-b55b-4baed5063b2c.

professional and retired veteran, respectively. Plaintiffs received no warning, instruction to move or other command prior to DHS officers' use of force. As described further below, the attack on the crowd was unprovoked but very aggressive.

49.     In contrast, on October 4, 2025, Defendant DHS posted a video on their official Instagram page of counter protesters in the street in front of the Portland ICE building, including the driveway, chanting "USA" to a group of DHS officers while they stood on the roof. In the video, these protesters were not shot, gassed, shoved, moved, or disrupted. You can also hear one counter-protester say "Fuck Antifa."[30]

50.     On October 5, as described further below, DHS officers charged protesters, including Plaintiff Dickinson. DHS officers also deployed munitions near Plaintiff Dickinson's feet and at others nonviolently protesting.

51.     While this occurred, Plaintiff Dickinson observed individuals standing at the gates of the driveway filming. It was Plaintiff Dickinson's impression that Defendants were attempting to get footage of agents in clouds of gas or smoke to share with the public.  Plaintiff Dickinson has seen that footage posted on Defendant DHS' social media.

52.     On October 18, the day of the No Kings rallies and the King Trump video, the officers again displayed their hostility and disdain for constitutionally protected dissent.  As captured on video, Defendants unleashed a continuous barrage of tear gas, flashbang grenades, and pepper balls on the nonviolent protest crowd for a period exceeding five minutes.

53.     Plaintiff Dickinson and other protesters, members of the Portland Police Bureau, and journalists were impacted by Defendants' munitions on October 18, 2025.

54.     In November 2025, including on November 14, 19 and 29, and upon information and belief, DHS agents persisted in firing chemical munitions at nonviolent protesters and

---

[30] Department of Homeland Security, (@dhsgov), Instagram (Oct. 4, 2025) https://www.instagram.com/p/DPZKp-3Ec9M/?hl=en.

causing physical injuries without first providing protesters with an opportunity to comply with instructions.

55.     The recent October and November events are representative of the types of violence that Defendants have directed at Plaintiffs and those similarly situated over the last several months and that continue to reoccur.

56.     The increasing rhetoric equating protesters to terrorists and demonizing so-called left-wing media goes hand-in-hand with the escalation of Defendants' violence and threats of force.  The violence is expected to continue.  Protests are expected to continue in Portland and at the Portland ICE building.  No Kings rallies are expected to continue, including in Portland on November 22, 2025. And people in Portland are expected to continue expressing and documenting opposition to fascism, including that being promoted by Defendants.

**4.  Defendants have repeatedly disregarded and unnecessarily injured protesters and journalists.**

**a.  Defendants repeatedly use force against Plaintiff Dickinson.**

57.     **Plaintiff Jack Dickinson** is a Portland resident who has been attending protests at the Portland ICE building in a yellow chicken suit since June 2025.  Plaintiff Dickson has repeatedly experienced Defendants' violence over the course of the last several months.  DHS officers' repeated use of chemical munitions has also forced Plaintiff Dickinson to habitually wear a respirator when he attends protests at the Portland ICE building.

58.     Starting in early August and continuing to the present, Plaintiff Dickinson attends protests multiple days per week.  With regularity, Plaintiff Dickinson has his movements disrupted, halted, and/or changed due to Defendants' munitions use.  Plaintiff Dickinson reasonably fears for his safety from the cumulative effect on his body from the chemicals emitted from Defendants excessive use of harmful munitions.  At some point, Plaintiff Dickinson worries it will become so bad that he will be at risk of developing a long-term illness and will have to stop protesting.

59.    On or around August 16, 2025, Defendants stationed on the roof of the Portland ICE building shot Plaintiff Dickinson on the right filter of his respirator.  At the same time, DHS officers launched a tear gas cannister that sparked next to Plaintiff Dickinson's leg and burned a hole in his chicken suit.

60.    On or around August 23, 2025, DHS officers shoved Plaintiff Dickinson while he was standing off of federal property and to the side of the driveway at the Portland ICE Building. As he stood and attempted to walk further away from the building, DHS officers located on the roof of the building shot him in the back with munitions.

61.    On October 5, 2025, a group of approximately 15 DHS officers, forcefully charged Plaintiff Dickinson and a fellow protestor.  Shortly thereafter, one DHS officer ran at Plaintiff Dickinson with some type of gun drawn.  DHS officers again deployed a munition cannister at Plaintiff's feet, which emitted a red smoke-like substance.

62.    On October 18, 2025, Plaintiff Dickinson was protesting at the Portland ICE building.  Plaintiff arrived at the protest around 4:30 in the afternoon, just after the first time DHS officers deployed chemical munitions that day.  Plaintiff Dickinson could feel the ambient impacts of the chemicals in his body.  Plaintiff Dickinson went to get his respirator and returned to the protest.  Later in the evening, DHS officers deployed a heavy wave of chemical munitions. Plaintiff Dickinson did not have eye protection, and sustained a painful ocular reaction.  The chemicals also seeped into his mask, affecting Plaintiff Dickinson's nose and throat.

63.    The October 18 chemical exposure forced Plaintiff Dickinson to cross the street, and call out for medical attention, and lay on the ground.  Plaintiff Dickinson had severe nausea and was in significant pain.  The acute pain lasted approximately 15 minutes.  Plaintiff Dickinson felt residual physical impacts for approximately a day after.

64.    On or around October 31, 2025, Plaintiff Dickinson was protesting at the Portland ICE building when he observed munitions fired by DHS officers hit the ground right on the blue federal property line painted on the pavement outside the Porland ICE building.  Plaintiff Dickinson believes the munitions were pepper balls because of a visible substance dispersed on

impact that caused Plaintiff Dickinson to feel burning in his nose, eyes, and on his skin. The burning was severe enough that he had to leave the area and stop protesting until he could treat the condition.

