Kelly Simon, OSB No. 154213
  Direct: 971.322.0869
  Email: ksimon@aclu--or.org
Eri Andriola, OSB No. 246500
  Email: eandriola@aclu--or.org
ACLU Foundation of Oregon
PO Box 40585
Portland, OR 97240

Alexander M. Tinker, OSB No. 144939
  Direct:  503.802.5734
  Email:  alex.tinker@tonkon.com
Daniel H. Skerritt, OSB No. 681519
  Direct:  503.802.2024
  Email:  daniel.skerritt@tonkon.com
Maureen S. Bayer, OSB No. 214905
  Direct:  503.802.2115
  Email:  maureen.bayer@tonkon.com
Olivia Ashé, OSB No. 225796
  Direct:  503.802.2081
  Email:  olivia.ashe@tonkon.com
Tonkon Torp LLP
1300 SW Fifth Ave., Ste. 2400
Portland, OR 97201
Facsimile:  503.274.8779

J. Ashlee Albies, OSB No. 051846
  Email: ashlee@albiesstark.com
  Direct: 503.308.4770
Albies & Stark LLC
1500 SW 1st Ave., Ste 1000
Portland OR  97201
Facsimile: 503.427.9292

Jane L Moisan, OSB No. 181864
  Email: jane@pdxplp.com
  Direct: 971.258.12921
500 SW 1st Ave., Ste 1000
Portland OR 97201

        *Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(PORTLAND DIVISION)

| | |
|---|---|
| Jack Dickinson, a.k.a. "the Portland Chicken," Laurie Eckman, Richard Eckman, Mason Lake, and Hugo Rios, *on behalf of themselves and those similarly situated,*<br><br>          Plaintiffs,<br><br>     v.<br><br>DONALD J. TRUMP, President of the United States, in his official capacity; KRISTI NOEM, Secretary, U.S. Department of Homeland Security, in her official capacity; U.S. Department of Homeland Security.<br><br>          Defendants. | Civil No. 3:25-cv-02170-SI<br><br><br>**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br><br>(*Expedited Consideration Requested*)<br><br>ORAL ARGUMENT REQUESTED |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................4

    I.      DHS HAS REPEATEDLY INFLICTED VIOLENCE AGAINST DISFAVORED NONVIOLENT PROTESTERS AND DOCUMENTERS AT THE PORTLAND ICE BUILDING ................................................................................................ 4

    II.     DEFENDANTS' CONDUCT IS ESCALATING AT THE PORTLAND ICE BUILDING .................................................................................................... 12

    III.    DEFENDANTS' SIMILAR MISCONDUCT IN OTHER DEMOCRATIC CITIES ......................................................................................................... 13

    IV.    LOCAL LAW ENFORCEMENT AND EXPERTS AGREE THAT DHS'S USE OF MUNITIONS HAS BEEN UNLAWFUL AND UNSAFE. .......................... 15

ARGUMENT ..................................................................................................................17

    V.      Legal Standard ................................................................................. 17

    VI.    Plaintiffs have standing to bring a retaliation claim seeking injunctive relief...... 18

    VII.   Plaintiffs are likely to succeed on the merits of their first amendment retaliation claim.................................................................................................. 20

          A.     Plaintiffs and putative class members have engaged in constitutionally protected activity. .............................................................21

          B.     Defendant DHS's use of munitions/weapons have predictably chilled protesters of ordinary firmness. ......................................................22

          C.     There is ample evidence that a substantial or motivating factor for Defendant DHS's violence against Plaintiffs and putative class members was their protected activity ......................................................24

          D.     Moreover, the evidence above strongly suggests that Defendants have a policy of retaliation against protesters who disagree with them...............................................................................................27

    VIII.  Plaintiffs and putative class members will continue to suffer irreparable harm absent court intervention................................................................. 27

    IX.    The constitutional magnitude of Plaintiffs' injuries tips the balance of equities and public interest sharply in Plaintiffs favor ............................................ 29

    X.      The scope of relief is appropriate......................................................... 31

CONCLUSION ................................................................................................................33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.A.R.P. v. Trump*,
    605 U.S. 91 (2025) .................................................................................18, 31, 32

*Allee v. Medrano*,
    416 U.S. 802 (1974) ...........................................................................................20

*Boardman v. Pac. Seafood Grp.*,
    822 F.3d 1011 (9th Cir. 2016) ...........................................................................28

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) .............................................................................31

*Chicago Headline Club et al. v. Noem et al.*,
    N.D. Ill. Case No. 1:25-cv-12173 ......................................................................14

*City & Cnty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ...........................................................................31

*City of Houston, Tex. v. Hill*,
    482 U.S. 451 (1987) ...........................................................................................21

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) .............................................................................................19

*Collins v. Jordan*,
    110 F.3d 1363 (9th Cir. 1996) .......................................................................21, 22

*Cuviello v. City of Vallejo*,
    944 F.3d 816 (9th Cir. 2019) .............................................................................28

*Doe v. Harris*,
    772 F.3d 563 (9th Cir. 2014) .............................................................................20

*Elrod v. Burns*,
    427 U.S. 347 (1976) ........................................................................................2, 27

*Fed. Election Comm'n v. Furgatch*,
    869 F.2d 1256 (9th Cir. 1989) ...........................................................................28

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
    82 F.4th 664 (9th Cir. 2023) (en banc) .............................................................18

*Galvin v. Hay*,
374 F.3d 739 (9th Cir. 2004) ...............................................................................22

*Gavin Newsone, et al. v. Donald J. Trump et al.*,
25-cv-04870-CRB (Northern Dist., California, Dec. 10, 2025) ...............................................30

*Hartman v. Moore*,
547 U.S. 250 (2006)...............................................................................20

*Illinois v. Trump*,
155 F.4th 929 (7th Cir., Oct. 16, 2025)...............................................................................30

*Index Newspapers LLC et al v. United States Marshals Service et al.*,
977 F.3d 817 (9th Cir. 2020) ............................................................................... *passim*

*L.A. Press Club et al. v. Noem et al.*,
C. D. Cal. Case No. 2:25-cv-05563, Dkt. 55 (C.D. Cal. 9/10/2025) ............................3, 14, 32

*Libertarian Party of L.A. Cty. v. Bowen*,
709 F.3d 867 (9th Cir. 2013) ...............................................................................28

*Long Beach Area Peace Network v. City of Long Beach*,
574 F.3d 1011 (9th Cir. 2009) ...............................................................................29

*Los Angeles Press Club et. al v. Noem et al.*,
2025 WL 4058872 (9th Cir. 2025) ...............................................................................18

*Lozman v. City of Riviera Beach, Fla.*,
585 U.S. 87 (2018)...............................................................................20, 21, 22

*Meinecke v. City of Seattle*,
99 F.4th 514 (9th Cir. 2024) ...............................................................................18

*Mendocino Envtl. Ctr. v. Mendocino Cty.*,
192 F.3d 1283 (9th Cir. 1999) ...............................................................................20, 22

*Menotti v. City of Seattle*,
409 F.3d 1113 (9th Cir. 2005) ...............................................................................27

*Mt. Healthy City School Dist. Bd. Of Education v. Doyle*,
429 U.S. 274 (1977)...............................................................................21

*Nelson v. City of Davis*,
685 F.3d 867 (9th Cir. 2012) ...............................................................................1, 33

*Nieves v. Bartlett*,
587 U.S. 391 (2019)...............................................................................22

*Oregon v. Trump*,
    3:25-cv-1756-IM (District of Oregon, October 5, 2025)......................................................30

*Puente v. City of Phoenix*,
    123 F.4th 1035 (9th Cir. 2024) .......................................................................................25, 26

*Sanderlin v. Dwyer*,
    116 F.4th 905 (9th Cir. 2024) ...............................................................................................20

*Sanders Cty. Republican Cent. Comm. v. Bullock*,
    698 F.3d 741 (9th Cir. 2012) .................................................................................................28

*Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression &*
    *Criminalization of a Generation v. City of Seattle*,
    550 F.3d 788 (9th Cir. 2008) .................................................................................................29

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) .................................................................................................17

*Terminiello v. Chicago*,
    337 U.S. 1 (1949)....................................................................................................22, 29, 30

*Thomas v. Cnty of Los Angeles*,
    978 F.2d 504, 507 (9th Cir. 1992) .........................................................................................19

*Tichner et al. v. Noem*,
    D. Minn. Case No. 0:25-cv-04669.........................................................................................14

*Tincher v. Noem*,
    No. 26-1105 ...........................................................................................................................32

*Tinker v. Des Moines Independent Community School District*,
    393 U.S. 503 (1969)...............................................................................................................30

*Trump v. CASA, Inc.*,
    606 U. S. 831 (2025)...............................................................................................18, 31, 32

*Trump v. Illinois*,
    No. 25A443, 2025 WL 3715211 (U.S. Dec. 23, 2025) ..........................................................30

*Ulrich v. City and County of San Francisco*,
    308 F.3d 968 (9th Cir. 2002) .................................................................................................24

*United States v. Grace*,
    461 U.S. 171 (1983)...............................................................................................................29

*Warsoldier v. Woodford*,
    418 F.3d 989 (9th Cir.2005) ..................................................................................................27

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)............................................................................................17, 18

## INTRODUCTION[1]

Plaintiffs are peaceful protesters, who are exercising their First Amendment right to protest at or around the ICE building in Portland, Oregon at the corner of Southwest Moody and Southwest Bancroft ("ICE Building"). They respectfully seek a limited TRO enjoining Defendant Department of Homeland Security (DHS) from using excessive force on peaceful protesters at and around the ICE Building. Such relief is necessary because Defendants have engaged in an escalating pattern of unnecessary, excessive and indiscriminate violence against protesters at this site. Protests are picking up in response to Defendants' ongoing brutality across the nation, and DHS has countered with multiple displays of gratuitous violence in the last week, alone. Not only is Defendants' retaliation chilling Plaintiffs' and class members' First Amendment rights, it also poses an imminent risk that Defendants will needlessly kill or maim someone, as they have done repeatedly within the last few weeks.

