**Kelly Simon**, OSB No. 154213
ksimon@aclu-or.org
**Eri Andriola**, OSB No. 246500
eandriola@aclu-or.org
ACLU FOUNDATION OF OREGON
PO Box 40585
Portland, OR 97240

**J. Ashlee Albies**, OSB No. 051846
ashlee@albiesstark.com
ALBIES & STARK LLC
1500 SW First Ave., Ste. 1000
Portland OR 97201
Facsimile: 503.427.9292

**Jane L Moisan**, OSB No. 181864
jane@pdxplp.com
PEOPLE'S LAW PROJECT
1500 SW First Ave., Ste. 1000
Portland OR 97201
Facsimile: 503.558.2025

**Alexander M. Tinker**, OSB No. 144939
alex.tinker@tonkon.com
**Daniel H. Skerritt**, OSB No. 681519
daniel.skerritt@tonkon.com
**Maureen S. Bayer**, OSB No. 214905
maureen.bayer@tonkon.com
**Olivia Ashé**, OSB No. 225796
olivia.ashe@tonkon.com
TONKON TORP LLP
1300 SW Fifth Ave., Ste. 2400
Portland, OR 97201
Facsimile:  503.274.8779

   *Counsel for Plaintiffs*

PAGE 1 – DECLARATION OF MASON LAKE

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(PORTLAND DIVISION)

| | |
|---|---|
| JACK DICKINSON (a.k.a. "the Portland Chicken"), LAURIE ECKMAN, RICHARD ECKMAN, MASON LAKE, HUGO RIOS, *on behalf of themselves and those similarly situated*<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States, *in his official capacity*; KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS), *in her official capacity*; U.S. Department of Homeland Security<br><br>Defendants. | Civil No. 3:25-cv-02170-SB<br><br>**DECLARATION OF MASON LAKE** |

I, Mason Lake, hereby declare under penalty of perjury as follows:

1. I am an Oregon resident who was born and raised, and still lives in the City of Portland. I am 37 years old and have been a freelance photographer for about 17 years and a video journalist and reporter for about 7 years. I covered the protests in Portland extensively in 2020 and was injured while documenting those protests as well, including but not limited to mace and riot control gas munitions. Based on this in-depth experience documenting protests, I am familiar with the weapons and tactics that law enforcement use to control and disperse crowds.

PAGE 2 – DECLARATION OF MASON LAKE

2.  My footage of both the 2020 protests and the 2025 protests has been aired on national news networks such as MSNBC and the international website Storyful. My footage was also featured in the film Tipping Point and licensed to several other producers. I specialize in capturing entry-level cinema quality footage using specialized equipment. I am currently working on a documentary capturing the realities of these protests.

3.  I began attending protests to capture interactions between demonstrators and DHS at the Portland ICE facility in June 2025. Each time I am documenting a protest, I wear a press vest, which has the word "Press" in large letters on the front and back. I also wear a helmet that says "Press" on the front, back, and sides, and I wear a 3"x7" press badge around my neck. I carry my professional equipment, including a white lens camera and a microphone.

4.  On the night of June 10, 2025, I was documenting a protest when DHS officers decided to clear the driveway of the ICE building by force, including by using tear gas against protesters who were standing on the public sidewalk. I do not recall DHS issuing any warning about using the Bearcat vehicle. The facility deployed a Bearcat armored personnel vehicle that night, which drove out of the driveway and parked in the middle of the street facing the protesters. As far as I could see, none of the protesters was doing anything that created any type of threat to law enforcement. While this was happening, I stood on the corner of Bancroft Street and Moody Avenue, by the stop sign, away from where DHS agents were confronting people in the street, to document DHS's actions. I was not in the way of anyone. I did not stand in the driveway of the ICE building and was not on federal property.

5.  As I was filming, a bus drove by, temporarily blocking my line of sight. Suddenly, DHS officers began indiscriminately deploying tear gas beyond the driveway. I identified these DHS officers by the badges on their arms, which showed they were from the Texas ICE field office.

6.  I could smell and taste the CS tear gas. It made my eyes water and affected my breathing. I had a mask on, but it was slightly askew, so I was still exposed to the gas. I

PAGE 3 – DECLARATION OF MASON LAKE

witnessed and filmed the DHS officers using tear gas on an elderly man in a wheelchair wearing a veteran hat. They fired one cannister directly at the veteran, and another closer to my direction.

7.  On the night of June 13, 2025, I attended a protest in front of the ICE building to document the protest and DHS's actions. I wore my press vest, badge, and helmet. I filmed using professional equipment including my white lens camera.

8.  I filmed the roof of the ICE building, where DHS officers were setting up bright flood lights. As I was filming, one of the DHS officers pointed directly at me with his finger. I also observed an officer direct another officer to aim one of the bright flood lights at members of the press who were standing near the tree, effectively blinding myself and other journalists and making it more difficult for us to document what was going on.

9.  During the course of the night, some protesters stood in the driveway. From my observation, they did not appear to pose any threat to DHS officers. I observed some protesters attending the protest with makeshift shields. They looked to be made out of Rubbermaid lids with rope around them. Throughout the night, I witnessed DHS aim directly at the shields and shoot them with less lethal munitions. It looked like they were using the shields as target practice. I documented DHS officers shooting a protester who was reading a Native poem in the driveway of the ICE building with pepper rounds.

