**Kelly Simon**, OSB No. 154213
ksimon@aclu-or.org
**Eri Andriola**, OSB No. 246500
eandriola@aclu-or.org
ACLU FOUNDATION OF OREGON
PO Box 40585
Portland, OR 97240

**J. Ashlee Albies**, OSB No. 051846
ashlee@albiesstark.com
ALBIES & STARK LLC
1500 SW First Ave., Ste. 1000
Portland OR 97201
Facsimile: 503.427.9292

**Jane L Moisan**, OSB No. 181864
jane@pdxplp.com
PEOPLE'S LAW PROJECT
1500 SW First Ave., Ste. 1000
Portland OR 97201
Facsimile: 503.558.2025

**Alexander M. Tinker**, OSB No. 144939
alex.tinker@tonkon.com
**Daniel H. Skerritt**, OSB No. 681519
daniel.skerritt@tonkon.com
**Maureen S. Bayer**, OSB No. 214905
maureen.bayer@tonkon.com
**Olivia Ashé**, OSB No. 225796
olivia.ashe@tonkon.com
TONKON TORP LLP
1300 SW Fifth Ave., Ste. 2400
Portland, OR 97201
Facsimile:  503.274.8779

Counsel for Plaintiffs

DECLARATION OF GIL KERLIKOWSKE

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(PORTLAND DIVISION)

| | |
|---|---|
| JACK DICKINSON, a.k.a. "the Portland Chicken," LAURIE ECKMAN, RICHARD ECKMAN, MASON LAKE, and HUGO RIOS, *on behalf of themselves and those similarly situated,*<br><br>      Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, President of the United States, *in his official capacity*; KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS) *in her official capacity*; U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>      Defendants. | Civil No. 3:25-cv-02170-SB<br><br>**DECLARATION OF GIL KERLIKOWSKE** |

DECLARATION OF GIL KERLIKOWSKE

I, Gil Kerlikowske, declare:

1.       I am the former Commissioner of U.S. Customs and Border Protection ("CBP"). I served as the Chief of Police in Seattle from 2000 through 2009.

2.       I received a BA and MA from the University of South Florida in Tampa. I also graduated from the Executive Institute at the Federal Bureau of Investigation Academy in Quantico, Virginia. I served in the United States Army and Military Police from 1970 through 1972, where I was awarded the Presidential Service Badge, and where I began training in crowd control, riots, and civil disturbances. I have worked in law enforcement and policy for 52 years. I also have served as the Director of the Office of National Drug Control Policy. I have also served as Deputy Director of the U.S. Department of Justice, Office of Community Oriented Policing Services. I have been an IOP Fellow at Harvard Kennedy School of Government and have taught as a distinguished visiting fellow and professor of the Practice in Criminology and Criminal Justice at Northeastern University. A true and correct copy of my curriculum vitae is attached as **Exhibit 1**.

3.       During my tenure as Chief of Police in Seattle, I led and orchestrated the policing of hundreds of large and potentially volatile protests, many of which were much larger than the protests presently occurring in Portland. I did the same thing when I was Police Commissioner in Buffalo.

4.       I have been asked to evaluate whether the force that federal authorities used against journalists, legal observers and protesters at the protests outside of the one block building located at the corner of South Bancroft Street and South Macadam Avenue ("Portland ICE Building") was reasonable, and whether the relief stated in the injunction against Department of Homeland Security ("DHS") requested by Plaintiffs is safe and workable from a law enforcement perspective. I base this declaration based on my years of experience with crowd control and excessive use of force and the witness accounts, photographs and videos of the recent protests at the Portland ICE Building. My conclusions are as follows:

DECLARATION OF GIL KERLIKOWSKE

- **Opinion No. 1**: DHS has exhibited a consistent pattern of deploying excessive force against protesters and journalists around the ICE Building, including by using force against people who are not engaged in threatening acts, misusing crowd-control munitions and teargas, and indiscriminately using force that needlessly injures people who pose no threat to law enforcement.

- **Opinion No. 2**: The requested injunction is safe for law enforcement. There is no reason to use force or less-lethal weapons other than in the ways that they are supposed to be used. Defending federal property mainly involves establishing a perimeter around the building. There is no reason to target or disperse journalists or protestors who do not pose a threat from that position. To the extent officers leave federal property, or want to clear the driveway or street nearby, the requested injunction is also safe.

- **Opinion No. 3**: The requested injunction is workable. Trained and experienced law enforcement are able to protect public safety without using excessive force, even in the heat of volatile protests, even ones that are much bigger than the ones that have occurred at the Portland ICE Building thus far. Any difficulties to federal authorities arise from lack of training and experience working in dense urban environments and lack of leadership that is experienced in urban civil disturbances/unrest.

## QUALIFICATIONS

5.      I am an expert on crowd control and use of force. In my 47 years of law enforcement, I have had substantial training and experience with crowd control and civil unrest in the context of protests, use of force in that context, and use of force generally.

6.      My formal training on crowd control began when I was with the Military Police in 1970, where I received training on response to crowd and riot control, and I continued to learn about it throughout my career in law enforcement. I also had additional training in the Army on physical security measures. I received further in-service crowd control training when I served in the St. Petersburg Police Department. As a commander, I have supervised the training of officers

DECLARATION OF GIL KERLIKOWSKE

on the equipment, the types of orders they will receive, and the formations that will be used for crowd control. I have familiarity with less-lethal technology, and I have been shown and fired the soft nose, pepperball and FN303 at the CBP Harper's Ferry training center in 2016.  I introduced less-lethal weapons to the Border Patrol and went to the facility to talk with the instructors and see the technology firsthand. I also received substantial training as a commander, which covered crowd control and use of force, including without limitation, 11 weeks of training at the FBI National Academy in Quantico, three weeks of training at the Senior Management Institute for Police in Boston, two weeks of FBI Law Enforcement Executive Training in Quantico, and three weeks at the FBI National Executive Institute in Quantico.

7.      I have had more experience with crowd control during civil disturbances than almost all law enforcement officers in the country. I served as Chief of Police in Seattle, where I oversaw over 200 protests. We probably had at least 25 protests every year I was there. In addition to my experience in Seattle, I also served as Police Commissioner in Buffalo, New York, where I also had duties and experience with crowd control. In overseeing those protests, my job was to make sure that all the officers who reported to me, from the line personnel all the way up, were properly trained to handle the protests. I also helped formulate and execute the strategic plans for how we would police each protest. These plans included how and when to use force, who, if anyone, would be given less-lethal weapons, and how to treat journalists, legal observers and protesters. This was an evolving art/science that varied by situation and built on the institutional experience that we built up.

