**Kelly Simon**, OSB No. 154213
ksimon@aclu-or.org
**Eri Andriola**, OSB No. 246500
eandriola@aclu-or.org
ACLU FOUNDATION OF OREGON
PO Box 40585
Portland, OR 97240

**J. Ashlee Albies**, OSB No. 051846
ashlee@albiesstark.com
ALBIES & STARK LLC
1500 SW First Ave., Ste. 1000
Portland OR 97201
Facsimile: 503.427.9292

**Jane L Moisan**, OSB No. 181864
jane@pdxplp.com
PEOPLE'S LAW PROJECT
1500 SW First Ave., Ste. 1000
Portland OR 97201
Facsimile: 503.558.2025

**Alexander M. Tinker**, OSB No. 144939
alex.tinker@tonkon.com
**Daniel H. Skerritt**, OSB No. 681519
daniel.skerritt@tonkon.com
**Maureen S. Bayer**, OSB No. 214905
maureen.bayer@tonkon.com
**Olivia Ashé**, OSB No. 225796
olivia.ashe@tonkon.com
TONKON TORP LLP
1300 SW Fifth Ave., Ste. 2400
Portland, OR 97201
Facsimile:  503.274.8779

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(PORTLAND DIVISION)

| | |
|---|---|
| JACK DICKINSON (a.k.a. "the Portland Chicken"), LAURIE ECKMAN, RICHARD ECKMAN, MASON LAKE, HUGO RIOS, *on behalf of themselves and those similarly situated* <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, President of the United States, *in his official capacity*; KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS), *in her official capacity*; U.S. Department of Homeland Security <br><br> Defendants. | Civil No. 3:25-cv-02170-SB <br><br> **DECLARATION OF J. ASHLEE ALBIES** |

I, J. Ashlee Albies, hereby declare under penalty of perjury as follows:

1.      I am over the age of 18 and current counsel in this case.

2.      Attached hereto as Exhibit Albies A is a true and correct copy of a video clip admitted into the record on October 30, 2025 as Exhibit 53, in the case *State of Oregon, et al. v. Trump, et al*., No. 3:25-cv-01756-IM (D. Or.), also used and referenced as Exhibit 20 in the deposition of ICE Deputy Regional Director R.C. taken on October 24, 2025 in the case *State of Oregon, et al. v. Trump, et al.*, No. 3:25-cv-01756-IM (D. Or.).

PAGE 2 – DECLARATION OF J. ASHLEE ALBIES

3.       Attached hereto as Exhibit Albies B is a true and correct copy of a video clip admitted into the record on October 30, 2025 as Exhibit 54, in the case *State of Oregon, et al. v. Trump, et al*., No. 3:25-cv-01756-IM (D. Or.), also used as Exhibit 21 in the deposition of ICE Deputy Regional Director R.C. taken on October 24, 2025 in the case State of Oregon, et al. v. Trump, et al., No. 3:25-cv-01756-IM (D. Or.).

4.       Attached hereto as Exhibit Albies C is a true and correct copy of excerpts from the deposition of R.C. Public Redacted Deposition, taken on October 24, 2025 in the case *State of Oregon, et al. v. Trump, et al*., No. 3:25-cv-01756-IM (D. Or.) at pp. 303-305.

5.       Attached hereto as Exhibit Albies D is a true and correct copy of video of protests outside the ICE building on October 18, 2025, marked as Exhibit 753 in the merits trial on Plaintiffs' Motion for an Injunction, in the case *State of Oregon, et al. v. Trump, et al*., No. 3:25-cv-01756-IM (D. Or.).

6.       Attached hereto as Exhibit Albies E is a true and correct copy of video of protests outside the ICE building on October 18, 2025, marked as Exhibit 754 in the merits trial in *State of Oregon, et al. v. Trump, et al*., No. 3:25-cv-01756-IM (D. Or.).

7.       Attached hereto as Exhibit Albies F is a true and correct copy of Officer Spencer Schaff's narrative entry about getting hit with munitions, marked as Exhibit 913 in the merits trial in *State of Oregon, et al. v. Trump, et al*., No. 3:25-cv-01756-IM (D. Or.).

8.       Attached here to as Exhibit Albies G is a true and correct copy of Franz Schoening post event debrief summary from October 4, 2025, marked as Exhibit 548 in merits trial in *State of Oregon, et al. v. Trump, et al*., No. 3:25-cv-01756-IM (D. Or.).

9.       Attached hereto as Exhibit Albies H is a true and correct copy of excerpts of the transcript of proceedings on October 29, 2025 of Franz Schoening testifying in merits trial in *State of Oregon, et al. v. Trump, et al*., No. 3:25-cv-01756-IM (D. Or.).

