# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **JACK DICKINSON**, *also known as the Portland Chicken*; **LAURIE ECKMAN**; **RICHARD ECKMAN**; **MASON LAKE**; and **HUGO RIOS**, *on behalf of themselves and those similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>**DONALD TRUMP**, *President of the United States, in his official capacity*; **KRISTI NOEM**, *Secretary, U.S. Department of Homeland Security (DHS), in her official capacity*; and **U.S. DEPARTMENT OF HOMELAND SECURITY**,<br><br>Defendants. | Case No. 3:25-cv-2170-SI<br><br>**OPINION AND ORDER GRANTING TEMPORARY RESTRAINING ORDER** |

Kelly K. Simon and Eri Andriola, ACLU FOUNDATION OF OREGON, PO Box 40585, Portland, OR 97240; J. Ashlee Albies, ALBIES & STARK LLC, 1500 SW First Avenue, Suite 1000, Portland OR 97201; Jane L. Moisan, PEOPLE'S LAW OFFICE, 1500 SW First Avenue, Suite 1000, Portland OR 97201; Alexander M. Tinker, Daniel H. Skerritt, Maureen S. Bayer, and Olivia C. Ashé, TONKON TORP LLP, 1300 SW Fifth Avenue, Suite 2400, Portland, OR 97201; Matthew Borden and Hadley Rood, BRAUNHAGEY & BORDEN LLP, 747 Front Street, Fourth Floor, San Francisco, CA 94111; Marissa R. Benavides, BRAUNHAGEY & BORDEN LLP, 200 Madison Avenue, 23rd Floor, New York, NY 10016; and Kimberly S. Hutchison, SINGLETON SCHREIBER LLP, 591 Camino De La Reina, Suite 1025, San Diego, CA 92108. Of Attorneys for Plaintiffs.

Andrew I. Warden, Assistant Director, Federal Programs Branch, UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, 1100 L Street, NW, Washington, DC 20005; and John Bailey, Counsel to the Assistant Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, 950 Pennsylvania Avenue, NW, Washington, DC 20005. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

In a well-functioning constitutional democratic republic, free speech, courageous newsgathering, and nonviolent protest are all permitted, respected, and even celebrated. In an authoritarian regime, that is not the case. Our nation is now at a crossroads. We have been here before and have previously returned to the right path, notwithstanding an occasional detour. In helping our nation find its constitutional compass, an impartial and independent judiciary operating under the rule of law has a responsibility that it may not shirk. For that reason, and as more fully explained below, the Court grants Plaintiffs' motion for a temporary restraining order.

**BACKGROUND[1]**

In this putative class action, Plaintiffs and all putative class members seek to exercise their First Amendment rights to speak, gather news, or protest lawfully and peacefully at and around the Immigration and Customs Enforcement ("ICE") building located at 4310 S. Macadam Avenue, near the corner of Southwest Moody Avenue and Southwest Bancroft Street in Portland, Oregon ("Portland ICE Building"). These peaceful journalists and protesters include people ranging in age from young children (accompanied by their parents) to senior citizens, including Plaintiffs Laurie Eckman and her husband Richard Eckman. Officers working for the U.S. Department of Homeland Security ("DHS") shot 84-year-old Laurie Eckman in the head with a chemical impact munition while she was peacefully holding a sign on a public street. She walked home soaked in blood. Later that evening, she was treated in an emergency room, where she was diagnosed with a concussion. Earlier that day, DHS hit 83-year-old Richard Eckman's walker

---

[1] With their motion, Plaintiffs have filed 36 declarations and supplemental declarations, including corrected or amended declarations. *See* ECF 12-36, ECF 50-59, and ECF 64. The facts stated below are well supported by these declarations.

with chemical munitions, after opening fire on a nonviolent crowd that included Mr. and Mrs. Eckman.

Plaintiff Jack Dickinson has come to be known as "the Portland Chicken," after regularly attending protests in a yellow-fleece chicken costume with an American flag draped over his shoulders like a cape. Mr. Dickinson has attended many protests near the Portland ICE Building, often several times per week, and he has repeatedly witnessed and been subjected to violence by DHS officers who have used chemical munitions against him on multiple occasions. On one occasion, Mr. Dickinson was standing on the public sidewalk side of the driveway when federal agents shoved him with so much force that he stumbled approximately 15 to 20 feet through the street. When he stood up and started walking away, a federal agent standing on the roof of the building shot him in the back with munitions. On another occasion, Mr. Dickinson sat on the edge of the driveway near the gate of the Portland ICE Building. He sat silently and did not block the ability of vehicles to enter or exit. DHS, however, then fired a barrage of pepper balls at the seated protesters multiple times, and pepper sprayed Mr. Dickinson directly in the face twice. On another occasion, Mr. Dickinson picked up a sign and waved it, trying to diffuse the noxious gas permeating the air. He was then hit in the ankle by a volley of DHS munitions.

