**Kelly Simon**, OSB No. 154213
ksimon@aclu-or.org
**Eri Andriola**, OSB No. 246500
eandriola@aclu-or.org
ACLU FOUNDATION OF OREGON
PO Box 40585
Portland, OR 97240

**J. Ashlee Albies**, OSB No. 051846
ashlee@albiesstark.com
ALBIES & STARK LLC
1500 SW First Ave., Ste. 1000
Portland OR 97201
Facsimile: 503.427.9292

**Jane L Moisan**, OSB No. 181864
jane@pdxplp.com
PEOPLE'S LAW PROJECT
1500 SW First Ave., Ste. 1000
Portland OR 97201
Facsimile: 503.558.2025

**Matthew Borden**
borden@braunhagey.com
**Hadley Rood**
hrood@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210
Facsimile: (415) 276-1808

**Marissa R. Benavides**
Benavides@braunhagey.com
BRAUNHAGEY & BORDEN LLP
200 Madison Ave., 23rd Floor
New York, NY 10016
Telephone: (646) 829-9403
Facsimile: (646) 403-4089

PAGE 1 –    PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

**Kimberly S. Hutchison**
khutchison@singletonschreiber.com
SINGLETON SCHREIBER LLP
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
Telephone: (619) 771-3473
Facsimile: (619) 255-1515

**Zach Pangares**
zpangares@singletonschreiber.com
SINGLETON SCHREIBER LLP
1050 SW 6th Avenue, Suite 1100
Portland, OR 97204
Telephone: (619) 486-1608
Facsimile: (619) 255-1515

**Liam Barrett***
lbarrett@singletonschreiber.com
SINGLETON SCHREIBER LLP
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
Telephone: (619) 467-0919
Facsimile: (619) 255-1515

**Taylor Marrinan***
tmarrinan@singletonschreiber.com
SINGLETON SCHREIBER LLP
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
Telephone: (619) 977-6638
Facsimile: (619) 255-1515

*Pro hac vice applications pending


*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(PORTLAND DIVISION)

| | |
|---|---|
| Jack Dickinson, a.k.a. "the Portland Chicken," Laurie Eckman, Richard Eckman, Mason Lake, and Hugo Rios, *on behalf of themselves and those similarly situated,*<br><br>   Plaintiffs,<br><br>  v.<br><br>DONALD J. TRUMP, President of the United States, in his official capacity; KRISTI NOEM, Secretary, U.S. Department of Homeland Security, in her official capacity; U.S. Department of Homeland Security.<br><br>   Defendants. | Civil No. 3:25-cv-02170-SI<br><br><br>**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>ORAL ARGUMENT: March 2–4, 2026 |

TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................9

I.    BACKGROUND ......................................................................................................10

      A.    NEW EYEWITNESS DECLARATIONS ........................................... 11

      B.    DEFENDANTS' USE OF FORCE POLICIES..................................... 12

      C.    DECLARATIONS FROM OTHER PROCEEDINGS........................... 13

      D.    USE OF FORCE REPORTS ................................................................ 15

      E.    OTHER PROCEEDINGS AGAINST DEFENDANTS....................... 15

II.   ARGUMENT ...........................................................................................................16

      A.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF
            THEIR FIRST AMENDMENT RETALIATION CLAIM ................................. 17

            1.    There is ample direct evidence that Defendants' repression of
                  speech arises from animus. ...........................................................19

            2.    Substantial circumstantial evidence shows Defendants' retaliatory
                  intent .............................................................................................20

            3.    DHS has a policy or custom of retaliating against people who
                  protest against it ...........................................................................26

      B.    PLAINTIFFS AND PUTATIVE CLASS MEMBERS WILL SUFFER
            IRREPARABLE HARM ABSENT COURT INTERVENTION. ...................... 28

      C.    PLAINTIFFS' CONSTITUTIONAL INJURIES TIP THE BALANCE OF
            EQUITIES AND PUBLIC INTEREST IN THEIR FAVOR .............................. 29

III.  THE SCOPE OF RELIEF IS APPROPRIATE .................................................30

CONCLUSION...................................................................................................................32

TABLE OF AUTHORITIES

***CASES***

*A.A.R.P. v. Trump*,
　　605 U.S. 91 (2025).................................................................................. 30

*Ariz. Dream Act Coal. v. Brewer*,
　　757 F.3d 1053 (9th Cir. 2014) ............................................................... 29

*Baird v. Bonta*,
　　81 F.4th 1036 (9th Cir. 2023) ................................................................ 29

*CASA, Inc. v. Trump*,
　　793 F. Supp. 3d 687 (D. Md. 2025)........................................................ 28

*Castro v. Cty. of Los Angeles*,
　　833 F.3d 1060 (9th Cir. 2016) ............................................................... 30

*Chicago Headline Club, et al. v. Noem, et al.*,
　　No. 1:25-cv-12173 (N.D. Ill.) ................................................................ 15

*Chicago v. Terminiello*,
　　337 U.S. 1 (1949)................................................................................... 10

*De Jonge v. State of Oregon*,
　　299 U.S. 353 (1937)............................................................................... 10

*Reach Community Development v. Dep't of Homeland Sec.*,
　　No. 2:25-cv-2257 (D. Or., Dec. 5, 2025)............................................... 14

*Doe v. Harris*,
　　772 F.3d 563 (9th Cir. 2014) ................................................................. 17

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
　　82 F.4th 664 (9th Cir. 2023) .................................................................. 29

*FKFJ, Inc. v. Vill. of Worth*,
　　11 F.4th 574 (7th Cir. 2021) .................................................................. 17

*In re Focus Media Inc.*,
　　387 F.3d 1077 (9th Cir. 2004) ............................................................... 17

*Garcia v. Cnty. Of Alameda*,
　　150 F.4th 1224 (9th Cir. 2025) .............................................................. 16

*Hernandez v. Sessions,*
    872 F.3d 976 (9th Cir. 2017) ........................................................................... 28

*Index Newspapers LLC v. City of Portland,*
    480 F. Supp. 3d 1120 (D. Or. 2020) ...................................................... 16, 22

*Index Newspapers LLC v. United States Marshals Serv.,*
    977 F.3d 817 (9th Cir. 2020) .................................................. 16, 17, 21, 23

*L.A. Press Club, et al. v. Noem, et al.,*
    Case No. 2:25-cv-05563 (C.D. Cal.) .............................................................. 15

*Meinecke v. City of Seattle,*
    99 F.4th 514 (9th Cir. 2024) ........................................................................... 17

*Menotti v. City of Seattle,*
    409 F.3d 1113 (9th Cir. 2005) ................................................................. 18, 26

