NAOMI SHEFFIELD, OSB No. 170601
Chief Deputy City Attorney
naomi.sheffield@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR 97204
Telephone: 503-823-4047
Facsimile: 503-823-3089
*Counsel for Amicus Curiae City of Portland*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **JACK DICKINSON**, *also known as the Portland Chicken;* **LAURIE ECKMAN; RICHARD ECKMAN; MASON LAKE; AND HUGO RIOS**, *on behalf of themselves and those similarly situated,*<br><br>Plaintiffs,<br><br>V.<br><br>**DONALD TRUMP**, *President of the United States, in his official capacity;* **KRISTI NOEM**, *Secretary, U.S. Department of Homeland Security (DHS), in her official capacity;* **AND U.S. DEPARTMENT OF HOMELAND SECURITY,**<br><br>Defendants. | Case No: 3:25-cv-2170-SI<br><br>**DECLARATION OF FRANZ SCHOENING IN SUPPORT OF CITY OF PORTLAND'S BRIEF OF AMICUS CURIAE** |

I, Franz Schoening, declare as follows:

1.    The facts and events described below are personally known to me and if called to testify as to their accuracy, I would do so.  I submit this declaration in support of the City of Portland's Amicus Curiae brief in this matter.

2.    I am currently employed by the City of Portland as the Commander of the Specialized Resources Division. I have held that position since January 2024. Prior to that I was a Captain in the Portland Police Bureau's ("PPB") Training Division since October 13, 2022. I have been employed in a sworn capacity by PPB since January 2002. I began my career as a

Page 1 – DECLARATION OF FRANZ SCHOENING

**EXHIBIT C   Page 1 of 27**

police officer, predominantly in patrol. I was promoted to Sergeant in 2007 and was a patrol sergeant. I was assigned to PPB's Mounted Patrol Unit ("MPU") from 2010 to 2012. I have held the rank of Lieutenant since 2018, when I was assigned to the Chief of Police's Office as the executive officer for the Operations Branch. I was then assigned to PPB's Detective Division from February 2021 until October 13, 2022.

3.    In 2008, I became a squad leader with PPB's Rapid Response Team ("RRT"). RRT is PPB's detached unit primarily responsible for managing crowd control incidents. With the exception of 2010 to 2012 when I was assigned to the MPU, and from 2018 to 2019 when I was assigned to the Chief's Office, I was a squad leader with RRT and participated in RRT trainings and operations. From May 2019 to October 2020, I was RRT's Team Commander. As Team Commander, part of my responsibilities included administrative functions, such as procuring equipment, overseeing the RRT member selection process, and overseeing RRT training. In that role, I also deployed with RRT squads during crowd management or control incidents, provided real-time information to the Crowd Management Incident Commander ("CMIC") and his or her staff, and implemented the tasks or assignments given to the RRT squads by the CMIC. The CMIC is the PPB member who has overall authority and responsibility for conducting incident operations and is responsible for managing all incident operations at the scene.

4.    Since October 2020, in response to crowd management events, I have served as a CMIC. Beginning October 2024, I took over the role of program coordinator for all CMICs within PPB, which means I am responsible for coordinating on-call responsibilities for CMICs and Incident Management Team ("IMT") members, notifying CMICs when they have been activated by the Assistant Chief of the Operations Branch, organizing CMIC and IMT meeting dates and agendas, and tracking CMIC and IMT professional development and qualifications. Additionally, in my role as Commander of the Special Resources Division, I supervise the RRT Commander, ensure they are fulfilling their responsibilities, approve RRT Standard Operating Procedures, and ensure the Team's practices align with PPB's strategic goals.

Page 2 – DECLARATION OF FRANZ SCHOENING

**EXHIBIT C  Page 2 of 27**

5.      Attached hereto as *Exhibit 1* is Portland Police Bureau's Directive 635.10, which outlines PPB's policies for responding to public order events in Portland.

6.      Consistent with Directive 635.10, PPB responds to both planned and spontaneous events, by evaluating the nature of the events and determining the complexities or risks to public order and the resources necessary to manage those risks. For more complex events, PPB has specialized resources, including CMICs, IMTs, and RRT.

7.      As expressed in Directive 635.10, the policy of PPB and the goals of incident commanders when developing a response to a public order event is to uphold the rights of individuals engaging in First Amendment activity and free expression, while maintaining public safety, peace, and order. The way that police officers show up and respond at public order events can significantly impact those goals.

8.      I have been involved in PPB's response to public order events at the Portland ICE facility on S Macadam Avenue that began in early June of 2025 and have continued through present. I have been directly involved as an incident commander on multiple nights, and I have also remained aware of the activity at the facility through debriefings and information provided by other incident commanders and information shared with me in my role as the Special Resources Division Commander.

9.      During this time period, PPB has regularly monitored the protests at the ICE facility. PPB has often had dialogue liaison officers ("DLOs") in the crowd to speak with protesters and organizers to understand people's plans and intentions and to seek to de-escalate conflict. PPB has, at times, had plain clothed officers in the crowd identifying criminal activity and arresting individuals who engage in criminal activity. PPB has also, at times, had bike squads providing police support, as well as squads in full personal protective equipment when necessary.

10.     PPB has regularly maintained an individual contact person to connect nightly with the incident commander or a representative from Federal Protective Services ("FPS") at the ICE facility in order to provide assistance if criminal activity were to occur and to learn of the

Page  3  –  DECLARATION OF FRANZ SCHOENING

*EXHIBIT C   Page 3 of 27*

intended actions of federal law enforcement. We similarly communicated any observations we had of criminal activity or concerns that arose.

11.    In monitoring and responding to public order events at the ICE facility during the time period from June 2025 to present, there have been trends in activity. Initially in early to mid-June there were fairly significant crowds and criminal activity directed at the ICE facility itself and the officers who were there. This criminal activity included breaking windows, breaking the gates, lighting small fires, graffitiing the building, and throwing objects at officers. PPB activated a crowd management incident command team and convened resources to respond nightly to the protests during this time period.

12.    By late June 2025, most of the criminal activity at the ICE facility had ceased, and crowd sizes had significantly decreased. The conduct of protesters had become largely lawful or passive criminal activity such as blocking the driveway. At this time, PPB de-activated the IMT, but maintained nightly monitoring by Central Precinct patrol for the remainder of the summer with the exception of a couple of days where larger events occurred.

13.    On September 28, 2025, after President Trump announced his intent to deploy the National Guard to Portland, protests increased again in size. Over the next month, the trend in activity involved less criminal conduct focused at the ICE facility or federal officers, but more inter-protest conflict between people with conflicting views. This resulted in more harassment and assault incidents, where PPB has responded by making targeted arrests.

