# EXHIBIT 3

DAN RAYFIELD
Attorney General
SCOTT KENNEDY #260337
JACOB REISBERG #202247
SAMUEL A. KUBERNICK #045562
LEANNE HARTMANN #257503
Senior Assistant Attorneys General
DEREK OLSON #225504
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Scott.Kennedy@doj.oregon.gov
        Jacob.Reisberg@doj.oregon.gov
        Samuel.A.Kubernick@doj.oregon.gov
        Leanne.Hartmann@doj.oregon.gov
        Derek.Olson@doj.oregon.gov

*Attorneys for the State of Oregon*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| JACK DICKINSON, *et al.*,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>DONALD TRUMP, *et al.*,<br><br>　　　　Defendants. | Case No. 3:25-cv-02170-SI<br><br>DECLARATION OF CAMERON BAILEY IN SUPPORT OF BRIEF OF THE STATE OF OREGON AS AMICUS CURIAE |

1.      I, Cameron, Bailey, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

2.      I am a resident of Portland, Oregon. I am over the age of 18 and competent to provide testimony in this matter.

3.      I am familiar with the information set forth below, either through personal knowledge, consultation with Oregon State Police (OSP) staff, or from my review of relevant documents and information. If called as a witness, I could competently testify to the facts averred herein.

4.      I am the Criminal Investigations Captain with OSP. I have been a law enforcement officer for nearly 20 years and have worked for OSP the entirety of my law enforcement career. Starting in June 2017, I became Sergeant for OSP's Mobile Response Team (MRT). In 2020, I was assigned as a Sergeant out of the OSP Portland Area Command, overseeing a Major Crimes Unit and simultaneously serving as the Assistant Team Commander for MRT. I became the full-time Sergeant for MRT in 2021, and then Lieutenant over the Training and Recruiting Section in 2022. I was promoted to Captain in 2023, and in 2024 I started my current role as the Criminal Investigations Division Captain.

5.      I have received extensive training in order to perform the duties and functions of my job. Prior to my service with OSP, I served in the United States Army for seven years and am a combat veteran. I then joined OSP and completed the 22-week Oregon State Police Academy, meeting all Oregon Department of Public Safety Standards and Training (DPSST) certification requirements. I receive approximately 55 hours of annual ongoing training to cover all basic DPSST requirements, including but not limited to, firearms and defense tactics.

6.      Part of the MRT's mission is to provide tactical responses to effectively deal with civil unrest. In my role as MRT sergeant, from 2017 through 2022, I was a field leader for MRT's squads when deployed. When on duty as the MRT lead Sergeant, I usually commanded my own MRT squad as well as squads under other sergeants or MRT personnel. I communicated

with the incident commander and directed the deployment of MRT resources throughout Portland (or other areas in the state, as needed) in support of the overarching mission.

7. As part of my work, I am familiar with ORS 181A.708, "Use of tools in crowd management," and its restrictions on the use of less-lethal munitions. I understand that the provisions of ORS 181A.708 apply to all state law enforcement agencies, including OSP. I am also aware that ORS 181A.708 does not apply to federal law enforcement agencies.

8. As far as I understand, ORS 181A.708 came about as a result of civil unrest following the death of George Floyd in Minnesota in 2020. In my experience, ORS 181A.708 has provided workable standards for OSP to manage crowds at large protests, demonstrations, and other public order events. In my experience, that statute still allows OSP troopers to be responsive to such events, and to deal with criminal conduct that may occur at such events. It has not presented OSP with significant challenges. OSP has incorporated the standards of ORS 181A.708 into its "Mobile Response Team" policy, a copy of which is attached to this declaration. (*See* Ex. A).

9. I have personally reviewed the Temporary Restraining Order (TRO) that the Court issued on February 3, 2026, in this case, specifically pages 20-22 of the Opinion and Order Granting Temporary Restraining Order. I believe that its prohibition against the use of chemical or projectile munitions except in situations where there is an imminent threat of physical harm to a law enforcement officer or other individual, and its related prohibition against targeting individuals who do not pose a threat with less lethal munitions, are consistent with ORS 181A.708 and OSP's Mobile Response Team policy. And from my experience, these restrictions are workable from a law enforcement perspective.

10. Additionally, the TRO, like Oregon law and OSP policy, allows law enforcement officers to make otherwise lawful arrests upon probable cause to believe that a crime has been committed, and that the individual being arrested has committed a crime. It also permits law enforcement officers to use "proportional force," including less lethal weapons, on any individual "who poses an imminent threat of physical harm to a law enforcement officer or other

Page 3 -    DECLARATION OF CAMERON BAILEY

person." (*See* Ex. A., pp. 7-8). In these ways, the TRO still permits law enforcement to effectively respond to any crimes that may occur, and any threats to public safety, that might arise at a protest.

