DAN RAYFIELD
Attorney General
SCOTT KENNEDY #260337
JACOB REISBERG #202247
SAMUEL KUBERNICK #045562
LEANNE HARTMANN #257503
Senior Assistant Attorneys General
DEREK OLSON #225504
Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: 971-673-1880
Fax: 971-673-5000
Email: Scott.Kennedy@doj.oregon.gov
       Jacob.Reisberg@doj.oregon.gov
       Samuel.A.Kubernick@doj.oregon.gov
       Leanne.Hartmann@doj.oregon.gov
       Derek.Olson@doj.oregon.gov

*Attorneys for Amicus Curiae State of Oregon*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| JACK DICKINSON; LAURIE ECKMAN; RICHARD ECKMAN; MASON LAKE; and HUGO RIOS, on behalf of themselves and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, President of the United Stated, in his official capacity; KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS), in her official capacity; and U.S. DEPARTMENT OF HOMELAND SECURTIY,<br><br>Defendants. | Case No. 3:25-cv-02170-SI<br><br>BRIEF OF STATE OF OREGON AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

BRIEF OF STATE OF OREGON AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

# TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

I.     INTRODUCTION AND INTEREST ............................................................................... 1

II.    ARGUMENT ..................................................................................................................... 2

        A.     Like the TRO, A Preliminary Injunction Would Defend Constitutionally Protected Expressive Activity, Support Public Safety, and Promote the Public Interest. ........................................................................................................ 2

               1.     The Public Interest Requires the Court to Maintain the Protections in its TRO to Guard Against Defendants' Violations of Oregonians' First Amendment Rights. ........................................................ 3

               2.     From the Perspective of Oregon Law Enforcement, the TRO's Key Constraints are Workable and will Promote Public Safety ......................... 6

               3.     Other Sources Confirm the TRO's Workability and Benefits to Public Safety. .............................................................................................. 7

               4.     The TRO is also Substantially Consistent with Oregon Law Governing Crowd Management, Further Underscoring the Workability of the Court's Approach. ......................................................... 9

        B.     Federal Tactics at the ICE Facility Should also be Examined Alongside the President's Past Actions in Oregon, Which Reveal a Pattern of Unlawful and Harmful Conduct Toward Demonstrators ...................................... 11

III.   CONCLUSION ................................................................................................................ 14

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
   458 U.S. 592 (1982)..................................................................................................1

*City & Cnty. of S.F. v. USCIS*,
   981 F.3d 742 (9th Cir. 2020) ....................................................................................2

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983)....................................................................................................4

*Collins v. Jordan*,
   110 F.3d 1363 (9th Cir. 1996) ..................................................................................1

*Deras v. Myers*,
   272 Or. 47 (1975)......................................................................................................3

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
   72 U.S. 749 (1985)....................................................................................................3

*Earth Island Inst. v. Elliott*,
   290 F. Supp. 3d 1102 (E.D. Cal. 2017).....................................................................2

*Fenico v. City of Philadelphia*,
   755 F. Supp. 3d 602 (E.D. Pa. 2024) ........................................................................4

*G & V Lounge, Inc. v. Mich. Liquor Control Com'n*,
   23 F.3d 1071 (6th Cir.1994) .....................................................................................2

*Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*,
   512 F.3d 1112 (9th Cir. 2008) ..................................................................................2

*Hartman v. Moore*,
   547 U.S. 250 (2006)..................................................................................................4

*Index Newspapers LLC v. City of Portland*,
   480 F. Supp. 3d 1120 (D. Or. 2020) *(Index Newspapers II)*................................3

*Index Newspapers LLC v. U.S. Marshals Serv.*,
   977 F.3d 817 (9th Cir. 2020) *(Index Newspapers I)* ..................................2, 4, 12

*Los Angeles Press Club v. Noem*,
   799 F. Supp. 3d 1036, 1060 (C.D. Cal. 2025......................................................4

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

*N.F.I.B. v. Sebelius*,
    567 U.S. 519 (2012) ..................................................................................................... 1

*Oregon v. Trump*,
    --- F. Supp. 3d ----, 2025 WL 3126773 (D. Or. Nov. 7, 2025) ..................................... 13

*Republic of the Philippines v. Marcos*,
    862 F.2d 1355 (9th Cir. 1988) ....................................................................................... 7

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ....................................................................................................... 3

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ....................................................................................... 2

*Washington All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*,
    518 F. Supp. 3d 448, (D.D.C. 2021) ........................................................................... 11

## CONSTITUTIONAL PROVISIONS

Or. Const. art. I, § 8 ............................................................................................................... 3

## STATUTES, REGULATIONS, RULES

ORS 161.195–.275 ................................................................................................................ 10

