BRETT A. SHUMATE
Assistant Attorney General
ERIC HAMILTON
Deputy Assistant Attorney General
JOHN BAILEY
Counsel to the Assistant Attorney General
ANDREW I. WARDEN
Assistant Director
BRAD P. ROSENBERG (D.C. Bar No. 467513)
Special Counsel
U.S. Department of Justice, Civil Division
950 Pennsylvania Ave NW
Washington, D.C. 20530
Tel.:   (202) 514-6993
E-mail: John.Bailey@usdoj.gov
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| JACK DICKINSON, *et al.*,     ) <br>     ) <br> Plaintiffs,     ) <br>     ) <br> v.     ) <br>     ) <br> DONALD J. TRUMP, *et al.*,     ) <br>     ) <br> Defendants.     ) <br>     ) | Civil Action No. 3:25-cv-2170-SI |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................... 1

BACKGROUND ........................................................................................... 3

    A.   DHS Authority to Enforce Federal Law and Protect Federal Functions ....... 3

    B.   Violence Against DHS Officers Across the Nation and in Portland .............. 6

    C.   Procedural History ................................................................... 15

LEGAL STANDARD ................................................................................. 16

ARGUMENT ............................................................................................. 17

    I.   Plaintiffs Lack Article III Standing ................................................ 17

    II.   Plaintiffs' Claims Fail On The Merits. .......................................... 21

    III.   The Requested Injunction Is Overbroad and Unworkable. ......................... 27

        A.   The injunction impermissibly seeks relief on behalf of nonparties. ................................................................... 28

        B.   The requested injunction is unworkable and dangerous. ..................... 31

    III.   The Balance of Equities and Public Interest Disfavor Injunctive Relief. .... 36

    IV.   The Court Should Require a Bond and Stay Any Injunction. ..................... 38

CONCLUSION ........................................................................................... 38

# TABLE OF AUTHORITIES

### Cases

*AARP v. Trump,*
    605 U.S. 91 (2025) ................................................................................ 29, 30

*Am. Commc'ns Ass'n CIO v. Douds,*
    339 U.S. 382 (1950) ...................................................................................... 36

*Bell v. Keating,*
    697 F.3d 445 (7th Cir. 2012) ....................................................................... 36

*Boardman v. Pac. Seafood Grp.,*
    822 F.3d 1011 (9th Cir. 2016) ...................................................................... 35

*Campbell v. Miller,*
    373 F.3d 834 (7th Cir. 2004) ....................................................................... 26

*Capp v. County of San Diego,*
    940 F.3d 1046 (9th Cir. 2019) ...................................................................... 21

*Chicago Headline Club v. Noem,*
    Order, No. 25-3023 (7th Cir. Nov. 19, 2025) ....................................... 3, 27

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) ......................................................................... 17, 19, 20

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ............................................................................. 17, 20

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ...................................................................................... 31

*Garcia v. Google, Inc.,*
    786 F.3d 733 (9th Cir. 2015) ....................................................................... 16

*Graham v. Connor,*
    490 U.S. 386 (1989) ...................................................................................... 37

*Grayned v. City of Rockville,*
    408 U.S. 114 (1972) ...................................................................................... 21

*Hodgers-Durgin v. de la Vina,*
    199 F.3d 1037 (9th Cir. 1999) ...................................................................... 35

*In re Neagle*,
   135 U.S. 1 (1890) ............................................................................................ 3

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
   505 U.S. 672 (1992) ...................................................................................... 36

*Laird v. Tatum*,
   408 U.S. 1 (1972) .......................................................................................... 20

*Lewis v. Casey*,
   518 U.S. 343 (1996) ...................................................................................... 26

*Los Angeles Press Club v. Noem*,
   799 F. Supp. 3d 1036 (C.D. Cal. 2025), *granting partial stay pending appeal*, No.
   25-5975 (9th Cir. Dec. 18, 2025) ............................................................ 18, 28

*Los Angeles Press Club v. Noem*,
   Order, No. 25-5975 (9th Cir. Dec. 18, 2025).................................... 3, 27, 28

*Melendres v. Arpaio*,
   784 F.3d 1254 (9th Cir. 2015) ............................................................ 31, 35

*Menotti v. City of Seattle*,
   409 F.3d 1113 (9th Cir. 2005) .............................................................. 1, 25

*Mississippi v. Johnson*,
   71 U.S. 475 (1866) ........................................................................................ 31

*Missouri v. McNeely*,
   569 U.S. 141 (2013) ...................................................................................... 30

*Noem v. Vasquez Perdomo*,
   146 S. Ct. 1 (Sep. 8, 2025) .................................................................... 1, 17

*Nordstrom v. Ryan*,
   762 F.3d 903 (9th Cir. 2014) ...................................................................... 18

*O'Shea v. Littleton*,
   414 U.S. 488 (1974) ...................................................................................... 17

*Pinard v. Clatskanie Sch. Dist. 6J*,
   467 F.3d 755 (9th Cir. 2006) ...................................................................... 21

*Puente v. City of Phoenix*,
   123 F.4th 1035 (9th Cir. 2024)........................................................ 1, 22, 25

iii

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996) ............................................................ 31

*Tincher v. Noem*,
    164 F.4th 1097 (8th Cir. 2026) ............................................ 3, 27, 30, 36

*Trevino v. Gates*,
    99 F.3d 911 (9th Cir. 1996) .............................................................. 26

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) .................................................... 27, 29, 30, 37

*United States v. Griefen*,
    200 F.3d 1256 (9th Cir. 2000) ........................................................... 36

*Updike v. Multnomah County.*,
    870 F.3d 939 (9th Cir. 2017) ..................................................... 17, 19, 20

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ........................................................................ 29

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................... 16

## **Statutes**

6 U.S.C. § 202 .......................................................................................... 3

6 U.S.C. § 211(c)(8) ................................................................................. 3

6 U.S.C. § 252(a)(3) ................................................................................. 3

8 U.S.C. § 1103(a)(5) ............................................................................... 3

8 U.S.C. § 1357(a) ................................................................................... 3

19 U.S.C. § 1589a .................................................................................... 3

40 U.S.C. § 1315(a) .................................................................................. 3

40 U.S.C. § 1315(b)(2)(A) ......................................................................... 4

## **Other Authorities**

DHS, Press Release (Sep. 24, 2025),
    https://perma.cc/6FNP-42ED .................................................................. 6

DHS, Press Release (Oct. 14, 2025),
    https://perma.cc/3NKE-85XE ........................................................................ 6

DHS, Press Release (Jan. 12, 2026),
    https://perma.cc/LSC3-3J8X ......................................................................... 6

**INTRODUCTION**

Plaintiffs urge this Court to enter an injunction that effectively prohibits Defendants from using crowd control devices to protect a facility that is frequently besieged by violent agitators and obstructive crowds. Plaintiffs insist that such a sweeping and intrusive injunction is appropriate to prophylactically guard against, what they claim to be, retaliatory animus. But nothing in the First Amendment categorically prohibits officers from using "tear gas, other chemical irritants, . . . 'flash-bang grenades,'" and other crowd-control devices to disperse a crowd that has become violent or disruptive. *Puente v. City of Phoenix*, 123 F.4th 1035, 1042, 1062-63 (9th Cir. 2024). Nor does the mere use of such devices automatically support a claim of retaliatory animus; when federal law enforcement officers are forced to respond to a crowd containing "a violent subset of protest[e]rs who disrupt civic order," they may enforce dispersal orders against everyone in the vicinity. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1155-56 (9th Cir. 2005). Nothing in the First Amendment supports Plaintiffs' extraordinary request for injunctive relief, and Article III forbids it.

As a threshold matter, Plaintiffs have failed to establish Article III standing to seek prospective injunctive relief. Plaintiffs assert injuries based on sporadic past incidents dating back to June 2025, but standing for prospective relief "does not exist merely because plaintiffs experienced past harm and fear its recurrence." *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 2 (Sep. 8, 2025) (mem.) (Kavanaugh, J., concurring in the grant of the application for stay). Plaintiffs have failed to show an objectively reasonable likelihood that they will be subjected to retaliatory force in the future.

