# Exhibit 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| JACK DICKINSON, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, *et al.,*<br><br>    Defendants. | Case No.: 3:25-cv-02170<br><br>**DECLARATION OF ROBERTO CANTU** |

I, Roberto Cantu, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

2. I am the Deputy Director of the Federal Protective Service (FPS), Region 10, which encompasses Alaska, Washington State, Idaho, and Oregon. I have served in that position since September 9, 2023. FPS is the law enforcement agency within the U.S. Department of Homeland Security (DHS) that protects the federal government facilities and persons therein in accordance with 40 U.S.C. § 1315.

3. This declaration is submitted in support of Defendants' opposition to Plaintiffs' Motion for Preliminary Injunction.

4. Since June 2025, there have been ongoing protests of the Administration's immigration policies with many occurring at federal facilities in major urban centers, such as Los Angeles, San Francisco, Chicago, Dallas, Seattle, Denver, New York, Boston, Portland and Washington, D.C. Many of these protests, at times, have turned

violent, requiring FPS to use crowd control tactics to prevent the destruction of federal facilities or serious injury to federal employees and the public.

5. In Portland, Oregon, there have been regular protests at the Immigration and Customs Enforcement (ICE) building, also known as the Lindquist Federal Building, located at 4310 South Macadam Avenue. Although these protests vary in size and character, protestors have demonstrated outside the Lindquist Building on a near-daily basis since June 2025. During the summer of 2025 protests in front of the Lindquist Building were often violent in nature, where groups of protesters would threaten the building and federal law enforcement officers working in and around the facility. During the fall and winter of 2025, the size of the protests dropped significantly, and the incidents of violence became more infrequent. Since January 7, 2026, we have seen an uptick in the size of the protests near the ICE building.

6. At no time are officers under my command directed to threaten or assault any member of the public engaged in lawfully exercising their First Amendment rights. If officers under my command do order the dispersal of protesters, it is done because they are intermingled with the crowds that have otherwise been ordered to disperse or because dispersal is necessary for the protection of the public as well as the federal officers. There is a distinction between peaceful and protected protest activity and assaultive behavior, damage to government property, and aggressive actions that threaten the safety and security of federal property and personnel. There have been many instances since June 2025 when the actions of protesters remained peaceful and did not require a law enforcement response from FPS. It was only in specific instances when the character of the protests changed and presented a threat to the safety and security of federal property and personnel that FPS was required to take action to address potentially harmful situations.

7. In conjunction with its public order policing operations at the Portland ICE building, FPS uses crowd control chemical munitions to disperse crowds that refuse to comply with dispersal orders. It uses MK-9 foggers to deploy Oleoresin Capsicum (OC), an oil-based irritant derived from chili peppers, commonly known as pepper spray, in aerosol format. FPS also employs the PepperBall Launching System (PLS) to deploy breakable "pepper balls" that release OC in a dust format. Lastly, FPS employs the FN303 system that deploys breakable plastic balls that contain either Pelargonic Acid Vanillylamide (PAVA)[1], or non-chemical paint balls used for marking. FPS does not authorize the use of 2-chlorobenzylidene

---

[1] A synthetic version of OC.

Declaration of Roberto Cantu

2

malononitrile (CS) gas, commonly known as tear gas, or any other chemical munitions other than those discussed above, as part of its Public Order Policing operations.

8. All three of these chemical munitions (OC, PLS, and FN303) have a highly localized area of impact, generally limited to a radius of less than 20 feet. None are designed for broad or wide-area dispersal. Specifically, MK-9 OC spray canisters can deploy OC up to approximately 20 feet. A PAVA round can affect an approximate 15-foot radius from where it is compromised. The immediate impact zone for pepper balls is a 3-6 foot radius when deployed at dry hard ground from the PLS. When deployed onto a wet or soft surface, the pepper ball's impact is even less. Their effects can last between 15-45 minutes depending on conditions. FPS typically directs its chemical munitions at specific individuals as opposed to large groups of people, so exposure tends to be minimal, and rapidly dissipates. Of course, environmental conditions such as wind, precipitation, and air temperature can impact how long the chemicals remain in the area.

9. OC spray, the PLS and the FN303 are considered "less lethal" munitions and are viewed as intermediate force weapons. FPS utilizes chemical munitions so that it can deescalate a situation, allowing officers to avoid having to resort to physical confrontation with protesters with hard techniques such as hands-on, batons, tasers or other weapons. The use of chemical dispersal agents in crowd control situations results in fewer injuries to suspects, violent protestors, and officers. It also enables FPS to control large violent crowds with a small number of officers. Since June 2025, FPS has utilized chemical dispersal agents in situations where protesters posed a threat to officer safety or government property.