65.    On November 14, DHS officers shot chemical munitions from the roof into the crowd, some hitting the ground and others directly hitting protesters causing Plaintiff Dickinson discomfort in his eyes, nose and throat, and causing him to cough aggressively.

66.    Plaintiff Dickinson is experiencing increasingly stronger reactions to Defendants' chemical munitions. Beginning in September, Plaintiff Dickinson noticed that some mornings after DHS officers used chemical munitions on Plaintiff Dickinson and other protesters, Plaintiff Dickinson woke up nauseous. On information and belief, this increasingly bad reaction is due to repeated exposures to Defendants' munitions.

67.    Plaintiff Dickinson intends to continue nonviolently and lawfully protesting as long as he is able, but he fears Defendants will eventually, and unlawfully, cause him serious physical injury or death while he is protesting. Plaintiff Dickinson fears Defendants will direct and/or be permitted to use lethal force on protesters.

**b. Defendants shoot and gas an elderly couple who live in the neighborhood.**

68.    **Plaintiff Richard Eckman**, is an 83-year old Vietnam War Veteran from the United States Navy and a retired Major in the U.S. Army Reserve. He is a resident of Portland, Oregon. **Plaintiff Laurie Eckman**, aged 84, retired from working for Oregon State Parks and a career at the Oregonian newspaper.

69.    The Eckmans are married, have several children and grandchildren, and have lived in the SW Waterfront neighborhood within a few blocks of the Portland ICE Building since 2018.

70.    The Eckmans enjoy walking the neighborhood with their dog and feeling connected to the surrounding community as they walk and interact with their neighbors. Mrs. Eckman's favorite walking loop takes her on the bike/walking path between the Portland ICE building and the former Cottonwood School building.

71.     On October 4, 2025, the Eckmans observed a rally at Elizabeth Caruthers Park, saw veterans were present, and decided to join.  While in the park, they listened to speeches and information being shared about the rights of protesters.  Mr. Eckman was wearing clothing identifying himself as a veteran and uses a walker.  Following the rally, the Eckmans joined with the crowd and peacefully marched to the Portland ICE building.

72.     Outside the Portland ICE building, the Eckmans stood with other protesters just off of federal property and just east of the driveway to the building.  The crowd was peaceful, engaging in chanting, holding signs, and nonviolently expressing disagreement with Defendants' immigration policies and proposed use of the military in Portland.

73.     The Eckmans observed DHS officers with guns standing on the roofs looking down over the protest.  Not long after the Eckmans arrived, a group of federal DHS officers came out of the driveway gate near the end of the driveway.  Some wore dark uniforms and others green uniforms.  Many, if not most, appeared to be holding long guns of some type.  They also had helmets and masks.  The DHS officers then marched back behind the driveway gate and closed it.  The Eckmans did not observe any cars entering or exiting.

74.     Soon thereafter, without provocation, the driveway gate opened again and a larger group of DHS officers with the same attire and weaponry came barreling out of the gate toward the crowd and began firing weapons.  The DHS officers fired multiple impact rounds at the crowd.

/ /

/ /

/ /

75.     One of the DHS officers threw a munition in the direction of Mr. Eckman, which detonated and left residue on his walker.  He then observed multiple cannister-like objects emitting a gaseous substance.  There were multiple colors of smoke-like substances that began to fill the air, including white, green, and red.  Mr. Eckman's movement was disrupted and halted. He was choking and coughing due to the substances coming from the federal officers' munitions.



76.     Meanwhile, Mrs. Eckman's movement was disrupted and halted when she heard a loud bang and felt an extremely hard and direct impact to her head in the region of her right temple.  There was a small explosion of pepper dust as Defendants' munition hit Mrs. Eckman's head.  Blood poured from a wound on her head.  Mrs. Eckman suffered immediate, severe pain. She was choking and coughing, could not see, and was disoriented and frightened.  Other

protesters escorted Mrs. Eckman away from the place where she was struck to a safe place where she was provided with first aid.

77.    As the DHS officers rushed into the crowd with no warning, Mr. Eckman was knocked into forcefully by one of the DHS officers.  Eventually, with assistance from others, Mr. Eckman was walked out of the gas and eventually to where he found Mrs. Eckman sitting on a sidewalk receiving medical attention.

78.    Once the Eckmans returned to their home, Mrs. Eckman realized she was covered in blood.  It had soaked through her jacket, her shirt and her bra.  Her hair was also saturated with blood.



79.    Later that afternoon, her head wound began to bleed again and she continued to experience head pain, so she decided to go to the nearby emergency room at Oregon Health Sciences University (OHSU).  There, she was given a CAT scan and instructions for caring for a concussion.  She continued to have a headache the rest of the night.

80.    In the days that followed, Mrs. Eckman developed raccoon-like bruising surrounding her eye.  The wound on the right side of her head is still healing and appears to be forming a scar.  She later developed pneumonia like symptoms that are ongoing. Mrs. Eckman attributes these symptoms to exposure from Defendants' chemical munitions, including the

pepper ball exploding on her head and the tear gas. Mrs. Eckman remains concerned about the lasting effects of being exposed to the Defendants' munitions.

81.    On October 4, 2025, the Eckmans were not the only people injured, shoved, shot, and gassed.  There was another older couple present, including a retired veteran who was shoved into his wife, hurting her back. Many others were present who were gassed, shot at, and shoved by DHS officers.

82.    Since the protests began, DHS officers have been intentionally and indiscriminately attacking neutral members of the press along with protesters. This conduct has intimidated journalists and neutrals and reduced the number of media and observers willing to attend protests and to stay to document and observe the protests. Their conduct is part of a longstanding pattern of assaulting and threatening members of the press to deny them access and prevent them from telling the public about DHS conduct.