Plaintiffs are likely to win on the merits. Under longstanding law, law enforcement cannot use force against peaceful protesters, and even "a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force." *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012). Within the last two weeks, DHS agents shot pepper balls at, tear gassed and pepper sprayed Plaintiff Jack Dickinson on two occasions while he was peacefully protesting. Over the last 5 months, Mr. Dickinson estimates DHS exposed him to chemical munitions dozens of times. DHS shot 84-year-old Plaintiff Laurie Eckman in the head with a chemical impact munition while she was peacefully holding a sign on a public street; the same day, DHS hit 83-year-old Plaintiff Richard Eckman's walker with chemical munitions as Defendants used chemical munitions on a nonviolent crowd. A growing profusion of evidence shows that DHS deliberately and repeatedly is using excessive force—such that the former Commissioner of Customs and Border Protection

---

[1] In addition to this Motion for Temporary Restraining Order, Plaintiffs intend to file a motion for expedited discovery contemporaneously with this motion.

("CBP"), Gil Kerlikowske, has opined that DHS has shown a repeated pattern of excessive force against everyone present at the ICE Building, including Portland police officers.

Plaintiffs are also suffering irreparable harm. Defendants' conduct is chilling Plaintiffs and many others from exercising their First Amendment right to assemble and criticize the government. Even a temporary deprivation of this right is deemed irreparable. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")

Defendants' pattern of violence is even more chilling when considered in context. On January 7, 2026, DHS agents killed Renee Good in Minnesota, shooting her multiple times, including as she was driving away from them. DHS then offered false explanations for the killing, and top officials, including Vice President JD Vance, boasted that officers would have "absolute immunity" for conduct such as killing Ms. Good.  Robin Stein, Devon Lum, Dmitriy Khavin, Alexander Cardia, Aric Toler and Jeff Bernier, *Video Analysis of ICE Shooting Sheds Light on Contested Moments*, The New York Times (Jan. 15, 2026), https://www.nytimes.com/video/us/100000010648638/ice-shooting-renee-good-minneapolis-videos-analysis.html;   JD Vance says ICE agent in Minneapolis shooting has 'absolute immunity', Associated Press, YouTube (Jan. 8, 2026), https://www.youtube.com/watch?v=Tsq4o1VMLuc.  A few days after killing Ms. Good, DHS viciously maimed two young protesters in Los Angeles, Kaden Rummler and Britain Rodriguez, by shooting each of them in the eye, permanently blinding them. Neither protester posed an imminent threat to anyone, including law enforcement, much less did anything to justify using deadly force. The agency defended its conduct by saying "protesters were violent" and calling Mr. Rummler's claims of injury "absurd."[2] On January 24, 2026, DHS killed Alex Pretti by shooting him several times. In response, Defendants offered false descriptions of this event, too.

---

[2] Amy Taxin, *California Protester Left Blind in One Eye Is Among String of Violent Run-Ins With Federal Agents*, Associated Press (Jan. 16, 2026), https://apnews.com/article/immigration-protesters-injured-eye-california-santa-ana-1fa27b64a1ff1015d8852927793de321

Devon Lum, Haley Willis, Alexander Cardia, Dmitriy Khavin and Ainara Tiefenthäler, *New Video Analysis Reveals Flawed and Fatal Decisions in Shooting of Pretti*, The New York Times (Jan. 26, 2026), https://www.nytimes.com/video/us/100000010668660/new-video-analysis-reveals-flawed-and-fatal-decisions-in-shooting-of-pretti.html?smid=nytcore-ios-share. U.S. Border Patrol Commander Gregory Bovino stated that DHS "did a good job" and claimed that "pepper spray is a deescalation technique."[3]

Injunctive relief is also in the public interest. Since the Stamp Tax, the right to criticize the government has played a fundamental role in framing the public debate in our democracy. In *Index Newspapers*, this court, affirmed by the Ninth Circuit, recognized these principles, and protected the First Amendment rights of journalists and legal observers who posed no threat to law enforcement. As Courts following *Index Newspapers* have recognized, protecting the rights of non-violent protesters plays an equally important public function. *See, e.g*., *L.A. Press Club et al. v. Noem et al.,* C. D. Cal. Case No. 2:25-cv-05563, Dkt. 55 (C.D. Cal. 9/10/2025)

Under such circumstances, the limited relief that Plaintiffs seek is more than warranted. All Plaintiffs seek is that (1) Defendants be enjoined from using non-trivial amounts of force on people engaged in passive resistance, and (2) Defendants be enjoined from using crowd-control weapons in dangerous ways that violate their own policies and jeopardize peaceful protesters. Such relief is limited to the area at or around the ICE Building, directly targeted to the conduct at issue, and will not impede legitimate law enforcement activities.

---

[3] Minneapolis: Bash presses Gregory Bovino on Alex Pretti shooting, CNN, YouTube (Jan. 25, 2026), https://www.youtube.com/watch?v=-VBJx116hqk

## BACKGROUND

I.  **DHS HAS REPEATEDLY INFLICTED VIOLENCE AGAINST DISFAVORED NONVIOLENT PROTESTERS AND DOCUMENTERS AT THE PORTLAND ICE BUILDING**

**Plaintiff Jack Dickinson** is a Portland resident who, for months, has engaged in nonviolent protest at the ICE Building. Declaration of Jack Dickinson ("Dickinson Dec."), ¶¶ 2, 3. He has come to be known as "the Portland Chicken" after he started regularly attending protests in a yellow fleece chicken costume with an American flag draped over his shoulders like a cape. *Id.* at ¶ 6. Mr. Dickinson has repeatedly witnessed and been subjected to violence by DHS officers. *Id.* at ¶ 7. DHS has subjected Mr. Dickinson to chemical munitions on multiple occasions. *See generally,* Dickinson Dec. Beginning in August 2025, Mr. Dickinson began attending protests multiple times per week. *Id.* at ¶ 18.

On August 16, 2025, DHS shot a pepper munition from the roof of the Portland ICE Building, striking Mr. Dickinson's face respirator. *Id.* at ¶ 9.  On August 23, Federal agents shoved Mr. Dickinson while he was standing on the public sidewalk side of the driveway with so much force that he stumbled approximately 15 - 20 feet through the street.  *Id.* at ¶ 10.  When he stood up and started walking away, a federal agent shot him in the back with munitions from the roof of the building. *Id.*

On October 18, 2025, the day of a No Kings Rally, DHS officers deployed an especially large volume of chemical munitions. *Id.* at ¶ 15. Mr. Dickinson had an especially strong reaction to the chemicals that he was forced to lay down and receive medical attention. *Id.* Mr. Dickinson suffered nausea and residual impacts for the next 24 hours. *Id.*

Late into the night of October 31, agents aggressively deployed pepper balls, shot from near the blue line.  *Id.* at ¶ 16.  Mr. Dickinson was downwind and the burning in his nose and eyes and skin irritation became so severe that he had to leave the area and stop protesting until treating those conditions.  *Id.*

On November 14, 2025, DHS officers shot chemical munitions from the roof into the crowd, some hitting the ground and others directly hitting protesters.  *Id.* at ¶ 17. The violence he

has experienced directly, and has witnessed Defendants using against other protesters, has caused him to fear for his health, his safety, and his life, yet he is determined to continue protesting despite his fear. *Id.*, ¶¶ 20-36.

Mr. Dickinson was also among the group of protesters who participated in the Martin Luther King Day sit-in on the edges of the Portland ICE Building driveway area between S. Bancroft Street and the barred gates. *Id.* at ¶ 22. At this event, Mr. Dickinson sat on the edge of the driveway near the gate; he sat silently and did not block the ability of vehicles to enter or exit. *Id.* at ¶ 25. DHS fired a barrage of pepper balls at the seated protesters multiple times, and pepper sprayed Mr. Dickinson directly in the face twice. *Id.* at ¶¶ 26-27. DHS arrested Mr. Dickinson, dragged him across the pavement, and processed him into a cell. *Id.* at ¶¶ 28-30. Mr. Dickinson estimates it was approximately 30 minutes before he was able to see again, and access eye wash. *Id.* at ¶¶ 29. DHS forced Mr. Dickinson to remove his chicken suit, flag, belt, and passport, and DHS officers took pictures of him in his cell. *Id.* at ¶ 30.

Mr. Dickinson also protested on January 24, 2026, to protest the killing of Alex Pretti in Minneapolis. *Id.* at ¶ 35. Three times, Mr. Dickinson witnessed DHS officers come out, protesters would leave the driveway without force, and then DHS officers would come out to the blue line and deploy munitions indiscriminately into the crowd. *Id.* at ¶ 36. At one point, Plaintiff Dickinson picked up a sign and waived it to diffuse the gas in the air, and he was hit in the ankle by a volley of DHS munitions. *Id.* at ¶ 37. The third exposure caused Mr. Dickinson to leave to avoid further health impacts. *Id.* at ¶ 42. Mr. Dickinson attempted to return the next night, but a heavy gassing before his arrival prevented him from staying. *Id.* at ¶ 44.