10. I walked around the side of the ICE building with several other journalists to observe and document DHS's operations. We were near the train tracks and the tree; I do not believe that I was on federal property at any time. The entire time we were walking, we were illuminated by the bright flood lights I had seen CBP officers putting up on the roof earlier that night, and my press vest and helmet were clearly visible.

PAGE 4 – DECLARATION OF MASON LAKE



11.     Suddenly, I heard something whizzing through the tree branches near us, and my camera began picking up projectiles. I realized that DHS officers were firing at me and the other journalists I was with. DHS officers struck my arm, my camera, microphone, and monopod with less lethal munitions. I did not hear officers issue any kind of warning or say anything to us before they began shooting at us. I believe they were shooting pepper balls. I saw my arm, monopod, and lens were covered in pepper powder after the less lethal projectiles struck me. I had to decontaminate all my equipment and clothing afterwards. I had bruising because of the hit.

12.     On July 4, 2025, I documented another protest outside of the ICE building. As always, I wore my press vest, helmet, badge, and other protective gear. During this time, I was standing to the right of the driveway, just east of the driveway, between the lamppost and the stop sign. I tend to say at least 9 or 12 feet to the side of the driveway. I usually stand several feet away from protesters too.

PAGE 5 – DECLARATION OF MASON LAKE

13. There were between a few dozen to 50 protesters present that night. I witnessed and filmed the local Portland Bike Ride, as well as a photo installation made and hung on the fence across from the facility by a community member. I also witnessed and filmed what appeared to be a sniper on the rooftop of the ICE facility

14. At one point, I documented DHS shoot a cannister into the impound lot across from the ICE building, and the cannister caught fire. It was unclear to me why DHS shot the cannister. The protesters present did not do anything to threaten DHS before they shot the cannister toward them. Protesters came together and provided water bottles to help put out the fire.

15. The protest was peaceful throughout the night. I filmed people singing, chanting, and reading poetry in and around the driveway to the ICE building. Nonetheless, DHS officers made several advances throughout the night to clear the area using force. I filmed several of these pushes by DHS officers. During the first push, DHS officers on the roof shot skat shells at me. I was not doing anything to threaten law enforcement or get in their way, and as is my usual practice, I was not standing near people who were protesting.

16. Before the second push, I had been filming for ten consecutive minutes and found the protest to be completely peaceful. DHS officers in black uniforms and ICE/SRT in camouflage uniforms came out of the building to clear the peaceful crowd. Before this, DHS officers played a prerecorded warning, stating that the building was closed to the public and to members of the press. On other occasions, I have seen that DHS will play this at some point in the night, but not directly before they actually come out to clear the crowd. This warning contains no instructions or other information on how people—and specifically members of the press—should react. They did not give me as a member of the press any specific warning. They started indiscriminately deploying tear gas and shooting less lethal munitions into the crowd.

17. I was affected by the teargas that was fired indiscriminately into the crowd. For the next four days, the top of my lungs were more sensitive because of the prolonged exposure to the tear gas.

18. I was standing to the right of the driveway and documenting DHS officers clearing the assembled people. I was distanced from any protester and about 30 feet away from the officers, next to the stop sign on the corner. As DHS officers used tear gas and less lethal munitions on the crowd, I was shot in the groin area. I believe I was shot by someone in a camouflage uniform, who was likely from ICE or CBP/SRT. Previous experiences with law enforcement using force at protests has taught me to wear protective gear in these situations. I was wearing protective gear on this night, and it was the only thing that saved me from more serious injury as a result of being shot by DHS. Even with this protective gear, I experienced bruising as a result. I left close to midnight because I was experiencing so many effects from the tear gas. I otherwise would have stayed to keep doing my job.

19. I attended yet another protest to document interactions between protesters and DHS on the night of September 13, 2025. I once again wore my press vest, badge, and helmet and carried my professional equipment with me.

20. At one point in the night, I was standing off to the left side of the driveway to the ICE building, on the public sidewalk. There were protesters standing around me, some of whom were verbally engaging with the DHS officers on the roof above us. The DHS officers were shining a bright light directly into our faces. Then, I observed a DHS officer take out what appeared to be their personal cell phone. I know that the government-issued phones are shaped differently than normal cell phones, so I knew that this was not their work phone. My understanding is that DHS officers are not supposed to use their personal cell phones while on duty. They pointed the phone at us like they were taking photos or recording us.

21. I was wearing a headlamp in addition to the rest of my gear. I briefly flashed my headlamp at the DHS officers. I did this to try to signal the officer to put their phone away. I was

PAGE 7 – DECLARATION OF MASON LAKE

also trying to convey that the officers should not be shining a bright light in our faces. I did not move towards or motion at the officer in any way.

22. In response to this, the other DHS officer pulled out a long barrel rifle with a scope, silencer, and laser attached. He aimed the laser directly at my head. I could feel the heat of the laser on my face. Other people around me saw and pointed at the laser. I felt that this was an act of targeting, and that they were trying to intimidate me against calling them out on their inappropriate behavior. Despite this intimidation tactic, I stayed at the protest and continued documenting.