8.      I have been tasered twice (while I was Police Chief in Seattle) and been subjected to pepper spray (while I was the commanding officer in Buffalo). I have reviewed and approved the training and policies on policing numerous demonstrations. I assigned command personnel to go to the WTO, IMF, G-8 and N. Ireland to gain knowledge from viewing how other departments handled these incidents. The commanders returned and provided the knowledge they had acquired. After a "Mardi Gras" disturbance went awry in Seattle, Austin, and Philadelphia, those agencies came to Seattle for a meeting I convened to go over how these

should be policed and lessons learned. As a president of the Police Executive Research Forum, President of the Major Cities Chiefs Association, and member of the International Association of Chiefs of Police, I have attended dozens of national and international law enforcement conferences where discussions and presentations on demonstrations and riots have been the topic.  For example, Chief Norm Stamper did a detailed presentation and analysis of what occurred in Seattle in November 1999 during the World Trade Organization demonstration. I have been on the front lines of many demonstrations in Seattle, standing in uniform with my officers and know firsthand what policing a chaotic and volatile demonstration is like.

9.      I have also had substantial training and knowledge related to use of force by law enforcement. As the head of multiple police departments and law enforcement agencies, I was responsible for how the officers working under me behaved and for supervising investigations into excessive force. I was also ultimately responsible for how they were trained. I was the Internal Affairs commander in St. Petersburg. I also received approval to form Internal Affairs (Professional Standards) for CBP, hired the Assistant Commissioner and reviewed and approved the policies for receiving and investigating complaints, including those involving the use of force. I have reviewed and assessed hundreds of use of force reports and investigations. For almost my entire career, evaluating uses of force has been one of my job duties.

10.      I provided expert opinions on DHS's use of force in *Index Newspapers LLC v. City of Portland*, 480 F.Supp.3d 1120 (D. Or. 2019), affirmed in *Index Newspapers, LLC v. U.S. Marshals Service*, 977 F.3d 817, 837 (9th Cir. 2020), *Los Angeles Press Club v. Noem*, No. 25-cv-5563 (C.D. Cal.), *Chicago Headline Club v. Noem*, No. 25-cv-12173 (N.D. Ill.), in which I have reviewed substantial videos and testimony related to DHS's use of force in policing protest activities.

## MATERIALS REVIEWED

11.      The evidence and materials I reviewed in connection with preparing this declaration are:

DECLARATION OF GIL KERLIKOWSKE

a.    All the declarations, photos and video footage that have been submitted in support of Plaintiffs' motion for a temporary restraining order.

b.    Testimony and video footage from *State of Oregon v. Trump*, 25-cv-1756 (D. Or. 2025), available at https://www.doj.state.or.us/oregon-department-of-justice/federal-oversight/public-records-reading-room/.

c.    Video of the sit-in protest on Dr. Martin Luther King Jr.'s birthday.

12.    From my work on other matters, I have also reviewed photos, videos, and testimony submitted by both sides in *Index Newspapers LLC v. City of Portland*, 480 F.Supp.3d 1120 (D. Or. 2019), affirmed in *Index Newspapers, LLC v. U.S. Marshals Service*, 977 F.3d 817, 837 (9th Cir. 2020), *Los Angeles Press Club v. Noem*, Case No. 2:25-CV-05563-HDV-E (C.D. Cal.), and *Chicago Headline Club v. Noem*, No. 25-cv-12173 (N.D. Ill.).

13.    I have read a number of articles that include video footage, which discuss DHS's policing of ICE-related protests, such as https://theintercept.com/2025/07/07/ice-raids-la-violence-video-bystanders/.

14.    I have also read a number of articles that more generally discuss DHS's policing, such as articles about the killing of Renee Good. I did not read these materials specifically for forming any opinion in this matter, but they are part of my background knowledge.

15.    These materials, witness statements and videos, are the type of information typically relied upon by experts in my area to assess whether tactics and force used by law enforcement during protests constituted unreasonable or excessive force.

## DISCUSSION AND ANALYSIS

16.    As detailed below, it is my opinion that (1) DHS has repeatedly employed unnecessary and excessive force against protesters at the ICE Building in Portland, (2) the terms of Plaintiffs' proposed injunction are safe for law enforcement, and (3) the terms of Plaintiffs' proposed injunction can be followed by trained law enforcement with leadership that is experienced in civil disturbances and unrest.

DECLARATION OF GIL KERLIKOWSKE

## I.     Opinion 1: DHS Is using Excessive and Unnecessary Force

17.     I have reviewed trial testimony, multiple declarations as well as video evidence from several different protests against ICE. My review of the materials I have seen shows that DHS appears to have engaged in widespread use of excessive and unnecessary force against protesters and other people present at the protests.

18.     DHS's stated purpose for involvement in the protests at the Portland ICE Building is that it is trying to protect federal property. Generally, in defending a property, police form a perimeter around the property. In this defensive stance, law enforcement officers (LEOs) generally do not need to use force unless they are under attack, or if someone is trying to break into the facility. At that point, the correct protocol is to issue instructions to the crowd, such as "move back," and warn them. If officers are still under attack or crowds are trying to break into the facility after being given clear instructions to move away, using teargas may be appropriate. If that does not work, or if specific individuals are hurling projectiles, it may be warranted to use less-lethal impact munitions to target specific individuals who pose a threat in order to stop them. If a specific person is doing something dangerous, such as throwing fireworks, it is not permissible to fire less-lethal projectiles into a crowd to try to stop that person because it could cause serious injury to people who are not engaged in unlawful activities. An individual who is the threat from hurling objects, or using fireworks as weapon, should be specifically identified. Any less-lethal projectile should be directed to them and not fired generally into the crowd. Even when the individual is identified it may not be possible to fire the less-lethal projectile because of that person's use of the general crowd as cover. Officers positioned on the roof of the ICE Building may act as spotters to help identify wrongdoers, but it is inappropriate for them to shoot less lethals at people from that vantage point, unless the person threatening them is far away from others, because this unnecessarily endangers people who are not posing any threat. Less-lethal munitions are capable of killing people, and they should only be targeted at specific individuals when other lesser levels of force have failed or are unavailable. It does not appear that DHS has followed these protocols and has instead is using teargas and less-lethal munitions,

DECLARATION OF GIL KERLIKOWSKE

excessively, improperly and indiscriminately in ways that are highly dangerous to everyone present.

19.    I have reviewed a substantial number of transcripts, declarations and videos that involve a diverse mix of individuals discussing experiences both to themselves and those around them. The witnesses include law enforcement, journalists and participants in the protests, and comprise a wide range of ages. The evidence I have seen also spans a range of dates, and the protests vary in size and duration. The materials I have reviewed show that DHS has continued to use excessive force against protesters, including by repeatedly failing to give warnings before deploying force, by using force that is unnecessary and by misusing crowd control weapons, such as firing pepper balls directly at people.