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.**

PAGE 3 – DECLARATION OF J. ASHLEE ALBIES

DATED:  January 27, 2026.

*s/ J. Ashlee Albies*
 J. Ashlee Albies, OSB No. 051846
Of Attorneys for Plaintiffs

# EXHIBIT ALBIES A

**EXHIBIT ALBIES A – PLACEHOLDER VIDEO Submitted in native format by USB drive**

# EXHIBIT ALBIES B

**EXHIBIT ALBIES B – PLACEHOLDER VIDEO Submitted in native format by USB drive**

# EXHIBIT ALBIES C

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


STATE OF OREGON, the CITY OF PORTLAND,

and the STATE OF CALIFORNIA

        Plaintiffs,

v.                    Case No. 3:25-cv-01756-IM

DONALD TRUMP, in his official capacity as President

of the United States, PETE HEGSETH, in his official

capacity as Secretary of Defense; U.S. DEPARTMENT OF

DEFENSE; KRISTI NOEM, in her official capacity as

Secretary of Homeland Security; and U.S. DEPARTMENT

OF HOMELAND SECURITY,

        Defendants.

_____

                    PUBLIC REDACTED VERSION

          REMOTE VIDEOTAPED DEPOSITION OF

                        R. C.


                        TAKEN ON

           FRIDAY, OCTOBER 24, 2025

                 9:06 A.M.


         100 SOUTHWEST MARKET STREET

         PORTLAND, OREGON  97201

```
 1   speculation.
 2              THE DEPONENT:  I have no idea.
 3   BY MR. MARSHALL:
 4        Q.    Have -- has -- have -- has DHS deployed
 5   four times the number of federal officers that it
 6   was -- had deployed on October 7th to now?
 7        A.    I can -- from the time -- from October 7th
 8   to now four times?  I'd have to look at the 209s to
 9   be definitive, but I would -- I am pretty confident
10   to say no, not four times.
11        Q.    So not a 400 percent increase?
12        A.    Correct.
13        Q.    What would the rough percentage increase
14   be?
15              MR. BAILEY:  Objection, lack of
16   foundation.
17              THE DEPONENT:  I -- I'd have to look at
18   the 209s.  I -- I really don't want to give an
19   answer that would be grossly inaccurate.
20              MR. MARSHALL:  Let's look at a video that
21   ends in the numbers 97 -- or actually I'll just say
22   what -- actually it's Bates stamped Oregon DEFS
23   7497.  And we'll mark that Exhibit 20, and then
24   Exhibit 21 is going to be Oregon DEFS 7498.
25              (WHEREUPON, Exhibit 20 and Exhibit 21 were
```

**NAEGELI**   | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

1  marked for identification.)

2         MR. MARSHALL:  And let's play Exhibits 20

3  and 21 consecutively.

4         (WHEREUPON, Exhibit 20 was played.)

5         MR. MARSHALL:  So I believe that was

6  Exhibit 20, and now we'll show Exhibit 21.

7         (WHEREUPON, Exhibit 21 was played.)

8  BY MR. MARSHALL:

9     **Q.  Does the use of force in Exhibit 20 and 21**

10 **appear appropriate to you?**

11    A.   No, sir.

12    **Q.  Why not?**

13    A.   The level of force used, you can -- they

14 did not -- I -- my officers, I would imagine, are

15 trained to be able to walk up to the individual and

16 start soft and not escalate to that -- that level.

17 I guess the -- the theme that I use and I tell

18 everybody when they -- when they come out to

19 Portland, given the fact that some of them don't

20 have a lot of law enforcement experience and they

21 may be a little badge heavy as we've seen with that

22 ICE individual, is to be reasonable in your use of

23 force.

24         And so in my personal opinion, that --

25 that use of force was not reasonable given the fact

1  that the -- there was -- the gentleman wasn't

2  running.  I do know that that is the individual that

3  filed the tort claim.  And I've read his statement,

4  which is not consistent with his activities at that

5  facility.  I can tell you that I was told by my

6  investigation branch chief that individual had been

7  arrested several times, and so we had a -- that was

8  a targeted arrest.

9     **Q.    Was the individual who affected the arrest**

10 **put on leave?**

11    A.    No.  And I would not have -- no.  To my

12 knowledge, no, he was not.

13    **Q.    Was that -- was the individual affected**

14 **that arrest disciplined?**

15    A.    That would be up to the agency to -- I --

16 I know the agency's aware and -- made aware of that

17 incident and so as far as any discipline, that would

18 be internal to that individual and his agency.

19    **Q.    So I understand that you're not**

20 **responsible for it.  Do you know if that individual**

21 **has been disciplined or not?**

22    A.    I --

23    **Q.    Or you don't know one way or the other?**

24    A.    I do not know one way or another.

25          MR. MARSHALL:  Let's now look at the video

1              MR. MARSHALL:  Understood.  Thanks,

2     everyone.