Plaintiff Mason Lake is a Portland resident who is a freelance video journalist and filmmaker who has covered protests in Portland since approximately 2020. He specializes in documenting protests in Portland through high quality visual media, and his footage of protests has been aired on national news networks. Mr. Lake has observed DHS officers using tear gas and projectile munitions repeatedly. During one protest, a DHS officer shot Mr. Lake in the groin, causing bruises despite his wearing protective gear. On another occasion, DHS officers

trained a laser on Mr. Lake, and, later, another DHS officer maced Mr. Lake directly in the face and on his video-recording equipment.

Plaintiff Hugo Rios is a freelance photojournalist who covers protests at the Portland ICE Building. At one protest, Mr. Rios watched DHS officers leave the Portland ICE Building to shoot pepper balls and throw tear gas canisters at protestors who were dancing. The officers gave no warning. While Mr. Rios was photographing what was occurring, a DHS officer pushed Mr. Rios from behind. DHS officers then shoved Mr. Rios from the front several times and hit his camera until it stopped working. Although Mr. Rios was standing without anyone else in his immediate vicinity, a DHS officer fired a tear gas cannister at his feet and shot him with pepper balls approximately 20 times.

Another person, who is not named as a Plaintiff but is a putative class member, is Aaron Smith. Mr. Smith is a videographer who on many occasions has documented protests at the Portland ICE Building. On one occasion, he observed DHS officers rush out of the building and, without warning, shoot munitions repeatedly into a crowd that was dancing. At other times, he observed DHS officers targeting press, legal observers, and medics. On one occasion, Mr. Smith was standing without anyone else in his immediate vicinity, and a DHS officer fired a tear gas cannister that struck Mr. Smith directly in the leg. Mr. Smith promptly was taken to an emergency room, where he required stitches. Although concerned about his own safety, Mr. Smith considers his filming the protests to be important in combatting false narratives. In support of the pending motion for a temporary restraining order ("TRO"), Plaintiffs have submitted sworn declarations from more than thirty people with similar observations.

These occurrences are not infrequent. Indeed, they are escalating. Some of the reported incidents at the Portland ICE Building go back to June 2025 and continue through the rest of that

year. In early 2026, Plaintiffs identify similar conduct by federal officers at that location occurring on January 19, January 24, and January 25. Based on events occurring on these three days, Plaintiffs filed their pending motion for a TRO on Tuesday, January 27, 2026. On Friday, January 30, 2026, the Court held a telephone conference with counsel for Plaintiffs and Defendants, during which the Court set a preliminary injunction hearing for March 2, 2026. The Court also directed the parties to confer over the weekend of January 31st and February 1st to see whether a stipulation could be reached that would obviate the need for Court intervention before March 2nd. *See* ECF 44. During a telephone hearing with the parties on February 2nd, counsel reported to the Court that they were unable to reach an agreement. *See also* ECF 49. Even while the parties were conferring during the weekend regarding a potential stipulation, the challenged conduct at the Portland ICE Building continued and even increased. *See* ECF 50 through ECF 59 and ECF 64. The Court heard argument on the pending TRO motion on February 2nd and allowed Defendants to have the remainder of the day to file any written material that they wanted the Court to consider.

## STANDARDS

In deciding whether to grant a motion for a TRO, courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "A plaintiff seeking a preliminary injunction must establish [1] that it is likely to succeed on the merits, [2] that it is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that an injunction is in the public interest." *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1122-23 (9th Cir. 2024) (brackets omitted) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "When the government is

a party, the last two factors (equities and public interest) merge." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021); *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"The first factor—likelihood of success on the merits—is 'the most important.'" *Apache Stronghold v. United States*, 101 F.4th 1036, 1049 (9th Cir. 2024) (quoting *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc)). The preliminary injunction factors are evaluated on a "sliding scale," however, such that "a stronger showing of one element may offset a weaker showing of another." *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, 122 F.4th 825, 844 (9th Cir. 2024) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)). "Alternatively, a preliminary injunction may issue where 'serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor' if the plaintiff 'also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest.'" *Id.* (quoting *All. for the Wild Rockies*, 632 F.3d at 1135).