*NAACP v. Button,*
    371 U.S. 415 (1963) ........................................................................................ 10

*Nelson v. City of Davis,*
    685 F.3d 867 (9th Cir. 2012) .......................................................................... 27

*Nordstrom v. Ryan,*
    762 F.3d 903 (9th Cir. 2014) ................................................................... 26, 30

*Pinard v. Clatskanie Sch. Dist. 6J,*
    467 F.3d 755 (9th Cir. 2006) .......................................................................... 18

*Reach Cmty. Dev. v. Dep't of Homeland Sec.,*
    Case No. 3:25-cv-02257 (D. Or. Feb. 6, 2026) .................................. 13

*Reach Cmty. Dev. v. Dep't of Homeland Sec.*
    Case No. 3:25-cv-2257 (D. Or. Dec. 5, 2025) .................................... 13

*Republic of the Philippines v. Marcos,*
    862 F.2d 1355 (9th Cir. 1988) ........................................................................ 17

*Rodriguez v. Robbins,*
    715 F.3d 1127 (9th Cir. 2013) ........................................................................ 29

*Sanderlin v. Dwyer*,
     116 F.4th 905 (9th Cir. 2024) ........................................................................ 17

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
     240 F.3d 832 (9th Cir. 2001) .......................................................................... 17

*Tichner, et al. v. Noem, D. Minn.*,
     Case No. 0:25-cv-04669 (D. Minn.) ............................................................... 15

*Trump v. CASA*,
     606 U.S. 831 (2025) ........................................................................................ 30

*Ulrich v. City and County of San Francisco*,
     308 F.3d 968 (9th Cir. 2002) .......................................................................... 18

*Winter v. Natural Res. Def. Council, Inc.*,
     555 U.S. 7 (2008) ............................................................................................ 17

## OTHER AUTHORITIES

ASSOCIATED PRESS, *J.D. Vance says ICE agent in Minneapolis shooting has 'absolute immunity'*,
     *available at* https://youtu.be/Tsq4o1VMLuc?si=dKJO1CiXbzcMRA39 ......................... 16

*Border Patrol official praised agent's 'excellent service' hours after he shot Chicago
     woman, new evidence shows*, CNN (Feb. 11, 2026)
     https://www.cnn.com/2026/02/11/us/chicago-border-patrol-shooting-video-
     evidence ......................................................................................................... 16


https://www.washingtonpost.com/investigations/2025/10/29/trump-administration-
     misleading-videos/ .......................................................................................... 19

Lauren Dake, *Oregon officials and residents say Portland isn't 'war-ravaged,'* NPR
     (Oct. 2, 2025) *available at* https://www.npr.org/2025/10/02/nx-s1-
     5558406/oregon-officials-and-residents-say-portland-isnt-war-ravaged ......................... 20

Maria Villarroel, *Greg Bovino sent thank you note to Border Patrol agent after he
     shot woman 5 times*, THE MIRROR US (Feb. 11, 2026) available at
     https://www.themirror.com/news/politics/greg-bovino-sent-border-patrol-
     1676061 ........................................................................................................... 16

Mattathias Schwartz, "Top Border Official Praised Agent Who Shot Chicago Woman,
     Evidence Shows" NEW YORK TIMES, (Feb. 11, 2026), *available at*
     https://www.nytimes.com/2026/02/11/us/dc-chicago-border-
     officials.html?smid=nytcore-ios-share ............................................................ 16

Oct. 21, 2025 Remarks, *available at*
    https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-diwali-
    celebration-white-house-october-21-2025/#132 ................................................................... 19

*President Trump Speaks to Reporters Upon Departure to Norfolk, Virginia* at 1:58-
    2:08, C-SPAN, (Oct. 5, 2025), *available at* https://www.c-
    span.org/program/white-house-event/president-trump-speaks-to-reporters-
    upon-departure-to-norfolk-virginia/666741 ...................................................................... 19

Sec. Kristi Noem, DHS Press Release (July 11, 2025) *available at*
    https://www.dhs.gov/news/2025/07/11/anarchists-and-rioters-portland-
    illegally-dox-ice-officers-and-federal-law ......................................................................... 19

**INTRODUCTION**

Plaintiffs are nonviolent, nonthreatening protesters and journalists who are exercising their First Amendment right to protest and news gather at or around the ICE building in Portland, Oregon at the corner of South Moody and South Bancroft ("Portland ICE Building"). Since this case was filed, and before, Defendants have engaged in an escalating pattern of unnecessary, excessive retaliatory violence against Plaintiffs and putative class members during protests outside the Portland ICE Building. Plaintiffs respectfully seek a preliminary injunction that mirrors the Temporary Restraining Order ("TRO") that this Court issued on February 3, 2026, and adds additional relief by requiring agents policing the Portland ICE Building to wear identification numbers. This additional relief is necessary to ensure this Court's ability to enforce the preliminary injunction.

While a TRO motion was pending, Defendants unleashed repeated volleys of tear gas and pepper balls into a large protest crowd that included Plaintiffs Jack Dickinson, Laurie Eckman, and Richard Eckman, alongside families with young children and other elderly people. Defendants' retaliation against people who are protesting against Defendants' conduct chills Plaintiffs' and putative class members' First Amendment rights and poses an ongoing risk that Defendants will needlessly kill or maim someone in Portland, as they have already done elsewhere in the United States.

After the Court issued the TRO, it allowed expedited discovery. As detailed below, the few documents that Defendants have so far made available further support the injunctive relief that the Court has put in place. For the same reasons the Court already gave, for the reasons that will be shown in the discovery Defendants are yet to produce, and for the reasons that will given at the evidentiary hearing on this motion: (1) Plaintiffs are likely to succeed on the merits of their First Amendment retaliation claim; (2) Plaintiffs are likely to suffer imminent harm absent such an order; (3) the balance of equities weighs in Plaintiffs' favor; and (4) an injunction is in the public interest. *See throughout* Dkt. No. 68.

"The right to speak freely and to promote diversity of ideas and programs is []one of the chief distinctions that sets us apart from totalitarian regimes." *Chicago v. Terminiello,* 337 U.S. 1, 4 (1949). Our traditions also recognize this right as a critical component of preserving nonviolence and "the security of the Republic." *See De Jonge v. State of Oregon*, 299 U.S. 353, 365 (1937). The aim of preserving the power of peaceful political evolution is the point that perhaps belies why some in positions of power might attempt to choke the First Amendment of the "breathing space" that our constitution needs to survive. *NAACP v. Button*, 371 U.S. 415 (1963).