14.    ORS 181A.708 sets forth specific limitations on when certain crowd control munitions, including impact munitions and indiscriminate tools, such as tear gas, can be used during a public order event. Additionally, ORS 181A.710 prohibits a law enforcement agency from using another law enforcement agency as a proxy to use crowd control munitions in a manner that would violate ORS 181A.708 or any court orders or act in concert with another law enforcement agency to engage in such conduct. Throughout this entire time period, from June 2025 through January 31, 2026, I have observed numerous times where federal law enforcement officers at the ICE facility used crowd control munitions in a way that would violate ORS

Page 4 – DECLARATION OF FRANZ SCHOENING

**EXHIBIT C   Page 4 of 27**

181A.708. These uses of munitions inconsistent with Oregon law, inhibit PPB's ability to actively coordinate a crowd control response with the federal law enforcement.

15.    Particular examples of incidents where federal officers appeared to use force inconsistent with Oregon law, PPB Directives, and my understanding of best practices include:

a.    On October 4, 2025, a large group of individuals during a daytime protest, marched to the ICE facility. There were many community members, and clearly some older members of the community. Some individuals trespassed on the ICE facility driveway. Federal officers were able to, and did, come out and make arrests. PPB had dialogue liaison officers deployed close to the crowd and bicycle officers nearby, prepared to make arrest for criminal conduct or address safety issues. At one point, federal officers returned to the building, and there was an undeployed tear gas canister left on the pavement. PPB recovered the canister and notified FPS. Immediately after, federal officers came out of the building and deployed tear gas on a crowd of people. At that time, we had seen no violent criminal conduct—at most passive trespassing and civil disobedience-type conduct. The use of tear gas was startling. That same day, later in the evening, federal law enforcement officers left the ICE facility to clear individuals from the driveway and began to push the crowd east on S Bancroft and north on S Moody—pushing them quite a distance away from the ICE facility. During this time, I still did not see any criminal conduct that would explain this push, and federal officers again used significant crowd control munitions, including large amounts of tear gas. During this time, PPB had DLOs and bike officers who had to leave the area because they were being impacted by the tear gas.

b.    On October 18, 2025, there was a fairly large crowd outside of the ICE facility. PPB had DLOs and bike officers in close proximity to address the crowd and intervene in the event that criminal activity occurred. The federal law enforcement officers again deployed a significant amount of crowd control

Page 5 – DECLARATION OF FRANZ SCHOENING

**EXHIBIT C   Page 5 of 27**

munitions, impacting some PPB officers both with tear gas and at least one officer with a direct impact munition. The Sergeant struck by an impact munition reported positioning his team at a safe distance from the ICE facility, and video showed that he was positioned on the traffic island on S Bancroft on the east side of S Macadam. He was a bike squad Sergeant, wearing very identifiable PPB uniforms with bright yellow sleeves. Despite the positioning and identifiable uniforms, the bike squad was exposed to CS gas, and while putting on gas masks, the Sergeant was struck in his shoulder. This danger prompted this team of bike officers to leave the area. Based on our officer observations and the publicly available video there did not appear to be violent or criminal behavior from the crowd that would have been a basis for the use of such indiscriminate force tools. To the contrary, from publicly available video that I viewed, it appeared that a federal officer carrying a .40 millimeter launcher deployed either a .40 millimeter CS or smoke munition skat shell toward the ICE facility. The munition skipped off of the driveway and onto the roof of the ICE facility where other federal officers were standing. Immediately after, the federal officers standing on the roof began launching crowd control munitions toward the crowd from the roof.

c.     I observed video and spoke to officers regarding an incident on October 20, 2025 regarding the use of pepper balls by federal officers. Federal officers appeared to be deploying pepper balls at individuals standing at the corner of Bancroft and Moody who were hiding behind a stop sign and shining a flashlight toward the ICE facility. PPB bicycle officers were in the vicinity, and the individuals ran behind them. Subsequently, federal officers approached the PPB officers, telling them "You need to engage or get out of the way." This illustrates the disconnect in the federal government's response and PPB's capacity to respond. Federal officers use force and expressed frustration at PPB's response

Page 6 – DECLARATION OF FRANZ SCHOENING

*EXHIBIT C  Page 6 of 27*

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

even in situations where there was no violation of Oregon law that PPB could respond to—there was no actionable criminal behavior taking place.

16. Generally, based on my observations of federal uses of force at the ICE facility since June, it is common that the types and amounts of force being used is disproportionate to the level of criminal conduct or violence that I have observed. This impacts PPB's ability to enforce the laws and keep the community safe for a number of reasons:

a. The lack of unified command and control between law enforcement officers at the ICE facility has limited the amount and accuracy of communication and information that PPB receives. Multiple federal law enforcement agencies at the ICE facility appear to be operating under their own rules of engagement without coordinating the deployment of indiscriminate force tools through a single incident commander. Due to this lack of coordination it is frequently the case that nothing is communicated to PPB prior to federal officers using significant amounts of indiscriminate force. This lack of information is further exacerbated by the fact that the uses of force often do not appear to be in response to violent criminal conduct. These factors make the uses of force and location of force by federal officers unpredictable to PPB in the same way they are unpredictable to members of the crowd. This puts PPB officers at a safety risk themselves and forces them to pull back from their positions within the crowd. By leaving the area, PPB officers are not close enough to observe criminal conduct and make necessary arrests or intervene.

b. Because of the limitations set forth in ORS 181A.708 and ORS 181A.710 regarding use of force, using proxy law enforcement agencies, and acting in concert with other law enforcement, the federal law enforcement officers' uses of force diminish PPB's ability to effectively engage in the space near the ICE facility and provide assistance and a coordinated response when actual criminal activity occurs.

Page 7 – DECLARATION OF FRANZ SCHOENING

**EXHIBIT C  Page 7 of 27**

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

c.     The indiscriminate uses of force also often change the behavior of the crowd. When the crowd begins to perceive illegitimate or unjust actions, the collective identity and normative behavior of the crowd become more resistant to exercises of authority, including those by PPB. This makes it more difficult for PPB officers to gain voluntary compliance and to de-escalate. For example, on October 4, 2025, after federal law enforcement officers used tear gas, PPB experienced a marked decline in cooperation from protesters to move out of the street to prevent traffic safety hazards. Previously, PPB had successfully engaged with the group to ensure traffic flowed on Bancroft. But after the federal uses of force, many people refused to comply with these requests.