11. I have been the incident commander on several occasions when the Portland Police Bureau (PPB) asked OSP to provide assistance in responding to public order events near the ICE facility in Portland located at 4310 South Macadam Avenue.

12. In particular, on October 18, 2025, I was the incident commander over OSP's response to a "No Kings" rally near that facility. I was overseeing OSP's on-the-ground response from a command post. The on-the-ground commander reported to me, and I also observed by live video feed, that federal officers deployed tear gas on the crowd. According to reports that I received from OSP troopers, the deployment was a surprise to everyone; the troopers did not hear any warnings before federal officers deployed the gas and I could not hear any warnings when I viewed the live feed.  In addition, the reports that I received were that the deployment of tear gas was not in response to a threat to life or serious bodily injury to any individual, or to bring an objectively dangerous and unlawful situation safely under control.

13. The absence of any audible warnings prior to the deployment of tear gas on October 18, 2025, would be contrary to ORS 181A.708's detailed requirements for the provision of warnings before launching tear gas at a crowd. It would also be contrary to OSP's Mobile Response Team policy. (*See* Ex. A at 7).  Additionally, deployment of tear gas into the crowd, which did not appear to be in response to a threat to life or serious bodily injury to any individual, or to bring an objectively dangerous and unlawful situation safely under control, would be contrary to ORS 181A.708's requirements regarding the use of tear gas for crowd management.  Deployment of tear gas under those circumstances would also be contrary to OSP's Mobile Response Team policy.  (Ex. A at 7).

14. The October 18, 2025, incident negatively affected the on-the-ground troopers, who were on bicycles and therefore not able to don gas masks. The officers had to move out of


the area until the gas dissipated and were unable to carry out their duties of assisting PPB with crowd management and monitoring for possible criminal activity.

15. Although it is my understanding that none of the troopers were seriously injured or incapacitated in that incident, they were temporarily taken away from their mission—which was to help PPB maintain public order—due to the apparent unannounced deployment of tear gas by federal law enforcement officers. That disruption happened at a terrible time, because the mere visible presence of officers is often crucial to maintaining public order in a tense situation. Because of what appeared to be the unannounced deployment of tear gas, the officers could not remain present at the rally.

16. In addition, I have seen instances where protesters at public order events may perceive the use of tear gas, or other less-lethal weapons, as illegitimate or disproportionate to the situation. In those instances, members of a crowd can become more hostile toward law enforcement officers, and a largely calm situation may become volatile. For that reason, when a riot control agent such as tear gas is used without advanced warning, or proper admonishments, there are situations in which it can be counterproductive to officers' dual mission of maintaining public order while respecting protesters' First Amendment rights.

17. OSP stands ready to assist PPB and other state law enforcement agencies with crowd management. OSP was not asked to provide assistance to PPB on January 31, 2026, or February 1, 2026, so I cannot speak in detail about what occurred on those dates.

**I declare under penalty of perjury that the foregoing is true and correct.**

EXECUTED in the United States on February 13, 2026.

_____
CAMERON BAILEY
Oregon State Police
Criminal Investigations Captain

Page 5 -   DECLARATION OF CAMERON BAILEY

# EXHIBIT A



# DEPARTMENT OF STATE POLICE

## Mobile Response Team

| Effective Date: December 2, 2022 | Supersedes Date: July 8, 2020 | Policy Number: 508.8 |
|---|---|---|
| **Reference/Laws/Statutory Authority:** Department Manual Chapter 508.3; ORS 166.015; ORS 181A.704; ORS 181A.708; ORS 181A.710; HB 4008 (2022) ||| 
| **Applies to:** ☐ All Personnel  ☐ All Management  ☑ Sworn Personnel  ☐ Non Sworn Personnel  ☐ Other ||| 
| **Issuing Authority:** Superintendent of State Police || **Pages** 4 |

## I. Purpose

To outline the composition and the deployment procedures for the Department's Mobile Response Team (MRT).

## II. Policy

The Oregon State Police maintains an MRT under the direction of the Field Operations Bureau Major or the Bureau Major's designee. The primary assignment for the MRT will be to provide a high profile tactical response to manage and potentially address civil disturbances. The MRT may be requested when a civil disturbance has, or is likely to, escalate beyond the capabilities of the primary agency.