ORS 181A.708 ............................................................................................................... *passim*

Or. Laws 2021, Ch. 540 § 2 ..................................................................................................... 9

Or. Laws 2022, Ch. 40 § 3 ....................................................................................................... 9

Cal. Penal Code § 13652(b) ..................................................................................................... 9

Mass. G.L. c. 6E, § 14(e) ......................................................................................................... 9

555 Code of Mass. Regs. 6.08 ................................................................................................. 9

## OTHER AUTHORITIES

Dionne Barnes-Proby et al., *Improving Protest Policing: Lessons Learned and
    Recommendations for Law Enforcement and Protest Organizers* (2026),
    https://www.rand.org/content/dam/rand/pubs/research_reports/RRA4200/RRA42
    18-2/RAND_RRA4218-2.pdf ................................................................................... 8, 9

Page iii -   BRIEF OF STATE OF OREGON AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS'
             MOTION FOR PRELIMINARY INJUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

Jason Silverstein, *The Global Impact of George Floyd: How Black Lives Matter Protests Shaped Movements Around the World*, CBS News (June 4, 2021, 19:39 ET), https://www.cbsnews.com/news/george-floyd-black-lives-matter-impact/ [https://perma.cc/Y6DY-CVBY] ...................................................................................9

Maggie Koerth & Jamiles Lartey, *Why So Many Police Are Handling the Protests Wrong*, The Marshall Project (June 1, 2020), https://www.themarshallproject.org/2020/06/01/why-so-many-police-are-handling-the-protests-wrong [https://perma.cc/8Z4Q-PZ86] ..............................................8

U.S. Dep't of Interior, Nat'l Park Serv., U.S. Park Police, G.O. 2301, Demonstrations and Special Events (June 9, 2022), https://www.nps.gov/subjects/uspp/upload/General-Order-2301-Demonstrations-and-Special-Events.pdf ........................................................................................8

U.S. Dep't of Just., Off. of Cmty. Oriented Policing Servs., *After-Action Assessment of the Police Response to the August 2014 Demonstrations in Ferguson, Missouri* (2015), https://portal.cops.usdoj.gov/resourcecenter/content.ashx/cops-p317-pub.pdf ...................................................................................................8

Zane Sparling, *Trump Warns Portland, "We'll Go Back in When the Crime Starts," as National Guard Demobilizes*, The Oregonian (Jan. 13, 2026, 11:50 PT), https://www.oregonlive.com/politics/2026/01/trump-warns-portland-well-go-back-in-when-the-crime-starts-as-national-guard-demobilizes.html [https://perma.cc/TU2N-AAYB] .....................................................................14

Zane Sparling & Tatum Todd, *Trump's Obsession with Portland Goes Back Years. His Message has Escalated,* The Oregonian (Oct. 3, 2025, 8:26 PT), https://www.oregonlive.com/politics/2025/10/trumps-obsession-with-portland-goes-back-years-his-message-has-escalated.html [https://perma.cc/CYQ4-UXW2] ........12

I.  INTRODUCTION AND INTEREST

"Demonstrations can be expected when the government acts in highly controversial ways," and "[t]he more controversial" those acts become, "the more likely people are to demonstrate." *Collins v. Jordan*, 110 F.3d 1363, 1372 (9th Cir. 1996). It is therefore unsurprising that many Oregonians have, in recent months, demonstrated outside the Immigration and Customs Enforcement facility in South Portland (ICE Facility). The peaceful expression of such beliefs is one of Oregonians' most fundamental Constitutional rights.

Yet Defendants have repeatedly met these demonstrations with excessive shows of force. Oregonians from all walks of life—parents, children, teachers, healthcare providers, members of the legal profession, and countless others—have been subject to tear gas, pepper balls, and flash-bangs without regard for the bedrock constitutional principles that constrain all law enforcement. Simply put, in a betrayal of the public's trust, federal agents have punished Oregonians for exercising their rights of assembly and expression.

The State of Oregon (the State) therefore submits this brief to support the Court's entry of a preliminary injunction that will protect Oregonians' constitutional rights and their physical safety. The State is well positioned to speak to these issues: it has a strong "interest in the health and well-being . . . of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 593 (1982). And because the Constitution reserved the plenary police power for the states, Oregon also retains the sovereign authority to ensure that law enforcement within its borders respects the "lives, liberties, and properties of the people" who live here. *N.F.I.B. v. Sebelius*, 567 U.S. 519, 536 (2012) (quoting The Federalist No. 45, at 293 (J. Madison)). For these reasons, the State has an undeniable interest in advocating for its residents' First Amendment rights on the one hand while promoting safety and public order on the other.