Plaintiffs' First Amendment retaliation claims also fail on the merits. The record shows that federal officers did not deploy crowd-control munitions as a matter of course. Instead, DHS officers resorted to less-lethal tools only when crowds became unlawful and dangerous—attempting to breach the facility, assaulting officers, and refusing lawful dispersal orders. Plaintiffs offer no direct evidence of retaliatory motive and instead rely on generalized rhetoric and armchair expert commentary. And Plaintiffs' own declarations reflect sporadic and intermittent exposure to crowd-control devices, not a consistent practice of targeting protected speech. Where DHS policies expressly prohibit retaliation and require officers to intervene and report improper force, Plaintiffs' attempt to portray a handful of alleged incidents as a systemwide constitutional violation has no chance of success.

Even if relief were available, Plaintiffs' request—which would enjoin Defendants vis-à-vis "any individual" in the vicinity of the facility—is a classic universal injunction. And it is flatly inconsistent with the Supreme Court's recent reaffirmation that equitable relief must be limited to what is necessary to redress the injuries of the plaintiffs before the court. Separately, the proposed injunction is unworkable and dangerous. It amounts to an effective ban on crowd control devices outside the facility, and supervisory DHS officials have explained that forcing officers to resort to hands on tactics to control violent mobs would endanger the safety of both officers and the public. Courts of appeals—including the Ninth Circuit—have repeatedly stayed analogous efforts to usurp executive authority and empower judges to superintend law-enforcement activities under threat of contempt as overbroad and

unworkable. *See Los Angeles Press Club v. Noem*, Order, No. 25-5975 (9th Cir. Dec. 18, 2025); *Tincher v. Noem*, 164 F.4th 1097 (8th Cir. 2026); *Chicago Headline Club v. Noem*, Order, No. 25-3023 (7th Cir. Nov. 19, 2025).

For all of these reasons, the Court should deny Plaintiffs' motion.

## BACKGROUND

A.    **DHS Authority to Enforce Federal Law and Protect Federal Functions.**

As relevant here, DHS's mission in Portland has two main components: enforcing federal immigration law and safeguarding federal property and personnel.

DHS is empowered to "control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5). U.S. Customs and Border Protection (CBP), an agency within DHS, is charged with "enforc[ing] and administer[ing] all immigrations laws." 6 U.S.C. § 211(c)(8). Immigration and Customs Enforcement (ICE), another agency within DHS, is likewise charged with enforcing and administering federal immigration laws. *See, e.g.*, *id.* §§ 202, 252(a)(3). CBP and ICE officers have criminal and civil arrest authority. *See, e.g.*, 8 U.S.C. § 1357(a)(2), (4), (5); 19 U.S.C. § 1589a.

In addition to the Executive's inherent constitutional authority to protect federal officials, federal property, and the performance of federal functions, *see In re Neagle*, 135 U.S. 1, 64-68 (1890), Congress has charged DHS with "protect[ing] the building, grounds, and property that are owned, occupied, or secured by the Federal Government . . . and the persons on the property." 40 U.S.C. § 1315(a). That includes the Portland ICE facility located at 4310 South Macadam Avenue. *See* Ex. 1, Decl. of

Roberto Cantu (Cantu Decl.) ¶ 5.  The protection of the facility falls primarily within the responsibilities of the Federal Protective Service (FPS), a law enforcement agency within DHS charged specifically with protecting federal facilities and personnel.  *See id.* ¶ 2.  These officers possess a wide range of law enforcement powers to "enforce Federal laws and regulations for the protection of persons and property."  40 U.S.C. § 1315(b)(2)(A).

DHS has issued policy guidance on the use of force by its personnel.  *See* DHS, Update to the Department Policy on the Use of Force (Feb. 6, 2023) (DHS Policy).[1] The general principles undergirding DHS Policy is "respect for human life," "de-escalation," and "use of safe tactics."  *Id.* § III.  DHS thus authorizes officers to "use only the level of force that is objectively reasonable in light of facts and circumstances confronting [the officer] at the time force is applied," recognizing that officers are "often forced to make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving."  *Id.* §§ II.B, C.2.  The Policy also provides that law enforcement "should seek to employ tactics and techniques that effectively bring an incident under control while promoting the safety of [the officer] and the public, and that minimize the risk of unintended injury or serious property damage."  *Id.* § III.C. But this does not mean that officers must "meet force with equal or lesser force," "retreat to avoid the reasonable use of force," or "wait for an attack before using reasonable force to stop a threat."  *Id.* § III.D.

---

[1] Available at https://www.dhs.gov/sites/default/files/2023-04/23_0206_s1_use-of-force-policy-update.pdf

Moreover, the DHS Policy requires officers, when feasible, to attempt to identify themselves and issue a verbal warning to comply with instructions before using force. *Id.* § III.E. Whether a warning is feasible is guided by several considerations, including whether the resulting delay is likely to increase the danger to the officer or others, allow for a subject's escape, or result in the commission of a crime. *See id.* Further, officers must demonstrate proficiency with less-lethal force devices, such as impact weapons or chemical agents, before carrying or deploying such devices. *See id.* § IV.

DHS has also instructed its personnel about the importance of respecting activities protected by the First Amendment. *See* Ex. 5, DHS Memo re: Information Regarding First Amendment Protected Activities (May 17, 2019). "DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights." *Id.* at 1.

In addition to DHS's department-level policies, the DHS agencies involved in protecting the Portland ICE facility have issued component-specific guidance on the use of force. *See* CBP, Use of Force Policy (January 2021)[2]; Ex. 6, Dickinson_00000145 (FPS Use of Force Policy) (filed under seal); Ex. 7, Dickinson_00000292 (ICE Use of Force Policy) (filed under seal). Each component is required to train officers on their specific use of force policy at least annually. DHS Policy § III.I.

---

[2] Available at https://www.cbp.gov/sites/default/files/assets/documents/2021-Jul/cbp-use-of-force-policy_4500-002A.pdf

FPS has also issued specific guidance regarding the management of public order policing events, which include "First Amendment protected activities, demonstrations, protests, unlawful activities resulting in civil disturbance, and other crowd management events." FPS Directive No. 15.5.4.7 Public Order Policing § I (attached to PI Mot., Ex. 18 (filed under seal), ECF No. 93-10). This guidance is designed to, among other things, "[e]nsure that people can safely exercise their First Amendment Rights at" federal facilities, and that "any time place and manner restrictions emplaced on protests are reasonable, limited, content neutral, and use consistently regardless of the subject matter." *Id.* § VI.A.

## B.    Violence Against DHS Officers Across the Nation and in Portland.

Opposition to this Administration's lawful enforcement of federal immigration law has increasingly manifested as violence directed at federal law enforcement personnel. Nationwide, assaults on ICE officers and agents has risen dramatically— around 1,300%–including a 3,200% increase in vehicle attacks and an 8,000% increase in death threats.[3] This escalating epidemic of violence towards federal officers also directly threatens the safety of detainees and members of the public. Two detainees were recently killed after an "Anti-ICE" sniper attempted to assassinate officers at an ICE facility near Dallas, Texas.[4] And foreign cartels, in coordination with domestic extremist groups, have recently placed targeted bounties on ICE and

---

[3] DHS, Press Release (Jan. 12, 2026), https://perma.cc/LSC3-3J8X.
[4] DHS, Press Release (Sep. 24, 2025), https://perma.cc/6FNP-42ED.

CBP personnel.[5]

Since June 2025, the Portland ICE facility has experienced significant unrest targeting both the building and those who work in it. Crowds as large as several thousand have gathered outside the facility. Demonstrations frequently turn violent and destructive, threatening the facility and the safety of federal personnel inside. Organized rioters, often equipped with gas masks, weapons, and shields, regularly: attempt to break into the facility; assault law enforcement officers, including with rocks, bottles, and high-powered lasers and flashlights; kick and throw lawfully-deployed crowd control munitions back at officers and towards other bystanders; barricade the facility gates, including with dumpsters and ropes; and destroy federal property and obstruct federal functions. *See generally* Cantu Decl. & Cantu Exs. A-Q (declarant exhibits filed under seal); Ex. 2, Decl. of Timothy Sullivan (Sullivan Decl.) & Exs. A-L. (declarant exhibits filed under seal).