10. The following information is based largely on the information contained in FPS Spot Reports or Incident Reports. Spot Reports are e-mail updates from one of the FPS MegaCenters (FPS's call center) to FPS leadership of significant incidents involving FPS or the facilities that FPS protects. Incident Reports are the reports that FPS officers complete on a Form 3155 to document an incident they have responded to. Spot Reports and Form 3155s are official FPS records kept and maintained in the regular course of business. Attached are fair and accurate copies of the Spot Reports and 3155s referenced in this declaration.

11. On June 10, 2025 at approximately 7:08 p.m. a transport van attempting to leave the facility was blocked by demonstrators standing in the driveway. After repeated verbal commands to clear the driveway were ignored, FPS officers deployed

Pepperball Launching Systems (PLS) loaded with LiveX OC rounds, firing at the ground and near demonstrators' feet as area-denial munitions to disperse the crowd and clear a path. Demonstrators moved off federal property and appeared to do so without injury. At approximately 7:12 p.m., when additional demonstrators advanced onto federal property toward officers, FPS officers deployed FN303 launchers, firing approximately eight to ten impact projectiles at demonstrators' lower legs, causing them to stop advancing and withdraw. At approximately 9:00 p.m., officers used PLS pepperball rounds for area denial and, when necessary, as direct-impact munitions to the legs of aggressive demonstrators. FPS officers also deployed MK-9 OC spray both directly at individuals who were blocking vehicles or attempting to spray officers with civilian OC devices, and more broadly to create OC "fog" that prevented further assaults and cleared obstructions. FN303 launchers were again used to target the lower extremities of demonstrators who were throwing rocks or adding debris to barricades, and to strike barricade materials themselves, causing demonstrators to retreat. By approximately 10:40 p.m., all courtyard exits had been blocked by debris, demonstrators were throwing rocks, bricks, and other objects. At approximately 10:52 p.m., due to life-safety concerns and the inability to safely exit the facility, ICE SRT initiated a coordinated clearing operation. SRT deployed CS gas canisters and additional PLS pepperball munitions into the driveway area to disperse more than 20 demonstrators and break up the barricades. The ICE SRT "Bearcat" armored vehicle was driven over the debris blocking the driveway while SRT officers advanced on foot, broadcasting loudspeaker warnings from the Bearcat for demonstrators to leave federal property or face the use of necessary force. At approximately 11:15 p.m., as SRT and FPS personnel held a skirmish line in front of the facility, demonstrators threw rocks and other objects, striking at least two SRT officers. In response, SRT and at least two FPS officers deployed additional PLS pepperball rounds at the ground and lower extremities of demonstrators to stop the attacks and push the crowd farther east. After the combined deployment of CS gas, pepperball munitions, FN303 impact rounds, and MK-9 OC spray, officers were able to disperse the crowd, clear the remaining debris, and restore access to the facility. This incident is documented in FPS Incident Report F25100135899. *See* Exhibit A.

12. On June 13, 2025, at approximately 6:26 p.m., demonstrators began throwing fireworks toward the facility gates. At approximately 7:18 p.m., over 100 demonstrators were reported adjacent to federal property, and by 7:21 p.m. some in the crowd were throwing rocks at FPS officers. At approximately 7:53 p.m., an ICE

SRT arrived on scene. At approximately 7:58 p.m., SRT deployed a stinger grenade to help push the crowd back. By approximately 7:59 p.m., the crowd had been pushed from the immediate gate area, although about 20 individuals remained in the driveway behind a makeshift shield wall. The situation escalated further over the next hour, with demonstrators blocking both directions of Bancroft Street with motorcycles and debris. At approximately 8:47 p.m., ICE SRT deployed pepper balls and CS gas against demonstrators who were blocking the entrances in order to restore access to the driveway. At approximately 11:00 p.m., SRT deployed smoke munitions in response to objects being thrown at officers. Long-Range Acoustic Device (LRAD) warnings were repeatedly broadcast before and after these deployments, instructing demonstrators to leave the driveway and cease unlawful activity. This incident is documented in FPS Incident Report F25100137787. *See* Exhibit B.

13. On July 4, 2025, at approximately 8:04 p.m., an FPS officer on duty at the ICE facility arrested two individuals who were pushing ICE officers who were conducting another arrest. Prior to the arrest, the FPS officer issued a verbal warning to the suspects to step back, which they ignored. In response, the FPS officer deployed OC spray from a MK-9 Fogger at the suspects, with each burst lasting approximately one second each. This incident is documented in FPS Incident Report F25100147862. *See* Exhibit C.