       **c.    Defendants intentionally tear gas and shoot Plaintiff Lake.**

83.    **Plaintiff Mason Lake** is a freelance video journalist and filmmaker who has covered protests in Portland since approximately 2020. He lives in Portland and specializes in documenting protests in Portland through high-quality video and photos. He extensively covered the George Floyd protests in 2020 and has attended approximately 8-9 nights of protests at the Portland ICE Building since June 2025.

84.    Each time Mr. Lake attends a protest to document it, he wears a press vest, which says "Press" in large letters on the front and back, a helmet that says "Press" on the front, back, and sides, and a 3"x 7" press badge. He carries clearly professional equipment, including a white lens camera. He is clearly present at protests in a journalistic capacity.

85.    On the night of June 10, 2025, Mr. Lake was documenting a protest when DHS officers decided to clear the driveway of the Portland ICE building by force, including by using tear gas against protesters who were standing on the public sidewalk. Mr. Lake stood on the corner of Bancroft Street and Moody Avenue, by the stop sign. Mr. Lake was not standing in the driveway to the federal building and was not obstructing traffic.

86.    Mr. Lake was in the process of documenting DHS deploying teargas in the area of the driveway when a bus drove by, temporarily blocking his line of vision. In that moment, DHS officers began to expand the area where they were deploying tear gas to beyond the driveway, indiscriminately teargassing the crowd. During this, DHS officers launched a tear gas cannister in his direction. Mr. Lake's footage of this incident confirmed that DHS officers had been the ones to deploy the tear gas, based on the ID badges on the officer's arm, which identified the officer as being from the Texas ICE field office.

87.    Mr. Lake was wearing a mask, but it was slightly askew at the time, so he could still smell and taste the CS tear gas used. It made his eyes water and affected his breathing. He also witnessed and filmed DHS officers using tear gas on an elderly man in a wheelchair wearing a veteran hat. The DHS officers fired one cannister directly at the veteran and another in Mr. Lake's direction.

88.    On the night of June 13, 2025, Mr. Lake was documenting a protest outside of a federal building. He filmed DHS officers on the roof of the building as they were setting up the bright flood lights that have become well-known during these protests. As he was filming, one DHS officer pointed at him with his finger, singling him out. A DHS officer also directed another officer to turn on the bright flood light, seemingly to blind Mr. Lake and other journalists who were filming their actions on the roof of the building.

89.    During the course of the night, some protesters stood in the driveway to the federal building. These protesters posed no threat to Defendants. Nonetheless, Mr. Lake documented DHS officers using excessive force against these protesters throughout the night. He observed some protesters attending the protest with makeshift shields. They looked to be made out of Rubbermaid lids with rope around them. Throughout the night, he witnessed DHS aim directly at the shields and shoot them with less lethal munitions. It looked like they were using the shields as target practice. Mr. Lake filmed a DHS officer firing a pepper round at a protester who was reading a Native poem while standing in the driveway to a federal building.

90.     Mr. Lake and several other journalists walked around the side of the building to observe DHS operations. Mr. Lake was near the train tracks and the tree on one side of the federal building and does not believe he was on federal property at any time. He was illuminated by the bright floodlights on the top of the federal building as he walked, and his press vest and helmet were clearly visible.

91.     As he was walking, he suddenly heard and filmed projectiles coming through the tree branches. He realized DHS officers from CBP were firing pepper balls at him and the other journalists walking around the side of the building. DHS officers' pepper balls struck Mr. Lake in the arm and also hit his camera, microphone, and monopod. He had light bruising and had to decontaminate his clothes and his equipment when he got home.

92.     Mr. Lake and other journalists were clearly identifiable, posed no threat to DHS officers, and, to Mr. Lake's knowledge, were not on federal property when DHS officers opened fire on them. By directing less-lethal ammunitions directly at a group of well-marked journalists, DHS officers targeted journalists as they attempted to document Agency and DHS officers' actions on the night of June 13.

93.     On the night of July 4, 2025, Mr. Lake again attended a protest at the federal building to document the protest. As always, he wore his press vest, hat, badge, and other protective gear.

94.     Mr. Lake documented an instance where a cannister shot by DHS officers set fire to the impound lot across the street from the Portland ICE building. Protesters provided water bottles to help put out the fire.

95.     DHS officers made several advances throughout the night to clear the area using force. During the first push, DHS officers on the roof shot at Mr. Lake with small skat shells while he was trying to document the interactions between DHS officers and protesters.

96.     Directly before the second push, Mr. Lake filmed the protest for ten consecutive minutes and found it to be completely peaceful. People were singing, chanting, and reading poetry in and around the driveway to the federal building.

97.    DHS officers in dark uniforms and DHS officers in camouflage uniforms came out of the building indiscriminately deploying tear gas and shooting less-lethal munitions into the crowd.

98.    Mr. Lake was affected by the tear gas that was fired indiscriminately into the crowd. For the next four days, he experienced increased sensitivity in the top of his lungs as a result of his prolonged exposure to the tear gas.

99.    As DHS officers used tear gas and less-lethal munitions on the crowd, Mr. Lake stood to the right of the driveway documenting DHS officers clearing the people assembled in the area. He was distanced from protesters and was about 30 feet away from the officers, next to the stop sign on the corner. As he was filming, he was struck by a less-lethal projectile in the groin area. He believes he was shot by DHS officers in a camouflage uniform. He avoided more serious injury only because he was wearing protective gear, which he knew to wear because of past incidents where he was subjected to excessive force by law enforcement. Nonetheless, he did experience light bruising where this projectile struck him. He left the area close to midnight because he was experiencing so many effects from the tear gas blanketing the crowd.

100.    DHS officers did not attempt to identify members of the press before firing tear gas and less-lethal munitions into a crowd of peaceful protesters. Their use of less-lethal projectiles when vision was limited due to the thick clouds of tear gas in the area increased the likelihood of injury.

101.    Mr. Lake returned to document another protest at the federal building on the night of September 13, 2025.

102.    Mr. Lake stood off to the side of the driveway to the federal building, on the public sidewalk to document the protest and Defendants' actions. Protesters stood around him, some of them engaging with DHS officers.