**Plaintiffs Laurie Eckman** is an 84-year-old woman who lives in Portland, Oregon, just a few blocks from the Portland ICE Building. Declaration of Laurie Eckman ("L. Eckman Dec."), ¶¶ 2, 5. Mrs. Eckman and her husband spontaneously decided to attend an afternoon protest in a neighborhood park, and the crowd marched to the Portland ICE Building. *Id.* at ¶¶ 2, 10-14. At the Portland ICE Building, the Eckmans stood to the Northeast of the building on the South side of S Bancroft Street. *Id.* at ¶ 15. DHS officers with some type of guns watched the crowd from

the roof, while the crowd was peacefully chanting and holding signs. *Id.* at ¶¶ 14, 16. Mrs. Eckman held a sign that read, "No Kings," on one side, and "Will swap 10,000 immigrants for one little King Donald." *Id.* at ¶ 12. The Eckmans observed DHS officers wearing different uniforms come out of the driveway gates and return behind the gates. *Id.* at ¶ 16. Suddenly and without warning, a larger group of officers barreled out of the gate, rushed toward the crowd, and started firing a bunch of munitions, including chemical munitions. *Id.* at ¶ 17. Mrs. Eckman heard a loud bag and felt painful direct impact near her right temple. *Id.* at ¶ 18. Mrs. Eckman was coughing and choking, could not see, and was disoriented and very scared. *Id.* Some members of the crowd helped Ms. Eckman to a location where she could receive medical attention. *Id.* at ¶¶ 20-23. She walked home soaked in blood. *Id.* at ¶¶ 24-25; L. Eckman Dec. Exhibits A & C. Later that evening, she was treated in the emergency room for a concussion. *Id.* at ¶ 26. A racoon-like bruise developed around her right eye and a scar formed on her head. *Id.* at ¶¶ 27, 29, 31; L. Eckman Dec. Exhibits B & D. She has had persistent pneumonia-like symptoms for over three months. *Id.* at ¶ 32. Mrs. Eckman experiences apprehension walking in her neighborhood, and no longer feels safe attending protests where federal agents may be present due to fear of experiencing the same violence again. *Id.* at ¶¶ 34-35.

**Plaintiff Richard Eckman** is an 83-year-old Vietnam War Veteran from the United States Navy and a retired Major in the U.S. Army Reserve.  Declaration of Richard Eckman ("R. Eckman Dec."), ¶¶ 4, 5. Mr. Eckman attended the October 4, 2025 afternoon protest at the Portland ICE Building with his wife, Laurie Eckman. *See generally, id.* Mr. Eckman decided to put his U.S. Navy hat on to show that he was a Navy veteran. *Id.* at ¶ 11. With the assistance of a walker, he joined the march to the Portland ICE Building. *Id.* at ¶¶ 13, 17. When the DHS officers rushed out and fired their munitions, Mr. Eckman's walker was struck by a munition that detonated near him and left residue on the walker's frame, leaving Mr. Eckman feeling targeted, struggling to breathe, and disoriented. *Id.* at ¶ 17.  With the assistance of other protesters, Mr. Eckman was able to be walked away from the officers and clean his eyes. *Id.* at ¶ 19. Mr. Eckman was relieved to find his wife, but was very worried about her. *Id.* at ¶¶ 20-21. Mr.

Eckman still struggles to understand how guns, which require aiming, can be used on peaceful protesters or be pointed at his wife's head. *Id.* at ¶ 23. He no longer feels safe attending protests where federal officers could commit the same violence against him and his wife. *Id.* at ¶ 28.

**Declarant Chad Lucero** attended the same protest as the Eckmans. Declaration of Chad Lucero (Lucero. Dec.) ¶¶ 3, 13. Chad Lucero was assisting Laurie Eckman get out of the DHS officers' tear gas. Lucero Dec. at ¶ 15. While standing next to Ms. Eckman, Mr. Lucero observed Ms. Eckman get struck in the head with a pepper ball, which caused a cloud of smoke to ricochet off of her head and blood to gush from the wound. *Id.* at ¶¶ 19-20. As Mr. Lucero continued to assist Ms. Eckman, Mr. Lucero's partner was shot in the buttocks, causing a welt. *Id.* at ¶ 22. Mr. Lucero has attended many protests at the Portland ICE Building in October 2025, and he has observed DHS using pepper balls almost every time, including shooting protesters from the roof. *Id.* at ¶¶ 28-29, 32. Mr. Lucero plans to continue protesting, but he is afraid he will be seriously injured or that DHS officers will be authorized to use lethal force. *Id.* at ¶¶ 35-36.

**Plaintiff Hugo Rios** has been a freelance photojournalist for seven years. Hugo Rios Declaration, ("Rios Dec.")  ¶ 1.  He began attending the protests at the ICE facility in Portland on August 1, 2025. *Id.* at ¶ 2. On the afternoon of September 1, 2025, Mr. Rios went to Elizabeth Caruthers Park at the South Waterfront to document protest activity in his capacity as a journalist, wearing clear "PRESS" markings, carrying protective gear, and with his professional camera.  *Id.* at ¶ 3.  The protest crowd marched to the Portland ICE Building, and approximately 100 people spent the afternoon playing music and dancing; the mood was positive. *Id.* at ¶ 4. Later than night, Mr. Rios returned to document the protests at the Portland ICE Building, where protesters were doing a line dance. *Id.* at ¶ 5. Without warning, officers began shooting and throwing tear gas at the protesters. *Id.* Mr. Rios was filming when he was suddenly pushed by a DHS officer from behind. *Id.* at ¶ 6. A couple minutes later, a DHS officer shoved Mr. Rios again, saying "I don't care" when Mr. Rios explained he was a journalist. *Id.* at ¶ 7. The shoving damaged Mr. Rios' camera to the point it stopped recording. *Id.* at ¶ 7. Several minutes later, an officer tossed a tear gas cannister at Mr. Rios' feet while he was standing away from the crowd

alone. *Id.* at ¶ 8. Then, without warning, multiple officers opened fire at Mr. Rios simultaneously, shooting him with pepper balls an estimated 20 times all over the front of his body and on his equipment. *Id.* at ¶ 9. Mr. Rios wants to continue to document the Portland ICE Building protests but is hesitant and afraid of being attacked and injured more severely. *Id.* at ¶¶ 12-13.

**Plaintiff Mason Lake** is a Portland resident who is a freelance video journalist and filmmaker who has covered protests in Portland since approximately 2020. Declaration of Mason Lake ("Lake Dec."), ¶ 1. He specializes in documenting protests in Portland through high quality visual media, and his footage of protests has been aired on national news networks. *Id.* at ¶¶ 1-3. Mr. Lake has observed DHS officers using tear gas and projectile munitions repeatedly. *See generally, id.* DHS officers have also shot munitions directly at Mr. Lake multiple times in 2025, including on June 13, July 4, September 13, often while he was clearly marked as press and standing apart from protesters. *Id.* at ¶¶ 11,15, 24. On June 13, Mr. Lake observed DHS officers shoot pepper balls at a protester who was reading a Native American poem in the driveway of the Portland ICE Building. *Id.* at ¶ 9. During the July 4 protest, DHS shot Mr. Lake in the groin, causing bruising despite wearing protective gear. *Id.* at ¶ 18. On September 13, DHS officers trained a laser on Mr. Lake at one point, and later, a DHS officer maced Mr. Lake directly in the face and on his equipment. *Id.* at ¶¶ 22, 24-25.

Mr. Lake did not return to document protests at the ICE Building until January 24, 2026 because he took time off to recover physically and emotionally from prior events. *Id.* at ¶¶ 26-27. He put on his gas mask immediately because he could smell it as he approached from over a block away, and when he arrived he observed people impacted by the gas. *Id.* at ¶ 28. While there, DHS officers used gas twice more, including HC gas. *Id.* at ¶¶ 29-30. Mr. Lake intends to continue covering events, but is questioning the need to be at the ICE Building because of the risk to his safety. *Id. at* ¶ 31.

**Declarant Aaron Smith** is a videographer who began documenting protests at the Portland ICE Building since July 2025. Declaration of Aaron Smith ("Smith Dec."), ¶¶ 1, 2. At

the protests, he has observed DHS officers rush out of the building and, without warning, shoot munitions repeatedly into a crowd that had just been dancing the cha-cha. *Id.* at ¶¶ 4-5. He also observed DHS officers targeting press, legal observers, and medics. *Id.* at ¶ 5. On one occasion in August 2025, Mr. Smith was shot multiple times with some type of projectile. *Id.* at ¶ 6. Later the same night, he was standing without anybody else in his immediate vicinity when a DHS officer fired a tear gas cannister that struck Mr. Smith directly in the leg. *Id.* at ¶ 10. Mr. Smith was rushed to the emergency room and required stitches. *Id.* at ¶ 11; Smith Dec. Exhibit A. Despite Mr. Smith's fear, he considers his work to film the protests to be important to combat false narratives. *Id.* at ¶ 16. Mr. Smith still attends protests regularly but is more cautious. *Id.* at ¶ 17.

**Declarant Calley Ekberg** is a school psychologist who attended an afternoon protest at the Portland ICE Building on October 18, 2025, at which she stood across the street from the ICE Building wearing a squirrel onesie. Declaration of Calley Ekberg ("Ekberg Dec."), ¶¶ 1-2. Without warning or audible instruction, DHS officers launched tear gas from the roof, encircling Ms. Ekberg and leaving her no route to avoid exposure. *Id. at* ¶ 3. No matter where she turned, she was surrounded by gas, which caused her to lose vision, leaving her disoriented and afraid. *Id. at* ¶¶ 4-6. Her eyes remained irritated for days, and she obtained medical treatment. *Id. at* ¶ 7. In the weeks that followed, Ms. Ekberg experienced shortness of breath for the first time in her life; her doctor diagnosed her with restrictive airway disease which the doctor later confirmed was related to the tear gas exposure. *Id. at* ¶¶ 8-9. The fear of being gassed again has caused Ms. Ekberg to significantly reduce her protest activity. *Id. at* ¶ 12.

**Declarant Mason Thomas** attended the same October 18 protest as Ms. Eckberg. Declaration of Mason Thomas ("Thomas Dec."), ¶ 4. Mason attended the protest with their spouse, and it was their first protest at the Portland ICE Building. *Id. at* ¶ 3. At the protest, Mason observed DHS officers shooting what appeared to be pepper ball guns toward a group of protesters standing near the blue line; the protesters were not attempting to cross the line, nor were they threatening officers. *Id. at* ¶¶ 6-7. When DHS officers fired tear gas into the protest

crowd, Mason felt intense burning and felt like he was suffocating. *Id. at* ¶ 8. Since October 18,

2025, Mason has been hospitalized twice for asthma exacerbations and has received numerous

breathing treatments and medications. *Id. at* ¶ 10. The experiences of October 18, 2025, caused

Mason and their spouse to invest in personal protective equipment, including respirators, eye

protection, and ear plugs so that they could continue protesting. *Id. at* ¶ 9. At subsequent

protests, DHS officers have shone lights and lasers on Mason, have called them names and made

demeaning comments, and have physically shoved them in a manner that has made them feel

singled out. *Id. at* ¶¶ 13-14. Mason is fearful of encountering DHS officers even when not at

protests. *Id. at* ¶ 15.