23. Later that night, I was in the process of documenting the protest. I was standing near the stop sign across the street from the ICE building, at the corner of Bancroft Street and Moody Avenue, but moved into Bancroft Street along with a group of protesters so I could better see what was going on. I was turned away covering the crowd in one direction when I became aware that an incident was unfolding between DHS officers and some of the protesters behind me. I did not see who started this, but when I moved closer to document, I saw some people start to get shoved. I saw DHS officers push two people over in front of me. I knew they were DHS because of their black uniforms.

24. In response, I yelled "Hey!" to call attention to DHS's violent behavior. At this point, I was standing approximately 10 to 15 feet away from where the people were being shoved. A DHS officer saw me and my camera. Then he aimed law enforcement-grade mace, with CS and OC added to it, directly at me and my equipment. I felt targeted. I believed this was mace because it was stronger and more concentrated than typical tear gas or pepper spray. I was struck directly in the face, and the mace also covered my camera and back-up camera. A lot of my equipment was damaged, and I will have to have my camera professionally repaired and cleaned. I have had to wear gloves when holding my camera since this incident because it was so saturated in the mace. It ruined my microphone sock, and I had to put my backup camera in rice to try to get rid of the mace.

PAGE 8 – DECLARATION OF MASON LAKE

25. Even though I had my gas mask on, the mace collected in my hair and even in my sweat, so that as soon as I took my gas mask off, my eyes swelled shut from the pain. Immediately after DHS targeted me with mace, I sought medical attention. After about 10-15 minutes, I was able to keep my eyes open long enough to air them out, get back in my car, and drive home to decontaminate. Because of the damage to my equipment, I could no longer continue documenting the protest as I otherwise would have and had to return home.

26. I had not been to document a protest at the ICE building since the incident on September 13. I have experienced burnout because of the successive injuries I have sustained and intimidation I have faced at the hands of DHS. I have had to take time off to recover both physically and emotionally from being maced and having my equipment damaged.

27. I returned to a protest at the ICE building for the first time on Saturday, January 24, 2026. I was there for approximately an hour and a half to observe and document. Most of the time, I stood on the flat sidewalk on the side of the driveway to document the protest. I did not join the crowd standing in the driveway at any time.

28. I arrived at approximately 6:30 PM, after the first gassing had occurred. I observed people doubled over, coughing, who appeared to be dealing with the effects of the gas. So many crowd control munitions had been deployed by the time I arrived that I was able to smell it from over a block away, so I was able to put on my gas mask before I arrived. Based on the side effects I was witnessing from people over a block away, I knew that at the very least CS gas had been deployed, and an additional smell in the air, plus people exhibiting more severe side effects, hinted at HC gas deployment as well.

29. I observed DHS officers exit through the gate and deploy heavy gassing both times while I was present. It was enough gas to completely obscure the driveway, such that you could not see it at all. I only heard DHS issue one vague, pre-recorded warning during the course of the time I was present, and this did not immediately precede DHS officers coming out to clear the driveway. This warning occurred at some point between the two times that I witnessed the

PAGE 9 – DECLARATION OF MASON LAKE

officers come out. I do not remember them giving any specific warning immediately before coming out and deploying less-lethal weapons, including the HC gas.

30.     I understand that DHS deployed HC gas at this protest. I recognized the smell and observed yellowish powder in the driveway that is characteristic of HC gas. Later that night, I was able to observe the HC cans to confirm this had been used.

31.     I believe it is vitally important to cover these protests and show what is actually happening at them. I plan to continue working toward this goal and making sure footage of DHS's actions at these protests is widely available. I do intend to remain active and continue to cover events. However, I am questioning my need to be at the ICE building on the front lines because of the risk to my physical safety.

32.     In my time attending and documenting these protests, I have noticed that DHS officers seem to watch me and other members of the press. I have seen them pop out when they think they are not being filmed to try to avoid being on camera. I have seen them throw tear gas cannisters at the feet of members of the press. These actions feel targeted and personal.

33.     Compared to the protests I covered in 2020, DHS's actions over the course of these protests has felt much more vindictive than law enforcement actions during 2020. When DHS officers come out of the ICE building, I get the impression that they do so to hurt people, to scare people, and to make noise that will further frighten people and keep them from exercising their rights to protest and to document.

34.     I have agreed to serve as a class representative in this case. I understand that this requires that any actions I take must be for not just myself, but for all others who are not named plaintiffs, but are in a similar situation regarding their need for protection from abusive practices by Defendants that are designed to suppress our exercise of First Amendment rights. I understand that this requires that I do not have any interests that are in conflict with the interests of other class members. I hereby confirm that I know of no such conflicts. I also confirm that I will make all decisions in a manner that fairly represents the interests of all class members, and

that I will make no decisions or take any actions as a class representative that are for my sole benefit, rather than for all class members.

      **Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.**

Signed by:

*Mason Lake*
EEC58AD0517E454...
_____
MASON LAKE

1/26/2026
_____
DATE