20.    Below is my detailed analysis of the some of the evidence that I have reviewed. Because many of the misuses of force discussed in the declarations and shown in the videos have been of the same nature, I have not provided a detailed analysis for each of the declarations that I have reviewed.

A.    **Testimony of Commander Franz Schoening**

21.    In the *State of Oregon v. Trump* case, the Commander of the Portland Police Bureau testified that federal officers had used indiscriminate force on crowds in ways that violated Oregon law and unnecessarily injured members of the Portland Police Bureau who were trying to do their jobs.

22.    For example, Commander Schoening testified that on October 4, 2025:

> [A]fter the federal officers went back inside the facility, that there was an un-deployed crowd control munition, a tear gas canister, left on the -- on the pavement. We recovered that and notified FPS that we had recovered that.
>
> And almost immediately following that, FPS – or federal officers came back out and deployed CS gas on that crowd, that largely we had seen no violent criminal conduct. It was all passive trespassing, civil disobedience-type conduct.

DECLARATION OF GIL KERLIKOWSKE

> So, I think, their use of CS gas on that crowd was startling. It
> certainly departed from what I would say was best practice or legal
> under ORS.

(Tr. at 82.)

23.    I agree with Commander Schoening's opinion that using teargas in the absence of

any violent criminal conduct is excessive force. Doing so expressly violates DHS's use of force

policy, which only permits the use of teargas in response to active resistance. Simply refusing to

disperse is, at most, trespassing, which is passive resistance and cannot justify the use of force.

24.    For example, if federal agents want to clear a path for a vehicle to enter or exit the

ICE Building, the appropriate way to do this is to audibly ask people to clear the way, explain to

them exactly where they should go and make sure that people who want to follow the direction

have the ability to safely exit the area. If people still refuse to clear a path, then officers should

explain that they will be arrested if they do not follow the instructions. If that does not work, then

officers should begin arresting people. Once people see others being arrested this often works to

clear crowds. If people resist arrest or try to prevent the arrest, this amounts to active resistance,

and it may be appropriate to use pepper spray targeted at specific individuals. Pepper spray is

much more targeted than tear gas and poses less risk to bystanders and people and businesses in

the neighborhood. As Commander Schoening also pointed out, teargassing crowds tends to anger

people and increase resistance, whereas people who have been properly warned understand that

arrest is the expected consequence of violating a lawful order.

25.    Commander Schoening also testified that later that evening, federal agents once

again used excessive force and pushed protesters far away from the ICE building without any

warning or apparent justification.

> [On] the evening of October 4[,] We saw federal officers come out
> in significant numbers, and they began to push the crowd east on
> Bancroft and then turned and pushed them north on Moody.
>
> They pushed them quite a distance up Moody, which was again a
> significant departure from the established practice that we had seen
> where we had officers on the ground observing. We had livestream

DECLARATION OF GIL KERLIKOWSKE

video of the command post. We simply weren't seeing any criminal
conduct that would explain what was going on. And then we saw
federal officers use a significant amount of crowd control
munitions, including a significant amount of tear gas.

That, again, was a little startling, just looking at the situation on the
ground.

It, again, departed from my belief of what is best practices and
what was justifiable under ORS and even under the *Graham*
standard.

(*Id*. at 83.)

26.     Pushing a crowd, without warning and without reason is excessive force. It also

exacerbates the risks to law enforcement because instead of protecting a building from a safe

position, it puts officers out in the open where they are more vulnerable. In the same way that

trained law enforcement officers do not stand in front of, or behind vehicles, needlessly leaving a

safe stronghold increases the possibility of confrontation and of having, or perceiving, the need

to use force.

27.     I also agree with Commander Schoening that using less lethal munitions and

teargas on a peaceful crowd is excessive force for many reasons, including that it is

disproportionate to any threat to law enforcement, and because, as discussed further below, less

lethal rounds should be targeted at specific wrongdoers who are posing an imminent threat to law

enforcement, not fired indiscriminately.

28.     Commander Schoening further testified that federal agents injured Portland Police

officers during the federal agents' indiscriminate attack on the crowd:

Q. Were your officers, PPB officers, impacted by the Federal
Government's use of force on October 4th?

A. Yes, they were.

Q. And how were they impacted?

A. So, again, we were deployed down there operationally to try
and be able to intervene if we saw criminal conduct. Part of that
requires being present. We had dialogue officers down there,

DECLARATION OF GIL KERLIKOWSKE

> bicycle officers, and part of the operational posture was to be close
> and present enough to de-escalate, particularly again what we're
> seeing, which was that interpersonal conflict. Also, to be prepared
> to intervene if there was criminal conduct focused at the ICE
> facility. The use of federal -- by federal officers of the crowd
> control munitions and tools down there required our officers to
> leave the area. They were actually impacted by the tear gas as well.

(*Id.* at 85.)

29.     This is also a misuse of force, and it is similar to conduct that federal agents

engaged in during their policing in Chicago, where they also exposed local law enforcement to

teargas. One basic principle of policing protests is that law enforcement agencies should

coordinate with each other so they do not work at cross purposes, such as trying to move crowds

in the opposite direction, or harm one another, as occurred here. Commander Schoening's

testimony highlights that federal agents are failing to take basic steps that are well understood by

people familiar with how to police protests, which is rendering the protests unsafe. As

Commander Schoening also testified, by forcing local law enforcement officers to leave the area,

federal agents prevented local police from using basic de-escalation techniques that could have

actually defused tensions, rather than increased them.

30.     Commander Schoening further testified that federal agents again subjected

Portland Police officers to crowd control munitions on October 18, 2025. (*Id.*) He explained that

in the process of subjecting protesters to indiscriminate force, a federal officer fired a munition

> Out of the .40 millimeter launcher, it skipped off of the driveway
> in front of the ICE facility and went up onto the roof of the ICE
> facility where there were federal officers standing, and those
> federal officers immediately started launching crowd control
> munitions into the crowd.
>
> So we didn't see any violent conduct or behavior that would have
> otherwise precipitated that use of force. It appeared to be triggered
> by the federal officer's deployment ammunition.
>
> Our officers were in close proximity and were struck by federal
> munitions.

(*Id.*)

DECLARATION OF GIL KERLIKOWSKE

31.     In addition to the issues highlighted above, these events also amount to excessive force for many reasons. First, it is excessive force to fire less lethal munitions at anyone who is not posing an immediate threat to law enforcement. Second, it is excessive to fire in the direction of your own officers, especially when doing so is not necessary to prevent the imminent threat of harm. Third, it was excessive for the officers on the roof to launch crowd control munitions into the crowd, especially in response to being shot at by their own agent.