3              THE VIDEOGRAPHER:  Okay.  Before we go off

4     the record, our court reporter will take orders for

5     the transcript, and I will take orders for the

6     video.

7              THE REPORTER:  I understand there's an

8     order for the transcript but Mr. Marshall, you

9     wanted to order the original, correct?

10              MR. MARSHALL:  That's correct.  The

11     standing order stands.

12              THE REPORTER:  Okay.  All right.  Good.

13     Go ahead.

14              THE VIDEOGRAPHER:  All right.  The time is

15     8:13 p.m. and we're off the record.

16              (WHEREUPON, the deposition of R. C. was

17     adjourned at 8:13 p.m.)

18

19

20

21

22

23

24

25

**NAEGELI** | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

1                         CERTIFICATE

2

3        I, the undersigned, Vincent Guerrera, am a

4    videographer on behalf of NAEGELI Deposition &

5    Trial. I do hereby certify that I have accurately

6    made the video recording of the deposition of R. C.,

7    in the above captioned matter on the 24th day of

8    October, 2025, taken at the location of Portland,

9    OR.

10

11        No alterations, additions, or deletions were

12    made thereto.

13

14        I further certify that I am not related to any

15    of these parties in the matter and I have no

16    financial interest in the outcome of this matter.

17

18

19

20            Vincent Guerrera

21

22

23

24

25

**NAEGELI** | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

1                              CERTIFICATE

2

3        I, Kyle Nishida, do hereby certify that I

4   reported all proceedings adduced in the foregoing

5   matter and that the foregoing transcript pages

6   constitutes a full, true and accurate record of said

7   proceedings to the best of my ability.

8

9        I further certify that I am neither related to

10  counsel or any party to the proceedings nor have any

11  interest in the outcome of the proceedings.

12

13       IN WITNESS HEREOF, I have hereunto set my hand

14  this 25th day of October, 2025.

15

16

17

18

19   Kyle Nishida

20   Certificate No. 3240

21

22

23

24

25

**NAEGELI** | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

# EXHIBIT ALBIES D

**EXHIBIT ALBIES D – PLACEHOLDER VIDEO Submitted in native format by USB drive**

# EXHIBIT ALBIES E

**EXHIBIT ALBIES E – PLACEHOLDER VIDEO Submitted in native format by USB drive**

# EXHIBIT ALBIES F



**MOBILE REPORT ENTRY 8.1**

**Date:**10-20-2025

**Submitted by:**SCHAAF, SPENCER D

SP : 42  2025-680661

NARRATIVE TEXT ENTRIES



State of Oregon, et al v. Trump

**EXHIBIT
913**

USDC No. 3:25-cv-01756-IM

Supplemental 42 2025-680661

**Report Date**

October 20 2025

**Submitted by**

SCHAAF, SPENCER D (58874)

**Organization Unit**

RAPID RESPONSE TEAM

**NARRATIVE TEXT ENTRIES:**

## NARRATIVE: - NO KINGS SUPPLEMENTAL

### Added by SCHAAF, SPENCER D (58874)  on October 20 2025 at 23:02

On 10/18/2025 I was assigned as a Sergeant / Supervisor for the Rapid Response Team, Alpha Squad, assigned to monitor demonstration activity downtown and near the Portland ICE Facility on this date. There was a large anticipated demonstration at both locations on this date, as well as an IMT organized in regards to the planned event titled, "No Kings 2.0." RRT Alpha Squad was assigned to utilize bicycles to monitor daytime activities downtown, but I stayed past my regular shift hours of 0700-1700 to assist Bravo squad with a large demonstration in the evening at the ICE Facility.

After 1700 hours my activity mostly involved being on a bicycle near the intersection of S Macadam Ave / S Bancroft St. Members from RRT Alpha Squad and RRT Bravo Squad were using a central traffic island at this intersection to monitor crowd activity near the ICE Facility. Between the hours of 1700-1900 we had made interventions in what I recall as 3 separate escalating violent encounters inside of the crowd, making several arrests and advising others to leave the area. Our actions resulted in a significant reduction in tensions within the crowd, and following the removal of these individuals we observed little to no violent criminal activity. RRT Squads were tasked with reminding crowd members to attempt to stay on the sidewalks and not block traffic, but we advised there were likely over 500 individuals attending the demonstration near the ICE Facility, and it was impractical for individuals to stay out of the street. There was little to no room on the sidewalks on either side of the street in front of the ICE facility left for people to stand. Individuals in the crowd wearing bright outfits were directing traffic consistently for several hours, and vehicles were able to proceed during most of the evening.