## STANDING

Article III of the U.S. Constitution confers authority on the federal courts to hear cases or controversies brought by plaintiffs who have a "personal stake in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (cleaned up). To demonstrate standing, a plaintiff must show: "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent;[2] (ii) that the injury was likely caused by the defendant;

---

[2] An injury is "concrete" if it is "de facto; that is, it must actually exist," meaning that it is "real and not abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (cleaned up). "'Concrete' is not, however, necessarily synonymous with 'tangible.' Although tangible injuries are perhaps easier to recognize, [the Supreme Court has] confirmed in many . . . previous cases that intangible injuries can nevertheless be concrete." *Id.* An injury is "particularized" if it "'affect[s] the plaintiff in a personal and individual way.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992)).

and (iii) that the injury would likely be redressed by judicial relief." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).[3]

Plaintiffs must also "demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). For injunctive relief, plaintiffs must allege "either 'continuing, present adverse effects due to [their] exposure to defendants' past illegal conduct or 'a sufficient likelihood that [plaintiffs] will again be wronged in a similar way." *Villa v. Maricopa County*, 865 F.3d 1224, 1229 (9th Cir. 2017) (cleaned up) (first quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974), then quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)); *see also DZ Reserve v. Meta Platforms, Inc.*, 96 F.4th 1223, 1240 (9th Cir. 2024) (explaining that "[p]ast exposure to harmful or illegal conduct" may confer standing when the plaintiff "continue[s] to suffer adverse effects" and that the "plaintiff must demonstrate that he has suffered or is threatened with a concrete and particularized legal harm, coupled with a sufficient likelihood that he will again be wronged" (quotations omitted)). Plaintiffs can demonstrate that their injuries are likely to recur in "at least two ways": by showing that their injuries stem from the defendants' written policies, or that their injuries resulted from "a 'pattern of officially sanctioned . . . behavior, violative of the plaintiffs' rights.'" *Nordstrom v. Ryan*, 762 F.3d 903, 911 (9th Cir. 2014) (brackets omitted) (first quoting *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001), then quoting *LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985)).

If federal courts are too quick to close the courthouse doors on First Amendment claims, "free expression—of transcendent value to all society, and not merely to those exercising their

---

[3] The standing "inquiry in the [First Amendment] retaliation context focuses directly on the[se] three elements that form the 'irreducible constitutional minimum' of Article III standing." *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1174 (9th Cir. 2022) (quoting *Lujan*, 504 U.S. at 560).

rights—might be the loser." *See Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965)). Thus, courts apply the requirements of "standing less stringently in the context of First Amendment claims." *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1173-74 (9th Cir. 2022) (quotations omitted). "In the First Amendment context, 'the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression.'" *Id.* at 1174 (quoting *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021)).

Here, Plaintiffs have sufficiently alleged standing. Defendants concede that Mr. Dickinson and Mr. Lake have standing. They argue, however, that the remaining Plaintiffs do not satisfy the injury-in-fact requirement. Specifically, Defendants assert that because Mr. Rios and Mr. and Mrs. Eckman have only once been assaulted by federal agents, they have demonstrated a mere "past exposure to illegal conduct," which is insufficient to show an active case or controversy. *See Lyons*, 461 U.S. at 102. "[A]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013) (brackets omitted) (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)). Plaintiffs, however, have sufficiently alleged a specific present constitutional injury and a threat of specific future harm.

Plaintiffs are currently suffering First Amendment chill. *See Garcia v. County of Alameda*, 150 F.4th 1224, 1229 (9th Cir. 2025). "A chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury." *Id.* (brackets omitted) (quoting *Tingley v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022)). Chill is an objective inquiry; the question is whether Defendants' actions "would chill or silence a person of ordinary firmness from future First Amendment activities." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (cleaned up). Defendants' conduct—physically harming protestors and journalists without prior dispersal

warnings—is objectively chilling. Indeed, Mr. and Mrs. Eckman are now afraid to protest at the Portland ICE Building and have modified their "speech and behavior" to avoid being assaulted. *Garcia*, 150 F.4th at 1229 (quoting *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003)). Mr. Rios, too, now only covers the Portland ICE Building from a distance, even though it compromises the quality and detail of his journalism. Newsgathering "is a predicate for, and thus inextricably intertwined with," protected speech. *See id.* at 1231. Mr. Rios's "self-censorship" in hampering his newsgathering "is sufficient to satisfy the injury-in-fact requirement," as is Mr. and Mrs. Eckman's self-censorship in avoiding protests they would otherwise attend. *See id.* at 1229 (cleaned up).