## I.    BACKGROUND

As detailed in the Court's Order and Opinion Granting the Temporary Restraining Order ("TRO"), the record already contains compelling proof that Defendants repeatedly retaliated against Plaintiffs and class members. *See generally* TRO (Dkt. No. 68). Plaintiffs incorporate all such evidence into this motion and do not repeat it here. To briefly summarize the Court's findings, Plaintiffs and putative class members are "peaceful journalists and protesters include people ranging in age from young children (accompanied by their parents) to senior citizens" who have, with varying frequency between June 2025 and the present, attended protests at the Portland ICE Building and express their disagreement with Defendants' policies and official actions. Dkt. No. 68 at 2–4. At these protests, Defendants have unleashed violence against Plaintiffs and class members through chemical munitions, impact munitions, flash-bang grenades, pepper spray, and other acts of physical violence, despite the protests' nonviolent nature. *Id.* Since Plaintiffs filed their Motion for a Temporary Restraining Order, additional instances of Defendants' retaliatory violence have occurred, and new facts have emerged through: (1) new declarants (2) Defendants' written use of force policies (3) declarations from other proceedings; (4) Defendants' use of force reports; and (5) evidence from related actions across the country.

A.     NEW EYEWITNESS DECLARATIONS

New declarations gathered from eyewitnesses detail the breadth of Defendants' retaliatory response to protests. This evidence shows that Defendants have fired munitions into crowds with pregnant protesters, elderly protesters, and families. *See, e.g.*, Declaration of Anika Ades ("Ades Dec.") Exhibit 13 ¶¶ 3–11 ("Being pregnant, it's hard to hold urine, so when I began coughing from the gas I also urinated in my pants."); Dkt. No. 58, Supplemental Declaration of Jack Dickinson ("Supp. Dickinson Dec.") ¶ 9; Exhibit 7, Declaration of Joy Edwards ("Edwards Dec.") ¶¶ 4–9, 17–18; *see generally* Exhibit 8, Declaration of Maria Weyne ("Weyne Decl."). At times, the Defendants have also fired so much gas into protesters that it fills the air for blocks, far beyond the protests themselves. *See, e.g.*, Weyne Dec. ¶¶ 22–23. Defendants even shot tear gas from the Portland ICE Building's roof at the open window of a car stopped in traffic at Macadam Ave., merely because an individual was holding a protest sign out the window and shouting towards agents during the October 18, 2025, No Kings Day march. Edwards Dec. ¶¶ 4–5.

Even while the TRO motion was pending, Defendants continued to retaliate against Plaintiffs and putative class members.  Defendants most recently subjected Mr. Dickinson to chemical munitions as he protested among a large family-friendly crowd on January 31, 2025. Supp. Dickinson Dec. ¶¶ 4–16. On February 1, 2026, Defendants unleashed a volume of chemical munitions so great that it covered several blocks in thick gas. Edwards Dec. ¶¶ 23–25; Exhibit 10, Declaration of Moira Ryan ("Ryan Dec.") ¶ 9; Exhibit 16, Declaration of Christopher "Tyler" Fellini ("Fellini Dec.") ¶¶ 26–38. The munitions were so powerful that they permeated through protective equipment, even for those wearing multiple layers of masks. Edwards Dec. ¶¶ 23–25; Weyne Dec.  ¶¶ 21–22 ("Though we were wearing personal protective equipment ('PPE'), including goggles, a gas mask, and an KN95 mask, it did not prevent the smoke from permeating through. The gas caused burning, and my coworker had to use her inhaler.").

These most recent acts of violence, like their predecessors, have left Plaintiffs and putative class members not only afraid or unwilling to return to the Portland ICE Building, but—

for some—have left them unable to return due to sickness and injury. *See, e.g.*, Edwards Dec. ¶ 30 ("[As of February 10, 2026,] I have not returned to the Facility since [February 1, 2026], as the gas has left me feeling unwell and I need to recover from its effects."); Weyne Dec. ¶ 27 (After last reporting on a protest on February 1, 2026, "[e]ven on Saturday, February 7, 2026, I had to leave work because I felt ill from the effects of the gas.").

### B.    DEFENDANTS' USE OF FORCE POLICIES

Defendants' written use of force policies contrast with their actual policies on the ground.

For example,



¹ For the Court's ease, Plaintiffs have paginated non-declaration exhibits in red. All exhibit page citations refer to this pagination.



## C.    DECLARATIONS FROM OTHER PROCEEDINGS

On February 6, 2026, Defendants submitted several declarations describing their use of force at the Portland ICE facility in the case *Reach Community Development v. Department of Homeland Security*, No. 3:25-cv-2257 (D. Or., Dec. 5, 2025). The declarations of Roberto Cantu, Deputy Director of Federal Protective Services ("FPS"), Region 10, and Timothy Sullivan, CBP Incident Commander for the Portland ICE facility, describe multiple instances of use of force at the Portland ICE facility from approximately June 2025 to the present., *Reach Cmty. Dev. v. Dep't of Homeland Sec.*, 3:25-cv-02257 (D. Or. Feb. 6, 2026) at Dkt. 50-1 ("Cantu Dec.");

*Reach Cmty. Dev. v. Dep't of Homeland Sec.*, 3:25-cv-02257, at Dkt. 50-2 (D. Or. Feb. 6, 2026)
("Sullivan Dec.").

Plaintiffs anticipate taking Mr. Cantu's deposition. ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ Cantu Dec.¶ 6. The declaration also provides
a narrative of FPS's use of chemical munitions at the Portland ICE facility from June 2025 to
February 1, 2026. Several of these incidents involve officers deploying chemical munitions
when, by Mr. Cantu's own admission, there was no immediate threat to federal officers or
federal property, and chemical munitions were deployed seemingly indiscriminately. For
instance, he describes how, on September 1, 2025, "FPS and ICE SRT officers moved to clear
the driveway that was blocked, using the FN303 and PBL." *Id.* ¶ 13. He does not state that
protesters posed a threat to officers or federal property. *See id.* Similarly, Mr. Cantu describes
how, on January 19, 2026, federal officers "deployed pepper ball and OC spray at protesters in
an attempt to get protesters to leave federal property." *Id.* ¶ 26.