17.    I provided further testimony regarding these events and other incidents at the ICE facility at the trial in *State of Oregon, et al. v. Trump, et al.*, 3:25-cv-01756-IM (Oct. 29, 2025). The testimony I gave during that trial is true and correct to the best of my knowledge.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED:__2/12/2026__

Franz Schoening
Digitally signed by Franz Schoening
Date: 2026.02.12 10:45:12 -08'00'

FRANZ SCHOENING

Page  8  –  DECLARATION OF FRANZ SCHOENING

EXHIBIT C   Page 8 of 27

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047



**Join the Best: The Portland Police Bureau is hiring officers.**
Looking for an exciting & rewarding career, with benefits? We're hiring! **Salary ranges $84k-$120k +pay incentives.** Benefits are 95% paid by the city. Visit:   JoinPortlandPolice.com

# 0635.10 Portland Police Bureau Response to Public Order Events

Administrative Rules Adopted by Bureaus Pursuant to Rule Making Authority (ARB)

**Policy category:**  Field Operations (0600)

**Policy number:**  PPB-0635.10

**0635.10 Portland Police Bureau Response to Public Order Events**

**Refer:**
• ORS 131.675 Dispersal of Unlawful or Riotous Assemblies
• ORS 161.015 General Definitions (1) ("Dangerous Weapon")
• ORS 161.205 Use of Physical Force Generally
• ORS 166.015 Riot
• ORS 166.220 Unlawful Use of Weapon
• ORS 181A.250 Specific Information Not to be Collected or Maintained
• ORS 181A.708 Use of Chemical Incapacitants, Kinetic Impact Projectiles and Sound Devices
• ORS 181A.710 Use of Other Law Enforcement Agencies to Engage in Barred Conduct
• Oregon Administrative Rules 166-200-0405(5) and 166-200-0100(68)
• Portland City Code 14C.30.010, Authority to Restrict Access to Certain Areas
• Portland City Code 14C.30.020, Other Police Officers Authorized to Arrest, Cite, or Take Other Enforcement Action for Violations of City Code Provisions
• Portland City Code 14C.30.040, Seizure and Disposition of Weapons
• Portland City Code 20.12.200, Trespassing and Areas Closed to the Public
• Portland City Code 20.12.265, Park Exclusions
• DIR 0312.50, Identification
• DIR 0344.05, Bias-Based Policing/Profiling Prohibited
• DIR 0635.00, Strikes/Job Actions
• DIR 0635.20, Community Member Observation of Police
• DIR 0640.02, Photography and Digital Imaging
• DIR 0650.00, Search, Seizures, and Inventories
• DIR 0660.10, Property and Evidence Procedures
• DIR 0700.00, Bureau Response to All-Hazards Using the National

## Upcoming and Recent Changes

0635.10 Portland Police Bureau Response to Public Order Events - Executive Summary
**Effective Date:**   November 15, 2024

0635.10 Portland Police Bureau Response to Public Order Events - Second Universal Review
**Effective Date:**   August 9, 2024

0635.10 Portland Police Bureau Response to Public Order Events - First Universal Review
**Effective Date:**  March 3, 2024

View all changes

## Search Code, Charter, Policy

**Keywords**

[                    ]   Search

***EXHIBIT C   Page 9 of 27***

Incident Management System (NIMS)
• DIR 0900.00, General Reporting Guidelines
• DIR 0905.00, Non-Force After Action Reporting
• DIR 0910.00, Use of Force Reporting, Review, and Investigation
• DIR 1010.00, Use of Force
• DIR 1015.00, Less Lethal Weapons and Tools
• Operations Branch, Standard Operating Procedure #15: Mobile Field Force
• Forensic Evidence Division, Standard Operating Procedure: Video/Photographic Evidence Collected in Response       to Civil Disturbance or Crowd Management/Control Operations and the Disposition of Such Video/Photographs

**Definitions:**

• Civil Disobedience: A non-violent form of protest or resistance to obeying certain laws, demands or commands of a government.

• Civil Disturbance: An unlawful assembly that constitutes a clear and present danger of riot, disorder, interference with traffic upon the public streets or when another immediate threat to public safety, peace or order appears.

• Crowd Control: Law enforcement tactics and strategies used in response to an event to effect or influence a crowd to comply with a lawful order, when the event has become a civil disturbance or riot. Crowd control may include mass arrests, dispersal orders, the use of less lethal weapons, or other tactics that may be necessary to preserve life or safety.

• Crowd Intervention: Law enforcement strategies and tactics used, before riot declaration, to de-escalate or prevent or isolate disruptions or unlawful activity during an otherwise lawful event. Crowd intervention may include communication with event participants during the event, individual arrests targeting persons engaged in unlawful behavior, and other tactics that de-escalate crowd behavior and minimize disruption of those lawfully exercising their rights.

• Crowd Management: A public security practice in which crowds are managed to prevent the outbreak of crowd crushes, affrays, fights or riots, or in which an assembly, protest or demonstration is dispersed. This is a state law term that defines when certain weapons, tools, and proxy law enforcement use is restricted by state law. For this directive, crowd management encompasses crowd stewardship, crowd intervention, and crowd control.

• Crowd Management Incident Commander (CMIC): For this Directive, an incident commander who has received special training in crowd stewardship, intervention, and control. The Chief of Police will designate a command staff member to serve as the CMIC for every major public order event. When the CMIC assumes incident command responsibilities, they become the IC and possess the overall responsibility for managing the

*EXHIBIT C   Page 10 of 27*

**EXHIBIT 1**
**Page 2 of 19**

Case 3:25-cv-02170-SI   Document 98-3   Filed 02/16/26   Page 11 of 27

event by establishing objectives, planning strategies, and implementing tactics in accordance with this Directive and Directive 0700.00, National Incident Management System (NIMS) and Incident Command System (ICS). This position reports to the Assistant Chief of Operations or, if necessary, the Chief or Deputy Chief during events.

• Crowd Stewardship: Law enforcement review and tracking of public order events to determine what, if any, police presence is needed to facilitate the lawful expression of First Amendment Rights while preserving public safety. Crowd stewardship may include: event planning, communicating with participants before and during the event, information gathering and sharing, observing the event for criminal activity, deciding for or against visible police presence during the event, and other approaches.

• Feasible: When time and safety allow for a particular action.

• Handheld Chemical Incapacitant: The following, together or separately: (i)   Handheld  munitions and devices specifically designed to cause temporary pain, temporary irritation, temporary disruption of vital processes, temporary incapacitation, temporary disability or permanent harm through the toxic properties of toxic chemicals, or their precursors, that would be released as a result of the employment of the handheld munitions and devices; and (ii) Any equipment specifically designed for use directly in connection with the employment of handheld munitions and devices as described in subparagraph (i) of this subparagraph. "Chemical incapacitant" does not include tear gas.
   o   As used in this directive, Bureau Issued Oleoresin Capsicum spray (e.g., Sabre Red) is considered a                   Handheld Chemical Incapacitant.

• Incident Action Plan (IAP): An oral or written plan containing the objectives established by the IC or Unified Command and addressing tactics and support activities for the planned operational period.

• Incident Commander (IC): The person responsible for all incident activities, including developing strategies and tactics and monitoring resources. The IC has the overall authority and responsibility for conducting incident operations and is responsible for managing all incident operations at the incident site.

• Incident Command System (ICS): A standardized approach to the command, control, and coordination of on-scene management.

• Kinetic Impact Projectile (KIP): All non-lethal, less-lethal, or semi-lethal projectiles, including, but not limited to rubber and plastic bullets, beanbag rounds, sponge rounds, and pellet rounds.

• Lawful Objective: Any reason for police action that is valid under the law, which may include, but is not limited to: arresting, detaining, or searching a person; overcoming resistance or preventing escape; preventing the commission of a crime; defending self or others; preventing a person from

*EXHIBIT C   Page 11 of 27*

**EXHIBIT 1
Page 3 of 19**

2/13/26, 11:53 AM
Case 3:25-cv-02170-SI    Document 98-3    Filed 02/16/26    Page 12 of 27
0635.10 Portland Police Bureau Response to Public Order Events | portland.gov

self-harm; restricting access to an area in an emergency; ordering dispersals.