Examples of a civil disturbance for MRT response:

   A. An actual or anticipated gathering of a large number of people, where individuals within the group engage in a riot.

   B. An actual or anticipated gathering of a large number of persons where individuals

Policy: 508.8               Page **1** of **9**               Effective Date: 12/02/2022

within the group engage in property damage or display violent behavior or behavior that could reasonably escalate to violence.

The MRT may also be deployed to increase patrol presence at planned events where a large influx of people is expected.

### III. Definitions

A. <u>Civil Disturbance:</u> a gathering or assembly of persons during which individuals within the group engage in behavior that includes crowd crushes, affrays, fights, riots, actual or threatened violence, destruction of property, or other unlawful acts.

B. <u>Crowd Management:</u> public security practices in which crowds are managed to prevent the outbreak of crowd crushes, affrays, fights, or riots, or in which an assembly, protest, or demonstration is dispersed.

C. <u>Demonstration:</u> an assembly of persons organized primarily to engage in free speech activity. These may be pre-planned or previously scheduled events for which law enforcement can plan, or they may be spontaneous or covertly planned to avoid or reduce law enforcement response. "Demonstration" includes, but is not limited to, marches, protests, and other assemblies intended to express some form of "speech" and/or attract attention. Demonstrations can develop into civil disturbances, or develop pockets of civil disturbances, that necessitate law enforcement action.

D. <u>Emergency Medical Services (EMS):</u> Persons who have received formal training in prehospital and emergency care, and who acts in a professional capacity to attend to any person who is ill or injured.

E. <u>Handheld Chemical Incapacitant:</u> a munition or device specifically designed to cause temporary pain, temporary irritation, temporary disruption of vital processes, temporary incapacitation, temporary disability, or permanent harm through the toxic properties of toxic chemicals, or their precursors, that would be released as a result of the employment of the handheld munition or device. Handheld chemical incapacitants include any equipment specifically designed for use directly in connection with the use of handheld munitions and devices. Handheld "OC" spray also referred to as "pepper spray" would be considered a handheld chemical incapacitant. Handheld chemical incapacitants do not include "tear gas," as defined in this policy.

F. <u>Kinetic Impact Projectile:</u> all nonlethal, less-lethal, or semi-lethal projectiles,

including but not limited to rubber and plastic bullets, beanbag rounds, sponge rounds and pellet rounds.

G. <u>Medical Help:</u> Persons who are part of a demonstration or assembly of persons and who orally or physically identify themselves as providing first aid to other persons within the demonstration or assembled group.

H. <u>Riot:</u> a crime committed by a person if that person, in concert with five or more other persons, engages in tumultuous or violent conduct and intentionally or recklessly creates a grave risk of causing public alarm (ORS 166.015).

I. <u>Speech:</u>  An expression of ideas through words, writing or conduct that is likely to be legally recognized as protected under the 1st and 14th Amendments to the U.S. Constitution

J. <u>Tear Gas</u>: oleoresin capsicum or orthochlorobenzalmalononitrile, or other similar chemicals meant to accomplish the same effect, administered by any shell, cartridge, or bomb capable of being discharged or exploded, when the discharge or explosion will cause or permit the release or emission of the chemicals.

## IV. Procedures

A. A Commander and an Assistant Commander of the Mobile Response Teams will be designated by the Field Operations Bureau Major.

   1. Each MRT squad leader will assume duties of the Assistant MRT Commander if he or she is unavailable or as needed or directed by the MRT Commander.

B. Composition of squads

   1. The MRT will consist of three (3) squads, each composed of sixteen (16) members. Each squad will have twelve (12) line members, three (3) grenadiers, and one (1) medic. The composition of squads can be adjusted as needed depending on operational need or circumstances.

   2. Each squad will be commanded by a squad leader who holds the rank of sergeant or above and will be assisted in their duties by a team leader selected by the Commander and Assistant Commander.

C. Activation of MRT squad(s)

1. A request for an MRT activation will be made through the closest State Police office, the State Police's Northern Command Center (NCC), or the State Police's Southern Command Center (SCC).

    a. NCC and SCC will be provided a current list of MRT members, with station assignment and telephone number, by the MRT commander.

2. The official making the request should provide at a minimum the following information:

    a. A contact name, agency, and return telephone number.

    b. A description of the incident, providing as much detail as possible.

    c. The type of assistance expected.

    d. Location of a secure MRT staging area.

3. The local State Police office, NCC, or SCC will then contact the appropriate Region Captain for MRT response requests. Responsibility for notification of General Headquarters rests with the Region Captain.