Defendants' tactics at the ICE Facility have undermined both of these interests and therefore must be restrained by this Court. Witnesses who have reported their experiences to the State have described federal agents' wanton disregard for their right of assembly and physical

Page 1 -   BRIEF OF STATE OF OREGON AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS'
           MOTION FOR PRELIMINARY INJUNCTION

safety in recent demonstrations near the ICE Facility. The key constraints imposed by this Court's February 3, 2026 Temporary Restraining Order (TRO) are also workable from the perspective of Oregon law enforcement, substantially consistent with Oregon law, and supported by academic research on police practices. Moreover, recent history reveals that each time the President has directed federal officers and agents to respond to demonstrations in Oregon, their heavy-handed tactics have fomented fear, anger, and distrust. Whether driven by animus for Oregonians or a cynical disregard for their rights, history has shown that when the President intervenes in protests in Oregon, it makes Oregonians less safe.

For all of these reasons, the balance of equities and public interest strongly favor entering a preliminary injunction to curb Defendants' challenged conduct.

## II.    ARGUMENT

### A.    Like the TRO, A Preliminary Injunction Would Defend Constitutionally Protected Expressive Activity, Support Public Safety, and Promote the Public Interest.

In adjudicating motions for preliminary relief, "courts have consistently recognized the significant public interest in upholding First Amendment principles." *Index Newspapers LLC v. U.S. Marshals Serv. (Index Newspapers I)*, 977 F.3d 817, 838 (9th Cir. 2020) (citation and quotation marks omitted); *see also G & V Lounge, Inc. v. Mich. Liquor Control Com'n*, 23 F.3d 1071, 1079 (6th Cir.1994) ("it is always in the public interest to prevent the violation of a party's constitutional rights"). The public interest prong of the preliminary injunction analysis is also particularly relevant here, where the impact of the dispute reaches beyond the parties and carries the potential for public consequences. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009); *Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*, 512 F.3d 1112, 1126–27 (9th Cir. 2008). This includes third-party harms, such as those to the public's health and safety. *City & Cnty. of S.F. v. USCIS*, 981 F.3d 742, 760–62 (9th Cir. 2020); *Earth Island Inst. v. Elliott*, 290 F. Supp. 3d 1102, 1125–26 (E.D. Cal. 2017). The State believes that maintaining the protections outlined in the Court's TRO would plainly serve the public interest.

   1. **The Public Interest Requires the Court to Maintain the Protections in its TRO to Guard Against Defendants' Violations of Oregonians' First Amendment Rights.**

Article I, section 8 of the Oregon Constitution enshrines the protection of free speech and provides that "[n]o law shall be passed restraining the free expression of opinion, or restricting the right to speak. . . ." Or. Const. art. I, § 8. This guarantee reflects Oregon's recognition of the importance of expressive activity as a cornerstone of democratic life. *See Deras v. Myers*, 272 Or. 47, 56 (1975) (positing that the "very structure of our government rests upon freedom of expression"). While Oregon's constitutional protections for speech are not coextensive with the First Amendment, the former broadly align with, and reinforce, the latter. *See Id.* at 64. Together, these constitutional protections reflect an understanding that public spaces must remain open to lawful protest, observation, and newsgathering if democratic governance is to function effectively.

Interpreting the First Amendment, the Supreme Court has repeatedly emphasized that "speech on 'matters of public concern' . . . is 'at the heart of [its] protection.'" *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–759, (1985)). That protection extends to public demonstrations and protests, which "are clearly protected by the First Amendment." *Index Newspapers I*, 977 F.3d at 830. Because protest activity often occurs in shared civic spaces and is directed toward public audiences, government practices that impede protest activity can carry consequences that extend beyond the immediate participants. *See* Declaration of Justin Stevens (Stevens Decl.) ¶ 21 ("[W]e saw a woman walking with an arm crutch. She seemed to be struggling with all the tear gas in the air. I do not know if she had anything to do with the protest activity."). For that reason, law-enforcement practices that burden or prevent public demonstrations implicate the public interest, not merely the interests of individual litigants. *See Index Newspapers LLC v. City of Portland (Index Newspapers II)*, 480 F. Supp. 3d 1120, 1155 (D. Or. 2020) (noting "the public's interest in receiving accurate and timely reporting, video, and photographic information about

the protests and how law enforcement is treating protestors"); *Fenico v. City of Philadelphia*, 755 F. Supp. 3d 602, 625 (E.D. Pa. 2024) (protests and protestors are "subject[s] of general interest and of value and concern to the public.").