In response to violent, obstructive, or trespassing crowds, federal law enforcement have, at times, used approved crowd control devices to disperse crowds that have refused to comply with dispersal orders. *See generally id.* Some of these devices are chemical-based crowd control agents that have varying dispersal impact zones. *See* Cantu Decl. ¶ 8; Sullivan Decl. ¶ 10. Each of the crowd control munitions are intermediate or less lethal force weapons that assist officers in deescalating situations, like civil disturbances. *See* Cantu Decl. ¶¶ 8–9; Sullivan Decl. ¶¶ 9, 11. Using these devices allows law enforcement to avoid physical confrontations that

---

[5] DHS, Press Release (Oct. 14, 2025), https://perma.cc/3NKE-85XE.

would risk injuries to officers and members of the public alike. *See* Cantu Decl. ¶¶ 28-29; Sullivan Decl. ¶¶ 11, 30-31.

Although Plaintiffs reference incidents at the Portland ICE facility going back to June 2025, Plaintiffs in their briefing and in expedited discovery have focused on a handful of discrete events that occurred between September 2025 and February 2026. Defendants' evidence presents a far more complete picture of these incidents than Plaintiffs' self-serving declarations, demonstrating that federal officers responded lawfully and appropriately when using crowd control techniques to protect federal property and personnel.

*September 1, 2025*: On Labor Day, protestors arrived at the ICE facility carrying improvised weapons and shields; they blocked the entrance and exit into facility. *See* Cantu Decl. ¶ 14 & Ex. D. The crowd damaged the fence surrounding the property, and the crowd failed to comply with lawful orders to disperse despite repeated verbal and Long-Range Acoustical Device (LRAD) warnings. *Id.* As a result, officers deployed pepper balls against those damaging the fence as well as those blocking the main entrance of the facility with a prop guillotine. *Id.* Eventually, after the crowd failed to respond to additional warnings, officers deployed hand-thrown chemical munitions and pepper balls to disperse the unlawful crowd. *Id.* Plaintiff Hugo Rios, a "freelance photojournalist," describes being exposed to gas as he was "film[ing] the events and tr[ying] to stay out of the fray." Decl. of Hugo Rios (Rios Decl.) ¶¶ 1, 7-8, ECF No. 20.

*September 13, 2025*: As a law enforcement vehicle arrived in the afternoon,

five protestors ran toward the gate of the facility, screaming and recording with their cellphones.  There is no indication that crowd control devices were used.  *See* Cantu Ex. E at 6.  Later, approximately 20 protestors approached the driveway and attempted to impede traffic.  Cantu Decl. ¶ 15 & Ex. E at 7.  After multiple verbal warnings were ignored, officers deployed pepper balls to move the demonstrators and clear the driveway.  *Id.*  Around midnight, approximately 20 protestors were blocking the driveway after having received multiple warnings to leave.  *Id.*  Two FPS officers deployed pepper balls, and one officer deployed OC spray, as officers attempted to make a targeted arrest of an individual who had earlier started a fire on the driveway of the facility.  Cantu Decl. ¶ 15 & Exs. E, F.  An officer grabbed the subject, who was lying on the ground after running back towards the crowd.  *See id.*  Several protestors then dragged the subject back into the crowd, officer in tow; other officers "push[ed] protestors away . . . using riot shields, pepper spray and pepper spray launchers," permitting them to detain the subject.  Cantu Ex. F at 3.  As the arresting officer was dragged by the crowd, she scraped her hand and both knees.  *Id.*

At some point that evening, Plaintiff Mason Lake, also a freelance journalist, was exposed to OC spray while standing 10 to 15 feet away from "an incident" involving officers and protestors.  Decl. of Mason Lake (Lake Decl.) ¶¶ 23-24, ECF No. 30.  She "felt targeted" by officers.  *Id.* ¶ 24.

*October 4, 2025*:  In the early afternoon, approximately 100 individuals trespassed on federal property and refused to disperse despite numerous LRAD warnings to vacate the area.  *See* Cantu Decl. ¶ 16 & Ex. G at 3.  Officers attempted

to push the crowd back.  *See* Cantu Decl. ¶ 16.  While pushing the crowd back, one subject attacked an FPS officer and threw a large heavy object striking the officer's upper body.  *See id.*  In response, the officer deployed OC spray and the subject was detained.  *See id.*

CBP officers also used less lethal devices to assist FPS with managing the crowd.  *See* Sullivan Decl. ¶¶ 17-19 & Ex. A.  As the crowd attempted to interfere with arrests, hand-tossed smoke munitions were deployed to "create a safe environment for agents to complete the arrest without further interference from the crowd."  Sullivan Ex. A at 22.  Undeterred, multiple protestors began "kicking and attempting to pick up actively deployed munitions."  *Id.*  At that point, "[r]ecognizing the potential danger posed by individuals redirecting munitions toward agents," an officer deployed a less lethal munition launcher.  *Id.*  The munition detonated and "effectively mitigated the threat posed by the crowd's behavior."  *Id.*

At some point that afternoon, Plaintiffs Laurie and Richard Eckman joined the demonstration outside the facility.  *See* Decl. of Laurie Eckman ¶¶ 10, 17, ECF No. 13; Decl. of Richard Eckman ¶¶ 9, 15, ECF No. 14.  While standing near the building, the Eckmans saw officers "fire[] munitions at the crowd and toss[] a chemical munition[]" in their direction.  Decl. of Laurie Eckman ¶ 17.  Richard "felt targeted" because he was "dress[ed] in clothing identifying [him] as a veteran."  Decl. of Richard Eckman ¶ 17.

<u>*October 18, 2025*</u>:  A crowd of hundreds of individuals gathered near the facility.  Around 4:30 p.m., agents attempted to effectuate a targeted arrest of a

suspect who had earlier been observed throwing an object at law enforcement personnel. *See* Sullivan Ex. C at 5; *see also* Sullivan Exs. D, E. The crowd started to surround the arresting officers as they tried to get control of the subject, at which point smoke canisters were deployed to provide the officers with concealment from the crowd. Sullivan Ex. C at 6. After several individuals picked up the smoke canisters and appeared to prepare to throw them back at officers, officers deployed two CS gas canisters to disperse the crowd. *Id.* The deployment was "effective, preventing the subject from retrieving the munitions and preventing an assault against officers[] by forcing the crowd to immediately retreat and comply with lawful orders to move from the area." *Id.* Later, the crowd again turned violent, as several individuals began throwing objects at officers. *See* Sullivan Ex. E at 8. Once again, "munitions were deployed in accordance with established protocols . . . to address the threats posed by the crowd, ensure the safety of law enforcement personnel, and protect federal property." *Id.*

Plaintiff Jack Dickinson "arrived shortly after the first gassing around 4:30 p.m." and was "impacted by the tear gas." Decl. of Jack Dickinson (Dickinson Decl.) ¶ 15, ECF No. 26. When officers deployed munitions later that night, Dickinson had "a very bad reaction" in his eyes "and the seal to [his] mask seemed compromised." *Id.*

*January 19, 2026*: Around 7 p.m., approximately 40 individuals, including Plaintiff Dickinson, conducted a sit-in on the facility's driveway. *See* Cantu Ex. I at 4; Dickinson Decl. ¶ 22. Several LRAD warnings to vacate the driveway "advised that

failure to comply could result in arrest, detention, or exposure to chemical munitions," but the protestors remained. Cantu Ex. I at 5. FPS officers then deployed several rounds of pepper balls, which were ineffective. Cantu Decl. ¶ 17. FPS officers then exited the facility through the gate and gave repeated verbal warnings to clear the driveway. *See* Cantu Ex. I at 5. The protestors failed to comply, at which point an officer deployed several bursts of OC spray, which also appeared to have no effect on the demonstrators. *Id.* Four protestors, including Dickinson, were taken into custody for failure to comply and trespassing. Cantu Decl. ¶ 17; Dickinson Decl. ¶ 31.