14. On September 1, 2025, FPS was monitoring Labor Day protest activities at the ICE facility where a crowd was blocking entrances and exits at the facility. Some protesters carried bats, improvised weapons, shields, and were wearing what appeared to be ballistic vests. Despite repeated verbal and LRAD warnings to leave, the crowd did not comply. At approximately 7:58 p.m., an FPS officer deployed pepper balls against protesters who were unlawfully removing boards from the fence on ICE property. At approximately 9:38 p.m., an FPS officer deployed pepper balls to disperse a group blocking the main entrance of the facility. This deployment was in response to protestors placing a prop guillotine at the front entrance, blocking vehicle entry and exit from the facility. At approximately 10:23 p.m., after additional warnings, FPS and ICE SRT officers moved to clear the driveway that was blocked, using the FN303 and PLS. This incident is documented in FPS Incident Report F25100176397. *See* Exhibit D.

15. On September 13, 2025, at approximately 7:12 p.m., after about a dozen demonstrators were in the driveway and refused to comply with commands to leave,

ICE SRT deployed a Pepperball toward the ground to disperse the group and force them off federal property. Later that evening, after additional warnings at approximately 8:45 p.m. were ignored, ICE SRT again deployed PLS pepperball rounds to clear demonstrators from the driveway. At approximately 11:40 p.m., FPS officers pushed out of the gate in line formation to clear the driveway so ICE SRT vehicles could depart and to execute a targeted arrest of a demonstrator, who had been observed earlier in the evening. burning an American flag on the driveway. As officers attempted to detain the individual, multiple demonstrators surrounded them, grabbed at the suspect, and tried to pull the suspect away. They pushed the officers and attempted to seize their shields. FPS officers on the line responded with pepperball munitions, firing multiple three- to four-round bursts at demonstrators who were grabbing and pulling the suspect away from arresting officers and at others who were advancing toward the ongoing struggle. At roughly the same time, other FPS inspectors deployed handheld MK-9 OC spray three times—once at a demonstrator trying to rip a police shield from an FPS officer, once at a demonstrator fighting with an FPS officer on the ground, and once at two demonstrators who advanced toward him after ignoring commands to move back. Another FPS officer deployed his MK-9 OC spray at several individuals who continued to advance in an apparent attempt to "unarrest" the suspect after repeated orders to stop and move back; he aimed at the face and neck area, and those sprayed retreated toward the nearby intersection.  Separately, at approximately 11:50 p.m., when about 20 demonstrators were again blocking the driveway after multiple warnings, two FPS officers deployed PLS pepperball munitions for area dispersal and one inspector deployed MK-9 OC spray to clear the driveway and detain a demonstrator for damage to federal property.  This incident is documented in FPS Incident Reports F25100182565 and F25100182592.  *See* Exhibits E and F.

16. On October 4, 2025, an FPS officer assigned to the ICE facility observed approximately 100 demonstrators trespassing on federal property. At approximately 1:04 p.m., after multiple verbal orders issued via LRAD to vacate the area, the officer, along with other federal law enforcement officers, deployed from the facility driveway. During the deployment, the officer encountered a subject and issued several verbal commands to step back and leave federal property. The subject ignored the commands, prompting the officer to make physical contact and push the individual toward the street. The subject then shoved the officer and threw a large, heavy object, striking the officer's upper body. In response, the officer deployed OC spray with his MK-9, and the subject was subsequently detained by federal law

enforcement. This incident is documented in FPS Incident Report F26100001887. *See* Exhibit G.

17. On January 19, 2026, FPS was monitoring Martin Luther King Day demonstrations. At approximately 7:15 p.m., FPS deployed pepper ball and OC spray at protesters in an attempt to get protesters to leave federal property. It was ineffective and four protesters were taken into custody for failure to comply and trespassing. At approximately 7:59 p.m., FPS officers deployed pepper ball at protestors burning the American flag on federal property. This incident is documented in FPS Spot Report 26002106 and Incident Report F26100046782. *See* Exhibits H and I.