103.    DHS officers shined a bright light directly into the faces of Mr. Lake and the protesters around him. Mr. Lake then observed one of the DHS officers take out what appeared

to be their personal cell phone in order to take photos of the protesters and Mr. Lake. The cell phone did not appear to be the phone DHS officers are issued through the government.

104.    Mr. Lake was wearing a headlamp on this occasion, and he flashed the light at the DHS officers as a way to ask them not to record the protesters on their personal devices, and also to make the point that DHS officers should not be shining floodlights into the eyes of journalists and protesters.

105.    In response, a DHS officer pulled out a rifle with a laser attached. The DHS officer pointed the laser directly at Mr. Lake's head in an obvious show of targeting and intimidation. Mr. Lake could feel the heat of the laser on his skin, and other protesters around him pointed it out and could see the laser on him.

106.    Despite this intimidation tactic, Mr. Lake remained at the protest and continued to document events as the night went on.

107.    Later that night, Mr. Lake was near the stop sign across the street from the federal building, at the corner of Bancroft Street and Moody Avenue. He then moved into Bancroft Street, along with a crowd of protesters, and was covering the crowd in one direction when an incident began to unfold between DHS officers and protesters. He moved closer so he could document. He saw that some people got shoved, and as he watched, he saw DHS officers in dark uniforms push two people over.

108.    When the DHS officers in dark uniforms pushed two people down in front of him, Mr. Lake yelled, "Hey!" He was approximately 10 to 15 feet away from where the people were being shoved. A DHS officer then saw him and his camera and aimed law enforcement-grade mace with CS and OC added to it directly at him and his equipment. Mr. Lake believed the gas used to be mace because it is stronger and more concentrated than typical tear gas or pepper spray.

109.    The mace struck him directly and damaged both his camera and his back-up camera. He will have to have his camera professionally repaired and cleaned, and he has had to wear gloves when holding his camera since this incident. He was wearing a gas mask, but took

the gas mask off after the attack and was subject to the mace that had collected on his hair and his sweat. His eyes swelled shut from the pain. He immediately sought medical attention from the medics on-site, and after about 10 to 15 minutes, he was able to open his eyes long enough to air them out, get in his car, and get home.

110.    Mr. Lake has not been to document a protest at the Portland ICE Building since this incident. The accumulation of injuries Defendants inflicted on him have made him not want to report on protests for concern for his own safety. After being maced, he has had to take time off to recover both physically and emotionally. Mr. Lake believes in the importance of documenting Defendants actions during protests and in making sure this footage is widely available. He intends to remain active and cover events but is now questioning being at the Portland ICE Building on the front line because of the risk to his physical safety.

### d.  Defendants Intentionally tear gas and shoot Plaintiff Rios

111.    **Plaintiff Hugo Rios** has been a freelance photojournalist for seven years.

112.    On August 1, 2025, Mr. Rios began attending protests at the Portland ICE Building to capture interactions between demonstrators and DHS officers.

113.    On September 1, 2025, Mr. Rios went to Elizabeth Caruthers Park at the South Waterfront to document protest activity in his capacity as a journalist. Mr. Rios clearly marked himself as press by wearing a black helmet, goggles, and a velcro tag labeled "PRESS" across his chest. He carried his professional camera—a Canon EOS R5 with a 24-105mm lens—as well as an external battery pack, external monitor, microphone, iPhone mount, and aluminum frame to protect the cameras.

114.    Around mid-afternoon that day, people started marching down the street towards the Portland ICE Building. Mr. Rios followed them. At the Portland ICE Building, the mood appeared to be positive. There was a DJ playing music, and people were dancing and chanting. Mr. Rios observed approximately a hundred people gathered in front of the building. He captured footage of the dancing, then took a break to eat dinner. He planned to return later in the evening.

115.    When Mr. Rios returned to the Portland ICE Building after dinner, protesters had started a line dance. They were standing on the sidewalk and in the street on the Bancroft Street side of the facility. At 10:24pm, while people were still dancing, the driveway gate opened and DHS officers started to walk towards the crowd. Without any warning, the DHS officers began shooting at protestors and throwing tear gas canisters. Mr. Rios was standing on the sidewalk across the street from the Portland ICE Building to the north, looking south towards the gate.

116.    As Mr. Rios was filming the DHS officers exiting the gate, another line of 6-7 DHS officers were walking towards the crowd from Macadam St. Suddenly, without warning or verbal command, a DHS officer pushed Mr. Rios from behind.

117.    Mr. Rios continued to film the events and tried to stay out of the fray. A couple minutes later, another DHS officer told Mr. Rios to move back. Mr. Rios was still wearing his "PRESS" gear and explained to the officer that he was just filming. The DHS officer said, "I don't care," shoved him from the front very forcefully about four times, and hit his camera. The DHS officer's attacks on Mr. Rios's camera damaged it to the point that it stopped recording, but Mr. Rios was able to continue recording events on his iPhone.  As a result of the DHS officer's conduct, Mr. Rios also was blocked from filming what DHS officers and protesters were doing.

118.    Approximately six minutes later, a DHS officer tossed a tear gas canister at Mr. Rios's feet. Mr. Rios was standing away from the crowd and alone at the time, and was not engaged in any activity. Given Mr. Rios's isolation, the teargas attack appeared to be targeting him alone. The attack frightened and shocked him. He felt frozen in place.

119.    After a DHS officer threw the teargas canister, multiple DHS officers opened fire on Mr. Rios and repeatedly shot him with pepper balls and/or other impact munitions. Mr. Rios estimates he was hit approximately 20 times. Mr. Rios took hits across the front of his body from his shoulder down to his feet, and he was shot in the back as well. The pepper balls also hit Mr. Rio's battery pack and made a dent in it. No DHS officers gave Mr. Rios any warning before they started shooting him.