**Declarant Jeffrey Miller** attended a protest at the Portland ICE Building on October 11,

2025. Declaration of Jeffrey Miller ("Miller Dec."), ¶ 2. That evening, Mr. Miller was trying to

support people who were impacted by DHS officers' impact munitions, smoke, tear gas, and

pepper balls. *Id.* at ¶¶ 8-9. While doing so, approximately forty (40) federal officers streamed out

of the Portland ICE Building in tactical gear and face coverings shooting pepper ball guns at

protesters, including Mr. Miller. *Id.* at ¶ 10. DHS officers shot pepper balls at people who were

as many as two blocks from the building and were not threatening anybody. *Id.* at ¶ 13. DHS

officers shoved Mr. Miller, kneeled on his back, kicked him in the torso repeatedly, stomped on

his hand breaking his finger, then drug him into the building. *Id.* at ¶¶ 14-19. Inside the building,

Mr. Miller was shoved against the wall, had some of his clothing torn off, had his genitals

groped, and was made to stand with his pants pulled down to his knees for several minutes. *Id.* at

¶¶ 19-21, 26.  Mr. Miller was eventually released without any citation. *Id.* at ¶ 44.

At the end of October 2025, Mr. Miller was getting coffee in Northeast Portland when an

ICE vehicle approached him. *Id.* at ¶ 45. An ICE agent forced him into the vehicle at gunpoint,

and drove away. *Id.* at ¶¶ 45-46. Another agent in the car stated, "this guy's not fucking illegal,"

and the agents let Mr. Miller out of the car near the IKEA out by the Portland Internal Airport.

*Id.* at ¶ 46. Mr. Miller has not returned to protest at the Portland ICE Building, but he would like

to return to assist people. *Id.* at ¶ 48. However, if he goes back, Mr. Miller intends to stay far from the building and is afraid he will be targeted. *Id.* at ¶ 50.

**Declarant Sarah Yonally** is a health professional who has been protesting the Trump Administration's racist policies by attending protests at the Portland ICE Building almost daily since July 4, 2025. Declaration of Sarah Yonally ("Yonally Dec."), ¶¶ 2-3. Ms. Yonally has had to stop bringing youth and relatives in their 70s to protests out of fear for their safety. *Id.* at ¶ 39. On October 4, Ms. Yonally was gassed so badly that she was sick for several days with flu-like symptoms. *Id.* at ¶¶ 4-6. On October 11, Ms. Yonally observed one DHS officer shooting munitions at face and chest height until another officer instructed to shoot at the legs. *Id.* at ¶ 7; Yonally Dec. Exhibit A. On November 14, while following instructions to move to the side to allow a vehicle to pass and as she walked away, Ms. Yonally was repeatedly shot with pepper balls in the legs, feet, crotch, and thumb. *Id.* at ¶ 8. The impacts caused significant bruising. *Id.* at ¶¶ 9-10; Yonally Dec. Exhibit B. Throughout November 2025, DHS continued to shoot pepper balls at protesters, including Ms. Yonally. *Id.* at ¶¶ 14-17. Ms. Yonally also attended the January 19, 2026 sit-in and was again subjected to pepper balls and maced to the point she could not open her eyes. *Id.* at ¶ 24. Over the weekend of January 24-25, Ms. Yonally observed agents aiming and firing their munitions at protesters' heads and bodies. *Id.* at ¶ 38.

**Declarant Anna Shepherd** has attended protests at the ICE Building since October 2025. Declaration of Anna Shepherd ("Shepherd Dec."), ¶ 2. During the October protesters, Ms. Shepherd observed pepper balls striking protesters in the chest, arm, hand, and she was subjected to tear gas multiples times. *Id.* at ¶¶ 4-13. On October 31, Ms. Shepherd was tackled when officers lunged at her sister standing next to her filming. *Id.* at ¶¶ 15-16. While Ms. Shepherd and her sister were on the ground, DHS officers were shooting pepper balls from the roof. *Id.* at ¶ 17. DHS also subjected Ms. Shepherd to repeated uses of force in January 2026, including being shot in the back with pepper balls to the point of ripping through her jacket. *Id.* at ¶¶ 22-33, Ex. D.

## II.    DEFENDANTS' CONDUCT IS ESCALATING AT THE PORTLAND ICE BUILDING

**On January 19, 2026 – Martin Luther King Jr. Day** – a group of approximately 20 protesters conducted a sit-in on the ICE Building driveway. Declaration of Kevin Foster, ("Foster Dec."), Exhibit A; Declaration of Rigoberto Martinez ("Martinez Dec."), ¶ 8.  They formed two lines on the outer edges of the driveway so that vehicular traffic was not blocked. Shepherd Dec. ¶ 22. Each protester held a memorial sign with an image of a person who has died at the hands of or in DHS custody. Shepherd Dec. ¶ 22. Eventually**,** a squad of DHS officers emerged from the building, stood behind the closed barred driveway gates and, without warning, repeatedly fired a near-constant stream of pepper balls at the ground in front of the protesters and just above their heads. Protesters remained seated in the driveway. Martinez Dec. at ¶ 9; Simmons Dec. ¶¶ 5-7; Blazak Dec. ¶¶ 8, 11; Shepherd Dec. ¶ 23. DHS opened the gates and came out firing at the protesters again. Shepherd Dec. ¶ 23. DHS officers arrested four of the protesters seated nearest the gates. While arrests were taking place, a DHS officer sprayed mace down the line of the faces of some protesters. Foster, Ex. A. Another DHS officer hosed protestors' memorial signs with pepper balls down the other line of protesters. Foster, Ex. A. The shots left markings and holes in the signs of the people DHS had already killed. Declaration of Randall Blazak ("Blazak Dec."), ¶ 13, Exhibit *Blazak*_B. DHS officers struck several passive protesters directly with pepper balls. Declaration of Marvin Simmons ("Simmons Dec"), ¶ 10 (struck 5 times, hitting both feet and both legs); Blazak Dec. ¶ 10 (hit in feet).

**On January 24, 2026 – two days after DHS killed Alex Pretti –** protesters marched from Elizabeth Caruthers park in the Southwest Waterfront neighborhood to the ICE Building. On multiple occasions that night, federal agents deployed pepper balls, flashbangs, and gas canisters into the crowd of protesters. Shepherd Dec. ¶¶ 27-31; Exs A, C; Dickinson Dec. at ¶ 36. Protesters experienced burns on their hands, could not see, had difficulty breathing due to the chemical munitions, and were shot by pepper balls in the back, head and chest. Shepherd. Dec. ¶¶ 27-31; Ex. B. On at least one occasion, DHS officers fired a barrage of gas without warning or apparent reason; no vehicles attempted to enter or exit and they made no arrests. Blazak ¶¶ 23-

27; Blazak Exhibit C; Dickinson Dec. at ¶ 36 (describing protesters moving of their own volition and the driveway clear when DHS officers fired indiscriminately into the crowd). Protesters recovered a spent cannister from one of the munitions that indicated the munition was "Large Style Maximum Smoke HC." Dickinson Dec. at ¶ 41 and Ex. C. Plaintiff Dickinson described the events on January 24 as "the most aggressive the DHS officers had been with their use of force since the summer." Dickinson Dec. at ¶ 43.

On January 25, 2026, protesters returned again to the ICE Building. At or around 8:29 pm, DHS officers shot munitions into the crowd of protesters in the street in front of the ICE Building and began arresting protesters in the street. Shepherd Dec. ¶ 37; Ex. E. Two DHS officers held one protester to the ground, and one officer kneeled on the protester's neck. *Id*. An officer pushed Declarant Shepherd to the ground, who was filming the events. *Id*. DHS officials shot Declarant Shepherd with pepper balls, and ripped her jacket in the back. *Id*. Ex. D.

## III.    DEFENDANTS' SIMILAR MISCONDUCT IN OTHER DEMOCRATIC CITIES

In Los Angeles, California Defendants, including DHS units led by CBP "Commander in Charge" Gregory Bovino, repeatedly engaged in violent suppression of First Amendment activity since the Spring of last year. It held that "federal agents' indiscriminate use of force—targeting journalists standing far from any protest activity, launching scorching-hot tear gas canisters directly at people, and shooting projectiles at protesters attempting to comply with dispersal orders—will undoubtedly chill the media's efforts to cover these public events and protesters seeking to express peacefully their views on national policies." It stated that while it had no sympathy for people engaged in violence, "the actions of a relative few does not give DHS *carte blanche* to unleash near-lethal force on crowds of third-parties in the vicinity." It further found that "under the guise of protecting the public, federal agents have endangered large numbers of peaceful protesters, legal observers and journalists—as well as the public that relies on them to hold their government accountable. The First Amendment demands better." The court then issued an injunction adopting this Court's relief from Index Newspapers, along with

protections for protesters similar to those sought by Plaintiffs here. *See L.A. Press Club et al. v. Noem et al.,* C. D. Cal. Case No. 2:25-cv-05563.