32.     Commander Schoening offered the following testimony about the pattern of conduct by DHS that he and his officers were observing at protests:

> Q. And based on your knowledge and expertise, is the amount of force used by law enforcement officers at the ICE facility a good indication of the level of violence or unrest caused by the protests?
>
> A. No, it is not.
>
> Q. Why not?
>
> A. Because the types and amounts of force being used by federal officers is disproportionate to the level of criminal conduct or violence we're seeing down there, and that's based on my long career and experience in public order policing and what we teach as best practice.
>
> Q. And how does the current response to -- by federal law enforcement officers at the ICE facility impact the ability of PPB to enforce laws or keep the community safe?
>
> A. A couple of different ways. Again, as I mentioned earlier, when -- when federal officers are using indiscriminate force tools, including the use of CS gas, distraction devices, that sort of thing, we're not getting that information ahead of time.
>
> We don't have any way of predicting when that might happen. Again, it's not in response to violent criminal conduct that we're observing or seeing. So the decision to use those munitions is frequently unpredictable.

(*Id*. at 99.)

DECLARATION OF GIL KERLIKOWSKE

33.     Commander Schoening has experience with policing protests, including the much larger and more volatile ones in 2020, with which I am familiar. I agree with his conclusion that federal agents are exhibiting a pattern of excessive force. Commander Schoening's testimony is consistent with the video evidence and testimony by other declarants and testimony of other leadership within the Portland Police Bureau. It is telling that law enforcement officers who were present have testified under oath that (i) federal agents are repeatedly using indiscriminate force on crowds, (ii) federal agents are escalating conflicts and (iii) federal agents are interfering with local police who are trying to use established crowd management and crowd control techniques, such as de-escalation, which are also required under the DHS use-of-force policy. This testimony is also consistent with my opinion, detailed further below, that local law enforcement is far better equipped to properly handle protests than the federal agents who have been doing so in Portland.

**B.      Laurie Eckman**

34.     Plaintiff Laurie Eckman is an 84-year-old woman. She attended a protest on October 4, 2025. Consistent with Commander Schoening's testimony, she testified that the protest was peaceful and that federal agents emerged from the ICE building and began discharging chemical weapons at the crowd and firing munitions at the crowd without providing any warnings or directions. Shortly after the agents emerged from the building, a federal agent shot her in the head with what appears to have been a pepperball. Ms. Eckman suffered a head wound and respiratory injuries from which she apparently still has not recovered.

35.     Under these circumstances, shooting Ms. Eckman was more likely than not excessive use of force for several separate and independent reasons.

-   First, Ms. Eckman was not doing anything to threaten law enforcement or others. The rule that all officers must follow, and CBP's use of force policy in specific, provides that LEOs may not deploy force, and less lethals in particular, unless it is necessary to stop an imminent threat of harm.

-   Second, Ms. Eckman was not given any warning. Generally, before using force, law enforcement should issue warnings and use de-escalation techniques. It does not

DECLARATION OF GIL KERLIKOWSKE

appear that federal agents did that. Nor does there appear to have been any exigency that would have made it infeasible to give a warning.

- Third, pepper balls should not be fired at people, they should be fired near to a targeted wrongdoer to release the chemical agent inside the pepper ball. For example, one use we trained for at CBP was to shoot a pepper ball near someone scaling a wall to enter the United States illegally to release the powder and deter the entry. The dangers of shooting pepper balls at people became widespread public knowledge in 2004, after Victoria Snelgrove was killed by a pepper ball fired by a Boston police officer after the Red Sox beat the Yankees in the American League Playoffs.

- Fourth, less lethal weapons should never be targeted at someone's head, unless the situation calls upon the officer to respond with deadly force. DHS's own use of force policies state that less lethal rounds should never be targeted at someone in this manner.

- Fifth, law enforcement may not retaliate against individuals for engaging in protected First Amendment activities, such as protesting. At the time federal agents shot her, Ms. Eckman was carrying a sign that stated "No Kings" on one side, and "Will swap 10,000 immigrants for one little King Donald" on the other. Federal officers have had extensive marksmanship training, and if an officer is firing projectiles at people, they are likely to hit their targets.

36.    Ms. Eckman's declaration describes a pattern of excessive force against other people as well. This includes indiscriminately firing teargas canisters at the crowd. (Eckman Decl. ¶ 17.) This is excessive because teargas is not supposed to be deployed in this manner; it must be used to address at least active resistance. Even if federal agents had asked the crowd to disperse, which they did not do according to the Portland Police and Ms. Eckman, failure to obey a dispersal order is at most passive resistance and does not permit law enforcement to use non-trivial amounts of force. There does not appear to have been any attempt at de-escalation or warning, which should be documented. The federal agents' decision to teargas the crowd does

DECLARATION OF GIL KERLIKOWSKE

not appear to have been done in response to any act or threat, and it does not appear to be targeted at specific actors who are doing something that warrants force.

37.    Ms. Eckman's observation that federal agents were firing crowd-control munitions at the crowd also is more likely than not excessive force. Less lethal munitions should only be targeted at specific wrongdoers to prevent an imminent threat of harm. Law enforcement officers who are trained in policing civil unrest are capable of identifying specific individuals who are engaged in unlawful activities and taking appropriate action against them. Taking appropriate action against a criminal violator can be when it is occurring, if possible, or by identifying the individual for later arrest and prosecution. Law enforcement did this, for example, with videos of the criminals who attacked the United States Capitol on January 6, 2021. This also occurred in the wake of the George Floyd protests in 2020.

38.    All these uses of force are more likely than not disproportionate to any legitimate law enforcement interest and extremely dangerous to everyone at the protest. Moreover, they do not appear to be the isolated conduct of a single officer, especially when this is considered in light of the experiences of the other declarations and videos I have reviewed, as discussed below.

**C.    Richard Eckman**

39.    From my review of Mr. Eckman's declaration, it appears more likely than not that federal agents used excessive force on him and others on October 4, 2025.

40.    Mr. Eckman is United States Navy veteran, who served in the Army reserve until 1995, when he retired as a Major. He walks with the aid of walker.

41.    Like his wife, he describes federal agents emerging from the ICE Building and firing impact rounds and teargas into a peaceful crowd. Federal agents rushed into the crowd, knocking him over, and teargassed him.

42.    For the same reasons given with Ms. Eckman, the unprovoked attack on Mr. Eckman, who posed no imminent threat to law enforcement, was engaged in protected First Amendment activities, and was embedded in a crowd of peaceful protesters was excessive. So

DECLARATION OF GIL KERLIKOWSKE

was subjected him to chemical weapons without warning. His testimony about federal agents'
behavior is consistent with Commander Schoening and Ms. Eckman.