At some point around 1900-1930 hours several uniformed members of a Federal agency I could not recognize from afar came out of the ICE Facility. I watched from the aforementioned traffic island at S Macadam Ave / S Bancroft St. The Federal Officers made two line formations facing opposite directions in parallel with the driveway to the ICE facility along S Bancroft St. I had broadcast on the radio I believed the Federal Officers intended to make a push on the crowd to clear the street and allow Federal employees' vehicles to enter and exit the facility. I watched as most, if not all, members of the crowd moved out of the area of the driveway at the direction of Federal Officers. After a short pause, Federal Officers began deploying multiple munitions on crowd members. There were munitions utilized which I recognized, and some which I did not. I witnessed both hand tossed and launched CS (tear gas) cannisters deployed, pepper ball rounds deployed, some munitions similar to a Flash Sound Distraction Device (flashbang), and something similar to "skat rounds," or munitions deployed from a 40mm launcher which carry a payload such as CS and separate into smaller projectiles after leaving the 40mm launcher. I felt I was a safe distance from the driveway of the ICE Facility, which I believed was the intended target area of these munitions, and a check using Google Maps data showed my position on the traffic island was nearly 100 feet away from the driveway of the ICE facility. I was standing with several RRT bicycle officers, and gave instructions for them to put on their gas masks to prevent exposure to CS gas. Immediately after giving these instructions, I felt a sudden pain as an impact projectile hit me on my right shoulder. I recall saying out loud to other RRT members, "one of those [munitions] hit me." RRT members put on their gas masks and left the area.

I am unsure what type of munition I was hit with. When I was hit, I recall hearing several distinct sounds associated with the firing of pepper balls. When I spoke with officers who were present, one officer, ▇▇▇▇▇▇ reported to me he could see a Federal Officer on the roof of the ICE Facility deploying "skat rounds," in our general direction. Based on these facts I believe it is most likely I was impacted by a pepper ball round or a projectile which broke off from the "skat round," after making impact with the ground.

The day following this event I developed a small welt in the area I was hit.

My Body Worn Camera was not recording since I was not engaging in any law enforcement action. There was a video posted to open source social media which captured the moment where I got hit. The video was posted to the X / Twitter Page of user @comradecamera and was retrieved at the following URL: https://t.co/RZ5ulflj9H" . The caption for the video read: "DHS deployed chemical munitions at the ICE building (again) tonight.. Portland Police officers are caught in tear gas, get struck with munitions, and rush to put on masks before leaving the area." I captured a portion of the full video on my Bureau phone and uploaded it to Evidence.com for preservation purposes.

This report is intended as information only regarding myself being struck by munitions.

END OF REPORT.

# EXHIBIT ALBIES G

# Public Order Post Event Debrief Summary

**Date and time: Oct 4th, 2025 at 1200**

**Location of start of Event: Elizabeth Caruthers Park**

**IC: Franz Schoening**

**Narrative of event:**

On Oct 4th there was a planned rally and march in the South Waterfront Park at Elizabeth Caruthers Park beginning at noon.  PPB staffed an IMT/ICP, RRT, DLOs, Sound Truck, Field Arrest Team, air support, and a QRT.

Over the course of an hour, roughly 200 people gathered at the park to listen to speeches. They then marched southbound on Moody to Bancroft and gathered in front of the ICE facility.  Several people from the crowd walked onto the posted no-trespassing area of the ICE facility driveway, but the remainder of the crowd gathered on the sidewalk and in the street immediately in front of the building.

Federal officers came out of the facility and arrested at least one person and then moved back into the building.  After they had returned to the facility, one of our DLOs found an intact tear-gas munition with the pin still in the fuze. An RRT member responded to the area and secured the munition.  We notified the FPS IC that we had recovered one of their munitions.

Almost immediately afterwards, federal officers came back out and deployed CS gas and took additional persons into custody.  Our members did not observe any person or property crimes being committed prior to that and our members were forced to leave the immediate area due to crowd control munitions being deployed.  The open source livestream videos showed a variety of federal officers from different agencies including FPS, ICE, and Bureau of Prisons.

The crowd demeanor became hardened and resistant to our DLOs attempts to engage them.  There was a group of corkers blocking traffic at Macadam/Bancroft and Moody/Bancroft.  Most vehicles were willing to follow their directions, but over the course of a few hours we had a couple vehicles that intentionally ignored their attempts to redirect traffic, and drove through the crowd gathered in the street.

Those flashpoints, along with verbal arguments happening between people with opposing viewpoints, were gradually escalating tensions in the crowd and were increasing risks to the safety of community members.

DLOs attempted to convince people to move out of the street, and to convince the corking volunteers to stop blocking traffic.  They did not get any compliance or cooperation.   Sound Truck announcements were made asking people to move out of the street and those were also unsuccessful.  Finally we transitioned to RRT bike officers activating BWC and admonishing corkers that they would be cited or arrested if they did not move out of the street. RRT members explained our increasing concern for the safety of event participants when they gave the admonishment and warning.  That combined effort finally gained compliance and we were able to re-open Bancroft Street to vehicular traffic.