A plaintiff may not "bring a First Amendment claim 'by nakedly asserting that his or her speech was chilled.'" *Twitter*, 56 F.4th at 1174 (quoting *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003)). *See also Lopez v. Candaele*, 630 F.3d 775, 787 (9th Cir. 2010) ("Mere allegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." (cleaned up)). Plaintiffs, however, have shown an objective chill caused by Defendants physically assaulting protestors and journalists. They have presented "concrete evidence to substantiate their fears" that Defendants' conduct will continue, which is enough to show a non-speculative risk of future injury. *See Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 825 (9th Cir. 2020) (quoting *Clapper*, 568 U.S. at 420). Although "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief *if unaccompanied by any continuing, present adverse effects*," *id.* (cleaned up; emphasis in original) (quoting *Lyons*, 461 U.S. at 102), here Plaintiffs have shown continuing, present adverse effects.

In addition to the declarations submitted with their motion for temporary restraining order, Plaintiffs submitted supplemental declarations, videos, and photographs showing that Defendants have continued to fire munitions, tear gas, and flash bangs into protestor crowds without warning. This is "powerful evidence of the . . . ongoing, sustained pattern of conduct that resulted in numerous injuries to members of the press" and peaceful protestors after "the complaint was filed." *See id.* at 826. Some protestors also have been injured "more than once"—Defendants teargassed Mrs. Eckman again, for example, on January 31st. *See id.* As the Ninth Circuit reaffirmed in *Index Newspapers*, findings like these are "compelling because 'the possibility of recurring injury ceases to be speculative when actual repeated incidents are documented.'" *Id.* (quoting *Thomas v. County of Los Angeles*, 978 F.2d 504, 507 (9th Cir. 1992)). Thus, Plaintiffs have suffered injury-in-fact and have standing to sue.

## DISCUSSION

In their First Amended Class Action Complaint, Plaintiffs assert seven separate claims. First, Plaintiffs allege First Amendment retaliation. Second, Plaintiffs allege that Defendants have violated Plaintiffs' First Amendment rights by engaging in viewpoint discrimination and unlawfully interfering with Plaintiffs' exercise of speech, press, and assembly. Third, Plaintiffs Lake and Rios, and a subclass, allege that Defendants have violated their First Amendment right of access and their protected acts of newsgathering in a place historically open to the public and press. Fourth, Plaintiffs allege that Defendants have violated Plaintiffs' Fourth Amendment rights by engaging in excessive force against them. Fifth, Plaintiffs allege that Defendants have violated Plaintiffs' Fifth Amendment right to due process by engaging in violent conduct that shocks the conscience, acting with deliberate indifference to the risk of injury to Plaintiffs, and acting with the purpose to harm Plaintiffs. Sixth, Plaintiffs allege that Defendants have violated the Administrative Procedure Act, 5 U.S.C. §§ 551-559. Seventh, Plaintiffs seek a declaration of

their rights, pursuant to 28 U.S.C. § 2201. In their pending motion for a TRO, however, Plaintiffs rely only on their first claim, alleging First Amendment retaliation.

## A. Likelihood of Success on the Merits

To prevail on a First Amendment retaliation claim, Plaintiffs must show that: (1) they were engaged in a constitutionally protected activity; (2) Defendants' actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial or motivating factor in the Defendants' conduct. *Index Newspapers*, 977 F.3d at 827; *see also Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016) (describing the third element as whether "there was a nexus between the defendant's actions and an intent to chill speech").

Regarding the first element, there can be no dispute that the First Amendment protects political protests in public forums like public sidewalks. *See, e.g.*, *Index Newspapers*, 977 F.3d at 830 ("Public demonstrations and protests are clearly protected by the First Amendment"); *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996) ("Activities such as demonstrations, protest marches, and picketing are clearly protected by the First Amendment."). Further, speech critical of public officials is "high in the hierarchy of First Amendment values." *See Lozman v. Riviera Beach*, 585 U.S. 87, 101 (2018) (citing *Connick v. Meyers*, 461 U.S. 138, 145 (1983)). The First Amendment also "protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill*, 482 U.S. 451, 461 (1987) (explaining that yelling obscenities and threats at a police officer is still protected under the First Amendment). Moreover, "there is a strong First Amendment interest in protecting the right of citizens to gather in traditional public forum locations that are critical to the content of their message, just as there is a strong interest in protecting speakers seeking to reach a particular audience." *Galvin v. Hay*, 374 F.3d 739, 752 (9th Cir. 2004). So too are "newsgathering and reporting activities"

protected by the First Amendment. *See Garcia*, 150 F.4th at 1230-32 (collecting cases). Here, there is more than enough evidence to show that Plaintiffs were engaged in constitutionally protected activities.