Mr. Sullivan in his declaration, describes CBP's use of force policy, as well as a narrative
of incidents of use of chemical munitions by CBP at the Portland ICE facility from June 2025 to
February 1, 2026. *See generally* Sullivan Dec. ██████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████ He also describes at least one instance of
warnings being given that were not adequately specific: Mr. Sullivan states that on October 4,
2025, a generic warning advising that failure to comply "could result in arrest." *Id.* ¶ 22.
Notably, he does not mention any warnings about force being used against protesters. *Id.*
Nonetheless, officers later used less lethal force on protesters. *Id.* A similar warning was
allegedly issued on January 24, 2026, once again only stating that protesters would be subject to
arrest if they did not comply. *Id.* ¶ 26. Nonetheless, officers later used less lethal force against
protesters. *Id.*; *see also id.* ¶ 27 (describing a similar warning allegedly issued on January 25,
2026, and less-lethal force being deployed later that night).

PAGE 14 – PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

### D.    USE OF FORCE REPORTS

Defendants have produced various use of force reports for incidents that have occurred from June 2025 to the present. ████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████

### E.    OTHER PROCEEDINGS AGAINST DEFENDANTS

The events in Portland are by no means isolated, as there is evidence "that Defendants have engaged in similar conduct in Los Angeles, Chicago, and Minneapolis." Dkt. No. 68 at 16 n.4 (citing *L.A. Press Club, et al. v. Noem, et al.*, C. D. Cal. Case No. 2:25-cv-05563 (Los Angeles, California); *Chicago Headline Club, et al. v. Noem, et al.*, N.D. Ill. Case No. 1:25-cv 12173 (Chicago, Illinois); *Tichner, et al. v. Noem*, D. Minn. Case No. 0:25-cv-04669 (Minneapolis, Minnesota)). Though the Court did not rely on Defendants' nationwide pattern of violence and repression in issuing its Temporary Restraining Order, Defendants' conduct indicates an intent to repress speech with which they disagree, rather than an intent to promote any legitimate law enforcement goal. This intent to silence is palpable for those in Portland. *See,*

*e.g.*, Dkt. No. 51, Supplemental Declaration of Richard Eckman ("Supp. R. Eckman Dec.") ¶ 7;

Dkt. No. 50, Supplemental Declaration of Laurie Eckman ("Supp. L. Eckman") Dec. ¶ 10.

DHS's violence against protesters across the nation has been well-documented in news

articles as well, demonstrating that officials within DHS and at the highest levels of government

have repeatedly sanctioned DHS's violent actions. *See, e.g.*, Andy Rose et al., *Border Patrol*

*official praised agent's 'excellent service' hours after he shot Chicago woman, new evidence*

*shows*, CNN (Feb. 11, 2026) https://www.cnn.com/2026/02/11/us/chicago-border-patrol-

shooting-video-evidence (last accessed February 12, 2026); Maria Villarroel, *Greg Bovino sent*

*thank you note to Border Patrol agent after he shot woman 5 times*, THE MIRROR US (Feb. 11,

2026) available at https://www.themirror.com/news/politics/greg-bovino-sent-border-patrol-

1676061 (last accessed February 12, 2026); Mattathias Schwartz, "Top Border Official Praised

Agent Who Shot Chicago Woman, Evidence Shows" NEW YORK TIMES, (Feb. 11, 2026),

*available at* https://www.nytimes.com/2026/02/11/us/dc-chicago-border-

officials.html?smid=nytcore-ios-share (last accessed Feb. 11, 2026); "JD Vance says ICE agent

in Minneapolis shooting has 'absolute immunity'", at 0:10-0:21, ASSOCIATED PRESS, *available at*

https://youtu.be/Tsq4o1VMLuc?si=dKJO1CiXbzcMRA39 (last accessed Feb. 11, 2026). This

evidence points to a policy of violent retaliation that runs to high-level policymakers.

## II.    ARGUMENT[2]

A court should grant a preliminary injunction when the plaintiff show that : (1) they are

likely to succeed on the merits; (2) they will suffer irreparable harm absent the relief they seek;

---

[2] As the Court decided in its Opinion and Order Granting Temporary Restraining Order, Plaintiffs have standing to pursue their claims. Dkt. No. 68 at 8 (citing *Garcia v. Cnty. Of Alameda*, 150 F.4th 1224, 1229 (9th Cir. 2025)). As such, Plaintiffs need not continually re-prove their standing while the controversy remains. *Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120, 1139 (D. Or. 2020) ("*Index Newspapers I*"), *aff'd Index Newspapers v. United States Marshal Srvs.*, 977 F.3d 817, 825–27 (9th Cir. 2020) ("*Index Newspapers II*"). Regardless, Defendants' conduct still forces Plaintiffs to change their behavior and stifle their constitutionally protected speech, as discussed throughout.

(3) the balance of equities between the parties tips in their favor; and (4) the preliminary relief is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008); *Meinecke v. City of Seattle,* 99 F.4th 514, 521 (9th Cir. 2024).

The Court found that Plaintiffs satisfied all four factors as to their First Amendment retaliation claim in its TRO, *see generally* Dkt. No. 68, and the standard for issuing a temporary restraining order is "substantially identical" to the standard for issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Plaintiffs address each *Winter* factor in turn.

### A.    Plaintiffs are likely to succeed on the merits of their First Amendment Retaliation claim

"To establish a substantial likelihood of success on the merits," Plaintiffs need only show "a fair chance of success" before the factfinder. *In re Focus Media Inc.*, 387 F.3d 1077, 1086 (9th Cir. 2004) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc)). To obtain a preliminary injunction on First Amendment claims, Plaintiffs need only "mak[e] a colorable claim that [their] First Amendment rights have been infringed or are threatened with infringement." *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014). Here, Plaintiffs provide compelling evidence that Defendants have fired tear gas and pepper balls, and engaged in other violence, towards Plaintiffs and putative class members based on their protected activity.

To prevail on a First Amendment retaliation claim, Plaintiffs must show that: (1) they engaged in a constitutionally protected activity; (2) Defendants' actions would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the protected activity was a substantial or motivating factor in the officers' conduct. *Sanderlin v. Dwyer,* 116 F.4th 905 (9th Cir. 2024) (citing *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020) ("*Index Newspapers II*")). "Substantial or motivating factor" does not mean the *sole* factor. *See FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 586 (7th Cir. 2021). Once a plaintiff demonstrates these three elements, the burden shifts to defendants to show that even without the

plaintiff's speech, defendants would have done the same thing. *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006).

As the Court found in its TRO, "there can be no dispute that the First Amendment protects political protests in public forums like public sidewalks." Dkt. 68 at 11. Similarly, Defendants have little ground to contest whether their actions are objectively chilling; "there is more than enough evidence to show that Defendants' persistent, excessive, and targeted violence has chilled some protesters and journalists from returning to the Portland ICE Building." Dkt. 68 at 12. As discussed above, some at the protests have been made so physically sick by Defendants' munitions use that they struggle to return for their own health. *See, e.g.*, Edwards Dec. ¶ 30; Exhibit 8 ("Weyne Dec.") ¶ 27. The core issue is thus whether Defendants have exhibited retaliatory intent.