• Mass Arrest: The tactic of simultaneously arresting, in one action, numerous people in a short amount of time during a crowd management event, with the intent of taking them into custody or issuing them criminal citations, when there is individualized probable cause.

• Mass Detention: The tactic of simultaneously detaining, in one action, numerous people during a crowd management event for a cursory investigation when there is individualized reasonable suspicion.

• Mobile Field Force (MFF): Sworn members, who are trained in basic crowd control tactics and techniques, organized into a squad and deployed to assist in crowd management.

• Operations Section Chief: A member, designated by the CMIC, who develops and implements strategy and tactics to carry out incident objectives. The designated member organizes, assigns, and supervises the tactical response resources.

• Persons-In-Charge: The person(s) designated by an event organizer or permit holder to act on behalf of, and with the authority of, the event organizer or permit holder.

• Police Action: Any circumstance, on or off duty, in which a sworn member exercises or attempts to exercise police authority. This includes, but is not limited to, stops, searches, arrests, and use of force.

• Portland Police Bureau Event Liaison: A Bureau member who has been designated by the IC as the primary contact for communication with the event's Person-In-Charge to police.

• Public Order Event: A lawful assembly of a large number of people. Generally, persons primarily organize to exercise their First Amendment right to express political or social views and influence public opinion; however, these events may include the assembling of people to participate in a social or community event. Events can be planned or spontaneous and may include, but are not limited to, distributing literature, displaying banners, assembling, marching, picketing, participating in festivals or concerts, or other similar activity.

• Rapid Response Team (RRT): The Bureau's all-hazard team of members who are specially trained to assist in the response to human-made/natural disasters and other emergency management situations which include, but are not limited to, the management and control of crowds through various tactics and techniques.

• Resistance: Opposition or obstruction directed towards an officer that impedes a lawful objective. Resistance may consist of the following:

    o   Passive Resistance: Non-compliance or non-cooperation with an

*EXHIBIT C   Page 12 of 27*

**EXHIBIT 1
Page 4 of 19**

officer's lawful order that is non-violent,                and does not involve active conduct or pose an immediate threat to the officer or the public.

 o Active Resistance: A person's physical attempt(s) to evade a member's control or lawful order.

- Riot: Six or more persons engaging in tumultuous and violent conduct and thereby intentionally or recklessly creating a grave risk of causing public alarm.

- Squad: A group of members tasked with accomplishing certain goals and missions.  A minimum of one supervisor shall be assigned to lead each squad. The maximum span of control is 1-7 members per supervisor. (ICS refers to this group as a "strike team").

- Tear Gas: Oleoresin capsicum or orthochlorobenzalmalononitrile, or other similar chemicals meant to accomplish the same effect, administered by any shell, cartridge, or bomb capable of being discharged or exploded, when the discharge or explosion will cause or permit the release or emission of the chemicals.

 o As used in this directive, Bureau-issued launched and tossed munitions that disperse CS, CN, or OC over an                area (e.g., Defense Technology Triple Chaser, or OC 40MM Skat Shell) or impact munitions with a chemical                payload (e.g., FN303 PAVA) are considered Tear Gas and are subject to the same restrictions.

- Unlawful Assembly: Five or more assembled persons who engage in trespass or intentionally cause, or with reckless disregard create a risk of causing, public inconvenience, annoyance, or alarm by engaging in one or more of the following activities, which may include but are not limited:

 o Fighting or violent, tumultuous or imminently threatening behavior;
 o Making unreasonable noise;
 o Disturbing any lawful assembly of persons without lawful authority;
 o Obstructing vehicular or pedestrian traffic on a public way;
 o Initiating or circulating a report, knowing it to be false, concerning an alleged or impending fire, explosion,                crime, catastrophe, or other emergency;
 o Damaging property; or
 o Creating a hazardous or physically offensive condition by any act which the person is not licensed or                privileged to do

- Warning: An officer's verbal order intended to obtain compliance and convey to the recipient that failure to          comply with the order may result in an officer's use of force.

**Policy:**
1. This Directive establishes procedures for the Bureau's response to public order events ("events").

*EXHIBIT C Page 13 of 27*

**EXHIBIT 1
Page 5 of 19**

2. The Portland Police Bureau recognizes both the importance of protecting First Amendment rights and the tradition of exercising free speech and assembly in the City of Portland. The Bureau is committed to respecting lawful assembly and expression of speech while also maintaining public safety, peace, and order.

3. The Bureau follows national best practices among the principles of crowd monitoring, crowd intervention, and crowd control. Absent immediate safety concerns, the Bureau begins with crowd monitoring and prioritizes event participant engagement and promoting the crowd to self-regulate.

4. While the First Amendment protects freedom of speech, it does not protect criminal acts.  The Bureau has a responsibility to protect public safety and maintain peace and order. The Bureau recognizes that a police response that impedes otherwise protected speech must be narrowly tailored to serve a significant government interest. Events may simultaneously include persons lawfully assembling and expressing speech, and persons unlawfully committing crimes. The Bureau must assess the totality of the circumstances to determine whether and to what extent police action is needed.

**Procedure:**

1. Core Principles.

1.1. Bureau members shall respect the First Amendment rights of all persons to peaceably assemble and exercise their freedom of speech.

1.2. When event participants comply with applicable laws and City ordinances, the Bureau shall attempt to limit police involvement by encouraging and supporting participant efforts to self-regulate and manage their events.

1.3. Nothing in this directive relieves members from following other Bureau directives, reporting or investigation requirements, or state or federal law.

1.4. Directive 1010.00, Use of Force, governs all uses of force, including force use during events.

1.4.1. In accordance with state law, members' force use for crowd management is further restricted by requirements in this directive (e.g., the restricted use of certain weapons and tactics for crowd management purposes).

1.5. The Bureau shall use the standardized, on-scene, all-hazards ICS to plan and manage events. Members shall refer to Directive 0700.00, Bureau Response to All-Hazards Using the National Incident Management System (NIMS), for specific guidance regarding incident management.

1.6. In accordance with ICS, the IC or designee shall develop an Incident Action Plan (IAP) for the event, if the IC deems a police response necessary. *EXHIBIT C   Page 14 of 27*

2.    Incident Action Plan.

2.1.    If the IC determines that a police response necessary, the IC or designee shall develop a written IAP for the event, when feasible.

2.1.1.    If it is not feasible to develop a written IAP, the IC or their designee shall ensure that they document the IAP through another available medium (e.g., radio or handheld recording, Computer Aided Dispatch, incident board, duty notebook, ICS 201 form, etc.)

2.1.1.1.    The IC or their designee shall provide justification for not issuing a written IAP in their after-action report.

2.2.    The IAP shall define the operational period, including approximate beginning and end dates and times.

2.3.    The IAP shall not circumvent the use of force requirements and guidance set forth in Directive 1010.00, Use of Force, or this policy.