4. The Field Operations Bureau Major will authorize any activations of MRT.

5. Upon receiving authorization, the appropriate dispatch center will assume call-out responsibility.

    a. Dispatch will notify the MRT Commander or Assistant Commander.

    b. Call out of appropriate MRT members, to include response instructions and staging location, will be determined by the MRT Commander or Assistant Commander.

    c. Dispatch will re-contact the requestor and provide response information to include MRT estimated time of arrival.

6. MRT members will report to the incident attired in the regulation uniform. Based upon the circumstances of the incident, the MRT Commander or Assistant Commander will determine if an alternate uniform is to be worn during the operation.

7. The first arriving squad leader will identify the incident commander. The agency, station, or Region Captain requesting MRT response will remain in command of the incident or mission until its conclusion.

Policy: 508.8                    Page **4** of **9**                    Effective Date: 12/02/2022

    a. When MRT(s) from more than one region are activated, the MRT Commander will report to the Region Captain of the region in which the civil disturbance is occurring.

        i. MRT leaders will be in command of, and responsible for, the actions of MRT members during operations.

        ii. Any deployment of two or more squads will require the presence of the MRT commander or assistant commander.

        iii. Tactical decisions made on-scene will be the sole responsibility of the acting MRT Commander or Assistant Commander. OSP Command members assigned to duties within the Command Post, while assisting a partner agency, under the guide of the Incident Command Structure and in cooperation and agreement with the Incident Commander, will mutually agree upon the tactical implementation of Department employees with regards to deployment locations, objectives, and intent.

8. An MRT squad leader, or their designee, will complete an After Action Report and submit it to the Field Operations Bureau Major as soon as practical after the incident or operation has been concluded.

## V. Rules

A. Crowd management techniques used by MRT shall safeguard the rights of protected speech and lawful assembly.

B. Employees formally assigned to MRT and engaged in crowd management or civil disturbance operations, except for those employees participating while in an undercover capacity, shall have:

    1. Their first initial and last name, or a unique identifier assigned by the Department or MRT Commander, affixed to the front and back of their uniform;

    2. If wearing a tactical helmet and assigned a unique identifier by the Department, the unique identifier affixed to the back of the employee's helmet.

    3. An OSP patch or similar insignia design affixed to one shoulder and the word

"TROOPER" affixed to the back of the uniform. The words "STATE TROOPER" or "STATE POLICE" or "OREGON STATE POLICE" will also suffice. These patches or insignia will be affixed in a manner that makes them plainly visible.

C. Pursuant to ORS 181A.704, squad leaders or designees will take the necessary steps to prevent the intentional obscuring of nametags or unique identifiers assigned by the Department.

D. MRT members will adhere to the Department's Mobile Recording Equipment policy, 502.27.

   1. Each MRT member will be issued a body-worn camera. It will be required for wear at all MRT operations or events.

   2. Due to the nature of MRT operations and the inability to charge body-worn cameras during deployment, the MRT Commander or Assistant Commander can approve the deactivation of the device to maximize the video capture and battery life.

   3. Members will activate their body-worn cameras in accordance with Department policy while engaged in crowd management, civil disturbance or demonstration operations, or patrol related missions.

   4. While engaged in crowd management, civil disturbance or other demonstration operations, members will activate their body-worn cameras in scenarios including, but not limited to, the following:

      a. At the direction of a squad leader, team leader or by a Commander;

      b. While engaged with members of the public in situations otherwise constituting an enforcement contact or criminal investigation;

      c. After leaving a staging or similar area but before contact with members of the crowd has occurred, in circumstances in which MRT is actively responding to incidents of civil disturbances, riots or where members are likely to engage in crowd management or civil disturbance operations where there is the possibility that force will be used, injuries could occur, or both.

E. When issuing or enforcing orders to disperse, employees will take reasonable efforts to accommodate community members with disabilities.

F. Pursuant to ORS 181A.708, electronically amplified noise-producing equipment

Policy: 508.8               Page **6** of **9**          Effective Date: 12/02/2022

may not be used as crowd management technique, other than as follows:

1. Announcements, which shall be made audibly and visually when possible.

2. Movement of emergency vehicles as allowed or required by ORS 820.300 or any other provision of law.

G. Use of Chemical Incapacitants

1. Pursuant to ORS 181A.708, the use of <u>tear gas</u> as a crowd management technique will only occur when the following criteria are met:

   a. An MRT Commander or Assistant Commander authorizes the use of the tear gas;

   b. The use is objectively reasonable by law enforcement to defend against a threat to life or serious bodily injury to any individual, including any peace officer; or to bring an objectively dangerous and unlawful situation safely and effectively under control; and

   c. De-escalation techniques or other reasonable alternatives to physical force have been attempted and failed.