The public interest analysis necessarily involves determining whether the challenged law-enforcement actions of Defendants impose a burden on constitutionally protected expressive activity. They have. The First Amendment prohibits government officials from subjecting individuals to retaliation for engaging in protected activities. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). And there is ample evidence that (1) Plaintiffs were engaged in a constitutionally protected activity; (2) Defendants' actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial or motivating factor in the Defendants' conduct. *See Index Newspapers I,* 977 F.3d at 827.[1]

Immediately following the federal response to protests near the ICE Facility on Saturday, January 31, 2026, and Sunday, February 1, 2026, the State received numerous reports from community members through the Attorney General's Federal Oversight and Accountability Reporting program concerning those events.[2] The State has contacted several of these individuals, each of whom has offered to convey their experiences in declarations. Those declarations, which are attached, demonstrate that federal agents' practices at the ICE Facility have violated the principles discussed above.

Specifically, each of the declarants describes having engaged in protected First Amendment activity and then facing conduct by federal agents that would chill a person of

---

[1] While "[p]ast exposure to illegal conduct does not in itself" justify "injunctive relief," *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983), First Amendment injuries "sharply differ[] from the substantive due process injury asserted in *Lyons*" and can therefore more readily support an injunction. *Index Newspapers I*, 977 F.3d at 826; *see also Los Angeles Press Club v. Noem*, 799 F. Supp. 3d 1036, 1061 (C.D. Cal. 2025).

[2] https://www.doj.state.or.us/oregon-department-of-justice/federal-oversight/report-concerns-related-to-federal-actions/ [https://perma.cc/W8X4-34RS].

ordinary firmness from continuing that activity. For example, one demonstrator, Lane Toensmeier, did not witness anyone at the January 31 protest "engaging in behavior that federal agents could reasonably have found threatening," and yet "without giving any audible warning, two agents came running out onto the second story rooftop and threw or fired canisters into the crowd." Declaration of Lane Toensmeier (Toensmeier Decl.) ¶¶ 11–12. He then "noticed a 6- or 7-year old child who looked to be really struggling from the tear gas, coughing or possibly throwing up." *Id.* ¶ 18. Similarly, Greg Scott reports that he "did not hear any warning to back away or disperse" before "federal officers fired a barrage of flash bang grenades, tear gas, and pepper balls into the crowd." Declaration of Greg Scott (Scott Decl.) ¶ 10. And Adina Rimes, a registered nurse, brought her two teenage children to the rally because she "wanted to show [them] that this is what we do in America when we disagree with what is going on, this is how we stand up for what is right." Declaration of Adina Rimes (Rimes Decl.) ¶ 6. Rimes "wanted to keep marching and protesting but the smoke made it too dangerous and painful to do so, and I was worried for my safety and the safety of my partner and kids if we kept moving forward. We had to turn around." *Id.* ¶ 19.

These declarations also demonstrate that protected First Amendment activity was a substantial or motivating factor in federal agents' conduct. Adrian Rodriguez explains that at the January 31 protest, "[e]veryone had just been chanting and marching peacefully. It wasn't until ICE used tear gas that the march stopped." Declaration of Adrian Rodriguez (Rodriguez Decl.) ¶ 18. Justin Stevens, who was present at a protest on the next day, February 1, "was shocked at the incredible force that the federal agents had unleashed on the peaceful crowd, all at once." Stevens Decl. ¶ 17. He then tried to document what was happening, and "focused my video on the federal agents who were on the second-story roof, firing on the crowd. As I did that, one of the agents shot a flash bang grenade right next to where I was standing." *Id.* ¶ 18. While he could not be sure, "[i]t seemed from where I was standing that he saw me recording with my phone and shot towards me." *Id.*

Page 5 -   BRIEF OF STATE OF OREGON AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS'
           MOTION FOR PRELIMINARY INJUNCTION

The chilling of expressive activity can diminish public discourse, reduce transparency, and undermine confidence in the fair administration of public order. Protecting this activity is in the public interest. A preliminary injunction that constrains Defendants' unlawful conduct would therefore advance both state and federal constitutional protections, and the public interest, by ensuring that law enforcement practices during public assemblies and protests do not prevent the exercise of constitutionally protected expressive activity.

### 2. From the Perspective of Oregon Law Enforcement, the TRO's Key Constraints are Workable and will Promote Public Safety.

Crucially, this TRO's key constraints are also workable from the perspective of maintaining public safety and allowing for legitimate law enforcement. Oregon State Police (OSP) Captain Cameron Bailey commands OSP's Criminal Investigations Division. He has 20 years of law enforcement experience, including extensive experience overseeing OSP's Mobile Response Team (MRT), which has the mission of responding to major demonstrations and civil unrest. Declaration of Cameron Bailey (Bailey Decl.) ¶¶ 4–6.