*January 24, 2026*: Around 5:00 p.m., hundreds of protestors flooded the vehicle entrance to the facility and began pounding on the building entry points. *See* Cantu Decl. ¶ 18 & Ex. K at 3. FPS issued four LRAD warnings, which were ignored. *See id.* Protestors began "attempting to penetrate into the building," including tearing plywood and damaging glass, at which point—nearly an hour after unrest began— pepper balls were deployed for area dispersal. Cantu Ex. K at 3; *see also* Sullivan Ex. F at 14-17. Throughout the rest of the evening, the crowd repeatedly attempted to damage federal property, barricade the vehicle gate, and throw objects at officers. *See* Cantu Decl. ¶ 18 & Ex. L at 4-5; Sullivan Decl. ¶ 22 & Ex. G at 43-54. "[A]rea saturation tactics were deployed due to continued aggressive actions by protestors," and crowd control munitions "were utilized in an effort to disperse the crowd, regain control of the area, and protect federal assets." Cantu Ex. L at 4.

Plaintiff Dickinson protested outside the facility between 4:00 p.m. and 5:00 p.m. and again between 8:15 p.m. and 11 p.m. Dickinson Decl. ¶ 35. At various

points, Dickinson describes being exposed to tear gas. *See id.* ¶¶ 37-38, 40. Plaintiff Lake arrived around 6:30 p.m. and saw officers "deploy heavy gassing." Lake Decl. ¶ 29.

*January 25, 2026*: That evening, two LRAD warnings were issued to individuals blocking the facility driveway. Cantu Decl. ¶ 19. After officers gave orders to move back and clear the area, officers were met with hostile behavior including threats of physical injury and strobe lights to disrupt vision. Sullivan Decl. ¶ 23. Later that night, FPS used pepper balls to disperse individuals from the driveway. Cantu Decl. ¶ 19 & Ex. M. CBP officers also deployed less lethal munitions after the crowd refused to comply with LRAD warnings and became physically aggressive. *See* Sullivan Decl. ¶ 23; Sullivan Exs. H at 10-14, Ex. I at 9-10. Plaintiff Dickinson arrived sometime after munitions were deployed; he "was not able to stay . . . for very long due to the extent of the gassing." Dickinson Decl. ¶ 44.

*January 31, 2026:* By 4:00 p.m., a few thousand protestors had gathered outside the facility. Cantu Decl. ¶ 20; *see also* Cantu Exs. N-P. Around 4:30 p.m., 10 to 15 agitators entered the property and began attempting to tear plywood off the guard shack. Cantu Decl. ¶ 20. Two LRAD warnings were given, and several protestors responded by producing umbrellas and forming a shield wall. *See id.* Additional individuals ran toward the vehicle gate with ropes, appearing to attempt to tie the gate shut. *Id.* As law enforcement officers deployed to move the crowd back from the gate and guard shack, multiple protestors responded by throwing rocks and other projectiles at officers. *See id.*; Sullivan Ex. K at 73-90. Officers deployed

chemical munitions to disperse the crowd, and several protestors responded by kicking or throwing those munitions back towards officers. *See*, e.g., Sullivan Ex. K at 73, 75, 76. Officers deployed further less lethal munitions against the assaultive protestors and returned to the facility once the crowd began to disperse. *See id.*

Around 5:45 p.m., officers again deployed to move the crowd away from the building, remove debris, and prevent the placement of a dumpster at the vehicle gate. Cantu Decl. ¶ 20 & Ex. O at 4; *see also, e.g.*, Sullivan Ex. K at 80. CBP agents provided support from the facility's second story rooftop. *See*, *e.g.*, Sullivan Ex. K at 87-88. Munitions were deployed at several members of the crowd who had become violent, including several assailants that were weaponizing high powered spotlights and lasers against officers on the roof. *See id.* Officers were unable to arrest these violent demonstrators "due to the officer safety concerns in a riot environment." *Id.* at 88.

Plaintiffs Dickinson and the Eckmans participated in the demonstration, were exposed to tear gas, and observed officers deploying munitions from the roof. *See* Suppl. Decl. of Jack Dickinson ¶¶ 4-13, ECF No. 58; Suppl. Decl. of Laurie Eckman ¶¶ 6-8, ECF No. 50. Mr. Eckman's "impression of [his] experience was that it seemed as though the federal agents wanted to cause the protestors pain." Suppl. Decl. of Richard Eckman ¶¶ 3-6, ECF No. 51.

*February 1, 2026*: Approximately 100 protestors stationed themselves in the driveway of the facility—some were "using wooden pallets and other debris to block the doors of the facility." Cantu Decl. ¶ 21. Three LRAD warnings were issued with

no compliance, and FPS officers deployed OC spray. *See id.*; *see also* Cantu Ex. Q at 2. CBP agents also deployed various less lethal devices, targeting individuals who attempted to breach the gate or throw projectiles at law enforcement personnel. *See* Sullivan Decl. ¶ 26 and Ex. L at 30-46. "The deployment of these munitions effectively disrupted hostile actions, enabling law enforcement personnel to regain control of the situation and subdue[] the violent crowd of protestors." Sullivan Ex. L at 35.

## C. Procedural History

Plaintiffs are five individuals—three protestors, and two freelance journalists—who attended protests at the Portland ICE facility at various points since June 2025. Am. Compl. ¶¶ 9-16, ECF No. 5. Plaintiffs allege that during certain of those protests, DHS officers targeted them with nonlethal crowd-control devices in a manner that violated the First Amendment. *Id.* ¶¶ 149-54. Plaintiffs sought to represent a putative class of "all persons who do or will in the future report on, document, observe, or protest against Defendants outside the Portland ICE building" as well as a subclass of persons "reporting on, documenting, or recording Defendants and their official conduct at protests at the Portland ICE Building." *Id.* ¶¶ 135-36.

Plaintiffs initiated this action in November 2025, *see* ECF No. 1, and they filed the operative complaint in December 2025, *see* ECF No. 5. Despite claiming to be suffering irreparable harm as a result of Defendants' conduct, Plaintiffs did not

initially move for emergency relief. Nor have they ever sought to certify their proposed class and subclass.

On January 27, 2026, Plaintiffs filed a motion for a temporary restraining order and requested expedited consideration of the request. *See* ECF No. 11. The court held a hearing on the motion on February 2, and it issued an opinion and order granting the temporary restraining order the following day. *See* ECF No. 68. The court held that plaintiffs established standing to seek prospective injunctive relief, *id.* at 6-10, were likely to prevail on the merits of their First Amendment retaliation claims, *id.* at 10-15, and that the remaining equitable factors weighed in favor of injunctive relief, *id.* at 15-18. The court then entered an order imposing various restrictions on the government's use of crowd-control devices at the Portland ICE facility. *See id.* at 20-21.

On February 12, Plaintiffs filed a motion for a preliminary injunction. *See* Pls.' Mot. for Prelim. Inj. (PI Mot.), ECF No. 94. They seek an injunction mirroring the temporary restraining order entered by the court, and also request an order requiring agents policing the Portland ICE facility to wear visible identification. *See id.* at 32.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To win a preliminary injunction, Plaintiffs must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an

injunction is in the public interest." *Id.* at 20. The first factor "is the most important," and courts "need not" reach the other factors when a plaintiff has failed to show a likelihood of success on the merits. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citation omitted).