18. On January 24, 2026, at approximately 5:13 p.m., between 200-300 protesters flooded the vehicle entrance at the ICE facility and began pounding on the building entry points. FPS issued four LRAD warnings which were ignored. At approximately 6:04 p.m., protesters were at the front gate of the facility attempting to penetrate the building. FPS deployed pepper ball forcing the crowd to disperse. At approximately 7:21 p.m., protesters created additional barricades with scooters and began moving toward the gate. At approximately 7:32 p.m., FPS conducted a push moving the protesters back off the property again, FPS used pepper ball and CBP BORTAC used CS gas. At approximately 8:42 p.m., FPS issued another LRAD warning. Protesters began to tamper with the security cameras with rakes and rocks. At approximately 9:48 p.m., federal officers saturated the area with pepper ball, FN303, smoke and flash bangs. Protesters continued to try and destroy security cameras with rakes and rocks. At approximately 10:35 p.m., FPS deployed pepper ball to try to prevent the protesters from damaging the cameras. This incident is documented in FPS Spot Report 26002870 and Incident Reports F26100049690 and F26100049684. *See* Exhibits J-L.

19. On January 25, 2026, approximately 7:28 p.m., protesters were blocking the driveway at the ICE facility. FPS issued two LRAD warnings to vacate the area. Four protesters were detained for failure to comply. At approximately 9:00 p.m., FPS used pepper ball and CBP used CS gas to disperse the remaining protesters from the driveway. This incident is documented in FPS Spot Report 26002942. *See* Exhibit M.

20. On Saturday, January 31, 2026, at approximately 4:14 p.m., a few thousand protestors were outside of the ICE facility. At approximately 4:26 p.m., 10 to 15 agitators entered the property and began banging on the guard shack and attempted

to barricade the door and tearing plywood off the guard shack. Two LRAD warnings were issued instructing the crowd to move off federal property. Immediately after the LRAD warnings, multiple protesters produced umbrellas and formed a shield wall. Additional individuals ran toward the vehicle gate with ropes, appearing to attempt to tie the gate shut. Federal officers were deployed to move the crowd back from the gate and guard shack. At approximately 4:49 p.m., an FPS officer deployed a taser and a CBP agent deployed gas toward protesters who were destroying the guard shack. During the deployment, multiple protesters threw hard unknown objects at law enforcement officers. No injuries were reported. At approximately 5:30 p.m., a security guard reported a protester throwing rocks at cameras on the east side of the building. At approximately 5:36 p.m., a protester was prying plywood off the back of the guard shack. FPS deployed pepper ball for area dispersal. At approximately 5:47 p.m., protesters moved a dumpster toward the front gate, and a security guard observed protesters again prying plywood from the guard shack. At approximately 5:50 p.m., federal officers deployed from the building to move the crowd away from the building, remove debris, and prevent the placement of the dumpster at the vehicle gate. At approximately 5:54 p.m., FPS deployed pepper balls and an FPS officer used a taser. At approximately 6:30 p.m., a security guard reported approximately 250 to 300 protesters in the area. At approximately 8:50 p.m., two protesters were arrested. One of those protesters was issued citations for damage to government property (6 C.F.R. § 139.25(b)), failure to comply with law enforcement (6 C.F.R. § 139.30), disorderly conduct while being arrested (6 C.F.R. § 139.35(a)), and wearing a mask to avoid detection (6 C.F.R. § 139.35(b)). The other was cited for damage to government property (6 C.F.R. § 139.25(b)), disorderly conduct while being arrested (6 C.F.R. § 139.35(a)), and wearing a mask to avoid detection (6 C.F.R. § 139.35(b)). Both were released after being issued citations. This incident is documented in FPS Spot Report 26003934, FPS Incident Reports F26100053026 and F26100053065. *See* Exhibits N-P.

21. On Sunday, February 1, 2026, at approximately 5:32 p.m., about 500 protesters were in front of the ICE facility. About 100 protesters had crossed into the driveway. They were using wooden pallets and other debris to block the doors of the facility. At approximately 5:38 p.m., FPS issued its first LRAD warning to clear the driveway. At approximately 5:41 p.m., FPS deployed OC spray for area dispersal and a second LRAD warning was issued. At approximately 5:45 p.m., a third LRAD warning was given with no compliance from the protestors. At approximately 6:40 p.m., protesters were banging on the front door of the building and trying to break

the front gate by rocking it. FPS deployed pepper spray and attempted to conduct a push. At approximately 6:48 p.m., protesters threw a smoke canister onto the roof of the facility. The smoke canister thrown on the roof created a fire on the ICE facility's roof, which was quickly contained. Two protesters were detained. One was charged with failure to comply, and trespassing, and the other was charged with failure to comply and disorderly conduct. This incident is documented in FPS Spot Report 26004008. *See* Exhibit Q.