120.    Mr. Rios continued to use his iPhone to document DHS officers shooting at the crowd of protesters. Mr. Rios stopped filming around 11:00 pm when the DHS officers went back through the gate and inside the Portland ICE Building.

121.    Mr. Rios desires to continue covering protests at the Portland ICE Building. However, he is hesitant due to his fear that he will be targeted by Defendants again, and that the Defendants will injure him even more severely than they did on the night of September 1.

122.    Because of Defendants' attacks, Mr. Rios is afraid to cover Defendants' conduct at close range. He intends to record them from a distance, even if it compromises the quality and detail of his reporting, because he does not want to be attacked again.

**5.    Defendants' "less lethal" weapons pose significant danger, including serious injury or death.**

123.    Significant risks exist when using chemical agents and kinetic weapons for alleged "crowd control." These risks include serious bodily harm, permanent injury, death, environmental damage.

124.    These so-called "less-lethal" weapons have the real risk of causing permanent injury or death, both to intended targets and bystanders, as a result of misplaced or ricocheting shots, indiscriminate use, inadequate user training, repetitive applications, intentional misuse. The risk to lawful protesters and journalists is increased by panic and chaos caused by frightened crowds, raising significant doubts that these weapons can be used in a manner that is simultaneously safe and effective.

125.    On information and belief, Defendants have used "less lethal" militarized weapons against protestors and journalists at the Portland ICE Building including kinetic impact projectiles ("KIP") such as rubber or plastic bullets, bean bags, paint balls, and sponges; chemical weapons include chemical irritants, pepper spray, pepper balls, and tear gas; and disorientation devices such as flashbang grenades, Stinger grenades, and fireworks; as well as batons and shields.

126.    Despite common misconceptions that alleged "crowd control" weapons are harmless, each of these weapons—including, and especially, chemical weapons and projectiles—can cause significant and long-lasting health harms.  When launched or fired from afar, these weapons are inaccurate and strike vulnerable body parts, as well as cause unintended injuries to bystanders.  When launched or fired at close range, these weapons can cause serious trauma and injury, including internal and external bleeding, contusions, blindness, hearing loss, and other physical damage.

127.    These so-called "less-lethal" weapons have the real risk of causing permanent injury, disability, or death, both to intended targets and bystanders.  These risks arise in particular as a result of misplaced or ricocheting shots; intentional targeting of the head, neck, or spine; indiscriminate use; inadequate user training; repetitive applications; intentional misuse; and panic and chaos caused by frightened crowds.  Those with pre-existing medical conditions are even more at risk of harm.  Significant doubt exists that these weapons can be used in a manner that is simultaneously safe and effective.

128.    When using chemical agents or kinetic impact projectiles against any group of more than ten people engaged in a protest, there is a high chance of harming peaceful participants, journalists and bystanders.

129.    No legitimate purpose existed or exists for the use of these so called "less-lethal" weapons at the Portland ICE building.  Defendants are acting to retaliate against and silence civilians engaged in protected First Amendment activities.

**6.  Defendants have shown clear bias and retaliation in the way they have treated Plaintiffs.**

130.    Defendants are suppressing viewpoints they do not like.  For example, on September 25, 2025, President Trump issued a presidential memorandum directing the National Joint Terrorism Task Force to investigate, prosecute, and disrupt individuals and groups that criticize law enforcement and border control policies and actions because such actions were "anti-American."  This theme has been conveyed to federal officers stationed at the Portland ICE

building.  Defendant Noem has promised the agents stationed at Portland that they will be given full authority to "hammer" and arrest protesters for their speech and with whom they are affiliated.

131.    Supporters of the Trump Administration have been welcomed to the federal government to promote its messages, including during Defendant Noem's visit to the Portland ICE Building.[31]

132.    Demonstrators at the Portland ICE Building who favor Defendants' conduct and policies have not been targeted by DHS officers' use of excessive force, despite engaging in conduct similar to those targeted.

133.    As a result of the conduct alleged above, Plaintiffs are suffering irreparable injury, are chilled in the exercise of their First Amendment rights, and will likely suffer recurring injuries like the ones Defendants already have inflicted on them.

134.    Plaintiffs seek this Court's protection of their constitutional rights, and they ask the Court to enjoin and prevent Defendants from further use of their unconstitutional tactics.

### RULE 23(B)(2) CLASS ACTION ALLEGATIONS

135.    Plaintiffs Jack Dickinson, Laurie Eckman, Richard Eckman, Hugo Rios, and Mason Lake seek to represent a class under Federal Rule of Civil Procedure 23(b)(2) of all persons who do or will in the future report on, document, observe, or protest against Defendants outside the Portland ICE building (Plaintiff Class).

136.    Plaintiffs Mason Lake and Hugo Rios additionally seek to represent a subclass under Federal Rule of Civil Procedure 23(b)(2) of all persons who do or will in the future reporting on, documenting, or recording Defendants and their official conduct at protests at the Portland Ice Building (Right-of-Access Subclass).

---

[31] Erik Neumann, *Right-wing influencers shape nation and Trump's understanding of Portland protests,* OPB (Oct. 13, 2025 6:00 AM, updated Oct. 13, 2025 4:32 PM) https://www.opb.org/article/2025/10/11/right-wing-influencers-shape-nation-and-trumps-understanding-of-portland-protests/.

137.    The Plaintiff Class satisfies the requirements for class certification set forth in Rule 23(b)(2) of the Federal Rules of Civil Procedure.  The Rule 23(b)(2) requirements are partly satisfied because Defendants have acted and refused to act on grounds that generally apply to the Class, including by (a) indiscriminately using chemical munitions on members of the Classes without warning or cause because of their First Amendment Activities; (b) indiscriminately using impact munitions on members of the Classes without warning or cause because of their First Amendment Activities; (c) shoving, pushing, and/or slamming members of the Classes without warning or cause because of their First Amendment Activities; (d) using munitions on the Classes in a manner intended to stop their First Amendment Activities; (e) using munitions on the Classes in a manner intended to cause injury or harm; (f) seizing members of the Classes for no reason; (g) engaging in policing without notifying the Classes of the agency authority or officer identity.