**In Chicago, Illinois**, there was Operation Midway Blitz. As part of this operation in Chicago and the surrounding areas, DHS again shot, beat, and gassed nonviolent protesters, many of whom were repeatedly protesting outside of an ICE facility in Broadview, Illinois. Judge Ellis found that Defendant Bovino, who reports directly to Defendant Noem, had lied under oath about why he threw a tear gas cannister into a nonviolent crowd of protesters, falsely claiming protesters were throwing rocks. *See, e.g.,* James Hill and Armando Garcia, *Border Patrol commander admitted he lied about tear gas incident, judge says, as she restricts use of force by immigration agents in Chicago*, ABC News (Nov. 7, 2025), https://abcnews.go.com/US/border-patrol-commander-admitted-lied-tear-gas-incident/story?id=127283392. Judge Ellis also issued an injunction to protect protesters from Defendants' brutality. *See Chicago Headline Club et al. v. Noem et al.,* N.D. Ill. Case No. 1:25-cv-12173.[4]

**In Minneapolis, Minnesota,** immediately following a DHS officer shooting and killing Renee Good, Defendants surged an aggressive federal response throughout the Twin Cities area, partly led by Defendant Bovino. Dubbed "Operation Metro Surge," the campaign of violence is ongoing and now familiar, and well documented: mask-clad DHS officers shooting, beating, and gassing nonviolent protesters while cabinet-level officials praise and encourage violent behavior and threaten to send the military. *See Tichner et al. v. Noem*, D. Minn. Case No. 0:25-cv-04669; *and see* Deputy Chief of Staff to the President, Stephen Miller, @StephenM, X (Jan. 13, 2025), https://x.com/DHSgov/status/2011213308968538361 ("You have federal immunity in the conduct of your duties."); *see also* Vance says ICE agent involved in fatal shooting has 'absolute immunity,' Associated Press (Jan. 8, 2026), https://apnews.com/video/vance-says-ice-agent-

---

[4] The injunction, which was much broader than the one sought here, was preliminarily stayed by the Seventh Circuit pending appeal as overbroad, and the case was dismissed as moot because DHS left Chicago before the court of appeals there could reach the merits.

involved-in-fatal-shooting-has-absolute-immunity-5109e1f2c2504fc5b3249196cc6ba014 (video
of Vice President Vance speaking at a press conference and referring to the officer who shot and
killed Renee Good when saying "that guy is protected by absolute immunity"); Juliana Kim and
Alana Wise, *Trump threatened to invoke the Insurrection Act (again). What is it?* NPR (Jan. 15,
2026), https://www.npr.org/2026/01/15/nx-s1-5678612/minneapolis-insurrection-act-trump-
threats.

After officials touted federal immunity, a DHS officer killed another Minnesotan,
shooting VA Nurse Alex Pretti multiple times. Experts have admonished the DHS officer
shootings based on widely available public video of both. *See, e.g.,* Reis Thebault and Maia
Coleman, *Pretti Shooting Was Flawed from the Start, Policing Experts Say*, The New York
Times, (Jan. 26, 2026), https://www.nytimes.com/2026/01/26/us/alex-pretti-shooting-federal-
agents-force.html;.

## IV.    LOCAL LAW ENFORCEMENT AND EXPERTS AGREE THAT DHS'S USE OF MUNITIONS HAS BEEN UNLAWFUL AND UNSAFE.

In sworn testimony before this court, Portland Police Bureau (PPB) Commander Franz
Schoenig testified that it was his impression that the amount of force used by law enforcement
officers at the ICE Building is not a good indication of the level of violence or unrest caused by
protests. Albies Declaration ("Albies Dec."), ¶ 9, Ex. H, pp. 81/10-84/3 (describing DHS use of
munitions is "not in response to violent criminal conduct"). Commander Schoenig called the
DHS force used on October 4, 2025 "startling" and "certainly departed from what I would say
was best practice or legal." *Id*. In addition to Laurie Eckman's injuries, DHS's use of tear gas
and other munitions required PPB officers to leave the area. *Id.* Commander Schoenig also
testified about October 18, 2025, describing that PPB officers were struck by federal munitions
despite not seeing "any violent conduct or behavior that would have otherwise precipitated that
use of force." *Id.* at pp. 85/7-86/16; Albies Dec., ¶¶ 5-7, Exs. D-F.

**Former CBP Commissioner and former Seattle Police Chief Gil Kerlikowske** agrees
with Commander Schoenig's assessment that DHS is engaged in "a pattern of excessive force."

Declaration of Gil Kerlikowske ("Kerlikowske Dec"), ¶¶ 23-33. In reviewing several declarations and videos, Mr. Kerlikowske identified a myriad of misuses of crowd control munitions, including but limited to:

- Using munitions, including teargas, on a peaceful crowd. *Id*. at ¶¶ 27, 37.

- Shooting munitions from a roof into a crowd. *Id*. at ¶¶ 46

- Using munitions on persons who pose no threat. *Id*. at ¶¶ 35, 42, 45, 49, 56-58.

- Using munitions or non-trivial force on people who are not actively resisting. *Id*. at ¶¶ 47, 63, 65.

- Using volleys of munitions in a grossly disproportionate manner. *Id*. at ¶¶ 64

- Failing to provide warning or engage in de-escalation prior to using force. *Id*. at ¶¶ 35, 42, 62.

- Shooting pepper balls or tear gas at people directly. *Id*. at ¶¶ 35, 44, 52-54.

- Targeting a person in the head, which can be lethal. *Id*. at ¶¶ 35, 44, 57.

- Shooting people across long distances due to loss of accuracy. *Id*. at ¶¶ 49

- Using munitions to retaliate against First Amendment activity. *Id*. at ¶ 35

Mr. Kerlikowske opines that law enforcement crowd control tools should be used only when there is active resistance, which is consistent with DHS policy. *Id*. at ¶ 47. In fact, CBP's policy specifically provides that officers may not deploy munitions "unless it is necessary to stop an imminent threat of harm." *Id*. at ¶ 35.

Mr. Kerlikowske offers two additional opinions. First, he opines that the requested order is safe for law enforcement. *See id*. at ¶¶ 69-70. Second, Mr. Kerlikowske opines that the requested order is workable. *See id*. at ¶¶ 71-75. Mr. Kerlikowske emphasizes, "Effective crowd control in the context of volatile protests involves constructing plans to minimize conflict, and to facilitate rather than suppress First Amendment activities." *Id*. at ¶ 73. Challenges in complying with the requested order would "arise from the failure of supervision and leadership, lack of

experience, and failure of leadership to ensure that the agents are properly trained for civil disturbances/unrest." *Id*. at ¶ 75.

**Dr. Rohini Haar,** a licensed emergency medicine physician and medical advisor for Physicians for Human Rights leads research on the impacts of violence and human rights violations on health in the United States and globally. Declaration of Dr. Rohina Haar ("Dr. Haar Dec."), ¶¶ 1-6. As part of her work, Dr. Haar was the first author of two editions of *Lethal in Disguise: The health consequences of crowd control weapons* and has multiple published peer-reviewed studies on the health impacts of both impact munitions and tear gas use. *Id.* at ¶¶ 8-9. Dr. Haar opines, "Despite common perceptions that crowd-control weapons are harmless, each of these weapons—including, and especially, chemical irritants and projectiles—can cause significant and long-lasting health harms." *Id.* at ¶ 61. The dual nature of pepper balls as a chemical irritant and projectile "increases the likelihood of both immediate injury and longer-term health consequences, underscoring the urgent need for stricture use protocols." *Id.* at ¶ 57. Misuse of already dangerous crowd-control weapons is an especially potent practice that can "dramatically escalate both the frequency and severity of harm." *Id.* at ¶¶ 18, 70. Firing chemical irritants projectiles and grenades can be especially dangerous because the canisters often used are hot, large, and fired at high speeds, which can result in severe or deadly trauma. *Id.* at ¶¶ 42-43. As far as Dr. Haar is aware, "every manufacturer of tear gas instructs that its products should not be fired directly into crowds or used to target individuals." *Id.* at ¶ 43.

## ARGUMENT

## V.    LEGAL STANDARD

The standard for issuing a temporary restraining order is "substantially identical" to the standard for issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). To prevail in this motion, Plaintiffs with standing to sue must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm absent the preliminary relief they seek, (3) the balance of equities between the parties tips in their favor, and (4) the preliminary relief is in the public interest. *Winter v.*

*Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)*; Meinecke v. City of Seattle,* 99 F.4th 514, 521 (9th Cir. 2024). When the non-moving party is the government, the balance of equities and public interest factors merge. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (en banc).

The Ninth Circuit permits a sliding scale approach to the *Winter* factors wherein "a stronger showing of one element may offset a weaker showing of another." *Id.* For example, where the equities and public interest tip sharply in favor of Plaintiffs, as it does here, Plaintiffs need "raise only serious questions" on the merits. *Id.* Nonetheless, Plaintiffs can establish a balanced scale with great weight in their favor on all four factors.

Finally, "courts may issue temporary relief to a putative class." *A.A.R.P. v. Trump,* 605 U.S. 91, 98 (2025) (citing 2 W. Rubenstein, Newberg & Rubenstein on Class Actions §4:30 (6th ed. 2022 and Supp. 2024)). This can be done prior to certifying the class. *Id.* The court's equitable powers to issue injunctions find their outer edges when orders go beyond granting "complete relief" to plaintiffs and putative class members. *Trump v. CASA, Inc.*, 606 U. S. 831, 854 (2025) ("[complete relief] is the maximum a court can provide").

## VI.    PLAINTIFFS HAVE STANDING TO BRING A RETALIATION CLAIM SEEKING INJUNCTIVE RELIEF

The Ninth Circuit recently refused to entertain Defendants' standing arguments in *Los Angeles Press Club*, finding them already foreclosed by *Index Newspapers.* See *Los Angeles Press Club et. al v. Noem et al.,* 2025 WL 4058872 (9th Cir. 2025) (rejecting defendants standing argument and permitting the C.D. Cal preliminary injunction order to remain enforceable as to plaintiffs, reporters and legal observers). For the reasons this Court and the Ninth Circuit gave in *Index Newspapers*, Plaintiffs have standing under Article III for at least three reasons.