### D.     Jack Dickinson

43.     From my review of Mr. Dickinson's declaration, it appears more likely than not
that federal agents have repeatedly used excessive force on him.

44.     On August 16, 2025, he reports that he was shot in his respirator. As noted above,
shooting less lethals at someone's head is a misuse of the weapon, unless deadly force is
required. Also, as noted above, it is unnecessary and dangerous to fire less lethals from the roof
of the ICE Building into a crowd because it is dangerous to peaceful protesters. On the same day,
federal agents hit Mr. Dickinson with a tear gas canister or flashbang grenade that burned his
clothing. Neither of those weapons should ever be fired at anyone. That is also a misuse of crowd
control weapons.

45.     On August 23, 2025, a federal agent shoved Mr. Dickinson for reasons that are
unclear and then shot him in the back with a less lethal munition. Less lethal munitions should
not be used to shoot people in the back because at that point, they do not pose an imminent threat
to law enforcement.

46.     Mr. Dickinson describes several additional incidents, where a federal agent draws
a gun on him (Dickinson Decl. ¶ 13), federal agents indiscriminately shoot chemical munitions
down from the roof into the crowd (*id*. ¶ 17), and firing less lethals indiscriminately into a crowd
(*id*. ¶ 36). These incidents all appear to be unnecessary, indiscriminate and excessive in light of
the circumstances described by Mr. Dickinson.

47.     Mr. Dickinson was also arrested at the MLK Day sit-in (discussed below). Before
he was arrested, federal agents pushed him and maced him in the face twice, when he does not
appear to be actively resisting them from his declaration and from the video evidence. This is
more likely than not excessive force, because non-trivial amounts of force cannot be used on
people who are passively resisting law enforcement. Such uses of force also violate DHS policy.

DECLARATION OF GIL KERLIKOWSKE

### E.    Jeffrey Miller

48.    From my review of Mr. Miller's declaration, it appears more likely than not that federal agents used excessive force on him and others on October 11, 2025.

49.    Mr. Miller describes several incidents of excessive force, including federal agents shooting at him and people around him who did not pose an imminent threat to law enforcement (Miller Declaration ¶ 10), using crowd control munitions on "anti-ICE demonstrators" who were not posing a threat to law enforcement (*id.* ¶¶ 12-13), and firing less lethals at people who were "a block or two away and not threatening." (*Id.* ¶ 13.) As I have explained, less lethals only should be deployed to target specific threats. Shooting at people far away is dangerous because the accuracy of the weapons decreases over distances and increases the likelihood of hitting an innocent person. In any event, it is unlikely that someone one or two blocks away could effectively throw something to injure an officer.

50.    He also describes agents knocking him over without warning, when there does not appear to be any clear reason why they would do so (*id.* ¶¶ 14-15) and further describes officers kneeling on his back, kicking his torso, stomping on his hand, breaking his finger, carrying him by his neck and legs, arresting him (ultimately without charging him), treating him roughly in the process and threatening to illegally detain him "for three to four days" in a holding cell. (*Id.* ¶¶ 17-37.) All of these tactics are excessive and improper and do not appear to have been aimed at addressing any illegal activity.

### F.    Chad Lucero, Mason Thomas, Calley Eckberg, and Sarah "Sky" Yonally

51.    These four declarations and videos corroborate other witnesses' descriptions of events and recount additional acts that more likely than not constitute excessive force.

52.    For example, Mr. Lucero witnessed federal agents shooting a tear gas canister directly at one protester's stomach at close range. (Lucero Declaration ¶ 11.) This is highly dangerous because tear gas canisters are metal projectiles and should never be directed at people unless deadly force is required. A number of people have been killed by tear gas canisters used in this manner. For example, this is how reporter Rueben Salazar was killed in 1970.

DECLARATION OF GIL KERLIKOWSKE

https://www.latimes.com/projects/chicano-moratorium/reporter-quest-answers-ruben-salazar-death/.

53.     Mr. Lucero also reports his partner being shot in the buttocks, while they were "a good distance away from the ICE building" and were "just standing there" not engaged in any threatening activity. (Lucero Declaration ¶ 22.) For the reasons above, shooting pepper balls at people is excessive, shooting at someone who does not pose a threat is excessive, and it is especially excessive to shoot someone in the back/backside because that shows that they could not be doing anything that would cause an immediate threat such that force is justified.

54.     Mr. Lucero also recounts federal agents targeting a protester who "was simply standing in the crowd peacefully protesting against ICE" with pepper balls on October 12, 2025. Mr. Thomas reports federal agents using pepper balls and tear gas on non-threatening crowds on October 18, 2024. Multiple declarants report officers unnecessarily shoving and hitting peaceful protesters on June 11, 2025, July 20, 2025, August 16, 2025, October 2, 2025, October 4, 2025, October 12, 2025, November 19, 2025, November 21, 2024, and November 29, 2025. From the descriptions given, these acts appear to be excessive force for the same reasons given above.

55.     Ms. Eckberg reports that federal agents teargassed her when she was across the street from the Portland ICE Building, trapping her without warning and without giving her any way to leave. (Eckberg Declaration ¶¶ 2-6.) From her description, this appears more likely than not to be excessive because she was too far away to pose any imminent threat, and because they did not give her any warning or way to avoid the use of force, and there does not appear to have been any exigency that would have prevented them from doing so.

56.     Ms. Yonally reports being teargassed amidst a non-threatening crowd that had complied with instructions to move and was not engaging in threatening behavior, destroying property, or blocking vehicles. (Yonally Decl. ¶¶ 4-5.) She counted over 50 empty canisters of pepper spray after one protest event. (Yonally Declaration ¶ 6.) From her description, these uses of force appear to be excessive for the reasons above; it is excessive force, and it violates DHS policy, to use chemical weapons on people who do not pose a threat to law enforcement. Even if

people had been passively resisting the federal agents' orders, which it appears they were not doing, using force on them would be excessive and violate DHS's use-of-force policy, which only permits using chemical munitions in response to "active resistance," such as resisting arrest or trying to interfere with the arrest of another.

57.    On October 11, 2024, Ms. Yonally witnessed a federal agent "firing munitions at protesters at approximately chest and face height." (Yonally Decl. ¶ 7.) This is excessive force for the reasons above—less lethal munitions are not supposed to be used in that manner, which can be lethal. On November 14, 2025, federal agents shot her in the legs, feet, crotch, and thumb with pepper balls after she had complied with their instructions to re-locate. (Yonally Decl. ¶ 14.) This is more likely than not excessive for many reasons already discussed, including that she did not oppose any imminent threat, they shot her multiple times, and they shot her on parts of her body at which less lethal weapons should not be aimed. Once again, federal agents shot her multiple times with pepper balls on November 19, 2025, after she had complied with their orders to re-locate. (Yonally Decl. ¶ 14.) Finally, Ms. Yonally states that federal agents have repeatedly fired pepper balls toward protesters to clear the driveway of the ICE building without warning. (Yonally Decl. ¶ 17.) For the reasons above, this is more likely than not excessive force because warnings should have been given first, protesters appear to have been complying with orders to re-locate, and even if protesters were disobeying orders to clear the driveway, it would be excessive to use less lethals in response to trespassing or passive resistance.