The restoration of traffic de-escalated the event for the next couple hours.  During this time, Judge Immergut also issued her decision to grant the Temporary Restraining Order against the deployment of National Guard into Portland.

Forward this document to the incoming IC, CHO and CAO

State of Oregon, et al v. Trump

**EXHIBIT
548**

USDC No. 3:25-cv-01756-IM

Over the next couple hours, a few tension points emerged as people with opposing viewpoints argued but PPB members did not witness any person crimes or property crimes. The federal officers would intermittently come out to clear the driveway and roadway to facilitate federal vehicles coming and going from the facility, and this would escalate the crowd for a short time but that tension would dissipate as soon as the federal officers would return into the building.

During this time, Katie Daviscourt appeared on the roof of the ICE facility and was filming the protest activity and smiling and laughing with another person. This is at least the second time we've seen conservative live streamers/influencers being granted access to the roof of the ICE facility.

At about 2015-2030, federal officers came out and began pushing the crowd on the east side of the driveway, eastbound on Macadam and then northbound on Moody. They left a small number of what appeared to be the conservative live streamers group on the east side of the gate and did not move them.

Our liaison called into the FPS IC and asked why federal officers were moving the crowd northbound on Moody when previous movements only cleared the area immediately surrounding their driveway. The IC stated they didn't know why federal officers were pushing that far from the facility.

The federal officers began deploying an extensive amount of crowd control munitions including pepper ball and CS gas, forcing PPB members who were in the area to move away. The area north of the ICE facility was saturated in CS gas. RRT bikes hung out to the north of the impacted area and looked for anyone who might need medical attention but no one flagged them down.

The federal officers then returned to the ICE facility and the crowd, which had dispersed, regathered in front of the building. The crowd size remained at about 100-125 people all the way up until shortly before midnight. There continued to be intermittent interactions with federal officers, and arguments in the crowd, but PPB members did not witness any person or property crimes. Traffic on Bancroft continued to flow, although the east bound lanes were occasionally partially blocked by protesters gathering in the roadway. RRT bikes continued to ride through the area and ask people to move out of the street. The crowd was not resistive and complied with their requests.

Just after midnight, someone lit a commercial grade mortar firework in the intersection of Macadam and Bancroft. RRT members stopped a person in the area and recovered some additional fireworks but there was not sufficient evidence to cite or arrest the person. The fireworks were recovered for destruction.

At 0040, IMT resources were demobilized and the event was turned over to Central Precinct.

Significant Decision Points:

Planning: The initial Op Period for today was from 1500-0300, but the relatively late addition of the planned event at noon caused the start time to move to 1100. Recent evening activity had been fairly light, and events had been concluding by about 2200 hours each night. Based on that, I made the decision to run one shift, knowing it would likely go close to 10 or 11 hours.

Unfortunately, the combination of federal uses of force escalated and entrenched the crowd, and Judge Immergut's decision being released this afternoon also seemed to result in slightly higher numbers this evening and a more persistent presence. When we hit 2300 hours with no end in sight, a moderate number of PPA members raised the contractual limit to shift hours and we were forced to release a portion of our resources.

Forward this document to the incoming IC, CHO and CAO

**In retrospect, I should have planned for two shifts to cover the entire op period.**

**Significant Issues and Problems:**

**The federal government's uses of crowd control munitions and other force seemed to entrench and harden some members of the crowd, which made it more difficult for our DLOs and bike officers to gain cooperation or compliance.**

**Use of Force:**

**None**

**Number of arrests and charges:**

**None. Federal use of crowd control munitions, at times, made it difficult to remain in the area to observe criminal conduct.**

**Lessons learned / recommendations:**

**Schedule two shifts if the events are realistically expected to last more than about 10 hours. Continue to leverage DLOs, Sound Truck, and RRT bikes.  Continue staffing Investigations Section Chief to ensure proper follow up on arrests and reports of crime. Consider staffing an officer in the ICP who can develop independent PC based on open source live stream video and write police reports documenting that.  This allows for PC arrests in the field, based on open source info.**

**Recommend exploring the legal and operational feasibility of using Archer-type anti-vehicle barricades to close Bancroft to vehicular traffic between Macadam and Moody.  This continues to be an area of increased risk as protesters in the street and vehicles transiting the area come into conflict.  Obviously there would need to be some kind of allowance for federal vehicles to access the area.**