Regarding the second element, the "ordinary firmness" test is an objective one. *See O'Brien v. Welty*, 818 F.3d 920, 933 (9th Cir. 2016) ("The test is generic and objective. Whether O'Brien himself was, or would have been, chilled is not the test."); *see also Mendocino Env't Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999) ("[I]t would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity . . . ."). Here, there is more than enough evidence to show that Defendants' persistent, excessive, and targeted violence has chilled some protesters and journalists from returning to the Portland ICE Building.

Regarding the third element, Plaintiffs may prove that their protected activity was a substantial or motivating factor by "either direct or circumstantial evidence." *Index Newspapers*, 977 F.3d at 827. That element, the Ninth Circuit has said, "involves questions of fact that normally should be left for trial." *Id.* (citing *Ulrich v. City & Cnty. of S.F.*, 308 F.3d 968, 979 (9th Cir. 2002)). Defendants argue, however, that they were merely enforcing the law and protecting federal property. Defendants' argument fails for at least four reasons.

First, several protesters and press have described being directly targeted with force in the head and other areas of the body without warning and despite posing no threat nor creating a driveway obstruction. Other protesters and press describe being targeted in a variety of ways, including being shot while standing apart from others, being attacked after verbally engaging with officers, or having their cameras or recording equipment hit directly by officers. In *Index*

*Newspapers*, the Ninth Circuit stated that this type of evidence was "exceptionally strong evidentiary support" for retaliatory intent. 977 F.3d at 829.

Second, that some protesters, like those who sat on the driveway at the Portland ICE Building, may have engaged in criminal or non-criminal violations will not insulate Defendants' actions from First Amendment liability. A law enforcement officer may lawfully arrest a person when there is probable cause to believe that person has violated the law, assuming that the arrest is not a mere pretext for an improper retaliatory purpose. But "a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force." *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012). Several protestors describe DHS officers shooting into nonviolent crowds from dangerous angles like the roof of the Portland ICE Building. This is strong circumstantial evidence of Defendants' intent to punish the crowd for their expression.

The pattern Plaintiffs illuminate stands in stark contrast to a case like *Puente v. City of Phoenix*, 123 F.4th 1035 (9th Cir. 2024). *Puente* involved a single protest event, as opposed to a systematic and sustained pattern of escalating violence over a period of months. In contrast, *Index Newspapers* rested on evidence of 45 instances of unwarned and significant uses of force over the course of two weeks. 977 F.3d at 827-28 (referring to the record established by plaintiffs as a "strong showing" of likelihood of success and providing "robust support" for the district court's conclusion of the same). Here, Plaintiffs have submitted more than 30 declarations describing events that have occurred during a period of months.

Third, Plaintiffs present strong evidence from both local law enforcement and outside law enforcement experts. Portland Police Bureau Commander Franz Schoenig testified that it was his impression that the amount of force used by federal officers at the Portland ICE Building is not a

good indication of the level of violence or unrest caused by protests at that location. ECF 35. Commander Schoenig called the DHS force used on one specific occasion that he personally observed "startling" and "certainly departed from what I would say was best practice or legal." *Id.* Commander Schoening also described another occasion when Portland Police Bureau Officers were struck by munitions fired by federal officers despite Commander Schoening not seeing "any violent conduct or behavior that would have otherwise precipitated that use of force." *Id.*