Even since Plaintiffs filed their motion for a temporary restraining order, the piles of evidence—both direct and circumstantial—of Defendants' retaliatory intent continue to accumulate. *See Ulrich v. City and County of San Francisco*, 308 F.3d 968, 979 (9th Cir. 2002) ("As with proof of motive in other contexts, this element of a First Amendment retaliation suit may be met with either direct or circumstantial evidence."). Plaintiffs examine both categories of evidence in turn. Plaintiffs then illustrate that the pervasiveness of this intent exists because it is the unwritten policy of Defendants to retaliate against people who protest against their activities. *See Menotti v. City of Seattle*, 409 F. 3d 1113, 1148 (9th Cir. 2005) (recognizing that a policy or custom of retaliation "may be inferred [from] widespread practices of evidence of repeated constitutional violations and the absence of evidence that [] officers were discharged or reprimanded" for retaliatory actions). Plaintiffs further anticipate that the evidentiary record will only grow stronger as discovery continues.

       **1.**      **There is ample direct evidence that Defendants' repression of speech arises from animus.**

Defendants have made their intent plain through their own public statements, including statements that: (1) paint Portland and Portland protesters in a false light, (2) treat protests against Defendants as terrorism; and (3) condone DHS violence against protesters.

DHS posted a false video on social media, which purported to show "fiery chaos" in Portland, claiming that "antifa terrorists had stormed federal facilities in Portland." https://www.washingtonpost.com/investigations/2025/10/29/trump-administration-misleading-videos/. The person who took the video "recognized the footage because he'd captured it himself days earlier, outside an ICE facility in Broadview, Illinois." Id. Plaintiffs have asked Defendants who created this, why and what communications they have had up their chain of command about it. Defendants have not yet responded, but Plaintiffs anticipate that such evidence will be strong circumstantial proof of animus against protesters at the very building called out in Defendants' false video.

The President, Secretary Noem, and Commander in Charge Bovino have all echoed the sentiments in this video. For example, President Donald Trump has repeatedly—and falsely— stated that Portland is "burning down." *See, e.g.*, Oct. 21, 2025 Remarks, *available at* https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-diwali-celebration-white-house-october-21-2025/#132 (last accessed Feb. 11, 2025) ("I looked at Portland over the weekend. The place is burning down. It's burning down."). He has falsely claimed that "Portland is burning to the ground" and that "the politicians are afraid for their lives." *President Trump Speaks to Reporters Upon Departure to Norfolk, Virginia* at 1:58-2:08, C-SPAN, (Oct. 5, 2025), *available at* https://www.c-span.org/program/white-house-event/president-trump-speaks-to-reporters-upon-departure-to-norfolk-virginia/666741 (last accessed Feb. 11, 2025). Secretary Noem has also publicly embraced the false narrative that Portland is "under siege" by "[r]ioters." Sec. Kristi Noem, DHS Press Release (July 11, 2025) *available at*

https://www.dhs.gov/news/2025/07/11/anarchists-and-rioters-portland-illegally-dox-ice-officers-and-federal-law (last accessed Feb. 12, 2025).

The President's characterization of Portland as "war-ravaged" is inaccurate, as confirmed by Oregon's Governor and Portland's police chief. *See* Lauren Dake, *Oregon officials and residents say Portland isn't 'war-ravaged,'* NPR (Oct. 2, 2025) *available at* https://www.npr.org/2025/10/02/nx-s1-5558406/oregon-officials-and-residents-say-portland-isnt-war-ravaged (last accessed Feb. 11, 2026). Rather, there have been "some confrontational protests outside the U.S. Immigration and Customs Enforcement building" in Portland which have "largely been nonviolent and contained." *Id.* Given this reality, President Trump's statements reveal that the highest levels of the Federal Government characterize nonviolent protest against Defendants as "war."

Commander Bovino has offered public support and encouragement for DHS agents who shoot people who disagree with their activities. *See, e.g.*, Schwartz, *supra* (Group texts to agent who shot woman five times asked if they are "supportive" and he responded, "Big time... Everyone has been including Chief Bovino, Chief Banks, Sec Noem and El Jefe himself … according to Bovino."). Vice President J.D. Vance has even stated that ICE officers have absolute immunity. *See* ASSOCIATED PRESS, *supra* ("The precedent here is very simple. You have a federal law enforcement official engaging in federal law enforcement action. That's a federal issue. That guy is protected by absolute immunity. He was doing his job."). When the highest officials of the Federal Government are not only condoning past acts of violence against protestors but also publicly stating that anything done by a federal agent while on duty is covered by immunity, the message is clear: violence against protesters is not only accepted; it is embraced.

> **2.    Substantial circumstantial evidence Shows Defendants' retaliatory intent**

Even with limited discovery, many types of circumstantial evidence confirm Defendants' policy and practice of retaliation. Such evidence includes: (1) evidence showing DHS officers

are directly targeting the medium of protest messages; (2) evidence of munitions being fired at people or crowds immediately after communicating an oppositional message or being seen recording DHS officers, (3) evidence of misuse of munitions on protest crowds and journalists, (4) evidence of DHS officers targeting people engaged in protected activity, including while they are standing apart from the crowd, and (5) evidence showing DHS officers are treating people with opposing viewpoints differently. The evidence below supplements the proof that Plaintiffs already provided in their TRO motion, where the Court already held that the sheer number of incidents documented in the declarations submitted with that motion provides strong evidence of Defendants' motivation to punish Plaintiffs and putative class members in retaliation for their protected expression. *See, e.g., Index Newspapers*, 977 F.3d at 829 (volume of evidence provided "exceptionally strong evidentiary support" for finding of retaliatory intent).