2.4.    The IC or designee shall develop a new IAP for each operational period.

3.    General Guidelines for Planned Events (At Least 24-hour Notice).

3.1.    The Assistant Chief of Operations and the precinct commander nearest to the event location shall determine whether a planned police response is necessary and the extent of initial staffing needs.

3.1.1.    Events that are small in crowd size, or for which credible information indicates that there is little concern of criminal activity, civil disobedience, civil disturbance, or riotous behavior, shall generally be managed at the precinct level.  The shift supervisor (Lieutenant) shall serve as the IC and determine precinct staffing needs.

3.1.1.1.    If crowd behavior escalates to a level that poses a threat to public safety, peace, or order during an event that is being managed by a shift supervisor acting as the IC, the shift supervisor must consult with a CMIC who will then determine if the CMIC should assume command and request additional resources.

3.1.2.    The Assistant Chief of Operations shall designate a CMIC for events that are anticipated to have a greater critical impact, require a significant police response, and/or have the potential to become a civil disturbance or riot.

3.2.    If the IC determines that basic Mobile Field Force (MFF) and bicycle units are not sufficient to manage the crowd, the IC may request a CMIC to assume control of the event.

3.3.    Only a CMIC may activate or request the Rapid Response Team (RRT), mass arrest teams, detention teams, or mutual aid.

4.    General Guidelines for Spontaneous Events (Less Than 24-hour Notice).

4.1.    Many spontaneous events can be lawful and facilitated with appropriate police assistance. A spontaneous or non-permitted event is not necessarily unlawful, nor does it automatically require a significant police response.

*EXHIBIT C    Page 15 of 27*

4.2.  A supervisor at the precinct of occurrence shall respond to the event to determine if a police response is warranted.

4.2.1.  If a police response is warranted, the on-scene supervisor shall serve as the IC for the incident and attempt to engage the event organizer or a person of influence in an effort to protect the safety of participants and the public, and to facilitate participants' right to lawfully assemble.

4.2.1.1.  If the Sergeant who is the first supervisor on scene of a spontaneous event determines that, within the ICS, they do not have the capacity to solely manage the event, they shall notify their Lieutenant, who may then respond to the scene and assume command after debriefing.

4.2.2.  The IC shall consult with a CMIC to determine if a higher level of police response is necessary or if the CMIC should assume command, based on crowd behavior.

5.  Communication with the Crowd.

5.1.  Communication is a critical function during, and when feasible, before, an event. Announcements and warnings serve an informational purpose but have certain functional distinctions. Generally, the Bureau will strive to directly communicate with event organizers and use amplified audio communications and the Public Information Officer (PIO) to issue announcements and warnings to the crowd for the purpose of decreasing the need for police action.

5.2.  When communicating with event participants, members shall endeavor to engage participants in a positive manner, when feasible.

5.2.1.  Members shall act in accordance with Directive 0310.00, Professional Conduct and Courtesy, and consider procedural justice principles focused on explaining their actions, in accordance with Directive 0025.00, Procedural Justice.

5.3.  Barring emergency circumstances, the Bureau shall issue announcements and warnings by using a graduated approach that aligns with its response of crowd stewardship, intervention, or control.

5.4.  Announcements.

5.4.1.  Announcements are designed to:

5.4.1.1.  Convey general information to the crowd in an effort to keep an event lawful;

5.4.1.2.  Communicate targeted information to specific persons to provide direction; and

5.4.1.3.  Serve as a de-escalation tool by directing and informing the crowd in an attempt to prevent the need for police action or the use of force.

5.4.2.  Throughout the event, members shall continuously monitor the crowd for behavior that presents a clear and present danger that threatens the public safety, peace, or order and issue appropriate announcements, as needed.

5.4.3.  When feasible, a designated announcer shall issue a minimum of two announcements at reasonable intervals to notify the crowd of impending police action.

5.4.4.  When issuing announcements, the announcer should cite specific

*EXHIBIT C   Page 16 of 27*

offenses and violations being committed and caution the crowd that riotous acts will not be permitted and may result in arrest or necessitate the use of force.

5.5.   Warnings.
5.5.1.    Warnings are designed to:
5.5.1.1.    Inform person(s) of impending police action (e.g., force); and
5.5.1.2.    Gain compliance with a lawful order.

5.5.2.    If the crowd or persons in the crowd engage in criminal activity or behavior that presents a clear and present danger that threatens the public safety, peace or order, members may shift to employing crowd intervention and/or crowd control tactics. If this occurs, members shall, when feasible, issue warnings to the crowd.

5.5.3.    Pursuant to Directive 1010.00, Use of Force and state law, members shall, when feasible, issue a warning before using force.

5.6.   Documenting Announcements and Warnings.
5.6.1.    Members shall document their issuance of an announcement(s) or warning(s) in an appropriate police report (e.g., date, time, location, announcing member, messages, number of warnings provided, etc.).
5.6.1.1.    If a member does not issue a warning before using force, the member shall document the reason in their force report.

5.7.   Amplified Audio Communications.
5.7.1.    When feasible, members should use a sound truck or another public announcement system to ensure the crowd can hear the Bureau's announcements or supplement warning issuances.
5.7.1.1.    Announcements and warnings to the crowd should be loud, intelligible, and consistent.
5.7.1.1.1.    When feasible, a member should position themselves at the back of the crowd to ensure the sound truck communication is sufficiently loud, intelligible, and consistent.
5.7.2.    The Bureau shall not use a sound device (e.g., the sound truck) for crowd management for any purpose other than announcements or warnings.
5.7.3.    During spontaneous events, members may not have access to a sound truck or another public announcement system, and the PIO may not be present. In these circumstances, members shall act in accordance with this section when operationally possible.

5.8.   Social Media Communication.
5.8.1.    When feasible, the PIO shall communicate the Bureau's announcements and warnings using social media.

6.   Crowd Stewardship.
6.1.   Planning and Communication.
6.1.1.    Bureau response to an event may not be necessary; however, when a police response is requested or deemed necessary by the Bureau:
6.1.1.1.    The Bureau shall make reasonable efforts to contact and engage

**EXHIBIT C   Page 17 of 27**

in dialogue with known event organizers to assist the Bureau in its planning and to develop a shared understanding of the organizers' needs and objectives. Similarly, the Bureau should communicate its expectations and inform participants on permissible and restricted actions during the event.

6.1.1.2.   The Bureau, through the PPB Event Liaison or another designee, shall attempt to maintain communication with known event organizers or the Person(s)-in-Charge before and during the event.  The Liaison shall maintain communications with the IC to keep them apprised of the situation.

6.1.1.3.   The Bureau, through the PIO or another designee, shall communicate through the use of social media and other conventional outlets to keep the public, including the crowd, informed throughout the event. The Bureau shall update its means of communication based on current technology.

6.2.    During the Event.

6.2.1.    The IC shall continuously monitor the event, weighing the totality of the circumstances to inform the decision to introduce police action to maintain public safety, peace, and order.

6.2.1.1.   When deciding whether to use certain police tactics within a crowd, the IC shall consider the government interest in intervening and the potential impact on the participants' ability to exercise their First Amendment rights.