2. Employees may only use tear gas as a crowd management technique in authorized circumstances if the following steps are taken in the following order:

   a. There has been an announcement of the Department's intent to use tear gas;

   b. Sufficient time has been allowed for individuals to evacuate the area; and

   c. It must be announced a second time, immediately before using the tear gas, that the Department intends to use tear gas.

3. Pursuant to ORS 181A.708, the use of <u>handheld chemical incapacitants</u> such as <u>handheld oleoresin capsicum spray</u> (handheld "OC" spray also referred to as "pepper spray") for crowd management is prohibited.

4. Notwithstanding #3 above, sworn employees may use their handheld chemical incapacitants (handheld "OC" also referred to as "pepper spray") during civil disturbances or demonstrations if such use is only against individual persons, and only if the employee is justified to use physical force pursuant to both the Department's Use of Force policy and Oregon Revised Statutes (ORS 161.195-161.275) against the individual person because of the

following:

    a. The individual poses an imminent threat of physical injury to the employee or to a third person, if the employee reasonably believes the use of OC spray is necessary to prevent the physical injury;

    b. The employee has probable cause to believe the individual has committed a crime and the employee reasonably believes it is necessary to use OC spray to effect an arrest of the individual; or

    c. The employee has probable cause to believe the individual has committed a crime, and the employee reasonably believes it is necessary to use OC spray to prevent the individual's escape from custody.

**If reasonable and feasible given the circumstances,** alternatives to deploying handheld chemical incapacitants must be considered, a warning must be made to the individual, and the individual must be provided with reasonable opportunity to comply before the deployment of a handheld chemical incapacitant.

H. Use of Kinetic Impact Projectiles

  1. Pursuant to ORS 181A. 708, the use of kinetic impact projectiles as a crowd management technique is prohibited.

  2. Employees may use a kinetic impact projectile during demonstration or civil disturbance operations only against an individual engaged in conduct otherwise justifying the use of physical force under the Department's Use of Force policy and Oregon Revised Statutes (ORS 161.195-161.275) because of the following:

    a. The individual poses an imminent threat of physical injury to the employee or a third person, if the employee reasonably believes the use of the kinetic impact projectile is necessary to prevent the physical injury;

    b. The employee has probable cause to believe the individual has committed a crime and the employee reasonably believes it is necessary to use the kinetic impact projectile to effect the arrest; or

    c. The employee has probable cause to believe the individual has committed a crime and the employee reasonably believes use of the kinetic impact projectile is necessary to prevent the individual's escape from custody.

  3. Employees may **not** discharge a kinetic impact projectile in a manner that

    intentionally targets the head of a person, except against an individual engaged in conduct otherwise justifying the use of **deadly physical force** by a peace officer pursuant to ORS 161.242 and the Department's Use of Force policy.

4. **If reasonable and feasible given the circumstances,** alternatives to deploying kinetic impact projectiles must be considered, a warning to the individual must be made, and the individual must be provided with a reasonable opportunity to comply before the deployment of kinetic impact projectiles.

I. Pursuant to ORS 181A.708, employees shall, when it is safe and possible to do so, minimize the incidental impact of handheld chemical incapacitants, tear gas, or kinetic impact projectiles used in conjunction with demonstrations or civil disturbance operations on bystanders, medical personnel, journalists, and other unintended targets.

J. Pursuant to ORS 181A.708, the Department shall make efforts to notify emergency rooms in the area of the type of handheld chemical incapacitants, tear gas, or kinetic impact projectiles used in conjunction demonstrations or civil disturbance operations.

K. Pursuant to ORS 181A.708, when handheld chemical incapacitants, tear gas, or kinetic impact projectiles are used in conjunction with demonstrations or civil disturbance operations, employees will attempt to take injured persons to safety or allow injured persons to seek medical help and may not prevent emergency medical services from reaching injured persons or prevent injured persons from seeking medical help.

L. Pursuant to ORS 181A.708, employees shall clean up, within a reasonable time, all visible debris in the area caused by the use of tear gas or kinetic impact projectiles.

M. An After Action Report shall be completed to assess law enforcement activities following each response to a mass demonstration, civil disturbance, other crowd management situation, or other operation, to ensure compliance with applicable laws and Department policies and procedures.

N. All use of force incidents will be reported as required in the Department's Use of Force policy (500.8).

Policy: 508.8               Page **9** of **9**            Effective Date: 12/02/2022