Captain Bailey has reviewed the TRO, including its prohibition against the use of chemical or projectile munitions except in situations involving an imminent threat of physical harm as well as its prohibition against targeting individuals who do not pose such a threat. *Id.* ¶ 9. He believes that those requirements are workable from a law enforcement perspective and that they align with OSP policy. *Id*. Indeed, coupled with other crowd management methods and de-escalation tactics available to law enforcement agencies, the TRO "still permits law enforcement to effectively respond to any crimes that may occur, and any threats to public safety, that might arise at a protest." *Id.* ¶ 10.

Additionally, Captain Bailey has served as incident commander for several public order events around the ICE Facility on occasions when the Portland Police Bureau (PPB) has requested OSP's assistance. *Id.* ¶ 11. His experience during those incidents illustrates the value in requiring federal officers to adhere to constraints such as these. Specifically, on October 18,

Page 6 -   BRIEF OF STATE OF OREGON AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS'
          MOTION FOR PRELIMINARY INJUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

2025, Captain Bailey served as incident commander when OSP deployed in response to PPB's request for assistance with crowd management for a "No Kings" rally near the ICE facility. *Id.* ¶ 12. According to reports Captain Bailey received from troopers under his command—and based on his viewing of live feed video of the October 18, 2025, incident—the deployment of tear gas was a "surprise" to the OSP troopers and the protesters. *Id.* ¶ 12.[3] To his knowledge, there were no audible announcements of federal law enforcement officers' intent to use tear gas. *Id.* And as far as Captain Bailey is aware, federal officers deployed it without regard to any objectively dangerous situation. *Id.* Blanketing the area with tear gas temporarily forced OSP's troopers to leave their posts, and it adversely affected their mission of helping PPB maintain public order. *Id.* ¶ 14. Indeed, the "disruption" caused by federal officers' use of tear gas "happened at a terrible time, because the mere visible presence of officers is often crucial to maintaining public order in a tense situation." *Id.* ¶ 15. Had the TRO's restrictions been in place at the time of this incident, it would have promoted public safety by preventing the federal tactics that forced OSP to leave the scene.

### 3.   Other Sources Confirm the TRO's Workability and Benefits to Public Safety.

If maintained as part of a preliminary injunction, the key limitations imposed by this Court's TRO are likely to improve public safety by requiring federal agents to adhere to reasonable and effective police practices. Importantly, crowd control munitions can, under certain circumstances, escalate protests rather than de-escalate them. As Captain Bailey explains, when a crowd perceives such measures to be illegitimate or disproportionate, they can "become more hostile toward law enforcement officers, and a largely calm situation may become

---

[3] Captain Bailey's recollection of the reports he received from other officers are appropriately considered by the Court, especially given the relaxed evidentiary standards applicable to preliminary injunction proceedings. *See Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (district court has discretion to consider hearsay "for purposes of deciding whether to issue [a] preliminary injunction") (citation modified).

Page 7 -   BRIEF OF STATE OF OREGON AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

volatile." Bailey Decl. ¶ 16. In those instances, measures like tear gas can be "counterproductive to officers' dual mission of maintaining public order while respecting protesters' First Amendment rights." *Id.*

The federal government has itself endorsed similar conclusions. In a review of the police use of force in Ferguson, Missouri after the shooting of Michael Brown, the U.S. Department of Justice found that use of aggressive tactics, including less-lethal projectiles, had the "unintended consequence of escalating rather than diminishing tensions." U.S. Dep't of Just., Off. of Cmty. Oriented Policing Servs., *After-Action Assessment of the Police Response to the August 2014 Demonstrations in Ferguson, Missouri* xiv, 59–60 (2015)[4]; *see also* U.S. Dep't of Interior, Nat'l Park Serv., U.S. Park Police, G.O. 2301, Demonstrations and Special Events § VIII.C (June 9, 2022)[5] (requiring Incident Commander, when reasonable and safe to do so, to employ de-escalation tactics and techniques "while promoting the safety of officers and the public while also minimizing the need to employ force and the risk of unintended injury or serious property damage").

Research helps explain why this is the case. When law enforcement unnecessarily employs escalatory tactics, including by unnecessarily using less-lethal weapons, it can "create feedback loops, where protesters escalate against police, police escalate even further, and both sides become increasingly angry and afraid." Maggie Koerth & Jamiles Lartey, *Why So Many Police Are Handling the Protests Wrong*, The Marshall Project (June 1, 2020, 14:55 ET).[6] A more nuanced approach is more effective. For example, a RAND research organization recently published a study finding that "success in managing protests may depend less on crowd-control

---

[4] https://portal.cops.usdoj.gov/resourcecenter/content.ashx/cops-p317-pub.pdf.