## ARGUMENT

## I.     Plaintiffs Lack Article III Standing.

At the threshold, Plaintiffs lack standing to seek prospective injunctive relief based on allegations that individual officers retaliated against them for their First Amendment activities in the past. Such standing "does not exist merely because plaintiffs experienced past harm and fear its recurrence." *Vasquez Perdomo*, 146 S. Ct. at 2 (2025) (Kavanaugh, J., concurring in grant of stay application) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). Plaintiffs must demonstrate a "real and immediate threat of repeated injury." *Updike v. Multnomah County.*, 870 F.3d 939, 947 (9th Cir. 2017) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)). Plaintiffs may not rely on a "speculative chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

The Supreme Court has consistently held that individual plaintiffs lack standing to seek forward-looking and programmatic relief based on isolated incidents of alleged unlawful behavior by law enforcement. In *Lyons*, police officers stopped the plaintiff for a traffic violation, seized him, and placed him in a chokehold. 461 U.S. at 97. The Court held that the plaintiff had not shown that "he was likely to suffer future injury from the use of the chokeholds" because no "immediate threat" existed that the plaintiff would be subjected to another chokehold "without any

17

provocation or resistance on his part," even though the police department allegedly had a policy of "routinely apply[ing] chokeholds in situations where they are not threated by the use of deadly force." *Id.* at 105.

*Lyons* and its progeny foreclose Plaintiffs' standing. At the outset, Plaintiffs have failed even to show that DHS has a policy of retaliation. DHS expressly prohibits officers from "profil[ing], target[ing], or discriminat[ing] against any individual for exercising his or her First Amendment rights." Ex. 3 at 1.; *see* Cantu Decl. ¶ 6. Any officers who use retaliatory force violate these policies and act in a manner antithetical to the values DHS is committed to upholding. DHS also authorizes officers to use force "only when no reasonably effective, safe, and feasible alternative appears to exist." DHS Policy § II.B. Even then, officers may deploy "only the level of force that is objectively reasonable in light of the facts and circumstances confronting [the officer] at the time force is applied." *Id.* And officers must "discontinue[]" their use of force "when resistance ceases or when the incident is under control." *Id.* § II.C.4. Officers also have a duty to intervene in and to report improper uses of force, and a failure to do so "is, itself, misconduct that may result in disciplinary action." *Id.* § III.H. As other courts have recently recognized, DHS's policies "correctly set out the bounds for the use of less lethal munitions and crowd-control weapons." *Los Angeles Press Club v. Noem*, 799 F. Supp. 3d 1036, 1067 (C.D. Cal. 2025), *granting partial stay pending appeal*, No. 25-5975 (9th Cir. Dec. 18, 2025).

Nor have Plaintiffs established an unwritten policy of "officially sanctioned" retaliation. *Nordstrom v. Ryan*, 762 F.3d 903, 901 (9th Cir. 2014). The incidents

alleged by Plaintiffs involved different officers or agents from different DHS components using different crowd-control techniques in response to different circumstances. Even if Plaintiffs had established that individual DHS officers or agents intentionally retaliated against them, that would amount at most to a handful of isolated episodes over a 7-month period. And during that period, there have been protests (of varying sizes and character) outside the Portland ICE facility on an almost daily basis. Cantu Decl. ¶ 5; Ex. 4, Decl. of Daniel Gleckman (Gleckman Decl.) ¶ 3; Ex. 3, Decl. of Jason Clearman (Clearman Decl.) ¶ 3.

Indeed, there have been many instances since June 2025 when the actions of protesters remained peaceful and did not require a law enforcement response. Cantu Decl. ¶ 6. It was only in specific instances like the ones described above when the character of the protests changed and presented a threat to the safety and security of federal property and personnel that action was required to address potentially harmful situations. *See id.* The record thus does not indicate that retaliatory force was used against demonstrators at all or even most such protests, as presumably would have occurred if an unwritten DHS policy condoning retaliation existed. In fact, Plaintiff Dickinson himself contends that, despite regularly wearing the same identifiable costume while protesting, he was only "exposed to chemical munitions approximately one third of the times" he demonstrated outside the facility. Dickinson Decl. ¶ 19. Plaintiffs have failed to prove that DHS (which expressly forbids retaliation) has an unspoken policy embracing retaliation.

19

The fact that Plaintiffs Dickinson and Lake allege exposure to crowd control devices on multiple occasions is not sufficient to establish standing. In *Updike*, the Ninth Circuit rejected a plaintiff's argument that, because law-enforcement officers had denied him interpretive services during his five previous arrests, plaintiff was at risk of being denied interpretive services in the future. 870 F.3d at 948. "[P]ast wrongs," the Court explained, "do not in themselves amount to [a] real and immediate threat of injury necessary to make out a case or controversy." *Id.* (quoting *Lyons*, 461 U.S. at 103). A plaintiff must instead "identif[y] specific . . . policies and practices that would subject him to . . . injurious acts again in the future." *Id.* This, of course, Plaintiffs have failed to do. Indeed, it is undisputed that DHS policies prohibit retaliation on the basis of First Amendment activity and excessive uses of force in violation of the Fourth Amendment.

Further, the evidence does not establish that the individual Plaintiffs would again be subjected to retaliatory force even if such a policy existed. *See Lyons*, 461 U.S. at 105. As noted, there have been regular protests outside the Portland ICE facility since June 2025. Even considering the allegations of the 33 declarants that are not parties to this case, Plaintiffs have identified only a comparatively small number of allegedly retaliatory incidents.[6] Thus, even if Plaintiffs intend to continue their First Amendment activities outside the facility, they have failed to establish that they will themselves be retaliated against in the future. *See Lyons*, 461 U.S. at

---

[6] Of course, Plaintiffs' cannot rely on harms alleged by third parties to support their own standing to sue.

105-06, 108; *accord Updike,* 870 F.3d at 948.  The threat of a future injury "must be *certainly impending*"; "[a]llegations of *possible* future injury are not sufficient." *Clapper,* 568 U.S. at 409 (emphases & alteration in original).

Nor can Plaintiffs evade *Lyons* by asserting that their First Amendment activities have been chilled by Defendants' conduct.  Plaintiffs cannot "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm," including by alleging a "subjective 'chill'" on protected speech.  *Id.* at 416-18 (quoting *Laird v. Tatum*, 408 U.S. 1, 13 (1972)).  Because Plaintiffs have failed to establish that it is likely they themselves will be retaliated against in the future, any asserted chill is objectively unreasonable.

## II.    Plaintiffs' Claims Fail On The Merits.

Even if Plaintiffs had standing to sue, their First Amendment retaliation claims would fail on the merits.  Plaintiffs have failed to show any violation of the First Amendment, let alone a violation that could justify the sweeping and unworkable injunction requested here.

To establish a claim for First Amendment retaliation, Plaintiffs must show that they (1) were engaged in constitutionally protected activity, (2) Defendant's conduct would chill a person of ordinary firmness from continuing to engage in protected activity, and (3) "the protected activity was a substantial or motivating factor" in the conduct of DHS officers.  *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006).

Each Plaintiff fails to make at least one of these showings, and thus, their First Amendment retaliation claims must fail.  Insofar as Plaintiffs were harmed while

participating, or aiding the crowd, in assaulting or obstructing federal officers or destroying federal property, they were not engaged in protected First Amendment activity. *See Grayned v. City of Rockville*, 408 U.S. 114, 116 (1972) ("[Where demonstrations turn violent, they lose their protected quality as expression under the First Amendment."). To the extent Plaintiffs were engaged in protected conduct when exposed to crowd control devices, the actions taken by officers "were motivated primarily by their legal obligation" to protect others, themselves, and federal property. *Capp v. County of San Diego*, 940 F.3d 1046, 1057 (9th Cir. 2019).

Declarations by supervisory DHS officials and incident reports produced in discovery show that officers did not deploy crowd control munitions as a matter of routine or in response to peaceful protest activity. DHS's differential response to regular protest activity by itself strongly undercuts any inference of retaliatory motive. *Cf. Puente*, 123 F.4th at 1063 (no reasonable jury could find dispersal of crowd control munitions was retaliatory when "the protests went on without any serious incident for several hours" but "[w]hen problems then began to arise, [police] initially responded with more limited measures and only decided to disperse the crowd when the requisite clear and present danger had materialized"). Instead, such tools were used in response to unlawful and dangerous conduct—including attempts to breach gates and building entrances, assaults on officers with projectiles and lasers, and obstructing facility access points. In those circumstances, use of less-lethal crowd control devices served the legitimate and non-retaliatory purpose of restoring order, dispersing violent and obstructive crowds, and preventing escalation into direct

physical confrontation that would pose even greater risks to officers, protestors, and bystanders. Plaintiffs cannot recast those measured responses as retaliation where the record reflects that force was consistently tied to objectively unlawful and threatening conditions—not to the viewpoint or message of the demonstrators.