22. FPS has authorized its personnel to use riot control agents as an intermediate force option to temporarily incapacitate a subject. They may be used in situations where empty-hand techniques are not sufficient or were deemed appropriate to control disorderly, non-compliant, or violent subjects, but where deadly force is not deemed justified. Riot control agents can be used to resolve potentially violent situations thereby reducing the likelihood of injury to law enforcement and other individuals.

23. FPS authorizes its personnel to use riot control agents against specific subjects engaged in unlawful conduct or who are otherwise actively resisting arrest. FPS does not permit the use of OC spray indiscriminately against groups of people where bystanders would be unreasonably affected, or against individuals not involved in criminal acts. Whenever reasonably possible, a verbal warning is issued prior to the use of riot control agents.

24. FPS provides its personnel with training on the use of the relevant OC and less lethal launcher, which is designed to train and certify students as OC and less lethal launcher operators and to provide them with knowledge in the proper techniques of care and cleaning, as well as the safe operation and deployment of the various OC deployment methods and less lethal launchers. They are also trained on tactical and safety considerations when deploying the referenced riot control munitions. Officer safety and consideration for the safety and well-being of the public is a central focus of all use of force training provided. To that end, training on post exposure care of an affected subject is also provided. Safety considerations for use in a variety of circumstances are also part of the training provided.

25. All FPS officers deployed to the Portland ICE Facility have personal identifying numbers affixed to their uniforms. Each identifier also reflects the officer's affiliation with DHS. These identifiers are located on the front of the tactical vest. Photos of the identification markings are below.



26. The current TRO's restrictions on the use of crowd control munitions have removed a critical tool that FPS needs to protect federal facilities, members of the public, and the federal workforce consistent with its statutory authority. With limited personnel available, the restrictions on crowd control tools and delayed response options significantly increase the risk to both staff and facility security. Officers may be unable to contain or de-escalate situations quickly, especially if multiple breach attempts or disturbances occur simultaneously, leaving the facility more vulnerable to unauthorized entry or violence. The prohibition on less lethal munitions forces officers to rely on physical intervention (hands on tactics) to manage breaches or remove individuals. This greatly increases the risk of injury to both officers and protesters, as physical confrontations are more likely to result in accidental harm, escalation, or use of higher levels of force. The prohibition on the use of less lethal munitions can delay or prevent effective crowd control and facility defense during

fast-evolving breach attempts. The inability to use less lethal munitions for trespassing or refusal to disperse removes key tools for deterring escalation before threats become imminent, potentially allowing breaches or violence to occur that could have been otherwise prevented.

27. The requirement in the TRO that prohibits using crowd control chemical munitions unless the specific target of the device is posing an imminent threat of physical harm to a law enforcement officer or another person also impairs FPS's ability to perform its mission. As written, this requirement prohibits FPS officers from using less lethal crowd control devices (*e.g.*, FN303, PepperBall launchers or handheld chemical irritants) on protesters unless there is an imminent threat of physical harm to a law enforcement officer or another person. FPS officers are authorized to use less lethal munitions to stop violations of federal law, (*e.g.*, 18 U.S.C. § 1361, 18 U.S.C. § 1363 or 41 C.F.R. § 102-74.380) that have a potential impact on federal property. While most criminal acts directed at federal property are also inherently directed at the FPS officers protecting the property or other persons on the property, requiring FPS to wait until the criminal acts progress to the point where the threat to the officers or other person is imminent places the officers and members of the public at greater risk than is necessary.

28. Similarly, the TRO's requirement that prohibits using crowd control munitions if doing so would endanger any other individual who does not pose an imminent threat of physical harm to a law enforcement officer or another person, places a significant limitation on the ability of FPS officers to safely protect federal buildings and law enforcement officers. The most effective method that FPS has to protect the federal personnel and facilities in situations involving dangerous crowds is to use less lethal munitions to push the entire crowd back away from the federal building making it harder to reach the building. In situations where individuals are throwing objects or dangerous implements, they are often intermingled with the rest of the protesters and may use protesters who are behaving peacefully as shields. In response to that type of threat, it is not possible for FPS officers to ensure that a less lethal munition will not inadvertently impact protesters who do not pose an imminent threat to law enforcement officers or other people. The practical impact of this restriction is that FPS will no longer be able to use its less lethal munitions to push

a crowd containing violent individuals back to a safe distance from the federal building being attacked.

Executed on February 19, 2026, at Auburn, Washington

ROBERTO R CANTU<br>
Digitally signed by ROBERTO R CANTU<br>
Date: 2026.02.19 10:45:21 -08'00'

ROBERTO CANTU