138.    This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Federal Rules of Civil Procedure 23.

139.    **Numerosity**.  The number of Class members is unknown, but based on reports and videos, the number of class members is hundreds to thousands of people who have nonviolently protested or desire to protest against Defendants at the Portland ICE building, a number that is constantly growing; it is therefore so numerous that the joinder of all members is impracticable.

140.    The Right-of-Access Subclass size is unknown, but likely includes dozens of individuals who have been lawfully documenting or desire to lawfully document Defendants actions in response to the protests at the Portland ICE Building.

141.    **Commonality**.  There are many questions of law and fact common to the Plaintiffs and Classes.  These common questions of law and fact include, but are not limited to:

### Questions Common to the Class:

(a)    Whether Defendants have engaged in a policy, pattern, and practices of retaliating against protesters and journalists at the Portland ICE Building.

(b)      What Defendants' uses of force at the Portland ICE Building would deter a person of ordinary resolve from reporting or protesting at the Portland ICE Building.

(c)      Whether Defendants are systematically using unnecessary, excessive and indiscriminate force against protesters and journalists at the Portland ICE Building

(d)      Whether Defendants can use crowd control weapons to move or disperse passively resisting individuals at the Portland ICE Building

(e)      Whether the Defendants' uses of force at the Portland ICE building are sufficiently narrowly tailored to achieve their purported legitimate ends.

(f)      Whether the Defendants' sustained and repeated uses of force would chill a person of ordinary firmness.

(g)      Whether Defendants' failure to issue verbal orders and provide an opportunity to comply prior to the use of force violates the rights of the class members.

(h)      Whether the Class was engaged in protected activity under the First Amendment.

(i)      Whether Defendants' violence against the Class constitutes First Amendment retaliation.

(j)      Whether Defendants' violence against the Class is prohibited viewpoint discrimination under the First Amendment, or otherwise infringes on the First Amendment rights of the Class.

(k)      The Defendants have acted, threatened to act, and will continue to act on grounds generally applicable to the class, thereby making final injunctive relief appropriate with respect to the Protest Class as a whole.

**Questions common to the Right-of-Access Subclass**

(l)      Whether the Right-of-Access Subclass is engaged in protected activity under the First Amendment.

(m)      Whether Defendants have stopped and prevented the Right-of-Access subclass members from engaging in the constitutionally protected activity of newsgathering.

(n)    Whether the protests and government responses thereto on public streets and sidewalks have historically been open to the press and general public.

(o)    Whether such open access serves a significant positive role to the functioning of democracy and government accountability.

(p)    Whether Defendants have an overriding interest in closure of access to preserve higher values.

(q)    Whether Defendants conduct is narrowly tailored their purported overriding interest

(r)    Whether Defendants' actions against the Right-of-Access Subclass violates their First Amendment right of access to document Defendants' official actions at protests at the Portland ICE Building.

(s)    The Defendants have acted, threatened to act, and will continue to act on grounds generally applicable to the class, thereby making final injunctive relief appropriate with respect to the Right-of-Access Subclass as a whole.

142.    **Typicality**.  Consistent with Federal Rule of Civil Procedure 23(a), the claims of the representative Plaintiffs are typical of the Class and/or Subclass that they seek to represent.

143.    Each Plaintiff has been subjected to one or more of the violations previously enumerated; and each Plaintiff seeks protection to bar the repeat of those violations in the future against themselves and those similarly situated. Individual Plaintiffs have no interest separate from those of the Class and/or Subclass and seek no relief other than the relief sought on behalf of the Class and/or Subclass.

144.    **Adequacy**.  Plaintiffs will fairly, fully, and adequately assert and protect the interests of the proposed Class and/or Subclass. Plaintiffs' interests are not antagonistic to or in conflict with the interests they seek to represent as Class representatives. They seek to enjoin common practices and policies that are injuring them and all Class and/or Subclass members.

145.    Plaintiffs' counsel are experienced in prosecuting class actions, civil rights, journalist rights, and protester rights litigation and are committed to protecting First Amendment

rights, and have prosecuted and intend to prosecute this action vigorously and to fairly represent the interests of the Class and Subclass.

146.    Consistent with Federal Rule of Civil Procedure 23(b)(2), Defendants have acted on grounds generally applicable to the Class.

147.    It will promote judicial efficiency to resolve the common questions of law and fact in one forum. No difficulty will be encountered in the management of this litigation that would preclude its maintenance as a class action.  The class action is superior to any other available means to resolve the issues.  Injunctive relief can and would most efficiently be determined on a singular class-wide basis in this forum.

148.    Pursuant to Federal Rule of Civil Procedure Rule 23(c)(4), the particular issues raised in this lawsuit are appropriate for certification—because resolution of such issues would advance the disposition of the matter and the parties' interests therein.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION – FIRST AMENDMENT RETALIATION

#### (On Behalf of All Plaintiffs and Class Members Against All Defendants)

149.    Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

150.    Plaintiffs are engaged in constitutionally protected acts of press, assembly, speech, and expressive conduct.

151.    Defendants' conduct has chilled and/or prevented Plaintiffs from freely exercising their First Amendment rights.

152.    Defendants' conduct would chill a person of ordinary firmness from continuing to engage in nonviolent protest or lawful press activities.

153.    Plaintiffs' protected First Amendment activities are a substantial or motivating factor in Defendants' conduct.

154.    Defendants' actions have caused and continue to cause Plaintiffs irreparable harm, including physical injury, fear of arrest, and a chilling of their willingness to exercise rights of speech, press, and assembly. Plaintiffs lack an adequate remedy at law.