First, as in Index Newspapers, some of the Plaintiffs here have been repeatedly injured at different protests, including after their complaint was filed. Thus, the threat of future injury to them is not speculative. *Index Newspapers*, 977 F3d. at 826. For example, Jack Dickinson has

been attending protests at the ICE Building since April 2025 and DHS has subjected him to munitions use repeatedly dating back to June 2025, including but not limited to the described 2025 incidents on August 16, October 5, August 23, October 5, October 18, October 31, November 14, as well as the very recent incidents in 2026 on January 19, January 24 and January 25.  *See generally,* Dickinson Dec. Similarly, Mason Lake has described specific incidents in June, July, September of 2025 and January 2026. *See generally,* Lake Dec. Both Dickinson and Lake intend to return to the protests.

Second, as *Index Newspapers* held, Fourth Amendment cases, such as *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), do not apply in the First Amendment context because "the nature of plaintiffs' injuries sharply differs from" that in *Lyons*, i.e. First Amendment chilling is an ongoing injury unlike the due process injury complained of as a result of a single chokehold in *Lyons. See Index Newspapers,* 977 F.3d at 826. The Eckmans want to protest at the ICE Building but are too afraid to do so. L. Eckman Dec. at ¶ 34; R. Eckman Dec. at ¶ 28; *accord* Rios Dec. at ¶ 12 (only willing to document protests from afar given severity of targeting and injuries). On January 25, Jack Dickinson wanted to protest but the gas fired before he arrived impacted him too badly to stay. Dickinson Dec. at ¶ 44.

Third, the geographic scope of the events is particularized, making the threat of future harm non-speculative. *See Thomas v. Cnty of Los* Angeles, 978 F.2d 504, 507 (9th Cir. 1992). As in *Thomas*, Plaintiffs only seek injunctive relief at a single protest site and within a single command structure where the supervisory officials have expressly encouraged violent repression of protest in Portland. *See* 978 F.2d at 508 (discussing the small geographic area at issue with repeated instances of harm that was tacitly authorized by policy makers); *see also* Donald J. Trump, (@realDonaldTrump) Truth Social (Sept. 27, 2025 at 07:19 ET), https://truthsocial.com/@realDonaldTrump/posts/115276694936263266 ("At the request of Secretary of Homeland Security, Kristi Noem, I am directing Secretary of War, Pete Hegseth, to provide all necessary Troops to protect War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists. I am also authorizing Full Force,

if necessary..."); Albies Dec, ¶¶ 2-4, Exs. Albies A, B, C (FPS Deputy Regional Director R. C. discussing what he believed to be an inappropriate use of force and that did not result in leave for the officer).

Finally, Defendants' ongoing pattern of conduct shows no sign of stopping. They do not claim that they are leaving Portland or stopping their immigration raids. As long as this continues, Plaintiffs intend to keep protesting and documenting. Dickinson Dec. at ¶48; Lake Dec. at 31.

## VII.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT RETALIATION CLAIM

Preliminary injunctions based on the First Amendment are appropriate when law enforcement actions "chill[] the willingness of people to exercise their First Amendment rights." *Allee v. Medrano*, 416 U.S. 802, 810 (1974). To obtain a preliminary injunction, Plaintiffs need only "mak[e] a colorable claim that [their] First Amendment rights have been infringed or are threatened with infringement." *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014). After that, the Government bears the burden of justifying the restriction on Plaintiffs' speech. *Id*.

The First Amendment prohibits government, including Defendants, from retaliating against people for their speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Indeed, a policy of retaliation for the exercise of constitutional rights "is a particularly troubling and potent form" of First Amendment violation. *Lozman v. City of Riviera Beach, Fla*., 585 U.S. 87, 100 (2018). To prevail on a First Amendment retaliation claim, Plaintiffs must show: (1) that they engaged in a constitutionally protected activity; (2) that the officers' actions would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the protected activity was a substantial or motivating factor in the officers' conduct. *Mendocino Envtl. Ctr. v. Mendocino Cty*., 192 F.3d 1283, 1300 01 (9th Cir. 1999); *Index Newspapers,* 977 F.3d 817 (9th Cir. 2020); *Sanderlin v. Dwyer,* 116 F.4th 905 (9th Cir. 2024) (permitting a First Amendment claim to proceed against an officer who shot a protester with a projectile). Substantial or motivating factor does not mean the *sole* factor.

Once a plaintiff can show the three elements above, the burden shifts to defendants to show that notwithstanding the plaintiff's speech, defendants would have done the same thing. *Mt. Healthy City School Dist. Bd. Of Education v. Doyle*, 429 U.S. 274, 287 (1977). The likelihood of such a contention being determinative in this case can be easily dismissed given the ample evidence of Defendants treating the same conduct differently depending on the viewpoint of the protesters. Protesters with favored viewpoints have been allowed to mull about the plaza, stand in the driveway, and even enter inside the building. *See e.g.,* Yonally Dec. at ¶ 32 ("I have watched DHS officers allow rightwing protesters cross the blue line, even on occasions when there are DHS or ICE vehicles entering and exiting the building.").  In other words, favored protesters have been permitted to trespass without a citation or arrest, let alone being shot at.

A.    **Plaintiffs and putative class members have engaged in constitutionally protected activity.**

Plaintiffs Jack Dickinson, Laurie Eckman, and Richard Eckman, along with several other putative class members supporting this motion were all engaged in nonviolent protest. At most, as described in the MLK Day events above, some individuals engaged in passive resistance that rose only to the level of a non-criminal trespass violation or non-criminal violation for refusing to obey an order to move.

The First Amendment, without question, protects political protests in public forums like public sidewalks. *See, e.g., Index Newspapers LLC et al v. United States Marshals Service et al.*, 977 F.3d 817, 830 (9th Cir. 2020) ("Public demonstrations and protests are clearly protected by the First Amendment"); *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996) ("Activities such as demonstrations, protest marches, and picketing are clearly protected by the First Amendment."). Speech critical of public officials is "high in the hierarchy of First Amendment values." *Lozman v. Riviera* Beach, 585 U.S. 87, 101 (2018) (citing *Connick v. Meyers,* 461 U.S. 138, 145 (1983)). The First Amendment also "protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 461 (1987)

(explaining that yelling obscenities and threats at a police officer is still protected under the First Amendment). Angry and inflammatory speech is likewise protected. *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949); *accord Collins*, 110 F. 3d at 1372 (explaining that when the government acts in highly controversial ways such passionate protests are likely to be inflamed). Moreover, "there is a strong First Amendment interest in protecting the right of citizens to gather in traditional public forum locations that are critical to the content of their message, just as there is a strong interest in protecting speakers seeking to reach a particular audience." *Galvin v. Hay*, 374 F.3d 739, 752 (9th Cir. 2004).

That some protesters, like those who sat on the driveway on MLK Day, may engage in non-criminal trespass violations or non-criminal rule violations by refusing to obey orders does not insulate all of Defendants' actions from First Amendment liability. *See, e.g., Lozman*, 585 U.S. at 96-99 (holding that conceded probable cause did not prevent plaintiff's First Amendment retaliatory arrest claim and recognizing "a risk that some police officers may exploit the arrest power as a means of suppressing speech"); *accord Nieves v. Bartlett*, 587 U.S. 391, 406 (2019)("Although probable cause should generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so."). On the facts of this case, not only is there a risk that police will use their arrest power to suppress speech, but there is strong evidence that they are using their broad discretion to do just that with respect to only disfavored speech.

### B. Defendant DHS's use of munitions/weapons have predictably chilled protesters of ordinary firmness.

The "ordinary firmness" test is an objective one. *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) ("it would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity").

Defendants' excessive and targeted violence has chilled some protesters and journalists from returning to the ICE Building at all. L. Eckman Dec. at ¶ 34 ("I no longer feel safe attending protests where federal agents may be present because I fear the same thing could happen to me again. If I thought I would be safe, I would protest at the ICE building again."); R. Eckman Dec. at ¶ 28 (same); Shepherd Dec. ¶ 36 ("I still feel I am at serious risk of being detained or harmed again simply for expressing my views"); *and see* Dickinson Dec. at ¶ 44 ("I was not able to stay [on January 25, 2026] for very long due to the extent of the gassing."). Others continue to attend (or consider attending) protests, but with significant fear and wearing personal protective equipment. Dickinson Dec. at ¶ 47 ("I am preparing for a situation where I am seriously injured or possibly killed..."); Thomas Dec. at ¶ 9; Smith Dec. at ¶ 14; Lake Dec. at ¶ 31 ("I am questioning my need to be at the ICE building on the front lines because of the risk to my physical safety."); Rios Dec. at ¶¶ 11-12 ("I am hesitant [to continue covering protests at the Portland ICE Building] due to my fear that I will be targeted by Defendants again"); Lucero Dec. ¶¶ 30, 35 (describing wearing a mask for protection and preparing for serious injury); Yonally Dec. ¶ 33 (describing personal protective gear to include gas mask, face shield, boots, long pants, and a big jacket to protect skin) Miller Dec. ¶¶ 48, 50 ("I am afraid they have been or will be authorized to use increased force and that it will come out of nowhere."); Ekberg Dec. at ¶ 12 ("I have also significantly reduced my participation in protests due to fear of being unjustly exposed to tear gas again or being detained.").

The resulting fear after experiencing law enforcement violence even persists beyond the Portland ICE Building, including ongoing concerns about one's physical health in all aspects of life and concerns about encountering DHS officers out in other parts of the community. *See, e.g.,* L. Eckman Dec. ¶¶ 32, 34-35 (persistent pneumonia-like symptoms for over three months and apprehension walking in her neighborhood); Eckberg Dec. ¶ 9 (diagnosed with restrictive airway disease and prescribed inhalers); Thomas Dec. ¶¶ 8-10, 15 (describing severe breathing problems and fear of encountering ICE in home community). In Mr. Miller's case, his fears were

realized when ICE forced him into their vehicle at gunpoint and dropped him off on the side of the road. Miller Dec. ¶¶ 45-46.