**G.    The Sit-in on Dr. Martin Luther King Jr.'s Birthday**

58.    On January 19, 2026, a small group of protesters engaged in a sit-in type protest in the driveway of the ICE Building. Video evidence shows that the protesters passively sat along the side of the driveway of the facility holding signs, and that Defendants more likely than not used excessive force on them.

59.    The video shows the gates opening, and at least eight officers coming out. The officers immediately begin firing multiple volleys of pepper balls, quite possibly more than 100 pepper balls, toward the protesters. One officer appears to use chemical spray on peaceful

DECLARATION OF GIL KERLIKOWSKE

individuals sitting or standing without posing any threat to law enforcement. The video does not show that the officers provided any warning before assaulting the protesters.



60.     The events shown in the video likely constitute excessive use of force for many reasons:

61.     First, as noted above, less lethal weapons are dangerous, and before they use them, officers should provide a clear warning and give individuals a chance to avoid being subjected to them. It is unclear if federal agents asked the protesters to leave the driveway or issued a use of force warning before opening the gates and firing at them. However, even if they had done so, there is no emergency shown in the video that would have prevented officers from warning the protesters before discharging their weapons at them. CBP's use-of-force policy both requires agents to engage in de-escalation and to give warnings, when feasible, immediately before using force. From the video, it does not appear that the federal agents did either.

DECLARATION OF GIL KERLIKOWSKE

62.     Second, for the reasons given above, a pepper ball should be directed toward a specific person who is doing something threatening. Nobody in the video is doing anything threatening; they are just passively sitting or standing. Some people in the video are yelling. None of the activities protesters are doing in the video constitutes any reason to use less lethal weapons on them. The protesters who the federal agents shoot at and spray in the video are not even blocking the driveway. The video shows federal agents arresting a few of the protesters, which may be appropriate if people are violating a law and have been duly warned, but it is unclear why the federal agents made the arrests shown in the video. Federal officers do not clear the driveway or remove all the individuals on whom they used less lethal weapons; they just take a few people into custody, including Plaintiff Jack Dickinson, and then go back into the facility. Given the nonviolent nature of the protesters and small number of them, it is unclear why federal agents arrested any of them or did not arrest all of them if there was some pressing need to remove people who were not blocking the driveway from the area.

63.     Third, firing volleys of pepper balls is grossly disproportionate to any threat to law enforcement. For the reasons above, it was inappropriate to fire any pepper balls. Firing multiple volleys toward individuals who pose no imminent threat of harm is excessive and indiscriminate and violates the CBP of force policy. Further, many of the people who the agents are shooting at appear to be far enough away that it would be difficult for them to even theoretically do anything that would pose an imminent threat to federal agents.

64.     Fourth, for the same reasons as above, the officer who walks along the wall in the left of the video spraying people who are sitting and standing by the wall is more likely than not excessive force. It is excessive to use non-trivial amounts of force on passive individuals, and it violates DHS policy.

65.     Fifth, toward the end of the video, after they have already retreated beyond the other side of the gate, federal agents fire pepper balls at the feet of someone who is holding up a phone to video them. This is more likely than not an excessive use of force for the reasons

DECLARATION OF GIL KERLIKOWSKE

above; it is excessive to fire less lethal weapons at someone who is not posing in imminent threat.

66.    In sum, this video shows multiple instances of what more likely than not constitutes excessive force, which is indiscriminately directed at the group of protesters.

### H.    Conclusion

67.    There appears to be a pervasive pattern of misuse of force by DHS against journalists, legal observers, and protesters who have been present at the protests at or around the ICE Building in Portland. That pattern appears to have continued through the recent events on MLK Day and afterward. This pattern includes failure to give warnings, using unnecessary force in the absence of danger to law enforcement, and misuse of crowd-control weapons.

## II.    Opinion 2: The Requested Injunction Is Safe for Law Enforcement

68.    In the context of defending federal property or supporting law enforcement operations, LEOs have no reason to misuse crowd-control weapons or use excessive force.

69.    Plaintiffs have asked that federal agents be prohibited from using crowd control weapons on individuals who do not pose an immediate threat to law enforcement. Complying with the relief requested by Plaintiffs would not be unsafe or burdensome for law enforcement trained to deal with situations involving large, and sometimes unruly crowds. As detailed above, Defendants' own policies prohibit using force in this manner.

## III.    Opinion 3: The Requested Injunction Is Workable

70.    Police forces under leadership trained and experienced in civil disturbances are able to protect public safety without violating any of the other restrictions in the proposed injunction.

71.    Most of the events that I have seen have been small and peaceful protests in which anyone who endangers law enforcement could be easily identified and arrested. However, I have policed, supervised operations for, and been involved in developing strategies for, massive, chaotic and much more violent protests. At these types of events, individuals sometimes may commit crimes. If the protests at the Portland ICE Building somehow grew to that size,

DECLARATION OF GIL KERLIKOWSKE

there is nothing in the proposed injunction that would prevent LEOs from arresting and charging such an individuals. It is quite common in some larger protests for violators to commit a criminal act and then use the anonymity of the crowd to blend back in, but those are just the general nature of some protests. The proposed injunction would be safe and workable in that context as well.

72.     Effective crowd control in the context of volatile protests involves constructing plans to minimize conflict, and to facilitate rather than suppress First Amendment activities. It also involves coordination between law enforcement agencies. That does not appear to have occurred in this case. In fact, federal law enforcement tear gassed Portland Police officers on at least two occasions.

73.     Police who are experienced with dealing with protests, and in specific protests where some individuals have engaged in violent and destructive acts, are capable assessing and managing the risks posed in these unique circumstances. The DHS officers involved in the incidents above appear to lack such experience.

74.     The protections in the proposed injunction are workable for trained law enforcement. To the extent that the federal agents would have any difficulty complying with the proposed injunction, such problems arise from the failure of supervision and leadership, lack of experience, and failure of leadership to ensure that the agents are properly trained for civil disturbances/unrest.