Forward this document to the incoming IC, CHO and CAO

CITY_000286

# EXHIBIT ALBIES H

1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF OREGON

3                       PORTLAND DIVISION

4
   STATE OF OREGON, the CITY OF    )
5  PORTLAND, and the STATE OF      )
   CALIFORNIA,                     )
6                                  )
                     Plaintiffs,   )  Case No. 3:25-cv-01756-IM
7                                  )
                          v.       )
8                                  )  October 29, 2025
   DONALD TRUMP, in his official   )
9  capacity as President of the    )
   United States; PETE HEGSETH,    )
10 in his official capacity as     )
   Secretary of Defense; U.S.      )
11 DEPARTMENT OF DEFENSE;          )
   KRISTI NOEM, in her official    )
12 capacity as Secretary of        )
   Homeland Security; and U.S.     )
13 DEPARTMENT OF HOMELAND          )
   SECURITY,                       )
14                                 )
                     Defendants.   )
15 _____)

16

17

18

19                  COURT TRIAL DAY 1

20               TRANSCRIPT OF PROCEEDINGS

21                   MORNING SESSION

22        BEFORE THE HONORABLE KARIN J. IMMERGUT

23          UNITED STATES DISTRICT COURT JUDGE

24

25

```
1                APPEARANCES FOR PLAINTIFFS

2    FOR PLAINTIFF STATE OF OREGON:

3    Mr. Brian Simmonds Marshall
     Mr. Scott P. Kennedy
4    Mr. Alexander Charles Jones
     Mr. Derek Olson
5    Mr. Ian Van Loh
     Ms. Rachel Sowray
6    Oregon Department of Justice
     100 S.W. Market Street
7    Portland, OR 97201

8    FOR PLAINTIFF CITY OF PORTLAND:

9    Ms. Caroline Turco
     Ms. Naomi Sheffield
10   Ms. Lucy Ohlsen
     Portland City Attorney's Office
11   1221 S.W. Fourth Avenue, Room 430
     Portland, OR 97204
12
     FOR PLAINTIFF THE STATE OF CALIFORNIA:
13
     Ms. Barbara Horne-Petersdorf
14   California Department of Justice
     Office of the Attorney General
15   300 S. Spring Street
     Suite 9th Floor
16   Los Angeles, CA 90013

17   Ms. Jane Reilley
     Ms. Anya Binsacca
18   California Attorney General's Office
     455 Golden Gate Avenue
19   Suite 11000
     San Francisco, CA 94102
20
     Mr. James Stanley
21   California Department of Justice
     Civil Rights Enforcement Section
22   1300 I Street
     Sacramento, CA 94102
23
     Mr. Jesse P. Basbaum
24   Office of Attorney General
     1515 Clay Street
25   Suite 2100
     San Francisco, CA 94609
```

1                         APPEARANCES FOR DEFENDANTS

2    FOR THE DEFENDANTS:

3    Ms. Jean Lin
     Mr. John Stephen Tagert
4    Ms. Kathleen Jacobs
     Mr. Christopher D. Edelman
5    Mr. Michael J. Gerardi
     Department of Justice - Civil Division
6    1100 L St NW
     Washington, DC 20005

7
     Mr. Eric Hamilton
8    Mr. John Bailey
     Mr. Tiberius T. Davis
9    Department of Justice - Civil Division
     950 Pennsylvania Avenue NW
10   Washington, DC 20530

11

12

13   COURT REPORTER:

14   Jill L. Jessup, CSR, RMR, RDR, CRR
     United States District Courthouse
15   1000 S.W. Third Ave.
     Room 301
16   Portland, OR 97204