Plaintiffs also provide the declaration of Mr. Gil Kerlikowske, a former Commissioner of U.S. Customs and Border Protection ("CBP") and a former Chief of Police in Seattle, Washington. ECF 34. Mr. Kerlikowske opines that DHS has shown a repeated pattern of excessive force against those present at the Portland ICE Building, including against Portland Police Officers. He has identified a myriad of misuses of crowd control munitions at the Portland ICE Building, including federal officers using teargas on a peaceful crowd, shooting munitions from a roof into a crowd, using munitions on persons who posed no threat, using munitions or non-trivial force on people who were not actively resisting, using volleys of munitions in a grossly disproportionate manner, failing to provide warnings and failing to engage in de-escalation approaches before using force, shooting pepper balls or tear gas at people directly, targeting a person in the head (which, he noted, can be lethal), shooting at people across long distances (which, he noted, is dangerous due to loss of accuracy), and using munitions to retaliate against First Amendment activity. *Id.* Indeed, Mr. Kerlikowske explained that law enforcement crowd control tools should be used only when there is "active" resistance and that this rule is consistent with DHS's Use of Force Policy. *Id.*; *see also* ECF 49-1 (Decl. of Kelly Simon

attaching Decl. of Gregory K. Bovino, Chief Patrol Agent, CBP, describing CBP's Use of Force Policy).

Fourth, a policy or custom of retaliation "may be inferred [from] 'widespread practices of evidence of repeated constitutional violations' and the absence of evidence that [] officers were discharged or reprimanded" for retaliatory actions. *Menotti v. City of Seattle*, 409 F.3d 1113, 1148 (9th Cir. 2005). Rather than reprimanding DHS violence against protesters, senior officials have publicly condoned it. There are clear instances of excessive force, including a use of force incident recorded by ICE's own cameras and deemed "inappropriate" and "not reasonable" by a Federal Protective Service ("FPS") Deputy Regional Director. Yet, the agents involved were not put on leave and do not appear to have been held accountable in any way. *See* ECF 35. This allows them and others to continue to use excessive force without correction. For all these reasons, there is more than enough evidence to show that the Plaintiffs' protected activities were at least a substantial or motivating factor in Defendants' conduct at issue. Thus, there also is more than enough evidence for the Court's conclusion that Plaintiffs have shown a likelihood of success on the merits of their claim of First Amendment retaliation.[4]

## B. Irreparable Harm

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). In the

---

[4] Additional evidence can also be found in the fact that Defendants have engaged in similar conduct in Los Angeles, Chicago, and Minneapolis. *See L.A. Press Club, et al. v. Noem, et al.*, C. D. Cal. Case No. 2:25-cv-05563 (discussing similar conduct in Los Angeles, California); *Chicago Headline Club, et al. v. Noem, et al.*, N.D. Ill. Case No. 1:25-cv 12173 (discussing similar conduct in Chicago, Illinois); *Tichner, et al. v. Noem*, D. Minn. Case No. 0:25-cv-04669 (discussing similar conduct in Minneapolis, Minnesota). To be conservative, however, the Court does not rely on any of Defendants' actions in those three cities to reach its conclusion here that Plaintiffs have shown a likelihood of success on the merits.

Ninth Circuit, "a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) (quoting *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 973- 74 (9th Cir. 2002)). Because constitutional violations often cannot be adequately remedied through damages, the Ninth Circuit does "not require a strong showing of irreparable harm for constitutional injuries." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019).

To justify preliminary injunctive relief, however, "a plaintiff must demonstrate immediate threatened injury." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (cleaned up). The Ninth Circuit instructs that, when "predicting the likelihood of future violations," courts should consider, in addition to "the commission of past illegal conduct":

> the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the extent to which the defendant's professional and personal characteristics might enable or tempt him to commit future violations; and the sincerity of any assurances against future violations.

*Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1263 n.5 (9th Cir. 1989).

The Court finds that the repeated shooting and teargassing of nonviolent protesters at the Portland ICE Building will likely keep recurring against Plaintiffs and the members of the putative class. Defendants' violence is in no way isolated. Similarly, statements made by DHS officials and senior federal executives show that the culture of the agency and its employees is to celebrate violent responses over fair and diplomatic ones.

Further, although some fully chilled protesters may be unlikely to be imminently shot, their ability to establish a likelihood of irreparable injury is no less available. Their legal injury is

a complete loss of their First Amendment freedom to protest and report news at the Portland ICE Building, and this injury recurs daily. *See Sanders Cty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 748 (9th Cir. 2012) (noting that when "First Amendment rights [are] being chilled daily, the need for immediate injunctive relief without further delay is, in fact, a direct corollary of the matter's great importance"); *Libertarian Party of L.A. Cty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013) ("[A]s the Supreme Court has recognized, a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury.").