     **Targeting the messages themselves:** Defendants have repeatedly destroyed signs that contain messages protesting against Defendants. For example, federal agents deliberately tore apart protester Helena Bartkowski's protest art depicting stories of people who were detained or deported by DHS. Exhibit 9, Declaration of Helena Bartkowksi ("Bartkowski Dec.") ¶10, Ex. A. On the night of October 4, just hours after shooting Ms. Eckman, dozens of DHS officers were recorded holding a perimeter stretching across a long swath of S Bancroft Street while a group of officers removed an "Abolish ICE" banner from property across the street and carried it into the ICE Building. Dkt. No. 18, Declaration of Jed Vankrieken ("Vankrieken Dec.") Ex. B. On January 19, 2025, DHS officers trained their pepper ball rifles directly at the memorial signs of people whose deaths are believed to be caused by DHS. Dkt. No. 36, Declaration of Sarah Yonally ("Yonally Dec") Ex. D; Dickinson Ex. A; *accord* Dkt. No. 27, Declaration of Kevin Foster ("Foster Dec.") Ex. A (capturing the events on video). On August 16, 2025, federal agents shot declarant Moira Ryan's protest sign out of her hand with a rubber bullet. Ryan Dec. ¶ 6; *see also* Exhibit 4 (federal agents deploying munitions and pepper spray directly at seated protesters' signs),

**Firing munitions in immediate response to oppositional messages or being recorded:** Defendants have also fired munitions or used force in direct response to oppositional messaging or recording, though the individuals holding them did not pose any objective threat. Edwards Dec. ¶ 5 (federal agents shot a tear gas cannister "directly at the open window" of a car stopped in traffic "where an individual in the passenger's side was holding a protest sign and yelling towards the federal agents."); Exhibit 11, Supplemental Declaration of Anna Shepherd ("Supp. Shepherd Dec.") Ex F. On one occasion, when Helena Bartkowski yelled at a federal officer for shoving another, mobility device-using protester, that federal agent pepper sprayed her directly in the face. Bartkowski Dec. ¶ 11. As the Court noted in its prior order, while Plaintiff Rios stood alone, photographing protests at the Portland ICE building, DHS officers pushed him from behind and from the front, hit his camera until it stopped working, and then fired a tear gas cannister at him before shooting him with approximately 20 pepper balls. Dkt. No. 68 at 4.

**Misuse of munitions**: Evidence of misuse of crowd control munitions is an especially potent form of circumstantial evidence. *See Index Newspapers I*, 480 F. Supp. at 1136. DHS officers have directed munitions at people's heads, have fired indiscriminately into masses of nonviolent protesters, and have shot into crowds from dangerous angles, including from roofs and overhead. *See, e.g.*, Ryan Dec. Exs. B–C. For example, as Vincent Hawkins protested on June 14, 2025, federal agents shot him in the eye with munitions, leaving him bleeding profusely and seriously concussed. Exhibit 12, Declaration of Vincent Hawkins ("Hawkins Dec.") ¶¶ 2–12, Ex. A, Ex. B, Ex. C. Furthermore, Defendants have deployed tear gas in such extreme volumes that they engulfed the streets for blocks. *See, e.g.*, Weyne Dec. ¶¶ 22; Edwards Dec ¶¶ 23–25. Defendants have deployed OC spray and pepper balls on protesters who were sitting peacefully in the driveway of the Portland ICE facility. *See* Exhibit 3 at 3: ███████

████████████████████████████

████████████████████████████████

███████████████████████████

████████████████████████

However, Defendants have released chemical munitions into the crowd without warning. *See, e.g.*, Weyne Dec. ¶¶ 6–7; *see also* Sullivan Dec ¶ 11 (admitting that CBP officers do not always issue a warning before using less lethal force). ████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████ Nonetheless, Defendants have shot peaceful protesters directly in the head and face with chemical munitions. *See generally* Hawkins Dec.; *see* Dkt. No. 13, Declaration of Laurie Eckman ("L. Eckman Dec.") ¶¶ 18–26. ████████████████████████
████████████████████████████████████

**Targeting non-threatening protesters, including people standing apart from crowds:** The record also provides several examples of federal agents targeting specific individuals with munitions and pepper spray. Dkt. No. 17, Declaration of Bennett Haselton ("Haselton Dec.") Ex. C (video of officers spraying a calm protester directly in the face), Ex. D. (video of officer ducking behind a protester in an inflatable frog costume in order to spray pepper spray into the vent hole of the costume); Ryan Dec ¶ 8 ("At around 6:30 P.M. a federal agent was shooting at . . . individuals [in the driveway] with pepper balls from the roof. Suddenly the agent on the roof turned and shot me in the stomach as I watched, though I was not on federal property. It hurt me so badly that I doubled over, holding my stomach."). In *Index Newspapers II*, the court found this type of evidence to be "exceptionally strong evidentiary support" for retaliatory intent. 977 F.3d at 829.

**Treating protesters differently based on their viewpoint:** Plaintiffs also produce evidence that not all persons present on closed federal property are treated the same. Protesters

expressing viewpoints critical of Defendants, and others documenting the protests are expressly targeted for violence, harassment, and arrest. Agents have also made inflammatory statements to protesters when challenged. One agent, for example, yelled at a protester to the effect of "you're a white boy and this has nothing to do with you." Weyne Dec. ¶ 25. Another leaned out from behind the Portland ICE Building's gate to specifically call out a known protester and show the protester his middle finger, before saying "Just wait till tonight. I'll see you tonight." Bartkowski Dec. ¶ 14. Yet others "wave at protesters, put up heart signs with their hands, tell us to 'get a job,' and . . . throw . . . water at protesters" in a manner protesters believe is intended to antagonize. Supp. Shepherd Dec. ¶ 8. One agent even "turned toward the crowd, paused, and deliberately performed a Nazi salute before walking back inside with a smirk." *Id.* ¶ 9. Others deemed unfriendly to Defendants are treated the same. Student journalist Maria Weyne was pushed by agents while walking backwards, attempting to access a public sidewalk. Weyne Dec. ¶ 5. Another declarant describes a special animus visited upon legal observers. *See, e.g.*, Dkt. No. 21, Declaration of Aaron Smith ("Smith Dec.") ¶¶ 5.

Counter-protesters expressing viewpoints supportive of Defendants, however, are not shot at, nor are they arrested or cited. *See e.g.,* Dkt. No. 25, Declaration of Chad Lucero ("Lucero Dec.") ¶ 27; Dkt. No. 12, Declaration of Jeffrey Miller ("Miller Dec.") ¶ 12. These protesters sharing Defendants' favored viewpoints are allowed to mull about the plaza, stand in the driveway, enter inside the building, and "embed" themselves with DHS agents for an up-front seat to the violence. *See, e.g.*, Yonally Dec. at ¶ 32. In other words, favored protesters are permitted to trespass without even citation or arrest. Defendants demonstrate this favoritism despite the fact the counter-protesters have engaged in violence against protesters and marchers, including "pepper spray[ing] protesters on numerous occasions." Edwards Dec. ¶ 19. While peaceful protesters are gassed, arrested, and attacked, those assaulting them are protected. This difference in treatment is further evidence that Plaintiffs' expression is the reason Defendants target them.