6.2.1.2.    The IC, or a designee, shall authorize the appropriate level of protective equipment based on several factors including, but not limited to:

6.2.1.2.1.    Member safety,

6.2.1.2.2.    Individual and/or group physical resistance,

6.2.1.2.3.    The presence of weapons,

6.2.1.2.4.    Actual or credible threats or indicators of violent behavior,

6.2.1.2.5.    Actual or credible threats or indicators of criminal actions, and

6.2.1.2.6.    The potential impact or perceived effect that appearing in protective gear may have on the crowd.

6.2.1.3.    When practical and in an attempt to avoid escalating the situation, the IC should strive to position members in protective gear in locations that minimize visibility until deployment is necessary for crowd intervention or control.

7.    Crowd Intervention.

7.1.    In some circumstances, there is little government interest in regulating non-violent crowd participation in civil disobedience. However, if individual behavior escalates and presents a clear and present danger that threatens the public safety, peace, or order, and the event can no longer be effectively managed through a minimal police presence, therefore increasing the government interest, the IC may adjust crowd tactics to adequately respond.

7.2.    During intervention, the Liaison or another IC-designated member shall continue to attempt to maintain communication with the known event organizers or the Person(s)-in-Charge the event.

*EXHIBIT C   Page 18 of 27*

**EXHIBIT 1
Page 10 of 19**

2/13/26, 11:53 AM
Case 3:25-cv-02170-SI    Document 98-3    Filed 02/16/26    Page 19 of 27
0635.10 Portland Police Bureau Response to Public Order Events | portland.gov

7.3.    When crowd intervention is necessary, members shall strive to distinguish between persons engaged in criminal behavior, persons peacefully and lawfully demonstrating, legal observers and members of the media, and nonparticipants.

7.4.    The Bureau shall use intervention strategies and tactics, such as individual arrests, in an attempt to de-escalate the situation and prevent further unlawful behavior without interfering with members of the crowd who are lawfully assembling.

7.5.    When feasible, an IC-designated member and/or the member operating the sound truck shall convey police action to the crowd via announcements and warnings and attempt to encourage lawful activity.

7.6.    The IC shall continuously evaluate the Bureau's response and return to crowd stewardship techniques, when feasible.

8.    Crowd Control.

8.1.    If crowd behavior continues to escalate after employing intervention strategies and there is increased and widespread behavior that presents a clear and present danger that threatens the public safety, peace, or order, the IC may adjust crowd tactics to adequately respond.

8.2.    The Bureau may employ crowd control strategies in an attempt to de-escalate and/or prevent further unlawful or threatening behavior by restoring public safety, peace, and order.

8.3.    Riot Declaration.

8.3.1.    When the crowd (consisting of six or more persons) engages in tumultuous and violent conduct that creates a grave risk of causing public alarm, the IC may declare a riot.

8.4.    Crowd Dispersal.

8.4.1.    Pursuant to City Code, the IC is authorized to close an area in the event of an emergency. An emergency includes a riot.

8.4.2.    Pursuant to ORS §131.675, the IC may order a crowd to disperse when five or more persons are unlawfully assembled.

8.4.2.1.    Before giving the order to disperse, the IC shall consider:

8.4.2.1.1.    Whether dispersal unduly endangers the public, officers, or participants in the crowd;

8.4.2.1.2.    If there are other means available to protect the public, officers, and participants in the crowd from a clear and present danger that threatens the public safety, peace, or order; and

8.4.2.1.3.    Which dispersal tactics and/or type of tools are proportional and necessary based on the circumstances.

8.4.2.2.    Before taking police action to disperse the crowd, and when feasible, the announcer shall issue a minimum of two warnings at reasonable intervals to allow the crowd to comply.

8.4.2.2.1.    Members shall take reasonable action to accommodate people with disabilities when issuing or enforcing orders to disperse.

8.4.2.2.2.    When time and circumstances permit, members shall provide

*EXHIBIT C   Page 19 of 27*

**EXHIBIT 1
Page 11 of 19**

detailed guidance regarding the direction in which the crowd may disperse (e.g., street or intersection names, landmarks, etc.), while keeping in mind that event participants may not know cardinal direction or street names, and ensure that avenues of escape (i.e., clear path or route) are available to the crowd.

9.    Use of Force.

9.1.    When authorized to use force, members should carefully consider the potential negative impact that their force use could have on the overall tenor or behavior of the crowd. Members shall only use objectively reasonable force necessary to accomplish a lawful objective, and their actions must be in accordance with the IAP objectives or the IC's direction.

9.2.    When the Bureau declares a riot and orders the crowd to disperse, and the crowd does not heed repeated warnings, and no reasonable alternative is apparent, the IC may authorize the use of force. Force must comply with Directive 1010.00, Use of force, and further restrictions found in this directive.

9.2.1.    Members shall only use authorized less lethal force for crowd management at the direction of the IC and, when applicable avenues of escape (i.e., clear path or route) are available to the crowd.

9.2.2.    The IC shall continuously evaluate the incident and adjust the Bureau's tactics, ensuring that its response is proportional to the threat posed by the crowd, and employ de-escalation and crowd stewardship tactics, when feasible.

9.3.    Members shall not use the following less lethal force options for crowd management, as defined by state law and Bureau policy, unless otherwise permitted by this policy:

9.3.1.1.    Conducted Electrical Weapon (CEW), unless on an individual where force is authorized.

9.3.1.2.    Kinetic impact projectiles, unless deadly force is authorized.

9.3.1.3.    Handheld Chemical incapacitants.

9.3.1.4.    Tear gas, unless:

9.3.1.4.1.    The use is objectively reasonable by law enforcement to:

9.3.1.4.1.1.    Defend against a threat to life or serious bodily injury to any person, including any peace officer; or

9.3.1.4.1.2.    Bring an objectively dangerous and unlawful situation safely and effectively under control;

9.3.1.4.2.    A commanding officer (the IC) authorizes the use of tear gas;

9.3.1.4.3.    De-escalation techniques or other alternatives to force have been attempted, when reasonable, and failed; and

9.3.1.4.4.    The Bureau has done the following, in the following order:

9.3.1.4.4.1.    Announced the Bureau's intent to use tear gas;

9.3.1.4.4.2.    Allowed sufficient time for persons to evacuate the area; and

9.3.1.4.4.3.    Announced a second time, immediately before using the tear gas, the agency's intent to use tear gas.

*EXHIBIT C    Page 20 of 27*

Case 3:25-cv-02170-SI Document 98-3 Filed 02/16/26 Page 21 of 27

9.4. Members may use the following KIPs and handheld chemical incapacitants on an individual person in a crowd if the person is engaged in conduct otherwise justifying the use of force under state law and Bureau policy.