[5] https://www.nps.gov/subjects/uspp/upload/General-Order-2301-Demonstrations-and-Special-Events.pdf.

[6] https://www.themarshallproject.org/2020/06/01/why-so-many-police-are-handling-the-protests-wrong [https://perma.cc/8Z4Q-PZ86].

tactics than on preparation, communication, and the perception of police legitimacy." Dionne Barnes-Proby et al., *Improving Protest Policing: Lessons Learned and Recommendations for Law Enforcement and Protest Organizers* (2026).[7] In short, promoting public safety and exercising reasonable restraint in the use of force are not competing interests; the two reinforce one another.

### 4. The TRO is also Substantially Consistent with Oregon Law Governing Crowd Management, Further Underscoring the Workability of the Court's Approach.

The TRO is also substantially consistent with Oregon's conception of the proper constraints on the use of force in crowd management as enshrined in State law. The Oregon Legislature enacted ORS 181A.708, entitled "use of tools in crowd management," after the murder of George Floyd in Minnesota sparked nationwide demonstrations. *See* Or. Laws 2021, Ch. 540 § 2 (eff. July 19, 2021); Or. Laws 2022, Ch. 40 § 3 (eff. Mar. 23, 2022); *see also* Jason Silverstein, *The Global Impact of George Floyd: How Black Lives Matter Protests Shaped Movements Around the World*, CBS News (June 4, 2021, 19:39 ET).[8] And Oregon is not alone: other states have enacted similar statutes regarding the use of less-lethal force in crowd management. *See* Cal. Penal Code § 13652(b); Mass. G.L. c. 6E, § 14(e); 555 Code of Mass. Regs. 6.08. Statutes like these underscore a critical point. While the federal government is not subject to ORS 181A.708,[9] that statute's successful implementation in Oregon—and the success of similar constraints across the county—demonstrate that restrictions similar to the ones imposed in this Court's TRO are workable and promote the public interest.

ORS 181A.708 covers the types of less-lethal force that state law enforcement agencies

---

[7] https://www.rand.org/content/dam/rand/pubs/research_reports/RRA4200/RRA4218-2/RAND_RRA4218-2.pdf.

[8] https://www.cbsnews.com/news/george-floyd-black-lives-matter-impact/ [https://perma.cc/Y6DY-CVBY].

[9] ORS 181A.708(1)(e)'s definition of "law enforcement agency" does not include federal agencies.

Page 9 -   BRIEF OF STATE OF OREGON AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

may use in crowd management. It pertains to "handheld chemical incapacitants," "kinetic impact projectiles," and "tear gas." ORS 181A.708(1). Similarly to the Court's TRO, the statute permits the use of tear gas for crowd management, but only under certain circumstances. Specifically, the use of tear gas must be (1) an objectively reasonable means to defend against a threat to life or serious bodily injury or to "bring an objectively dangerous and unlawful situation safely and effectively under control;" (2) a commanding officer must authorize its use; (3) de-escalation techniques or other alternative uses to force must have been attempted, when reasonable; and (4) law enforcement must make two announcements before deploying tear gas to allow sufficient time for "individuals to evacuate the area." ORS 181A.708(3).

The statue also prohibits law enforcement agencies from using handheld chemical incapacitants or kinetic impact projectiles for crowd management, but does not prohibit the use of those weapons "against an individual engaged in conduct otherwise justifying the use of physical force under ORS 161.195 to 161.275."[10] ORS 181A.708(5). Moreover, the statute prohibits discharging kinetic impact projectiles in "a manner that intentionally targets the head of a person," with the only exception being when the individual is engaged in "conduct otherwise justifying the use of deadly physical force by a peace officer under ORS 161.242." ORS 181A.708(4)(b). And critically, when it is safe and possible to do so, law enforcement agencies "shall minimize the incidental impact of the agency's use of handheld chemical incapacitants, tear gas and kinetic impact projectiles on bystanders, medical personnel, journalists and other unintended targets." ORS 181A.708(6).

Captain Bailey is also familiar with ORS 181A.708. Bailey Decl. ¶¶ 7-8. In his experience, that statute has been entirely workable in relation to OSP's crowd management efforts: its requirements have allowed OSP to manage crowds at public order events safely and effectively while still allowing the agency to assist PPB and other state law enforcement agencies

---

[10] Those statutory provisions broadly describe circumstances under which physical force may be justified under Oregon law.

Page 10 -   BRIEF OF STATE OF OREGON AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS'
            MOTION FOR PRELIMINARY INJUNCTION

to deal with criminal activity and objectively dangerous situations that may arise. *Id.* ¶ 8. Oregon's successful implementation of ORS 181A.708 confirms that the key protections in the Court's TRO are workable from a law enforcement perspective and in the best interest of Oregonians.