Plaintiffs have failed to identify any direct evidence supporting their claim that DHS intentionally targeted them for their First Amendment activity. They boldly claim that Defendants have "condon[ed] past acts of violence against protestors," but the statements Plaintiffs' point to—even out of context and assuming their veracity—on their face suggest no such thing. PI Mot. at 20. In reality, DHS expressly forbids such retaliation, *see* DHS Memo, Ex. 1, and further imposes a duty on officers to intervene in and report improper uses of force by other officers, *see* DHS Policy § III. Indeed, DHS is currently reviewing several use-of-force incidents that have occurred at the Portland ICE facility since September 1, 2025. *See* PI Mot., Sealed Ex. 15 at 17, ECF No. 93-8.

With no direct evidence of retaliatory motive, Plaintiffs contend DHS has engaged in a "pervasive patter[n] of misuse of force" against protestors and journalists outside the Portland ICE facility.[7] PI Mot. at 25. But Plaintiffs' own evidence squarely undermines that claim, reflecting at most sporadic and isolated incidents of alleged retaliation. Plaintiff Dickinson, for example, began regularly

---

[7] Plaintiffs' assertions about the conduct of DHS officers in other cities has no connection to the incidents at issue here, and are thus irrelevant. *See* PI Mot. at 15-16. Even if those incidents could be considered here or were part of this record, a plaintiff cannot establish an agency-wide pattern of retaliation by pointing to isolated incidents occurring across the country.

attending protests at the facility in identifiable garb in June 2025—yet the first purported retaliatory incident he describes did not occur until mid-August. *See* Dickinson Decl. ¶¶ 3, 6-9. And while Dickinson protested "four to six days or nights per week on average" during the months of August through November, he admits to being "exposed" to chemical munitions on only a third of the occasions he protested. *Id.* ¶¶ 18-19. Even if incidental "downwind" exposure to munitions could somehow count as a constitutional violation, *id.* ¶ 16, the lead Plaintiff's own sworn statements flatly dispel the notion that DHS has a pattern or practice of retaliation (one that would be directly contrary to the rules under which DHS officers operate). *See also, e.g.,* Rios Decl. ¶¶ 2-5 (attended and filmed protests beginning August 1, 2025; alleges no retaliatory incident until September 1, 2025).

Even if Plaintiffs had alleged that protestors were consistently exposed to crowd control devices outside the facility, such exposure would not support an inference of retaliation in these circumstances. To be sure, Plaintiffs and their declarants have described being exposed to crowd control devices while "standing apart from others," and (at least in their view) "posing no threat" and creating no "driveway obstruction." Pls.' Mot. for TRO at 24, ECF No. 11. But incidental exposure to crowd control munitions is a far cry from being "directly targeted with" retaliatory force. *Id.* And such incidental exposure here does not imply the use of "excessive" or "indiscriminate[]" force, either. PI Mot. at 18, 22. Plaintiffs' contrary position improperly discounts an alternative and more plausible explanation for the alleged misconduct: that Plaintiffs' injuries incidentally resulted from officers'

24

legitimate efforts to protect federal personnel, federal property, and the public from the chaos of violent protests.

As the record reveals, many crowd control devices are designed to disperse widely. *See* Sullivan Decl. ¶¶ 10-11. The devices are therefore likely to impact not only violent protestors but also people standing nearby who have disobeyed orders to disperse—including protestors and self-described journalists who position themselves in such locations. Moreover, once chemical munitions are deployed by officers, agitators frequently kick or throw the chemical munition canisters. *See, e.g.*, Sullivan Ex. K at 87-88. In such circumstances, the First Amendment does not immunize the public from the incidental effects of law-enforcement officers' efforts to restore order. *See Menotti*, 409 F.3d at 1134 ("once a pattern of chaotic violence had been established, it was unrealistic to expect police to be able to distinguish, minute by minute, those protestors with benign intentions and those with violent intentions"). The facts of this case underscore why "a conventional First Amendment retaliation framework, with its focus on subjective causation, is a poor fit for the crowd-dispersal context." *Puente*, 123 F.4th at 1063.

Nor do the armchair critiques offered by Gil Kerlikowske advance Plaintiffs' request for sweeping injunctive relief. Mr. Kerlikowske offers broad conclusions that DHS has engaged in a "pervasive pattern" of excessive force, but those opinions rest almost entirely on Plaintiffs' own declarations, selective (but unidentified) video clips and transcripts, and secondhand accounts—not on any comprehensive review of the operational record, use-of-force reports, or testimony of the officers involved. *See*

Decl. of Gil Kerlikowske (Kerlikowske Decl.) ¶ 67, ECF No. 34. A litigation-driven critique of isolated incidents, stripped of context and untethered from the full evidentiary record, cannot justify the requested injunction.

Relatedly, to the extent that individual DHS officers used more force than was warranted under the circumstances, such conduct is most naturally evaluated under the Fourth Amendment's excessive-force standards or other doctrines applicable to individual officer misconduct. Yet Plaintiffs do not rely on Fourth Amendment excessive-force principles in seeking a preliminary injunction. Plaintiffs' conflation of Fourth Amendment excessive-force claims with a claim for First Amendment retaliation is improper but unsurprising; Fourth Amendment claims require a different merits showing and are redressed by retroactive individualized relief, not a programmatic injunction constraining future law-enforcement operations. *See Campbell v. Miller*, 373 F.3d 834, 835-36 (7th Cir. 2004).

In the end, even if Plaintiffs could show a one-off constitutional violation amid a volatile situation at a facility that is frequently besieged by violent agitators, the record does not support an inference of retaliatory intent on the part of DHS as a whole to warrant a broad programmatic injunction. Critically, Plaintiffs' allegations of misconduct by individual officers occurred in the context of thousands of interactions between federal officers and protestors over a more than eight-month period. As the Ninth Circuit has explained in the related context of § 1983 claims against municipalities, "[l]iability for improper custom may not be predicated on isolated or sporadic incidents." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

Plaintiffs must instead identify "practices of sufficient duration, frequency[,] and consistency that the conduct has become a traditional method of carrying out policy." *Id.*

Plaintiffs have not made that showing here, especially where DHS policies expressly forbid retaliation. That failure precludes Plaintiffs from obtaining injunctive relief against the entirety of DHS—from line-level employees all the way up to the agencies' leadership—on the basis of the alleged ultra vires misconduct of a small number of agency employees. *Cf. Lewis v. Casey*, 518 U.S. 343, 359 (1996) (proof of isolated instances of misconduct was "a patently inadequate basis for a conclusion of systemwide violation and imposition of systemwide relief").

## III. The Requested Injunction Is Overbroad and Unworkable.

Plaintiffs' requested relief must be denied for two independent reasons. First, Plaintiffs seek exactly the sort of universal injunction that both the Supreme Court and Ninth Circuit have recently held exceeds the equitable authority of federal courts. Second, the relief sought is insufficiently tailored to prevent the harms alleged and would endanger the public, federal personnel, and federal property were it to remain in effect. Several courts have recently stayed such similarly overbroad injunctions. *See Los Angeles Press Club*, No. 25-5975 (9th Cir. Dec. 18, 2025); *Tincher*, 164 F.4th at 1099; *Chicago Headline Club*, Order, No. 25-3023 (7th Cir. Nov. 19, 2025).