## SECOND CAUSE OF ACTION – VIOLATION OF FIRST AMENDMENT

### (On Behalf of all Plaintiffs and Class Members Against All Defendants)

155.    Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

156.    Plaintiffs are engaged and desire to continue engaging in constitutionally protected acts of newsgathering, assembly, speech, and expressive conduct in a public forum.

157.    As alleged above, Defendants have engaged, and continue to engage, in conduct that violates Plaintiffs' First Amendment rights through restricting their First Amendment activities based on viewpoint.

158.    Additionally, Defendants violated Plaintiffs' First Amendment rights by restricting their First Amendment activities based on content and failing to narrowly tailor their restrictions to a compelling government interest.  Defendants had, and continue to have, less restrictive means available to them, but Defendants are choosing to ignore those options. Content-based restrictions are presumptively unconstitutional.

159.    Additionally, Defendants violated Plaintiffs' First Amendment rights by restricting their First Amendment activities and failing to narrowly tailor their restrictions to serve an important government interest unrelated to the suppression of speech.

160.    Defendants do not have a compelling or important government interest in silencing, relocating, or injuring nonviolent protesters or journalists.

161.    Defendants cannot show that they lack other, less restrictive means of protecting any property or safety interests it might assert other than by gassing, shooting, and shoving nonviolent protesters or journalists without warning or an opportunity to comply with lawful directives.

162.    Defendants' conduct has chilled and/or prevented Plaintiffs from freely exercising their First Amendment rights.

163.    Defendants' actions have caused and continue to cause Plaintiffs irreparable harm, including physical injury, fear of arrest, and a chilling of their willingness to exercise rights of speech, press, and assembly.  Plaintiffs lack an adequate remedy at law.

164.    Plaintiffs therefore seek declaratory and injunctive relief to prohibit Defendants from engaging in further viewpoint-based enforcement actions, and such additional relief as the Court deems just and proper pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 702.

## THIRD CAUSE OF ACTION – VIOLATION OF FIRST AMENDMENT RIGHT OF ACCESS

### (On Behalf of Plaintiffs Lake and Rios and the Right-of-Access Subclass Against All Defendants)

165.    Plaintiffs Lake and Rios and the Right-of-Access Subclass incorporate all paragraphs above by reference as if fully set forth herein.

166.    Plaintiffs and the Right-of-Access Subclass are engaged in constitutionally protected acts of newsgathering in a place historically open to the public and press. Defendants have stopped and prevented Plaintiffs and the Right-of-Access Subclass from engaging in such constitutionally protected activities by subjecting them to violence and engaging in other acts of interference.

167.    Defendants' policy of using violence against neutrals who are reporting on protests violates Plaintiffs' First Amendment rights on its face and as applied. Journalists engaged in newsgathering do not present public safety issues, and keeping them from newsgathering during a protest thus does not serve any legitimate government interest. Moreover, preventing journalists and observers from newsgathering at the moment Defendants decide to inflict violence on and move protesters does not provide alternative channels for newsgathering on Defendants actions.

168.    Defendants directly prevented and deterred Plaintiffs and the Right-of-Access Subclass from reporting on the protests, including the very state brutality against which the protesters were demonstrating. Defendants directly prevented and deterred Plaintiffs and the Right-of-Access Subclass from monitoring, recording, and reporting on Defendants misconduct and false narratives.

169.     The pattern of similar constitutional violations recently committed by DHS against journalists in other cities in response to ICE protests further demonstrates Defendants' unlawful pattern, practice, and policy.

170.     The pattern of similar constitutional violations against Plaintiffs and members of the Right-of-Access Subclass that occurred during the George Floyd protests in Portland in 2020 also demonstrates Defendants' unlawful pattern, practice, and policy.

171.     Defendants have no overriding government interest to justify denying access to journalists wishing to document their responses to protesters. Even if they did, Defendants fail to narrowly tailor their restrictions on access to any purported government interest.

172.     Granting access to journalists to document Defendants response to protests serves a vital role in the functioning of our democracy and in government accountability.


## FOURTH CAUSE OF ACTION – FOURTH AMENDMENT EXCESSIVE FORCE
### (On Behalf of All Plaintiffs Against DHS Defendants)

173.     Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

174.     Plaintiffs did not pose any imminent threat or danger to law enforcement.

175.     Defendants' conduct intentionally restrained the liberty of Plaintiffs, causing them to be choked, halted, held in a specific area, change their movements, leave the scene, stop their First Amendment activities, cry, fall, lie down, and bleed.

176.     Defendants lacked any reason to suspect Plaintiffs were engaged in a crime.

177.     Defendants lacked a government interest that justified the use and degree of force used on Plaintiffs when they subjected them to repeated uses of chemical irritants, impact munitions, slamming, shoving, and pushing.

**FIFTH CAUSE OF ACTION – FIFTH AMENDMENT DUE PROCESS**

**(On Behalf of Plaintiffs Against DHS Defendants)**

178.    Plaintiffs incorporate by reference each of the paragraphs of this Complaint as if restated fully herein.

179.    Defendants engaged in violent conduct that shocks the conscience.

180.    Defendants acted with deliberate indifference to the risk of injury to Plaintiffs.

181.    Defendants acted with the purpose to harm Plaintiffs.

**SIXTH CAUSE OF ACTION – ADMINISTRATIVE PROCEDURES ACT**

**Pursuant To 5 U.S.C. § 702, 704, 706(2)(A)–(C)**

**(On Behalf of All Plaintiffs and Classes Against All Defendants)**

182.    Plaintiffs incorporate by reference each of the paragraphs of this Complaint as if restated fully herein.

183.    Defendant DHS, through their respective heads, adopted and implemented multiple policies and/or directives, including:

(a)    Permitting the use of large volumes of chemical munitions, including tear gas, munitions covered with other chemical substances, and impact munitions on nonviolent protest crowds to relocate crowds away from ingress/egress on federal property.