C.    **There is ample evidence that a substantial or motivating factor for Defendant DHS's violence against Plaintiffs and putative class members was their protected activity**

Evidence of causation or motivation can but need not be direct; circumstantial evidence can suffice. *See Ulrich v. City and County of San Francisco*, 308 F.3d 968, 979 (9th Cir. 2002)("As with proof of motive in other contexts, this element of a First Amendment retaliation suit may be met with either direct or circumstantial evidence."). Evidence of misuse of crowd control munitions is an especially potent form of circumstantial evidence. *See*, *Index Newspapers*, Case No. 3:20-cv-01035, Dkt. 157 (D. Or. 8/20/2020), *aff'd by Index Newspapers*, 977 F.3d at 828-29.

Some protesters and press have also described being directly targeted with force in the head and other areas of the body without warning and despite posing no threat nor creating a driveway obstruction. *See, e.g.,* L. Eckman Dec. ¶¶ 18, 33 (84-year-old woman shot in the head without warning after holding a sign and standing away from the driveway); Dickinson Dec. ¶ 9 (struck with munition in the face respirator); Yonally Dec. ¶ 17 (describing pepper balls being fired at protesters who posed no threat and had complied with an instruction to clear the driveway).

Some protesters and press describe being targeted in a variety of ways, including being shot while standing apart from others or being attacked after engaging with officers in some manner. *See, e.g.,* Rios Dec. ¶¶ 8-9 (tear gassed and shot approximately 20 times while standing alone across the street from the building); R. Eckman Dec. ¶ 17 (feeling targeting when a munition hit his walker given the obvious Navy attire he was wearing); Lake Dec. ¶ 22 (describing feeling the heat of a laser from a DHS officer's gun in an act of targeting and intimidation); Lake Dec. ¶¶ 32-33 (describing press having gas thrown at their feet and describing recent events as "much more vindictive than [2020]"); Thomas Dec. ¶ 17 (describing

officers' comments and gestures as "intended to taunt or demean" and to mock protesters);

Miller Dec. ¶ 16 (describing observing DHS use tear gas after people yelled, "Fuck you ICE, go

home..."). In *Index Newspapers*, the court found this type of evidence to be "exceptionally strong

evidentiary support" for retaliatory intent. 977 F.3d at 829. And on MLK Day, DHS officers

opted to just shoot many of the seated protesters' memorial signs and not arrest them at all; it is

hard to imagine clearer evidence of one's expression being the reason for becoming the target of

DHS violence. *See, e.g., Index Newspapers*, 977 F.3d at 827 (describing federal officers shooting

a photojournalist in the word "PRESS" as evidence of retaliatory motive).

Multiple protesters describe DHS officers misusing munitions and shooting into

nonviolent crowds from dangerous angles like the roof. *See, e.g.,* Dickinson Dec. at ¶¶ 9-10, 17;

Lucero Dec. ¶ 32; Eckberg Dec. ¶ 3; Shepherd Dec. ¶ 17. It is hard to imagine DHS's pattern of

misuse of weapons as anything other than an attempt to punish the crowd for their expression.

*See, e.g.,* Kerlikowske ¶ 35 (explaining that federal officers are trained how to shoot, tend to hit

their targets, and describing Ms. Eckman's shot to the head as retaliation); *accord* Lake Dec. ¶

33 (comparing DHS violence in 2020 to now and describing current DHS behavior as "more

vindictive" and giving "the impression that they do so to hurt people, scare people...and keep

them from exercising their rights"). In just the last several days, there have been repeated

instances of indiscriminate tear gas use and firing tear gas into crowds. Dickinson Dec. ¶ 36;

Shepherd Dec. ¶ 33. Defendants' misuse of tear gas violates DHS's own policies. Kerlikowske

Dec. ¶ 70.

The pattern Plaintiffs have illuminated stands in stark contrast to a case like *Puente v.

City of Phoenix*, 123 F.4th 1035 (9th Cir. 2024). *Puente* involved a single protest event, as

opposed to a systematic and sustained pattern of escalating violence over a period of months. In

contrast, *Index Newspapers* rested on evidence of 45 instances of unwarned and significant uses

of force over the course of two weeks. 977 F.3d at 827-28 (referring to the record established by

plaintiffs as a "strong showing" of likelihood of success and providing "robust support" for the

district court's conclusion of the same).  Here, Plaintiffs submit over 20 declarations

documenting a myriad of uses of force over the span of seven months, the majority of which have happened since October 2025. Plaintiff Jack Dickinson estimates he has observed over 40 different days of significant uses of force, many of which included use of tear gas. Dickinson Dec. ¶ 19.  On January 19, 2026, in the span of about 7 minutes, DHS officers fired over 100 pepper balls targeting only an estimated twenty protesters who sat peacefully on the driveway's edges.  Foster Dec., Ex. A. The DHS uses of force that declarants describe likely constitute thousands of spent munitions for relatively small average protest crowds. Furthermore, Plaintiffs submit an expert declaration from Gil Kerlikowse concluding, as he did in *Index Newspapers*, that "[t]here appears to be a pervasive patter of misuse of force by DHS against, journalists, legal observers, and protesters who have been present at or around the ICE Building in Portland." Kerlikowske Dec. at ¶ 68.

In *Puente,* officers also attempted to use verbal commands, engage protesters in dialogue, and permit the protest to continue as long as it could. That is a very different approach than what we are seeing from Defendants at the Portland ICE Building. At the Portland ICE Building, DHS officers have repeatedly come out without warning and unleashed large volumes of munitions almost immediately, rather than attempting to de-escalate. *See, e.g.,* Kerlikowske Dec. at ¶¶ 35, 42, 62

Even without having had discovery yet, Defendants' own public statements provide direct evidence of their intent to retaliate and punish political opponents. Retaliation against political opponents is such a frequently exercised tactic of this administration and Defendants' that the direct evidence abounds. *See, e.g.,* First Amended Complaint, ¶¶ 19-43. Plaintiffs have also produced evidence that persons present on closed federal property with viewpoints supportive of Defendants do not get shot at, nor do they even get arrested or cited. *See e.g.,* Lucero Dec. at ¶ 27 ("Every protest I went to in October, the Federal Agents showed more favorable treatment towards pro-ICE demonstrators..."); Miller Dec. at ¶ 12 ("There was a significant amount of smoke and tear gas  used by federal agents against anti-ICE demonstrators,

but they did not use any weapons or force on the pro-ICE demonstrators."). This differential in treatment is also strong evidence of Plaintiffs' expression being the cause of their targeting.

In sum, the sheer number of incidents documented in the declarations submitted with Plaintiffs' motion provides strong evidence of Defendants' motivation to punish Plaintiffs and putative class members in retaliation for their expression. *See, e.g., Index Newspapers*, 977 F.3d at 829 (volume of evidence provided "exceptionally strong evidentiary support" for finding of retaliatory intent). Plaintiffs have produced a significant amount of both direct and circumstantial evidence that their expression and the expression of putative class members was a substantial or motivating factor in Defendants' violent responses.

> ### D. Moreover, the evidence above strongly suggests that Defendants have a policy of retaliation against protesters who disagree with them.

A policy or custom of retaliation "may be inferred [from] 'widespread practices of evidence of repeated constitutional violations' and the absence of evidence that [] officers were discharged or reprimanded" for retaliatory actions. *Menotti v. City of Seattle*, 409 F.3d 1113, 1148 (9th Cir. 2005). Rather than reprimanding DHS violence against protesters, senior officials have publicly condoned it. Where there are clear instances of excessive force—as  with a use of force incident recorded by ICE's own cameras and deemed "inappropriate" and "not reasonable" by FPS Deputy Regional Director—involved agents were not put on leave, and do not appear to have been held accountable, allowing them and others to continue using excessive force without correction. Albies Dec, ¶¶ 2-4, Exs. Albies A, B, C at pp. 303-305.

## VIII.    PLAINTIFFS AND PUTATIVE CLASS MEMBERS WILL CONTINUE TO SUFFER IRREPARABLE HARM ABSENT COURT INTERVENTION.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). In the Ninth Circuit, "a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th

Cir.2005) (quoting *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 973- 74 (9th Cir. 2002)).  Because constitutional violations can often not be adequately remedied through damages, the Ninth Circuit does "not require a strong showing of irreparable harm for constitutional injuries."  *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019).

To justify preliminary injunctive relief, "a plaintiff must demonstrate immediate threatened injury." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (simplified). The Ninth Circuit instructs that, when "predicting the likelihood of future violations," courts should consider, in addition to "the commission of past illegal conduct":

> the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the extent to which the defendant's professional and personal characteristics might enable or tempt him to commit future violations; and the sincerity of any assurances against future violations.

*Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1263 n.5 (9th Cir. 1989).

Considering the factors above, it is easy to find that repeated shooting of nonviolent protesters at the Portland ICE Building will likely keep recurring against Plaintiff Dickinson and other putative class members. As is evidenced by repeated events in Portland and punctuated against the backdrop of nationwide events, we know Defendants' violence is in no way isolated. Likewise, statements of DHS officials and senior federal executives show that the characteristics and culture of the agency and its employees is to celebrate and prioritize violent responses over fair and diplomatic ones. Finally, Defendants have offered no assurances that the conduct will cease or change.

While it may be true that the fully chilled protesters, like the Eckmans, are unlikely to be imminently shot, their ability to establish a likelihood of irreparable injury is no less available. Their legal injury – a complete loss of the First Amendment freedom to protest at the Portland ICE Building – recurs daily. *See Sanders Cty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 748 (9th Cir. 2012) (where "First Amendment rights [are] being chilled daily, the need for immediate injunctive relief without further delay is, in fact, a direct corollary of the matter's great importance"); *Libertarian Party of L.A. Cty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013) ("[A]s

the Supreme Court has recognized, a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury.").