Dated: January 27, 2026

Gil Kerlikowske

DECLARATION OF GIL KERLIKOWSKE

# EXHIBIT 1

R. Gil Kerlikowske

15 Water Street

Charleston, South Carolina 29401
gilkerlikowske@hotmail.com
Mobile: 202-306-9587

## Professional Experience

**February 2017 - Present**

Gil Kerlikowske LLC, Owner/Principal: A private consultancy specializing in border security, global supply chain security, public safety, and drug policy issues and practice.

Global Resilience Institute, Northeastern University, Distinguished Senior Fellow.

Rice University, Non-Resident Fellow (2017-2024)

Harvard University, John F. Kennedy School of Government, Institute of Politics, Resident Fellow, (Spring 2017).

Council on Foreign Relations, Member

**March 2014-January 2017**

Commissioner, United States Customs and Border Protection (CBP), U.S. Department of Homeland Security.

Nominated by President Barack Obama and unanimously confirmed by the U.S. Senate to head Customs and Border Protection (CBP). I was the only confirmed Commissioner in that Administration. CBP is the largest law enforcement organization in the country. It has over 60,000 employees throughout the world and a budget of $13B. Comprised of the Border Patrol, Air and Marine, and Field Operations, CBP has the dual responsibility of protecting our nation's borders and ensuring the efficient movement of both trade and travel. With Congressional approval I reorganized the executive staff, elevating trade to a direct report to me with an Executive Assistant Commissioner. I improved transparency and communication, oversaw a significant reduction in the use of force by Border Patrol agents, and implemented an electronic trade tracking system (ACE). Partnered with U.S. Chamber of Commerce on trade. I authorized the largest fine ever imposed by CBP against VW. I negotiated pre-clearance preliminary agreements with over six countries and implemented pre-clearance in the UAE. I significantly increased enforcement efforts on countries where the use of child labor violated U.S. law through Withhold Release Orders. I utilized an approved advisory committee of private sector stakeholders

from all disciplines of the trade and manufacturing centers to provide advice and guidance on how to improve Customs efforts to increase efficiency and effectiveness in global supply.

## May 2009-March 2014

Director, White House Office of National Drug Control Policy (ONDCP)

Nominated by President Barack Obama and confirmed by the U.S. Senate to lead the White House drug policy office.  ONDCP is responsible for establishing the policies, priorities, and objectives for the Nation's drug control program. I was charged with producing the President's National Drug Control Strategy. The strategy directs the Nation's anti-drug efforts and establishes a program, a budget, and guidelines for cooperation among Federal, State, and local entities. I travelled the country extensively meeting with Governors, Mayors, Judges, law enforcement executives, community leaders, and individuals in treatment and recovery to re-balance the Nation's efforts and resources to focus on drug abuse as both a public health and a public safety problem. I met with leaders in over fifteen countries to enhance collaborative strategies to prevent drug abuse and to engage in law enforcement efforts to combat smuggling and transnational organized crime. I co-authored the President's Transnational Organized Crime Strategy with John Brennan.

## August 2000-May 2009

Chief of Police, Seattle, Washington

In 2007 Seattle recorded the lowest crime rate in 40 years.  The department has over 1,900 employees to police a city of 680,000 residents.  I restructured a significant critical area that was partially responsible for the chief's position becoming available—Demonstration Management.  SPD is now requested for advice and consultation on managing crowds, from the G8 in Russia to the Presidential Inauguration.  SPD achieved National Accreditation in 2003 and 2006.

The Seattle Police Foundation was formed in 2001 and provided over $500,000 annually to the organization.  A Crime Scene Investigation unit was formed in 2004 and the Cold Case unit has solved a number of homicides, including one from 1969, at the time, the oldest cold case in the United States.

I implemented the first civilian oversight for the department. Responsibility for emergency preparedness for the entire city is a function of the department. A state-of-the-art Emergency Operations Center was designed and opened in 2008.  New records management and computer aided dispatch systems were implemented in 2008. The City agreed to the first comprehensive and sustainable growth in the size of the force since the 1980's. The Seattle Police Department is regarded as one of the most professional and cutting edge big-city police departments in the Nation.

## R. GIL KERLIKOWSKE

**July 1998-August 2000**

Deputy Director, U.S. Department of Justice, Office of Community Oriented Policing Services (COPS).

This agency is responsible for providing grant funds for additional police officers and technology to local governments.  As importantly, COPS supports community policing programs  by providing training and educational material to law enforcement and community groups.  I represented the Department at speaking engagements and media events throughout the country.  I was responsible for two divisions that comprise over 60 percent of the total personnel and $6 billion in federal investments.

**January 1994-July 1998**

Police Commissioner, Buffalo, New York

As the first outside Commissioner in 30 years, I was selected by the Mayor to restructure the organization. The department was viewed as being isolated from the community and its culture did not support community policing. Over the last two decades the department was not in the forefront in using modem crime prevention and control methods, training, and advanced technology.

During my tenure, overall serious crime decreased by over 31%, violent crime by 46%, and homicides were reduced by 51%.  A community policing implementation plan was developed and mini-precincts were opened.  Two state-of-the-art district stations were opened and two more were planned and funded. This completed realignment from 14 precincts to five districts.

I initiated a Citizen Advisory Committee, Citizen Police Academy, Youth Police Academy, and high school dialogues between officers and students that improved communication and provided closer cooperation with the community. The Yale Child Development-Community Policing Program, an intervention for children exposed to violence, was implemented.  A random drug-testing program was negotiated with the PBA for all officers including the Commissioner and command staff.  I implemented an objective examination process for selecting detectives.

An independent management study by the International Association of Chiefs of Police (IACP) found the department "far more contemporary, professional and effective" under my  leadership.

**January 1990-December 1993**

Chief of Police, Fort Pierce, Florida

Fort Pierce is a racially and ethnically diverse city that was experiencing significant crime problems. Programs such as Neighborhood Oriented Patrol, Victim Assistance and Mall

Watch contributed to a reduction in crime and an improved relationship between the community and the department. A neighborhood police station was opened that provided a safe haven for a variety of programs such as scouting and after-school tutoring. The department was selected by the Mott Foundation as one of four national sites for implementing neighborhood policing centers. The department received the Attorney General's crime prevention award. National accreditation was achieved.

**April 1987-January 1990**

Chief of Police, Port St. Lucie, Florida

Impact fees on new construction were implemented to pay for future police growth. The process to achieve national accreditation was begun and a new police headquarters was designed. The department received the Attorney General's crime prevention award.

**July 1985-April 1987**

Commanding Officer, Lieutenant, Criminal Investigation Division, St. Petersburg (FL) Police Department

St. Petersburg is a city of a quarter million residents and faces the same challenges as other large urban police agencies. This division is responsible for the investigation of all major crimes. Responsibilities included management of all phases of criminal investigations, polygraph services, crime analysis, victim assistance, hostage negotiation, and a violent crimes unit. New programs such as a weekly tactical crime meeting (a forerunner of COMPSTAT), statistical reporting format, interaction with community groups, and a management review and reallocation of personnel were implemented.