17

18

19

20

21

22

23

24

25

```
 1                           INDEX

 2  OPENING STATEMENTS:                     PAGE:

 3    City of Portland's Opening Statement    16

 4    State of Oregon's Opening Statement     23

 5    State of California's Opening Statement 25

 6    Defendants' Opening Statement           27

 7  PLAINTIFFS' WITNESSES:

 8    FRANZ SCHOENIG                          33

 9    Direct Examination by Ms. Sheffield     33

10    Cross-Examination by Mr. Davis         106

11    Redirect Examination by Ms. Sheffield  151

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Schoening - D

1    Based on my personal observations, my understanding of

2  the law, there are federal officers using crowd control

3  munitions in a manner that would violate 181A.708.

4  BY MS. SHEFFIELD: (Continuing):

5  Q.    I'm not going to put the public order summary up for

6  each night that you were an incident commander, but I wanted

7  to ask if there are any nights, since September 28th, that

8  stand out, in particular, to you with respect to the protest

9  activity at the ICE facility.

10  A.    Yes.    I would say October 4th was a fairly notable day.

11        We had, again, daytime events and also evening events.

12  We had a march that ended up going down to the ICE facility.

13        During the daytime, it was largely -- you know, again,

14  I guess I can't remember which group organized the event,

15  but it was largely just community members, a lot of older

16  folks showing up down there.

17        They did trespass on the federal property, on the

18  driveway.    They stood in front of the driveway.

19        I remember the -- I was the incident commander, and I

20  was observing livestream video and observed federal officers

21  come out and make at least one or more arrests.

22        I remember our members -- we had police bureau

23  officers -- again, they're deployed, prepared to intervene,

24  if we saw any criminal conduct, under Oregon Revised

25  Statute, where we could take enforcement action for any

Schoening - D

1  safety risks that came up.

2      Remember, they noted, after the federal officers went

3  back inside the facility, that there was an un-deployed

4  crowd control munition, a tear gas canister, left on the --

5  on the pavement.  We recovered that and notified FPS that we

6  had recovered that.

7      And almost immediately following that, FPS -- or

8  federal officers came back out and deployed CS gas on that

9  crowd, that largely we had seen no violent criminal conduct.

10  It was all passive trespassing, civil disobedience-type

11  conduct.

12      So, I think, their use of CS gas on that crowd was

13  startling.  It certainly departed from what I would say was

14  best practice or legal under ORS.

15      That transitioned into the evening hours.  I was the

16  incident commander in the evening hours.

17      Again, most of the protest activity we were seeing was

18  largely trespassing, passive conduct, civil

19  disobedience-type conduct.

20      At some point the federal officers -- it had become

21  kind of routine to observe them coming out to move -- clear

22  people out of the driveway to facilitate federal vehicles

23  coming to and from the facility and onto Bancroft.  That was

24  pretty normal operations for them.  That was -- you know, we

25  had taken the position we could not facilitate federal

Schoening - D

1   vehicles coming or going to the facility.  So that was just

2   kind of the pattern that had been established.

3         There was a significant departure from that the evening

4   of the 4th.  We saw federal officers come out in significant

5   numbers, and they began to push the crowd east on Bancroft

6   and then turned and pushed them north on Moody.

7         They pushed them quite a distance up Moody, which was

8   again a significant departure from the established practice

9   that we had seen where we had officers on the ground

10  observing.  We had livestream video of the command post.  We

11  simply weren't seeing any criminal conduct that would

12  explain what was going on.  And then we saw federal officers

13  use a significant amount of crowd control munitions,

14  including a significant amount of tear gas.

15        That, again, was a little startling, just looking at

16  the situation on the ground.

17        It, again, departed from my belief of what is best

18  practices and what was justifiable under ORS and even under

19  the *Graham* standard.

20        We called in to the command post.  I talked to the FPS

21  incident commander to try and figure out what was going on,

22  why they were pushing the crowd that far away from the

23  facility.

24        Again, if they -- if they were seeing criminal conduct

25  or violent behavior that we just weren't simply seeing on

Schoening - D

1  the ground or over the livestream video, and the incident

2  commander's answer, when we asked him why they were doing

3  what they were doing, was literally, "I don't know why."

4          MR. DAVIS:  Objection, Your Honor.  Hearsay.

5      And this is also becoming a narrative.

6          THE COURT:  Overruled on hearsay.

7      And ask your next question.

8          MS. SHEFFIELD:  I'll ask another question.

9  BY MS. SHEFFIELD: (Continuing):

10 Q.   Were your officers, PPB officers, impacted by the

11 Federal Government's use of force on October 4th?

12 A.   Yes, they were.

13 Q.   And how were they impacted?

14 A.   So, again, we were deployed down there operationally to

15 try and be able to intervene if we saw criminal conduct.

16      Part of that requires being present.  We had dialogue

17 officers down there, bicycle officers, and part of the

18 operational posture was to be close and present enough to

19 de-escalate, particularly again what we're seeing, which was

20 that interpersonal conflict.  Also, to be prepared to

21 intervene if there was criminal conduct focused at the ICE

22 facility.  The use of federal -- by federal officers of the

23 crowd control munitions and tools down there required our

24 officers to leave the area.

25      They were actually impacted by the tear gas as well.