## C. Balance of Equities and Public Interest

As previously noted, when the government is a party, the last two factors, balancing the equities and assessing the public interest, merge. *See Nken*, 556 U.S. at 435; *E. Bay Sanctuary Covenant*, 993 F.3d at 668. Further, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Index Newspapers*, 977 F.3d at 838 (citation omitted). In addition, as discussed more fully below, the requested relief would not unreasonably burden Defendants. They will still be free to cite or even arrest a person when the law permits. As Mr. Kerlikowske, a recognized expert in this field, explains:

> Most of the events that I have seen have been small and peaceful protests in which anyone who endangers law enforcement could be easily identified and arrested. However, I have policed, supervised operations for, and been involved in developing strategies for, massive, chaotic and much more violent protests. At these types of events, individuals sometimes may commit crimes. If the protests at the Portland ICE Building somehow grew to that size, there is nothing in the proposed injunction that would prevent [law enforcement officers] from arresting and charging such an individual. It is quite common in some larger protests for violators to commit a criminal act and then use the anonymity of the crowd to blend back in, but those are just the general nature of some protests.

ECF 34 ¶ 71. He adds that if DHS needs to clear a path for vehicular traffic or wants to clear the driveway to the Portland ICE Building, which has been a focal point in several protests, the

appropriate method is to ask people to clear the way for the car with clear instructions as to where to go and that failing to move or engaging in even passive resistance may result in arrest. *Id.* at ¶ 24.

The public interest in protecting First Amendment rights cannot be overemphasized. Freedom of speech, including through political protest, is "one of the chief distinctions that sets us apart from totalitarian regimes." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949) (cleaned up). As the Ninth Circuit has recognized, "robust political discourse within a traditional public forum is the lifeblood of a democracy." *Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression & Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 797 (9th Cir. 2008); *see also Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1021 (9th Cir. 2009) ("Political speech is . . . critical to the functioning of our democratic system."). The government's power to restrict speech in public forums is "very limited." *United States v. Grace*, 461 U.S. 171, 177 (1983). Protest particularly serves this core democratic function "when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello*, 337 U.S. at 4. Indeed, the First Amendment tolerates societal "trouble" caused by protest because "our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508-09 (1969) (cleaned up).

**D.  Scope of Relief**

Federal district courts "may issue temporary relief to a putative class." *AARP v. Trump*, 605 U.S. 91, 98 (2025).[5] Although Defendants argue that classwide relief is inappropriate

---

[5] Elsewhere in *AARP*, the Supreme Court stated that the "Court may properly issue temporary injunctive relief to the putative class in order to preserve [its] jurisdiction pending appeal." 605 U.S. at 97. The Ninth Circuit has cited *AARP* for the same proposition. *See Vasquez Perdomo v. Noem*, 148 F.4th 656, 688 n.15 (9th Cir. 2025) ("[T]he Supreme Court recently held

before certification, it is also necessary under the complete-relief principle. "The equitable tradition has long embraced the rule that courts generally may administer complete relief between the parties." *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025) (cleaned up). Thus, the relevant question under the complete-relief principle "is whether an injunction will offer complete relief *to the plaintiffs before the court*." *Id.* at 852 (emphases in original). In *CASA*, the Supreme Court explained that an injunction had the proper scope because it would "give that plaintiff complete relief," whereas "[e]xtending the injunction to cover all other similarly situated individuals would not render *her* relief any more complete." *Id.* at 852-53 (emphasis in original). Here, by contrast, the Court must extend the TRO to cover the putative class to offer Plaintiffs complete relief. *See id.* Were the Court only to enjoin Defendants from teargassing the named Plaintiffs, for example, airborne chemicals from Defendants' use of gas against other protestors would continue to chill Plaintiffs' First Amendment rights.[6]

---

that even before a class is certified—'provisionally' or otherwise—courts 'may properly issue temporary injunctive relief to the putative class in order to preserve [their] jurisdiction pending appeal.'" (quoting *AARP*, 605 U.S. at 97)).

Nothing in *AARP* or *Vasquez Perdomo*, however, require that a court must be acting to protect its jurisdiction to grant temporary relief to a putative class. On the contrary, *AARP*'s recognition that "courts may issue temporary relief to a putative class" embraces the general principle that some classwide benefits inure as soon as a class suit has been filed. 605 U.S. at 98 (citing 2 W. Rubenstein, Newberg & Rubenstein on Class Actions § 4:30 (6th ed. 2022 & Supp. 2024)). For example, the statute of limitations for all putative class members is tolled upon the *filing* of a class suit. *See Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 551 (1974) ("[T]he commencement of the action satisfied the purpose of the limitation provision as to all those who might subsequently participate in the suit as well as for the named plaintiffs."). Putative class members also receive the benefit of loyal counsel upon the filing of a class suit. *See* Fed. R. Civ. P. 23(g) & advisory committee's note to 2003 amendment ("[A]n attorney who acts on behalf of the class before certification must act in the best interests of the class as a whole."). At the minimum, "Rule 23 is not designed to afford class action representation only to those who are active participants in or even aware of the proceedings in the suit prior to the order that the suit shall or shall not proceed as a class action." *Am. Pipe*, 414 U.S. at 552.