Moreover, Defendants' use of force seems wholly unrelated to any purportedly unlawful acts by protesters and appears to target the crowd at large, even where unlawful activity could be managed individually. *See, e.g.* Supp. Dickinson Dec. ¶¶ 7–9 (though only approximately 15 to 20 protesters crossed onto federal property approximately 30 feet away from an ongoing march, agents fired flash-bangs and tear gas into the marchers). Weyne Dec. ¶¶ 6–7, 12–13; Hawkins Dec, ¶¶ 2–12 (shooting protester directly in the face with munitions as he stood among two or three others). Exhibit 14, Declaration of Alexander Sorrell ("Sorrell Dec.") ¶¶ 8–10 (shot with ceramic rounds and pepper balls for shining a flashlight towards the Portland ICE Building).

DHS's pattern of misuse of weapons is circumstantial proof of intent to punish the crowd for their expression. *See, e.g.,* Kerlikowske Dec. (explaining that federal officers are trained how to shoot, tend to hit their targets, and describing Ms. Eckman's shot to the head as retaliation); *accord* Dkt. No. 30, Declaration of Mason Lake ("Lake Dec.") ¶ 33 (comparing DHS violence in 2020 to now and describing current DHS behavior as "more vindictive" and giving "the impression that they do so to hurt people, scare people...and keep them from exercising their rights"). As Ms. Eckman eloquently summarizes:

> My impression of my experience was that it seemed as though the federal agents wanted to hurt the people protesting because they continued to throw tear gas at us when we were trying to get away. If they wanted us to leave the area, they made it very difficult to do so by firing tear gas toward the back of the crowd and in the pathway that the crowd had to exit the area.

Supp. L. Eckman Dec. ¶ 10.

Based on the TRO record, Plaintiffs' expert witness Gil Kerlikowse concluded that "[t]here appears to be a pervasive patter of misuse of force by DHS against, journalists, legal

observers, and protesters who have been present at or around the ICE Building in Portland."
Kerlikowske Dec. at ¶ 68. The new evidence only buttresses this conclusion.[3]

### 3. DHS has a policy or custom of retaliating against people who protest against it

Defendants' retaliation against Plaintiffs and class members likewise demonstrates the
appropriateness of preliminary injunctive relief because it demonstrates a policy and custom of
retaliation. *See Nordstrom v. Ryan*, 762 F.3d 903, 911 (9th Cir. 2014). A policy or custom of
retaliation "may be inferred [from] 'widespread practices of evidence of repeated constitutional
violations' and the absence of evidence that [] officers were discharged or reprimanded" for
retaliatory actions. *Menotti v. City of Seattle*, 409 F.3d 1113, 1148 (9th Cir. 2005) (discussing
*Monell* liability).

As the Court found in its Opinion and Order Granting Temporary Restraining Order:

> Rather than reprimanding DHS violence against protesters, senior
> officials have publicly condoned it. There are clear instances of
> excessive force, including a use of force incident recorded by ICE's
> own cameras and deemed "inappropriate" and "not reasonable" by
> a Federal Protective Service ("FPS") Deputy Regional Director.
> Yet, the agents involved were not put on leave and do not appear to
> have been held accountable in any way. This allows them and others
> to continue to use excessive force without correction.

Dkt. No. 68 at 15 (internal citation to Dkt. No. 35 omitted).

**Failure to investigate and discipline.** 

,

---

[3] Plaintiffs intend to submit a supplemental declaration by Mr. Kerlikowske once a protective
order has been issued and he can be shown the additional evidence Defendants have, and will,
produce.



As such, the record reflects that Defendants' motive in their actions was to punish Plaintiffs and class members and that they have made no attempt to hold any agents accountable for violating their own policies, thus encouraging agents on the ground to continue this misconduct without correction.

**Unlawful policies**. Defendants have also admitted to having unlawful policies. For example, Roberto Cantu, Deputy Director of FPS, Region 10, who is the commander of policing protests at the ICE Building for FPS, has admitted the FPS uses less lethal munitions to "disperse crowds that refuse to comply with lawful dispersal orders," which is not a proper use of less lethal munitions. Cantu Dec. ¶ 6; *see Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) ("[A] failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force."). For all those reasons, Plaintiffs show a strong likelihood of success on their First Amendment Retaliation claim.

PAGE 27 –  PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

**B.     Plaintiffs and putative class members will suffer irreparable harm absent court intervention.**

As the court as already emphasized, Plaintiffs' legal injury—a loss of First Amendment freedoms—recurs daily. Dkt. 68 at 16-17 (citing *Sanders and Libertarian Party of LA Cty*). As such, the harm they continue to suffer is irreparable. *See Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (deprivation of any constitutional right is an irreparable injury). Beyond the ongoing chilling that Plaintiffs experience, three out of five Plaintiffs were subjected to DHS violence after moving this court to enter a TRO to prevent the very harms they argued were likely to immediately recur. That Plaintiffs and putative class members hope to be protected by the TRO now in place does not defeat their ability to establish a likelihood of suffering similar irreparable harm. *cf. CASA, Inc. v. Trump*, 793 F. Supp. 3d 687, 698 (D. Md. 2025) ("The existence of a preliminary injunction issued by another court that provides relief to the plaintiffs does not negate their irreparable harm. The preliminary injunction issued by the District of New Hampshire could be modified, limited, or overturned at any time.") (internal citations omitted). As is evidenced by repeated events in Portland and punctuated against the backdrop of nationwide events, Defendants' violence is in no way isolated.

Indeed, Defendants continued to deploy chemical munitions on protesters and journalists for months, including in the days preceding the Court issuing its TRO. On February 1, 2026, Defendants unleashed a volume of chemical munitions so great that it covered several blocks in thick gas. Edwards Dec. ¶¶ 23–25; Ryan Dec. ¶ 9. Whatever the type of munitions was, it was so powerful that it permeated through protective equipment, even for those wearing multiple layers of masks. Edwards Dec. ¶¶ 23–25; Weyne Dec. ¶¶ 21–22. Likewise, statements of DHS officials and senior federal executives show that the characteristics and culture of the agency and its employees is to celebrate and prioritize violent responses over fair and diplomatic ones. *See* Dkt. 68 at 16. Finally, Defendants offer no assurances that the conduct will cease or change.