9.4.1. Handheld aerosol restraints, such as Bureau issued Oleoresin Capsicum spray; and

9.4.2. Non-chemical payload impact munitions.

9.5. Additional Requirements for Handheld Chemical Incapacitants and Non-Chemical Impact Munition Use:

9.5.1. Members shall attempt to minimize the incidental impact on bystanders, journalists, and unintended targets;

9.5.2. Members shall not use handheld aerosol restraints or non-chemical impact munitions on persons engaged in passive resistance that does not impede a lawful objective;

9.5.3. Members shall not deploy non-chemical impact munitions in a manner that intentionally targets the head of a person, unless the person is engaged in conduct that otherwise justifies the use of deadly physical force under state law and Bureau policy.

9.6. Cleanup Requirements.

9.6.1. Following the use of tear gas or KIPs, members shall, within a reasonable time of use of the tools and weapons, clean all visible debris caused by use.

9.7. Prohibited Crowd Control Tactics.

9.7.1. Members shall not use the following tools or tactics for crowd management purposes:

9.7.1.1. Fire hoses;

9.7.1.2. Canines;

9.7.1.3. Sound trucks for purposes other than issuing announcements and warnings.

9.7.2. Members shall not intentionally contact crowd members or bystanders with motor vehicles.

10. Medical Aid.

10.1. Members shall follow all post-force medical aid procedures set forth in Directive 0630.50, Medical Aid.

10.2. When members use handheld chemical incapacitants, tear gas, or KIPs in a crowd, the IC or a designee shall make efforts to notify emergency rooms in the vicinity of the type of aforementioned weapon or tool used.

10.3. When using handheld chemical incapacitants, tear gas, KIPs, or electronically amplified noise-producing equipment and when safe to do so, members shall:

10.3.1. Attempt to take injured persons to safety or allow injured persons to seek medical help;

10.3.2. Allow emergency medical services, including community medics, to reach injured persons; and

**EXHIBIT C   Page 21 of 27**

10.3.3.   Take reasonable action to accommodate disabilities when issuing or enforcing orders to disperse.

11.   Detentions and Arrests.

11.1.   Failure to comply with an order to disperse is not a crime and shall not be the basis for an arrest.

11.2.   Legal Observers and Members of the Media.

11.2.1.   Legal observers and members of the media have a constitutional right to observe, document, and report on public order events; however, they may not interfere with police action or impede a lawful objective.

11.2.2.   Members shall consider anyone identifying themselves as a member of the media, journalist, broadcaster, or legal observer, or displaying any indicia of the aforementioned, to be an authorized legal observer or member of the media.

11.2.3.   Members shall not detain or arrest legal observers or members of the media solely for their role in observing, capturing, and/or reporting on events.

11.2.4.   Members shall not interfere with media or legal observers performing their respective functions; however, media and legal observers are not exempt from arrest for their own criminal conduct.

11.3.   Mass Detentions and Arrests.

11.3.1.   Generally, the Bureau cannot practically accomplish mass detentions or arrests with standard detention and arrest procedures. Mass detentions and arrests require a specialized response and are most often associated with an unlawful assembly that constitutes a breach of the peace or presents a clear and present danger that threatens the public safety, peace, or order.

11.3.2.   The IC must authorize any mass detentions or mass arrests.  The IC or CMIC shall consult with the Detective Division to ensure mass arrest resources are available.

11.3.3.   The IC may only authorize mass arrests when there is probable cause to believe that the subjects of mass arrests have committed a criminal offense.

11.3.4.   The IC may only authorize mass detentions when there is reasonable suspicion to believe that the targets of mass detention have committed a criminal offense.

11.3.5.   Before authorizing mass detention or mass arrest, the IC shall:

11.3.5.1.   Consider whether other, less intrusive tactics are available to stop or investigate the criminal activity;

11.3.5.2.   Consider whether sufficient officers and resources are available to expeditiously investigate persons who are detained or process persons who are arrested;

11.3.5.3.   Consider whether they (the IC) reasonably believe the group is functioning as a unit; and

11.3.5.4.   Ensure they have individualized reasonable suspicion (mass

*EXHIBIT C   Page 22 of 27*

**EXHIBIT 1**
**Page 14 of 19**

detention) or individualized probable cause (mass arrest) for each person in the group to be detained or arrested.

12.    Video and Photographic Documentation.
12.1.    The Bureau may stream events to City facilities by live video feed to provide situational awareness to the IC.
12.1.1.    Pursuant to ORS 181A.250, the Bureau or IC shall not authorize recording or photographing events solely for the purposes of monitoring, collecting, or maintaining information about individuals or groups based solely on their political; religious; or social views, associations, or activities.
12.1.2.    When ordered by the IC to record criminal activity, members shall act in accordance with Directives 640.02, Photography and Digital Imaging, and 660.10, Property and Evidence Procedures, when photographing persons subject to authorized mass detention or mass arrest.
12.1.2.1.    The Forensic Evidence Division (FED) shall process recordings and photographs in the following manner:
12.1.2.1.1.    Provide a copy to the Detectives Division for review to determine what information the Bureau shall maintain as evidence of criminal activity.  The Bureau shall retain all evidentiary material in accordance with Directives 0640.02, Photography and Digital Imaging, and 0660.10, Property and Evidence Procedures.
12.1.2.1.2.    Provide a copy to the City Attorney's Office (CAO). The CAO shall act in accordance with state records retention laws when determining the disposition of the material(s).
12.1.2.1.3.    Provide a copy to the District Attorney's Office, when there is an arrest.
12.1.2.2.    The Bureau shall not retain non-evidentiary material.

12.2.    When feasible and consistent with the law, members shall activate their Body Worn Cameras when engaging with the public during a public order event.

13.    Member Identification During Events.
13.1.    Members shall have, "POLICE" and their first initial and last name or a unique identifier assigned by the Bureau affixed to the front and back of their uniform and, when applicable, the back of their tactical helmet.
13.1.1.    Members shall not intentionally obscure their identifying information and shall ensure that the information is clearly visible.

13.2.    If practical, safe, and tactically feasible, upon request by a member of the public, members shall provide their name and identification number, or, if applicable, their assigned unique identifier to the member of the public.
13.2.1.    Members may provide a Bureau-issued business card in lieu of the information in Section 13.2.

13.3.    Bureau Identification of Members.
13.3.1.    The Bureau shall manage public requests for officer identifying information as set forth in Directive 0312.50, Identification.

*EXHIBIT C   Page 23 of 27*

14.    Member Responsibilities During Events.

14.1.    The IC (or Designee) shall:

14.1.1.    Oversee the development, dissemination, and implementation of the IAP for the event in accordance with this Directive and ICS;

14.1.2.    Determine the mission and objectives and consider what crowd tactics are objectively reasonable under the totality of the circumstances;

14.1.3.    When feasible, attempt to maintain communication, through the PPB Event Liaison, with the Person-in-Charge, or their designee, during event;

14.1.4.    Approve the use of authorized protective gear;

14.1.5.    Ensure announcements communicated to the crowd are clear, consistent (non-conflicting), lawful, and appropriate for the circumstances. The content and timing of the announcement shall be documented and, if feasible, shall be audio recorded;

14.1.6.    Consider and ensure the performance of the following before authorizing the use of handheld chemical incapacitants for crowd management purposes:

14.1.6.1.    A riot must be declared, when authorized;

14.1.6.2.    Other force options are not likely to change behavior in a timely fashion;

14.1.6.3.    Proximity of deployed handheld chemical incapacitants to:

14.1.6.3.1.    Hospitals, schools, and convalescent facilities;

14.1.6.3.2.    Uninvolved community members;

14.1.6.3.3.    Residential areas;

14.1.6.3.4.    Freeways or areas with high density traffic; and

14.1.6.3.5.    Flammable materials.

14.1.6.4.    Weather, environmental, and topographical conditions; and

14.1.6.5.    Timing and coordination with other law enforcement agencies.

14.1.7.    Request additional resources, if there is a need for additional police resources to manage the event.

14.1.8.    Activate RRT, when they determine that there is a need for the specialized unit to assist with the management of the event; and

14.1.9.    Authorize the deployment of authorized less lethal weapons, when objectively reasonable.

14.1.10.    Write a daily summary of the event that assesses the Bureau's response and squad actions in relation to the IAP objectives and IC direction, and considers lessons learned (e.g., effective vs. ineffective action). The summary should inform future IC decision-making for the event.

14.2.    The Operations Section Chief shall (when assigned to an event):

14.2.1.    Propose the strategies, tactics, and assigned resources to meet the IC's objectives. The IC shall approve the strategic, tactical, and resource-related proposal.

14.3.    The Detective Division Commander or Supervisor shall:

14.3.1.    Coordinate with the IC to determine the scale of a mass arrest team response;

14.3.2.    Assign detectives to assist with any mass arrests;

**EXHIBIT C   Page 24 of 27**

14.3.3.   Manage the processing of all arrests pursuant to the Detective Division SOP; and

14.3.4.   Ensure that all required documentation for arrests is collected.

14.4.   Sergeants shall:

14.4.1.   Verify that all assigned squad members have the proper equipment;

14.4.2.   Ensure that squad members are briefed before the start of the event;

14.4.3.   Communicate orders from the IC or the Operations Section Chief to their squad;

14.4.4.   Only issue direction that conforms with the IAP and event objectives; and

14.4.5.   Ensure that squad members act in accordance with the IAP.

14.4.6.   By the end of shift, account for the number of munitions deployed by each less lethal operator and grenadier.

14.4.6.1.   If members need additional munitions during an event, the supervisor is responsible for tracking the issuance of those munitions.

14.4.7.   At the end of shift, notify the IC, through email or other written format, of any force use and report on munition deployment (types and number), and any injuries to Bureau members or event participants (when known).

14.5.   Officers shall:

14.5.1.   Follow the directions of the sergeant;

14.5.2.   Act in accordance with the IAP;

14.5.3.   Not take independent police action, unless exigent circumstances require immediate action for protecting themselves or others from physical harm. Such independent action must comply with all applicable Bureau directives; and

14.5.4.   When acting as a less lethal operator, account for and document all issued munitions in an appropriate police report at the end of shift.

15.   Coordination with Other Agencies.

15.1.   The Bureau may request assistance from other law enforcement agencies to sufficiently staff and respond to an event.

15.1.1.   The Bureau IC, or their designee, shall appropriately brief outside agency personnel before their deployment.

15.1.2.   The Bureau IC shall maintain the authority to determine tactical objectives; direct the overall police response (all agencies); and determine, when objectively reasonable, how and when to use force to address civil disturbances or riotous behavior and/or disperse the crowd.

15.1.3.   The Bureau expects assisting agencies to act in accordance with the lawful orders of the Bureau IC; however, their members' conduct is subject to the outside agency's policies and procedures.

15.2.   The Bureau shall not:

15.2.1.   Use a proxy law enforcement agency to use crowd management or control measures that are prohibited by Bureau directive or that a court or statute has barred the law enforcement agency from using;

*EXHIBIT C   Page 25 of 27*

Case 3:25-cv-02170-SI   Document 98-3   Filed 02/16/26   Page 26 of 27

15.2.2.　Act in concert with another law enforcement agency to engage in misconduct barred by court order, statute, or Bureau directive.

16.　Post-Event Reporting and Coordination Requirements.

16.1.　The IC (or their designee) shall:

16.1.1.　When applicable, write an overall police report that describes major decision-making during the event.

16.1.2.　For non-extended events, complete an After Action in accordance with Directive(s) 0905.00, Non-Force After-Action Reporting. Generally, extended events are events that last two weeks or more.

16.1.2.1.　If the IC authorizes mass detention or mass arrest during the event, they shall document:

16.1.2.1.1.　The criminal activity that gave rise to the authorization, including a brief description of the information relied on to conclude there was reasonable suspicion or probable cause to issue the authorization;

16.1.2.1.2.　Any alternatives they considered before determining that a mass detention or mass arrest was appropriate;

16.1.2.1.3.　How the mass detention or mass arrest affected public safety and the safety of the group detained or arrested;

16.1.2.1.4.　Any announcements made to the group detained or arrested, either before or after the detention/arrest, including the manner in which the announcements were communicated to the group; and

16.1.2.1.5.　What resources the Bureau deployed to assist in expediting the investigation or processing of the persons who were detained or arrested.

16.1.3.　For extended events, complete the After-Action within 60 days of the conclusion of the event. To ensure contemporaneous documentation, the IC shall initiate the After-Action Review before the conclusion of the event.

16.1.3.1.　Generally, extended events are public order events that last two weeks or more. The Chief has the discretion to extend the After-Action timeline, not to exceed 60 days, for non-extended events that warrant further review.

16.1.4.　Obtain and review approved force After-Action reports from the Force Inspector and include the number and types of force used during the event, and any other significant evidence from these reports, in the event After-Action.

16.1.5.　When possible, review any uses of force by other agencies' personnel as part of the overall event After-Action report;

16.1.6.　Complete the overall police report within at the conclusion the shift of each day of the event and, if necessary, supplement the report as additional evidence becomes available.

16.1.7.　Ensure all other applicable pertinent reports are timely submitted as required by Directive 0900.00, General Reporting Guidelines, and 1010.00, Use of Force; and

16.1.8.　Hold a formal debrief of the event to discuss the overall plan, tactics, staffing and areas of improvement. The debrief should include key supervisory member participants in the event.

*EXHIBIT C*　**Page 26 of 27**

16.2.    The Detective Division Commander or Supervisor shall:

16.2.1.    Ensure coordination with the District Attorney's Office or relevant prosecutor when arrests are made.

16.3.    Squad Supervisor Reporting and Incident Review Responsibilities.

16.3.1.    At the end of the event, the lead supervisor of each squad that took police action shall conduct a debriefing of the incident with their personnel and document it in their police report. Regarding uses of force, a designated supervisor shall write an After-Action for any force used by the squad in accordance with Directive 0910.00, Use of Force Reporting, Review, and Investigation, during the incident.

16.3.2.    Supervisors shall evaluate uses of force for compliance with this directive; Directive 1010.00, Use of Force; and any other applicable directives, operative IAPs, or other orders.

**Effective:       11/15/2024**
**Next Review:   11/15/2026**

*EXHIBIT C   Page 27 of 27*