**B.      Federal Tactics at the ICE Facility Should also be Examined Alongside the President's Past Actions in Oregon, Which Reveal a Pattern of Unlawful and Harmful Conduct Toward Demonstrators.**

The federal government's past actions reveal a pattern of provocation and antagonism against demonstrators in Oregon that has undermined, rather than promoted, public order. These incidents reveal that the unlawful federal tactics at issue here represent just one more chapter in Defendants' unlawful and inflammatory conduct aimed at protests in this State.

For example, just as Portland protests in the spring and summer of 2020 had begun to calm, the President intervened with an unprecedented federal response that escalated tensions. Following the murder of George Floyd, Portland experienced weeks of large daytime protests, as well as a surge of criminal incidents at night, in May and June of 2020. But as the Independent Monitor retained to review the City's handling of these events recounted, "[b]y June 23," these protests "were reduced in size, with sometimes only dozens of people in attendance;" indeed, many had "hoped that this marked the end" of the challenges Portland had faced that summer. Decl. of Scott Kennedy (Kennedy Decl.), Ex. 1 at 13 (Independent Monitor, LLC, *The Handling of the 2020 Protests and Riots in Portland, Oregon: An Independent Review* (2020)) (Monitor's Report).[11]

It was then that President Trump decided to intervene. On June 26, 2020, he issued an

---

[11] It is appropriate for the Court to consider the Monitor's Report and other non-legal resources presented here when weighing the equities and public interest in this proceeding. *See supra* note 2 (discussing the relaxed evidentiary standards applicable to preliminary injunction proceedings); *see also Washington All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 518 F. Supp. 3d 448, 453 n.2 (D.D.C. 2021) (rejecting as "misplaced" a party's effort to apply "cases addressing the evidentiary standards for sworn testimony" to information in an amicus brief).

Page 11 -    BRIEF OF STATE OF OREGON AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS'
              MOTION FOR PRELIMINARY INJUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

Executive Order "in response to what he characterized as left-wing violence in the United States throughout the month of June," and in July he sent more than 700 federal officers to Portland. *Id*. at 14. "Almost overnight, the protests and riots, which had largely self-extinguished, reignited, and their focus shifted to federal buildings, including Portland's Mark O. Hatfield United States Courthouse." *Id.* at 14. This was not just the Monitor's assessment: as the Ninth Circuit recounted, it is "undisputed that the intensity of the protests escalated after the federal [officers] arrived." *Index Newspapers I*, 977 F.3d at 822

Federal authorities employed significant amounts of force and other escalatory tactics against protesters in 2020. This included "large volumes of CS gas" and other "less-lethal munitions that caused grievous injury to persons who were not engaged in any violence." Monitor's Report at 14. And there were widespread reports of "federal officers dressed in camouflage . . . seizing people from Portland's streets in unmarked vans." *Id*. Around the same time, Portland also became a frequent object of threats and derision in the President's public commentary. Zane Sparling & Tatum Todd, *Trump's Obsession with Portland Goes Back Years. His Message has Escalated,* The Oregonian (Oct. 3, 2025, 8:26 PT).[12]

On July 29, 2020, the Governor of Oregon negotiated an agreement for a "phased withdrawal" of these federal forces, and she announced that OSP would assume responsibility for protecting the Federal Courthouse. Monitor's Report at 14–15. In marked contrast to the "inflammatory federal response," *id.* at 68, OSP worked to "de-escalate the tensions" in that area by "facilitating peaceful free speech and proportional response if criminal activity is observed," *id*. at 15. The subsequent shift in the situation was "immediate and palpable," and "use of force incidents and arrests declined as soon as the OSP assumed control." *Id.* Unfortunately, the damage had already been done: some held "all officers, including members of PPB," responsible "for the actions of federal personnel." *Id.* And "while the protests and riots had largely quelled

---

[12] https://www.oregonlive.com/politics/2025/10/trumps-obsession-with-portland-goes-back-years-his-message-has-escalated.html [https://perma.cc/CYQ4-UXW2].

Page 12 -  BRIEF OF STATE OF OREGON AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

by the end of June, in August, after the President's actions, the level of conflict between community members and PPB grew significantly." *Id.*

In late September 2025, this pattern repeated itself. The "level of civil unrest" Portland saw in 2020 "has not returned since," but "comparably small demonstrations at the Portland ICE building [ ] began in mid-June 2025." *Oregon v. Trump*, --- F. Supp. 3d ----, 2025 WL 3126773, *9 (D. Or. Nov. 7, 2025) (making extensive factual findings after a consolidated trial on the merits and preliminary injunction hearing about circumstances at the ICE facility). The protests in 2025 "peaked on June 14 and diminished quickly thereafter, especially as law enforcement adjusted to facts on the ground." *Id.* And "despite occasional spikes in activity," by "July and August, the size and energy of the protests continued to decline." *Id.* at *10. Then, "[b]y September, the energy of the protests reached its lowest point," and the minimal criminality that arose primarily involved "conflict between protesters and counter-protesters." *Id.* Indeed, in the last weeks of September, there was "[n]othing much going on outside the ICE building" aside from demonstrators wearing "inflatable costumes" and having "dance parties." *Id.* (citation modified).

It was at that moment that, once again, President Trump chose to intervene. On September 27, 2025, the President issued a social media post decrying what he viewed as a "War ravaged Portland" that was "under siege from attack by Antifa, and other domestic terrorists." *Id.* at *6. He therefore authorized the Secretary of War to use "Full Force" in the City. *Id.* After that, "protest activity outside the ICE building increased" (though it never became "unmanageable" for law enforcement). *Id.* at *25. One PPB witness described federal law enforcement's crowd control measures during this period as "a little startling." *Id.* This included an incident where federal law enforcement "came out in significant numbers" and pushed demonstrators "quite a distance up the street" for no apparent reason. *Id.* (citation modified). And while the President had based his directive on allegations of "vicious[] attack[s]" on federal law enforcement in Portland, the court held that the President lacked any "colorable basis" to federalize Oregon's

Page 13 -   BRIEF OF STATE OF OREGON AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS'
              MOTION FOR PRELIMINARY INJUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

National Guard. *Id.* at *7, *30.

Absent a preliminary injunction curbing the challenged conduct by federal agents at the ICE Facility, the historical pattern of Defendants' misguided law enforcement tactics in Oregon threatens to persist. Defendants have demonstrated, time and again, their unwillingness to adhere to the constitutional safeguards and law enforcement norms that should guide crowd management. And their tactics harm Oregon by violating its residents' most fundamental constitutional rights while also promoting resentment of all law enforcement—including state and local law enforcement—thereby undermining those officials' continual efforts to build rapport and trust with Oregonians. *See* Monitor's Report at 15 (discussing how some residents mistakenly attributed the abuses of federal officers to local officers).

Worse, as federal agents persist in their escalatory tactics, they threaten to promote the very conditions the President cited as a basis to deploy military troops in Portland's streets. By fomenting fear and outrage—and by employing heavy-handed tactics, including munitions that create the appearance of a "War ravaged" community for television and influencer audiences—the federal government also creates a pretext it may once again cite to justify military intervention. Indeed, the President has threatened to invoke the Insurrection Act as a means to "go back in" to Portland with military forces "when the crime starts." Zane Sparling, *Trump Warns Portland, "We'll Go Back in When the Crime Starts," as National Guard Demobilizes*, The Oregonian (Jan. 13, 2026, 11:50 PT).[13] The Court should consider Defendants' challenged conduct against this ominous backdrop, and the alarming history of the federal government's law enforcement tactics in Oregon, all of which further tip the equitable factors in Plaintiffs' favor.

### III.   CONCLUSION

For the foregoing reasons, the State of Oregon respectfully submits that the Court should enter a preliminary injunction to guard against Defendants' challenged conduct. The record

---

[13] https://www.oregonlive.com/politics/2026/01/trump-warns-portland-well-go-back-in-when-the-crime-starts-as-national-guard-demobilizes.html [https://perma.cc/TU2N-AAYB].

Page 14 -   BRIEF OF STATE OF OREGON AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS'
             MOTION FOR PRELIMINARY INJUNCTION

demonstrates that this is necessary to protect Oregonians' First Amendment activity and that it would promote public safety. Such protections are therefore in the public interest.

DATED February 16, 2026.

Respectfully submitted,

DAN RAYFIELD
Attorney General

    *s/ Scott Kennedy*
SCOTT KENNEDY #260337
JACOB REISBERG #202247
SAMUEL KUBERNICK #045562
LEANNE HARTMANN #257503
Senior Assistant Attorneys General
DEREK OLSON #225504
Assistant Attorney General
Trial Attorneys
Tel.: 971-673-1880
Fax: 971-673-5000
Scott.Kennedy@doj.oregon.gov
Jacob.Reisberg@doj.oregon.gov
Samuel.A.Kubernick@doj.oregon.gov
Leanne.Hartmann@doj.oregon.gov
Derek.Olson@doj.oregon.gov

*Attorneys for State of Oregon*