A.    **The injunction impermissibly seeks relief on behalf of nonparties.**

As the Supreme Court recently reiterated in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), injunctions must be no "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 861. Here, Plaintiffs' standing to sue for prospective relief is based solely on their allegations of past retaliation. Accordingly, Plaintiffs' claims would justify—at most—a narrow injunction directing DHS to stop retaliating against those Plaintiffs who could establish their Article III standing.

The injunction requested by Plaintiffs sweeps far more broadly than that. Indeed, it is a classic universal injunction. It would enjoin Defendants from using various crowd control techniques against "any individual" "at or in the vicinity of the" Portland ICE facility. ECF No. 68 at 20-21. An injunction that offers relief to "any individual" simply cannot be squared with *CASA*. If there were any doubt, the Ninth Circuit recently stayed a substantially similar injunction against DHS officials "to the extent that [its provisions] apply to protestors who are not parties to this litigation." *Los Angeles Press Club v. Noem*, No. 25-5975, Order (9th Cir. Dec. 18, 2025).

Plaintiffs nonetheless argue that a universal injunction is appropriate here because it is necessary to provide complete relief to them. More specifically, Plaintiffs contend that unless Defendants are "generally" prohibited from using crowd control devices, "airborne chemicals from Defendants' use of gas against other protestors would continue to chill Plaintiffs' First Amendment rights." PI Mot. at 31 (quoting

ECF No. 68 at 19). They similarly argue that a party-specific injunction would not provide full relief because it would be "unworkable to expect Defendants to identify" Plaintiffs in a large crowd. PI Mot. at 31. But that is the same flawed reasoning that the district court relied on in *Los Angeles Press Club*, as to which the Ninth Circuit subsequently granted a stay. The district court concluded that *CASA* did not control because "Plaintiffs could not be assured of any meaningful protection if Defendants were nonetheless permitted to deploy powerful crowd control weapons at journalists, legal observers, and protestors immediately adjacent to Plaintiffs." *Los Angeles Press Club*, 799 F. Supp. at 1071.

In issuing a stay of the injunction as to "protesters who are not parties to this litigation," the Ninth Circuit necessarily rejected the premise that speculative spillover effects of crowd control devices can justify extending relief to nonparties. This is unsurprising. "Complete relief is not a guarantee—it is the maximum a court can provide." *CASA*, 606 U.S. at 854; *accord Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction. . . . [A] federal judge . . . is not mechanically obligated to grant an injunction for every violation of law."). And the requested injunction does not "incidentally" grant relief to nonparties, *CASA*, 606 U.S. at 851; it primarily does so. For example, it would enjoin "target[ing] any individual with a less lethal munition, if doing so would endanger *any other individual* who does not pose an imminent threat." ECF No. 68 at 21 (emphasis added). It strains credulity that the injunction's

regulation of "any individual" for the purpose of protecting "any other individual" (rather than, say, "any Plaintiff") is designed merely to grant the five named Plaintiffs full relief.

Nor do Plaintiffs' class allegations provide an end-run to *CASA*. Plaintiffs' reliance on *AARP v. Trump*, 605 U.S. 91 (2025) is misplaced. That case concerned a class at risk of imminent deportation and irreparable harm, and temporary injunctive relief was necessary "to preserve [the Court's] jurisdiction pending appeal." *Id.* at 97. That does not remotely describe this case. Further, the Supreme Court explained that class-wide relief was appropriate in *AARP* because the underlying question to be adjudicated—the notice required by due process—"[wa]s the same" for both named plaintiffs and purported class members. *Id.* at 97 n.1, 98. That is not the situation here. Whether Defendants violated Plaintiffs' First Amendment rights depends on a fact-specific inquiry for each plaintiff. *See Missouri v. McNeely*, 569 U.S. 141, 158 (2013) ("[P]olice actions are judged based on fact-intensive, totality of the circumstances analyses rather than according to categorical rules . . . ."). In these circumstances, Plaintiffs proposed class "has *no* chance of getting certified" under Rule 23. *Tincher*, 164 F.4th at 1099 (staying similar overbroad injunction and noting that even if courts may issue temporary relief to a putative class, "overlooking the difficulties of certification, as the Supreme Court did in *AARP*, is not 'necessary to preserve our jurisdiction'").

Confirming the narrowness of *AARP*, one month later in *CASA*, the Supreme

Court emphasized that universal injunctions are improper, in part because they "circumvent Rule 23's procedural protections and allow courts to create de facto class actions at will."  606 U.S. at 849-50 (quotations omitted).  *CASA* made clear that a court's equitable powers do not permit relief to non-parties, 606 U.S. at 849-50.  If the mere inclusion of class allegations were sufficient to justify sweeping preliminary relief for individuals not before the Court, *CASA* would be a dead letter.  Litigants could (as Plaintiffs have done here) simply plead a putative class—without ever seeking certification—to obtain an impermissible universal injunction under the guise of Rule 23.  And that workaround has profound impacts when the government is sued because courts can effectively reanimate universal injunctions to restrain the Executive, precisely what *CASA* held to be improper.  *Id.* at 837-38.

Further, an injunction cannot issue against the President.  *See Mississippi v. Johnson*, 71 U.S. 475, 501 (1866); *Franklin v. Massachusetts*, 505 U.S. 788 (1992).  To the extent any injunctive relief is appropriate in this case, such relief can be directed only to DHS officials.  *See Swan v. Clinton,* 100 F.3d 973, 978 (D.C. Cir. 1996).

### B.    The requested injunction is unworkable and dangerous.

The sweeping injunction requested here violates a fundamental rule of equity: "injunctive relief must be tailored to remedy the specific harm alleged."  *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015) (quotations omitted).  "[A]n injunction against state actors must directly address and relate to the constitutional violation itself and must not require more of state officials than is necessary to assure their

compliance with the Constitution." *Id.* (cleaned up). Plaintiffs' proposed injunction flunks this principle several times over.

Each one of Plaintiffs' requests is overbroad and unsupported by their arguments. Consider first the request to prohibit Defendants from using less-lethal munitions "if doing so would endanger any other individual who does not pose an imminent threat of physical harm." ECF No. 68 at 21. This effectively imposes a zero-collateral harm rule on officers. In the volatile and fast-moving conditions that routinely arise outside the Portland ICE facility, however, the very purpose of crowd control devices is to disperse unlawful and violent crowds in a manner that minimizes harm—often through area effects that cannot be confined with surgical precision to a single individual. *See* Cantu Decl. ¶ 8; Sullivan Decl. ¶ 10. Requiring officers to somehow guarantee—on pain of contempt—that no bystander might be incidentally exposed would make lawful and necessary crowd control techniques effectively impossible. *See* Cantu Decl. ¶ 28; Sullivan Decl. ¶ 30. The inevitable result would be to deter officers from taking necessary steps to restore order and protect federal property, forcing them to choose between doing nothing and escalating to direct physical confrontation—a far riskier situation for both officers and the public. *See* Cantu Decl. ¶¶ 26-28; Sullivan Decl. ¶¶ 29-31. To both fulfill their duties and comply with this restriction, officers will face "more violent, physical engagements with the public, not less." Sullivan Decl. ¶ 31; *see* Cantu Decl. ¶ 26.

Combined with the other provisions of the injunction, the zero-collateral harm restriction operates as a functional ban on the use of the crowd control devices at the

32

Portland ICE facility. Plaintiffs seemingly acknowledge this, emphasizing Mr. Kerlikowske's ridiculous suggestion that officers facing "massive, chaotic and . . . violent protests" should—rather than deploy crowd control devices—simply "arrest[] and charg[e]" each individual bad actor in the crowd. PI Mot. at 31 (quoting Kerlikowske Decl. ¶ 71). And because even Mr. Kerlikowske admits that "[i]t is quite common in some larger protests for violators to commit a criminal act and then use the anonymity of the crowd to blend back in," *id.*, the judicially-supervised regime that Plaintiffs envision would require officers to respond to violent crowds by entering the mob and attempting to effectuate individual arrests. Such a regime is not just unworkable, it is extremely dangerous. *See* Cantu Decl. ¶¶ 28-30; Sullivan Decl. ¶¶ 28-29.

In any event, the Court should not credit Mr. Kerlikowske's opinions—offered without any firsthand knowledge of, or experience with, the current situation in Portland—over direct facts from current DHS officers that establish the injunction's unworkability. Mr. Kerlikowske's opinions derive from his personal experience with protests that occurred a decade ago or earlier. The declaration does not say whether Mr. Kerlikowske has ever been faced with the type of situations that DHS officers currently confront in Portland, or whether Mr. Kerlikowske was ever required to apply anything resembling the criteria in the temporary restraining order when responding to violent protests. The declaration also does not even address any of the practical concerns identified by federal law-enforcement officers currently deployed

to Portland, except to assert without any factual basis that those difficulties can only be explained by a lack of "training" and "leadership."  Kerlikowske Decl. ¶ 4.

The other provisions requested by Plaintiffs are also unworkable individually. First, and going far beyond any restriction imposed in *Index Newspapers*, Plaintiffs seek a flat ban on DHS's use of crowd control devices "in response to trespassing, refusal to move, or refusal to obey a dispersal order."  ECF No. 68 at 21.  They relatedly seek a blanket prohibition on the use of such devices "unless the specific target of such a weapon or device poses an imminent threat of physical harm to a law enforcement officer or other person."  ECF No. 68 at 20.  But nothing in the Constitution (much less the First Amendment) requires officers to respond to trespassing crowds with only "hands on tactics," or to wait until threatened physical injury is imminent before using less lethal force.  Cantu Decl. ¶ 26.  For good reason. Such rules would straightforwardly "place officers and members of the public at greater risk than is necessary."  *Id.* ¶ 27.

And more generally, stripping officers of their ability to use crowd control devices in response to trespassing crowds that refuse dispersal orders removes "key tools for deterring escalation before threats become imminent, potentially allowing breaches or violence to occur that could have been otherwise prevented."  *Id.* ¶ 26. Indeed, these restrictions ignore that swaths of protestors may block the ingress or egress points available to federal officers without necessarily posing an imminent threat of physical harm.  In that situation, the use of crowd control devices may be necessary to obtain compliance with lawful dispersal orders.  *See id.* ¶ 28; Sullivan

Decl. ¶ 31.  Plaintiffs' breezy suggestion that DHS officers should instead just "ask people to clear the way" is fanciful on this record.  PI Mot. at 31.

Moreover, the injunction contains no exception allowing officers to use crowd control devices to protect property; officers are prohibited from deploying crowd control devices to halt the destruction of buildings or vehicles unless the subject also poses an imminent threat of physical injury.  *See* Cantu Decl. ¶ 27.  That not only invites the destruction of federal property but also severely limits the capabilities of law enforcement to stop such damage once it begins.  *See id.*

Plaintiffs' last request—an affirmative injunction requiring officers to wear visible identification numbers with agency affiliation displayed—is both unnecessary and improper.  There is no need for such a disfavored mandatory injunction because DHS officers at the Portland ICE facility already wear uniforms with visible numerical identifiers and agency affiliation.  *See* Cantu Decl. ¶ 25; Sullivan Decl. ¶ 28; Gleckman Decl. ¶¶ 5-6; Clearman Decl. ¶¶ 5-6.  And regardless, such relief would be improper.  Again, "injunctive relief must be tailored to remedy the specific harm alleged," *Melendres*, 784 F.3d at 1265, and Plaintiffs' alleged First Amendment harms are unrelated to Plaintiffs' alleged difficulties in distinguishing among individual law enforcement officers.  Nor have they ever claimed to have a right to have each individual officer identified by a unique identifier other than what the officers and agents already wear.

## III.  The Balance of Equities and Public Interest Disfavor Injunctive Relief.

The Court should also deny Plaintiffs' request for a preliminary injunction because the remaining equitable factors decisively favor the government.  "A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief."  *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (quotations omitted).  Here, as explained above, Plaintiffs' allegations of injury are insufficient even to support their standing to obtain injunctive relief, much less demonstrate irreparable injury.  *Cf. Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1042-44 (9th Cir. 1999) (en banc) (holding that, even if plaintiffs had standing to obtain prospective relief based on past injuries notwithstanding the Supreme Court's decision in *Lyons*, their alleged irreparable injury remained too speculative to support injunctive relief).

By contrast, the federal government's interest in preventing attacks on federal officers and damage to federal buildings is paramount.  *See United States v. Griefen*, 200 F.3d 1256, 1260 (9th Cir. 2000) (health, safety, and protection of property "are compelling reasons" and "represent significant government interests.").  Indeed, First Amendment "freedoms themselves are dependent upon the power of constitutional government to survive"—and "[i]f it is to survive it must have power to protect itself against unlawful conduct."  *Am. Commc'ns Ass'n, CIO v. Douds*, 339 U.S. 382, 395 (1950).  The federal government also has an interest in "preserv[ing] the property under its control for the use to which it is lawfully dedicated[;]" for government

36

buildings, those uses are public uses that are in the public interest. *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679-680 (1992). The public interest is advanced when federal officers disperse violent opportunists near federal buildings and personnel. *See, e.g.*, *Griefen*, 200 F.3d at 1260 (upholding the relocation of protesters who "had already shown by their destructive conduct that they presented a clear and present danger to the safe completion of the construction project[]"); *Bell v. Keating*, 697 F.3d 445, 457-58 (7th Cir. 2012) ("[O]therwise protected speech may be curtailed when an assembly stokes—or is threatened by—imminent physical or property damage."). Plaintiffs cannot dispute that the federal government and public have a compelling interest in the protection of federal property and personnel.

Further, "to the extent the injunction's breadth and vagueness cause federal agents to hesitate in performing their lawful duties, it threatens to irreparably harm the government and undermine the public interest." *See Tincher*, 164 F.4th at 1099-1100. Under the injunction, any use of crowd dispersal tools are now subject to contempt proceedings if DHS officers make a reasonable but incorrect determination that the terms of the injunction do not apply to the "tense, uncertain, and rapidly evolving" circumstances they face. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). By itself, that violation of the separation of powers inflicts irreparable harm on the Executive Branch. *See CASA*, 606 U.S. at 859. And by improperly constraining DHS officers' ability to respond to conduct that threatens officer and public safety, the injunction irreparably harms the government, *see id.* at 861.

**IV.    The Court Should Require a Bond and Stay Any Injunction.**

Finally, if the Court grants an injunction, it should require a bond pursuant to Rule 65(c) commensurate with the scope of relief granted.  And to the extent the Court issues any injunctive relief, Defendants request that such relief be stayed pending the disposition of any appeal, or at a minimum, administratively stayed for seven days to allow Defendants to consider seeking relief from the Court of Appeals. Defendants have, at a minimum, satisfied the requirements for a stay pending appeal.  *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

**CONCLUSION**

For the reasons set forth above, the Court should deny Plaintiffs' motion for a preliminary injunction.  A proposed order is attached.


DATED: February 19, 2026                     Respectfully submitted,


                                             BRETT A. SHUMATE
                                             Assistant Attorney General

                                             ERIC HAMILTON
                                             Deputy Assistant Attorney
                                             General

                                             ANDREW I. WARDEN
                                             Assistant Director

                                             BRAD P. ROSENBERG
                                             Special Counsel

                                             JOHN BAILEY
                                             Counsel to the Assistant Attorney
                                             General
                                             /s/ John Bailey_____

38

U.S. Department of Justice, Civil
Division
950 Pennsylvania Ave NW
Washington, D.C. 20530
Tel.:      (202) 514-6993
E-mail: John.Bailey@usdoj.gov

Attorneys for Defendants

**CERTIFICATE OF COMPLIANCE**

This brief complies with the applicable word-count limitation under LR 7-2(b),

26-3(b), 54-1(c), or 54-3(e) because it contains 9,878 words, including headings,

footnotes, and quotations, but excluding the caption, table of contents, table of cases

and authorities, signature block, exhibits, and any certificates of counsel.

/s/ John Bailey_____