(b)    Permitting the use of less-lethal munitions and other physical force without warnings, directives, and an opportunity to comply.

(c)    Permitting officers to shoot less lethal munitions at crowds from rooftops even at steep angles that do not allow for safe use of the munitions.

(d)    Responding with force only to protesters who oppose Defendants' actions or policies, not those who are in favor of Defendants' actions or policies

(e)     Responding with force only to journalists and observers who document Defendants' abuses or disagree with Defendants' narratives, not those who obscure Defendants' abuses or agree with Defendants' narratives.

(f)     Dispersing, interfering with, or otherwise blocking journalists or observers when they are attempting to document Defendants' violence against or moving of protesters.

(g)     Permitting investigatory arrests, including tackling, handcuffing and forced photographing, without cause.

(h)     Permitting surveillance without cause of all persons within a half mile radius of the Portland ICE Building.

(i)     Engaging in policing activities while obscuring their agency affiliation and individual identities.

(j)     Not requiring that officers be trained in crowd-control or deescalation prior to being permitted to police protest crowds.

(k)     Permitting the cross-designation and deployment of officers to conduct FPS duties without proper training.

(l)     Treating documentation of federal agency actions as an attempted "doxxing" that presents a thre that justifies the use of significant force, including tear gas, impact munitions, and shoving to prevent documentation.

184.    These policies/directives constitute **final agency actions** within the meaning of 5 U.S.C. § 704 because they represent the consummation of the agencies' decision-making process and establish binding operational policy governing subordinate officers in the field. Plaintiffs have no other adequate remedy in any court to redress the harms caused by this final agency action.

185.    The policies above are arbitrary, capricious, an abuse of discretion, and contrary to law in violation of 5 U.S.C. § 706(2)(A) and (C), and inconsistent with statutory and regulatory limits, including 8 U.S.C. § 1357(a), 8 C.F.R. § 287.8, and 40 U.S.C. § 1315.

186.    Policies (a) – (h) and (l) are **contrary to constitutional right** and "not in accordance with law" within the meaning of 5 U.S.C. §§ 704 and 706(2)(A)–(B).

187.    Federal law and regulation limit the use of force by immigration officers:

(a)    Under 8 U.S.C. § 1357(a) and 8 C.F.R. § 287.8(a)(1)(ii), non-deadly force may be used only when an officer has reasonable grounds to believe such force is necessary.

(b)    Section 287.8(a)(1)(iii) requires an officer to use the **minimum non-deadly force necessary** and to escalate only when warranted by a subject's actions or apparent capabilities.

(c)    Section 287.8(a)(2)(ii) permits deadly force only when necessary to protect the officer or others from imminent danger of death or serious physical injury.

188.    By authorizing indiscriminate use of projectiles, chemical agents, and other militarized tactics against peaceful assemblies, Defendants exceeded their statutory and regulatory authority and acted in excess of their jurisdiction in violation of 5 U.S.C. § 706(2)(C).

189.    As a proximate result of Defendants' unlawful policies and practices, Plaintiffs and members of the class have suffered and will continue to suffer deprivation of liberty and constitutional injury for which no adequate remedy exists apart from review under the Administrative Procedure Act (APA).  Absent injunctive relief, Defendants will continue to implement and enforce the unlawful directive and policies described herein, causing ongoing and irreparable harm.

190.    Defendants' unlawful policies and practices against Plaintiffs and class members, described herein, have caused and are causing them irreparable harm.

191.    In the absence of an injunction, Defendants will continue to engage in their unlawful policies and practices against Plaintiffs and class members, described herein.

192.    Plaintiffs have no other adequate remedy in court, and the directive continues to govern Defendants' conduct.

## <u>SEVENTH CAUSE OF ACTION – 28 U.S.C. § 2201 DECLARATION OF RIGHTS</u>

### (Against All Defendants)

193.    Plaintiffs incorporate each of the paragraphs of the complaint as if restated fully herein.

194.    In a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought, under 28 U.S.C. § 2201.

195.    There is an actual and justiciable controversy within the jurisdiction of this court, inasmuch as one or more federal Defendants have adopted and continue to enforce federal policies and directives that authorizes use of force and arrests endangering Plaintiffs' and class members' First Amendment activities. No federal authority has agreed to stop this practice.

196.    A judicial declaration will serve a useful purpose in clarifying the parties' legal relations, confirming the limits of federal authority under 40 U.S.C. § 1315 and 8 U.S.C. § 1357, and preventing future unlawful use of force against Plaintiffs and similarly situated individuals.

//

//

//

//

//

//

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court grant the following relief:

A. Injunctive relief;

B. Declaratory relief;

C. An order vacating and setting aside Defendants' unlawful policies and agency actions;

D. An award of attorneys' fees and costs;

E. Any other relief this Court deems just and proper.

DATED:  December 10, 2025.

ACLU FOUNDATION OF OREGON


By:      *s/ Kelly Simon*_____

**Kelly Simon**, OSB No. 154213
  Email: ksimon@aclu-or.org
**Eri Andriola**, OSB No. 246500
  Email: eandriola@aclu-or.org

ALBIES & STARK LLC
**J. Ashlee Albies**, OSB No. 051846
  Email: ashlee@albiesstark.com

PEOPLE'S LAW PROJECT
**Jane L Moisan**, OSB No. 181864
  Email: jane@pdxplp.com

TONKON TORP LLP
**Alexander M.  Tinker**, OSB No. 144939
  Email:  alex.tinker@tonkon.com
**Daniel H.  Skerritt**, OSB No. 681519
  Email:  daniel.skerritt@tonkon.com
**Maureen S.  Bayer**, OSB No. 214905
  Email:  maureen.bayer@tonkon.com
**Olivia Ashé**, OSB No. 225796
  Email:  olivia.ashe@tonkon.com

*Counsel for Plaintiffs*