## IX.    THE CONSTITUTIONAL MAGNITUDE OF PLAINTIFFS' INJURIES TIPS THE BALANCE OF EQUITIES AND PUBLIC INTEREST SHARPLY IN PLAINTIFFS FAVOR

"It is always in the public interest to prevent the violation of a party's constitutional rights." *Index Newspapers*, 977 F.3d at 838 (citation omitted).  This must be most assuredly true when the threat of future constitutional violations could be any manner of person, including a vulnerable person, who spontaneously decides to join a protest at the Portland ICE Building and risks Defendants shooting them in the head.  *See, e.g.,* L. Eckman Decl., *supra.*

On the other hand, Plaintiffs are hard-pressed- to conceive of burdens it would place on Defendants to be restrained from shooting nonviolent protesters.  The relief Plaintiffs seek would still permit the arrest and/or citation of anyone who trespasses or refuses to obey lawful commands of federal officers, and still permits some uses of force in the face of real and imminent harm to law enforcement or others. Kerlikowske Dec. at ¶¶ 4, 69-75.

The public interest in protecting First Amendment rights cannot be overemphasized here. "Freedom of speech, including through political protest, is "one of the chief distinctions that sets us apart from totalitarian regimes." *Terminiello v. City of Chicago,* 337 U.S. 1, 4 (1949) (cleaned up). As the Ninth Circuit has recognized, "robust political discourse within a traditional public forum is the lifeblood of a democracy." *Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression & Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 797 (9th Cir. 2008); *see also Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1021 (9th Cir. 2009) ("Political speech is . . . critical to the functioning of our democratic system."). The government's power to restrict speech in public forums is "very limited." *United States v. Grace*, 461 U.S. 171, 177 (1983).  Protest particularly serves this core democratic

function "when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello*, 337 U.S. at 4. Indeed the First Amendment tolerates societal "trouble" caused by protest because "our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 508-09 (1969) (cleaned up).

Federal courts, including this one, have repeatedly understood that Defendants' policing escalations threaten to undermine the foundations of our democracy. Courts recognize that the administration, while targeting cities and states where citizens do not support its policies, has based its actions on hyperbole not supported by facts or law. *See Gavin Newsone, et al. v. Donald J. Trump et al.,* 25-cv-04870-CRB (Northern Dist., California, Dec. 10, 2025) ("The Founders designed our government to be a system of checks and balances. Defendants, however, make clear that the only check they want is a blank one." (fn omitted))." *See also Oregon v. Trump*, 3:25-cv-1756-IM (District of Oregon, October 5,2025 (second Portland TRO)), "even giving great deference to the President's determination," no lawful basis existed to support federalizing the National Guard, Findings of Fact and Conclusion of Law, (Dkt. 146 at 2); and *Illinois v. Trump,* 155 F.4th 929, 933 (7th Cir., Oct. 16, 2025) ("[T]the facts do not justify the President's actions in Illinois. . . ."  (The Supreme Court of the United States denied the administration's motion to stay the order of the District Court, *Trump v. Illinois, No. 25A443, 2025 WL 3715211 (U.S. Dec. 23, 2025).*

Federal courts serve as the guardians of First Amendment freedoms. Defendants' hostility toward people in this country exercising their First Amendment rights is palpable. Unless enjoined, heavy-handed- suppression of rights will continue, as shown by actions as recent as the DHS posting of January 13, 2026, egging on agents committing abuses with

boisterous (and legally questionable) statements about their immunity.  We seek this restraining

order on behalf of Plaintiffs and putative class members of protesters engaged in nonviolent

protest, including passive resistance, at the Portland ICE Building.

## X.    THE SCOPE OF RELIEF IS APPROPRIATE

Not only is Plaintiffs' requested relief within the court's equitable powers, it is safe and

workable as well. (Kerlikowske Decl. ¶¶ 68-74.) In fact, this court entered a much more detailed

order in *Index Newspapers* that proved workable and safe for Defendant DHS to operate under

for months, and for the City of Portland to operate under for years before incorporating the terms

into its police policies. Moreover, unlike the injunction in *Index Newspapers*, the requested relief

here is rooted in Defendants' policies, which they train on and are supposed to follow anyway.

A District Court has "considerable discretion in ordering an appropriate equitable

remedy." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1245 (9th Cir. 2018).

"Crafting a preliminary injunction is 'an exercise of discretion and judgment, often dependent as

much on the equities of a given case as the substance of the legal issues it presents.'" *California

v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018) (quoting *Trump v. Int'l Refugee Assistance Project*,

582 U.S. 571, 579 (2017)).

The requested relief appropriately applies to nonviolent protesters who are not named

plaintiffs within the limited area subject to the injunction. The U.S. Supreme Court recently

affirmed that "courts may issue temporary relief to a putative class" and "reject[ed] the

proposition that a class-action defendant may defeat class treatment, if it is otherwise proper, by

promising as a matter of grace to treat named plaintiffs differently." *A.A.R.P.*, 605 U.S. at 98; cf

*CASA, Inc.*, 606 U. S. 831 (concluding that courts lack authority to issue "universal

injunctions"). Doing so is appropriate here for at least three reasons. First, the complaint seeks

relief on behalf of a class of persons only engaged in protected First Amendment activity, so it

falls squarely within A.A.R.P. Second, this case presents a clear case for class certification

because it is confined to a narrow area where the same pattern of conduct is recurring with the

same commanders and same officers. Third, the nature of the conduct (indiscriminate violence against crowds) and the nature of the injury here (First Amendment chilling) can only effectively be addressed by the relief Plaintiffs seek.

In the *L.A. Press Club* case, in a brief order, the Ninth Circuit partially stayed a similar injunction as to persons who were not named plaintiffs. That case is different because the injunction before the court was based on a complaint that lacked class allegations. Here, as *A.A.R.P.* instructs, putative class members are named in the complaint also can enjoy relief. Defendants may also point to a per curiam order from the Eighth Circuit staying injunctive relief in Minnesota in *Tincher v. Noem*, No. 26-1105. That case, however, applied to the entire state of Minnesota and was thus, in the Eighth Circuit's view, "a universal injunction by another name." In contrast, Plaintiffs here seek an injunction that would only apply to a single site, and therefore only a single enforcement action at a single point in time. This is the same type of relief allowed in *A.A.R.P.*, which the United States Supreme Court decided just a month before *CASA*.

The relief is safe and workable for Defendants at the Portland ICE Building. As Mr. Kerlikowske explains:

> Most of the events that I have seen have been small and peaceful protests in which anyone who endangers law enforcement could be easily identified and arrested. However, I have policed, supervised operations for, and been involved in developing strategies for, massive, chaotic and much more violent protests. At these types of events, individuals sometimes may commit crimes. If the protests at the Portland ICE Building somehow grew to that size, there is nothing in the proposed injunction that would prevent LEOs from arresting and charging such an individual. It is quite common in some larger protests for violators to commit a criminal act and then use the anonymity of the crowd to blend back in, but those are just the general nature of some protests.

Kerlikowske Decl. ¶ 71.

The requested relief provides ample flexibility to law enforcement to respond to legitimate threats to federal personnel or property, while also ensuring First Amendment activity can take place without infringement. As Mr. Kerlikowske explains, if DHS needs to clear a path

for vehicular traffic or wants to clear the driveway to the ICE Building, which has been a focal point in several protests, the appropriate method is to ask people to clear the way for the car with clear instructions as to where to go and that failure to move or passive resistance may result in arrest. *Id.* at ¶ 24. Likewise, using force on passive protesters, as DHS did on MLK Day and on many other occasions, is excessive and does not achieve any legitimate police purpose. Nothing in the TRO prevents law enforcement from responding to legitimate threats. If an individual throws an object, the proper approach is to identify that individual and target a response specific to that person, not indiscriminately fire into crowds, as Defendants have been doing. *Id.* at ¶ 18.

Finally, the requested relief is consistent with DHS's own policies. For example, DHS's use of force policy only permits use of teargas in response to active resistance. *Id.* at ¶ 23. Under *Nelson* and DHS policy, non-trivial amounts of force cannot be used on people who are passively resisting. *Id.* at ¶ 47.

## CONCLUSION

For the reasons stated above, Plaintiffs urge this court to enter an order limited to Defendant DHS's conduct at or around the Portland ICE Building that:

a. Prohibits DHS from directing or using chemical or projectile munitions—including but not limited to KIPs, pepper ball or paintball guns, pepper or oleoresin capsicum spray, tear gas or other chemical irritants, soft nose rounds, 40 or 37mm launchers, less lethal shotguns, and flashbang, Stinger, or rubber ball grenades—unless the target poses there an imminent threat of physical harm to law enforcement or others present;

b. Prohibits Defendant DHS from firing munitions or using weapons (including those described above) at the head, neck or torso of any person, unless the officer would be legally justified in using deadly force against that person;

c. Targeting an individual with a less lethal munition if doing so would endanger individuals who do not pose an imminent threat to law enforcement or others. For purposes of illustration, DHS may not use chemical or projectile munitions in response to trespassing, refusal to move, or refusal to obey a dispersal order; and

d.      Nothing in this Order prevents DHS from making an arrest if they have probable cause to believe that a crime has been committed.

e.      Nothing in this Order prevents DHS from using proportional force, including less lethal weapons, on individuals who pose an imminent threat of physical harm.


DATED:  January 27, 2026.

ACLU FOUNDATION OF OREGON

By:      *s/ Kelly Simon*
         Kelly Simon, OSB No. 154213
           Email: ksimon@aclu--or.org
         Eri Andriola, OSB No. 246500
           Email: eandriola@aclu--or.org


ALBIES & STARK LLC
J. ASHLEE Albies, OSB NO. 051846
  email: ashlee@albiesstark.com

PEOPLE'S LAW PROJECT
Jane L Moisan, OSB NO. 181864
  Email: Jane@Pdxplp.Com

TONKON TORP LLP
Alexander M.  Tinker, OSB No. 144939
  Direct:  503.802.5734
  Email:  alex.tinker@tonkon.com
Daniel H. Skerritt, OSB No. 681519
  Direct:  503.802.2024
  Email:  daniel.skerritt@tonkon.com
Maureen S. Bayer, OSB No. 214905
  Direct:  503.802.2115
  Email:  maureen.bayer@tonkon.com
Olivia Ashé, OSB No. 225796
  Direct:  503.802.2081
  Email:  olivia.ashe@tonkon.com

*Counsel for Plaintiffs*