**August 1984-July 1985**

Visiting Fellow, United States Department of Justice, National Institute of Justice (NIJ).

Recipient of a one-year fellowship at the National Institute of Justice, the research arm of the Department of Justice and is on the leading edge of developments in the criminal justice field.

I was an advisor to the Director and also managed grants in excess of $3 million, including the Newport News Problem-Oriented Policing Project. Other responsibilities included developing new programs and drafting long and short-range plans for the Law Enforcement Division.

## R. GIL KERLIKOWSKE

**May 1980-August 1984**

Commanding, Lieutenant, St. Petersburg (FL) Police Department

Commanded several key sections of the St. Petersburg Police Department, including, Field Training, Vice and Narcotics, and Internal Affairs.

**February 1972-May 1980**

Police Officer, Sergeant, St. Petersburg (FL) Police Department

Patrol duty with an innovative inner-city team policing unit (a predecessor of community policing) and detective assignments in narcotics and later robbery-homicide. Began my career in St. Petersburg as a police cadet in 1969.

**February 1970-February 1972**

Security Team Leader, Army Military Police

Supervisor of one of the teams responsible for security of the presidential helicopter (President Richard Nixon).

## Select Awards and Offices

Chair, National Law Enforcement Explorers Board, (2015)
Women in Federal Law Enforcement, Award for "elimination of systemic barriers" (2015)
Penrith Award, National Executive Institute Associates (2014)
John P. McGovern Award for work in preventing drunk/drugged driving (2011)
Coordinating Council on Juvenile Justice and the Prevention of Delinquency (DOJ) (2011)
American Medical Association Nathan A. Davis Award (2011)
Honorary Doctorate, Humane Letters, University of South Florida (2010)
President, Major Cities Chiefs Association, elected twice (2007-2009)
Community Service Award, Association of Hispanic Chambers of Commerce, (2008) (WA)
Seattle University Community Leader Award, (2008)
Police Executive Research Forum *Leadership Award,* (2006)
Brotherhood/Sisterhood Annual Award, The National Conference (Christians and Jews) (1998)
President, Police Executive Research Forum (1996-1998)
Progressive Leadership Award, Citizen Action of New York (1996)
Vice Chair, Governor's Crime Laboratory Council (FL 1991-1994)
Gary P. Hayes Award for innovation in policing, Police Executive Research Forum, (1991)
U.S. Army Presidential Service Badge (1972) Outstanding Military Police Honor Graduate (1970)

R. GIL KERLIKOWSKE

## Select Speeches and Presentations

Naturalization Ceremony, Faneuil Hall, Boston (2016)
Australian National University Symposium on Policing (2007)
John Jay College of Criminal Justice, Patrick V. Murphy lecture (2007)
Community Policing, Police Service of Northern Ireland, Belfast (2005) Presentation on anti-terrorist exercise, conference in Belfast (2003)
Meeting of British Chief Constables. London (2002)
BBC Television, Glasgow: Juvenile Curfews—A Policy Debate  (1997)
F.B.L International Law Enforcement Academy, Budapest (1996)
 Secretary of Labor's Task Force on Labor/Management Cooperation (1995)
U.S. Conference of Mayors, Houston (1992)
 Testified before President's Commission on Missing Children (1986)
Speaker at annual meeting of Police Management Association, London (1985)

## Special Activities

Home Team Advisory Committee, Government of Singapore (2020)
Representative to Int'l Association of Chiefs of Police Executive Board (2015)
Panel member, National Academy of Sciences National Research Council, ***Protecting Individual Privacy: In the struggle Against Terrorists*** (2008)
Member of the Executive Session on Policing, Harvard University (2008)
International City Management Association, editorial advisor, ***Local Government Police Management***
Consultant to ***Early Warning-Timely Response, A Guide to Safe Schools***, developed by the Department of Justice and the Department of Education (1998)
Adjunct faculty Seattle University (graduate program), Florida Atlantic University, and Buffalo State College, Northeastern University, University of South Carolina
International Association of Chiefs of Police Legislative Committee
U.S. Conference of Mayors Police Policy Board
Advisory board member/speaker/lecturer on numerous national criminal justice projects
Book jacket or preface; ***Character and Cops (1994), Superpredators: The Demonization of Our Children by the Law (1999), Police Pursuits (2000)***

## Select Publications and Papers

President's Transnational Organized Crime Strategy (2010)

Homeland Security Success through Law Enforcement Collaboration, *The Police Chief (2014)*

Co-author, A Comprehensive Approach to Internet Safety, *The Police Chief(2008)*

Contributor, Community Policing: A Contemporary Perspective, 2nd edition (1998)
 OP-ED, *Boston Globe,* with Elliott Richardson, on crime prevention through law enforcement partnerships to intervene in children's lives (1997)

Co-author of article on community surveys, *The Florida Police Chief* (1989)

Co-author of article on visiting fellowships at the Department of Justice, *The Police Chief* (1985)

## Media Presentations

Extensive print, digital, radio, and television interviews domestic and international media outlets.

## Civic Involvement

National Board Chair, Fight Crime: Invest in Kids. Washington, D.C.
Hearing, Speech and Deafness Center, Seattle
United Way of King County, Seattle Advisory Board
Executive Board, National Conference (of Christians and Jews), New York
District Commissioner, Boy Scouts of America, New York and Florida
Board of Trustees, St. Mary's School for the Deaf,  New York
Board of Directors, Fort Pierce-St. Lucie County Chamber of Commerce
Campaign Chair, United Way of St. Lucie County (FL)
Board of Directors, Salvation Army. Seattle, New York and Florida
Board of Directors, "Success by 6", New York
Teacher in adult literacy program, Florida
Board of Trustees, Hospital Corporation of America, Port St. Lucie and Fort Pierce (FL)
Chair, School Superintendent's Advisory Committee, Fort Pierce (FL)
Chair, Advisory Committee of Rape Crisis Center, St. Petersburg (FL)
Board of Directors, Center Against Spouse Abuse, St. Petersburg (FL)

## Professional Development

National Executive Institute, FBI (1995)
Harvard University, John F. Kennedy School of Government National Executive Session on Policing (1988)
F.B.I. Law Enforcement Executive Development (1988)
F.B.I. National Academy (1984)
Florida Power Corporation, Total Quality Improvement (1988)
Senior Management Institute for Police (1983)

## Education

Master of Arts, Criminal Justice,  University of South Florida, Tampa (1985).
Emphasis in urban police administration.
Bachelor of Arts, Criminal Justice, University of South Florida (1978)