Schoening - D

1   And we kind of shifted to the posture of being a couple

2   blocks away to monitor kind of the periphery of the events,

3   at least until the tear gas dissipated.

4   Q.   Are there any other nights, during the period since

5   September 28th, that stand out in your memory?

6   A.   Yes.

7        October 18th, we had -- a fairly large crowd had

8   congregated at the ICE facility.  We had officers again and

9   dialogue officers there in close proximity prepared to

10  intervene if they saw criminal conduct.

11       There was a significant amount of crowd control

12  munitions used by federal officers that evening.

13       Some of our officers were impacted by that -- that use

14  of force.  The publicly available video that we saw -- and,

15  again, I'll acknowledge that you don't always see on video

16  everything that's happening; but, generally, you see enough

17  to understand why indiscriminate force tools are being used,

18  and we simply didn't see that.

19       What we saw, instead, was what appeared to be a federal

20  officer negligently discharging their .40 millimeter

21  launcher.

22            MR. DAVIS:  Objection.  Speculation.  He doesn't

23  know why the officer launched his munitions.

24            THE COURT:  Overruled.

25            THE WITNESS:  Okay.  The video showed a federal

Schoening - D

1   officer carrying a .40 millimeter launcher, based on my

2   experience and understanding, and appeared to launch what --

3   again, based on my experience -- and I've had a lot of

4   experience -- was probably a .40 millimeter CS or smoke

5   munition, Skat Shell.  It's a multiple projectile munition.

6       Out of the .40 millimeter launcher, it skipped off of

7   the driveway in front of the ICE facility and went up onto

8   the roof of the ICE facility where there were federal

9   officers standing, and those federal officers immediately

10  started launching crowd control munitions into the crowd.

11      So we didn't see any violent conduct or behavior that

12  would have otherwise precipitated that use of force.  It

13  appeared to be triggered by the federal officer's deployment

14  ammunition.

15      Our officers were in close proximity and were struck by

16  federal munitions.

17  BY MS. SHEFFIELD: (Continuing):

18  Q.   And I would like to show you what's been marked as

19  Exhibit 913.

20      Do you recognize this document?

21  A.   This appears to be a Portland Police Bureau police

22  report written by Sergeant Spencer Schaaf outlining

23  something that happened on the 20th.

24      MS. SHEFFIELD:  Can we actually move to the second

25  page, please?

Schoening - D

1   BY MS. SHEFFIELD: (Continuing):

2   Q.    Reading the narrative, can you identify what date the

3   event happened?

4   A.    October 18th.

5          MS. SHEFFIELD:  And can you make this a little

6   bigger on the second or the third paragraph?

7   BY MS. SHEFFIELD: (Continuing):

8   Q.    If you want to take a minute to just read it, have you

9   seen this document before?

10  A.    Yes, I've read it.

11  Q.    Can you describe what you understand Sergeant Schaaf is

12  describing or experienced on September 18th?  Or -- sorry --

13  on October 18th.

14  A.    Sure.  So this is a summary of his observations and

15  actions on October 18th, which also aligns with what I was

16  describing and the video that I've observed.

17         He describes being positioned close to the ICE facility

18  and observing federal officers coming out to clear the

19  driveway.  He watched most of the members of the crowd move

20  out of the driveway the direction of federal officers.  He

21  describes a short pause, and then describes federal officers

22  begin deploying multiple munitions on crowd members,

23  including CS gas, pepper balls, what he believed to be

24  flashed down -- distraction devices or flash bangs, to use

25  the layman's term.  Something similar -- something similar

Schoening - D

1    to Skat rounds -- something similar to Skat rounds, which --

2    again, which I described is a munition that contains some

3    munitions that spread when they're fired.

4        He described thinking that he was a safe distance away

5    from the ICE facility.  He described looking at -- later at

6    Google Maps and showing that it was over -- nearly 100 feet

7    away from the driveway, described being exposed to CS gas

8    and instructing his team to put on gas masks, and then

9    described a sudden pain and his belief that he was struck by

10   an impact munition on his right shoulder.

11       Following that, he made the assessment it was not safe

12   to be there, and they all left the area.  The RRT officers

13   left the area.

14            MS. SHEFFIELD:  And can I -- sorry.  I'm not sure

15   of the exhibit number.  I would like to pull up the map.  I

16   think it's Exhibit 307.

17            THE COURT:  Ms. Sheffield, how much time?  I am

18   trying to figure out when we should take a break.

19            MS. SHEFFIELD:  A break might make sense.  I

20   probably still have 20 or 30 minutes.

21            THE COURT:  Okay.  Why don't we do a short break

22   now.  So 15 minutes.

23       So what's -- you're commander now?  Commander, we'll

24   have you come back in 15 minutes, and we'll take a break.

25            We'll be in recess.  Thank you.

```
 1                   C E R T I F I C A T E
 2          State of Oregon, et al. v. Donald Trump, et al.
 3                       3:25-cv-01756-IM
 4                   Court Trial Day 1 - AM Session
 5                         October 29, 2025
 6
 7              I certify, by signing below, that the foregoing is
 8   a true and correct transcript of the record, taken by
 9   stenographic means, of the proceedings in the above-entitled
10   cause.  A transcript without an original signature,
11   conformed signature, or digitally signed signature is not
12   certified.
13
14   /s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
     _____
15
16   Official Court Reporter         Signature Date: 10/29/2025
     Oregon CSR No. 98-0346          CSR Expiration Date: 9/30/2026
17
18
19
20
21
22
23
24
25
```