[6] Defendants also urge the Court to limit the injunction only to the named Plaintiffs, citing the Ninth Circuit's decision in *L.A. Press Club, et al. v. Noem, et al.*, Case No. 25-5975,

## CONCLUSION

The Court GRANTS Plaintiffs' Motion for Temporary Restraining Order (ECF 11) and hereby enters the following Order.

## TEMPORARY RESTRAINING ORDER

1.          Defendants and their agents, employees, and all persons acting under their direction or in active concert or participation with them (collectively, "Enjoined Persons") are hereby prohibited and enjoined from engaging in or directing or encouraging others to engage in any of the following actions at or in the vicinity of the Immigration and Customs Enforcement building located at 4310 S. Macadam Avenue, near the corner of Southwest Moody Avenue and Southwest Bancroft Street in Portland, Oregon ("Portland ICE Building"):

        a.          No Enjoined Person may direct or use chemical or projectile munitions, including but not limited to kinetic impact projectiles, pepper ball or paintball guns, pepper or oleoresin capsicum spray, tear gas or other chemical irritants, soft nose rounds, 40mm or 37mm launchers, less lethal shotguns, and flashbang, Stinger, or rubber ball grenades, unless the specific target of such a weapon or device poses an imminent threat of physical harm to a law enforcement officer or other person.

        b.          No Enjoined Person may fire any munitions or use any weapons (including those described above) at the head, neck, or torso of any person, unless the officer is legally justified in using deadly force against that person.

---

ECF 66 (9th Cir. Dec. 18, 2025). There, the court stayed the injunction "to the extent that [it] appl[ied] to protestors who [were] not parties to this litigation." *Id.* at 1. The plaintiffs in *L.A. Press Club*, however, originally did not seek classwide relief, so *AARP*'s rule authorizing temporary relief to putative class members did not apply to the motion then pending before the district court. *See* C. D. Cal. Case No. 2:25-cv-05563.

c.      No Enjoined Person may target any individual with a less lethal munition, if doing so would endanger any other individual who does not pose an imminent threat of physical harm to a law enforcement officer or other person. For purposes of illustration only, no Enjoined Person may use chemical or projectile munitions in response to trespassing, refusal to move, or refusal to obey a dispersal order.

2.      Nothing in this Order shall prevent an Enjoined Person from making an otherwise lawful arrest if there is probable cause to believe that a crime has been committed and that the person being arrested has committed that crime.

3.      Nothing in this Order shall prevent an Enjoined Person from using proportional force, including less lethal weapons, on any individual who poses an imminent threat of physical harm to a law enforcement officer or other person.

4.      Defendants shall not be liable for violating this Temporary Restraining Order if a person is incidentally exposed to a crowd-control device, provided that such a device is deployed in a manner fully consistent with this Order.

5.      Defendants shall promptly provide either a copy of this Temporary Restraining Order or a reasonably complete, accurate, and comprehensive summary to all Enjoined Persons who will likely be assigned any duties at or in the vicinity of the Portland ICE Building. Further, Defendants shall promptly file with the Court a copy of what they provided or will provide in the future as new Enjoined Persons begin their work at or in the vicinity of the Portland ICE Building.

6.      In the interest of justice, Plaintiffs need not provide any security, and the Court waives all requirements under Rule 65(c) of the Federal Rules of Civil Procedure.

7.      This Order shall expire fourteen (14) days after entry, unless otherwise extended by stipulation of the parties or further Order of the Court.

8.      Plaintiffs may file a motion for preliminary injunction not later than February 12, 2026, Defendant may respond not later than February 19, 2026, and Plaintiff may reply not later than February 26, 2026. The Court will hold an evidentiary hearing beginning on March 2, 2026, at 9:00 a.m. in Courtroom 15B of the United States Courthouse in Portland, Oregon. All other provisions in the Court's First Case Management Order (ECF 44) remain in effect.

**IT IS SO ORDERED**.

DATED this 3rd day of February, 2026, at 1:57 p.m.

Michael H. Simon
United States District Judge