### C.    Plaintiffs' constitutional injuries tip the balance of equities and public interest in their favor

The nature and magnitude of Defendants' baseless crackdown on Plaintiffs' constitutionally protected speech tips the equities and public interest squarely in favor of a preliminary injunction. When the non-moving party to a preliminary injunction is the government, the balance of equities and public interest factors merge. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (en banc). Due to the public's interest in upholding the Constitution, "[a] plaintiff's likelihood of success on the merits of a constitutional claim also tips the merged third and fourth factors decisively in his favor." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023). As such, "plaintiffs who are able to 'establish[ ] a likelihood that [a] policy violates the U.S. Constitution . . . have also established that both the public interest and the balance of the equities favor a preliminary injunction.'" *Id.* (quoting *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014)). Plaintiffs and putative class members seek only to defend the First Amendment and lawfully exercise their rights without the threat of violence. As discussed above and as the Court found in its Order and Opinion Granting Temporary Protective Order, Plaintiffs are likely to succeed on the merits of their First Amendment Retaliation claim. Thus, the third and fourth factors weigh in their favor.

Moreover, the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Here, that is precisely the injunction Plaintiffs seek: one that merely ends Defendants' unlawful practice of retaliation. It is unclear what burdens it would place on Defendants to refrain from shooting nonviolent protesters, especially as the relief Plaintiffs seek still permits the arrest and/or citation of anyone who trespasses or refuses to obey lawful commands of federal officers, and still

permits some uses of force in the face of real and imminent harm to law enforcement or others. Kerlikowske Dec. at ¶¶ 4, 69-75.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████ Defendants have embarked on an actual policy and custom of excessive force against protesters, as described at length above. *See Nordstrom v. Ryan*, 762 F.3d 903, 911 (9th Cir. 2014) (A plaintiff may demonstrate constitutional harm if the harm is part of a pattern of behavior that violates the plaintiff's rights); *Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) ("[A] plaintiff can show a custom or practice of violating a written policy."). This actual policy includes regularly deploying what they themselves consider deadly force against peaceful protesters without prior warning, as Ms. Eckman experienced when they shot her in the head. L. Eckman Dec. ¶¶ 18–26. It burdens Defendants little to require that they abide by their own written policies and established law.

### III.    THE SCOPE OF RELIEF IS APPROPRIATE

For the reasons above the Court may, and should, convert its Temporary Restraining Order into a preliminary injunction covering Plaintiffs and the putative class. Plaintiffs intend to promptly move for class certification, meriting class-wide relief.[4] However, Plaintiffs need not move on behalf of a certified class to get relief for the class. *A.A.R.P. v. Trump,* 605 U.S. 91, 98 (2025) (citing 2 W. Rubenstein, Newberg & Rubenstein on Class Actions §4:30 (6th ed. 2022 and Supp. 2024) ("courts may issue temporary relief to a putative class")).

Furthermore, the scope of relief requested is necessary to offer complete relief to the named Plaintiffs themselves. *See Trump v. CASA*, 606 U.S. 831, 851-52 (2025) (equitable

---

[4] Plaintiffs are working expeditiously to seek discovery from Defendants to support this motion, recognizing that this motion must be supported by proof and not mere allegation.

powers permit courts to administer "complete relief between the parties"). As this court has aptly

recognized, Plaintiffs' legal injury, chilling, is not just the product of direct impact of munitions

but the repeated use on protesters at the Portland ICE Building generally. Dkt. No. 68 at 19

("Were the Court only to enjoin Defendants from teargassing the named Plaintiffs, for example,

airborne chemicals from Defendants' use of gas against other protesters would continue to chill

Plaintiffs' First Amendment rights."). As was evident on January 31, 2026, it would be wholly

unworkable to expect Defendants to identify somebody like Laurie Eckman or Richard Eckman

in a crowd of over one thousand people and seek to avoid hitting them.

Not only is Plaintiffs' requested relief within the court's equitable powers, it is safe and

workable. Kerlikowske Decl. ¶¶ 68-74. As Mr. Kerlikowske explains:

> Most of the events that I have seen have been small and peaceful
> protests in which anyone who endangers law enforcement could be
> easily identified and arrested. However, I have policed, supervised
> operations for, and been involved in developing strategies for,
> massive, chaotic and much more violent protests. At these types of
> events, individuals sometimes may commit crimes. If the protests at
> the Portland ICE Building somehow grew to that size, there is
> nothing in the proposed injunction that would prevent LEOs from
> arresting and charging such an individual. It is quite common in
> some larger protests for violators to commit a criminal act and then
> use the anonymity of the crowd to blend back in, but those are just
> the general nature of some protests.

Kerlikowske Decl. ¶ 71.

Likewise, if DHS needs to clear a path for vehicular traffic or wants to clear the driveway

to the ICE Building, the appropriate method is to ask people to clear the way for the car with

clear instructions as to where to go and that failure to move or passive resistance may result in

arrest. *Id.* at ¶ 24. Using force on passive protesters is unreasonable and excessive, and it does

not achieve any legitimate police purpose. Nothing in the TRO or proposed preliminary

injunction prevents law enforcement from responding to legitimate threats. If an individual

throws an object, the proper approach is to identify that individual and target a response specific

to that person, not indiscriminately fire into crowds, as Defendants have been doing. *Id.* at ¶ 18. This relief is consistent with DHS's own policies, as discussed at length above.

## CONCLUSION

For the reasons above, Plaintiffs request the Court:

1. **CONVERT** its February 3, 2026 Temporary Restraining Order into a preliminary injunction to last until final judgment in this action; and

2. **ORDER** agents policing the Portland ICE Building to wear visible identification numbers with agency affiliation displayed.

Respectfully submitted,
DATED: February 12, 2026.            By:     SINGLETON SCHREIBER, LLP
                                              *s/ Kimberly S. Hutchison*
                                              Email: khutchison@singletonschreiber.com
                                              *Pro Hac Vice*

                                              ACLU FOUNDATION OF OREGON
                                              Kelly Simon, OSB No. 154213
                                              Email: -ksimon@aclu-or.org
                                              Eri Andriola, OSB No. 246500
                                              Email: eandriola@aclu--or.org

                                              ALBIES & STARK LLC
                                              J. Ashlee Albies, OSB NO. 051846
                                              email: ashlee@albiesstark.com

                                              PEOPLE'S LAW PROJECT
                                              Jane L Moisan, OSB NO. 181864
                                              Email: Jane@Pdxplp.com

                                              BRAUNHAGEY & BORDEN LLP
                                              Matthew Borden
                                              borden@braunhagey.com
                                              Hadley Rood
                                              hrood@braunhagey.com
                                              747 Front Street, 4th Floor
                                              San Francisco, CA 94111

Telephone: (415) 599-0210
Facsimile: (415) 276-1808
*Pro hac vice*


*Counsel for Plaintiffs*

PAGE 33 –  PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION