**Kelly Simon**, OSB No. 154213
ksimon@aclu-or.org
**Eri Andriola**, OSB No. 246500
eandriola@aclu-or.org
ACLU FOUNDATION OF OREGON
PO Box 40585
Portland, OR 97240

**J. Ashlee Albies**, OSB No. 051846
ashlee@albiesstark.com
ALBIES & STARK LLC
1500 SW First Ave., Ste. 1000
Portland OR 97201
Facsimile: 503.427.9292

**Jane L Moisan**, OSB No. 181864
jane@pdxplp.com
PEOPLE'S LAW PROJECT
1500 SW First Ave., Ste. 1000
Portland OR 97201
Facsimile: 503.558.2025

**Matthew Borden** (*Pro hac vice*)
borden@braunhagey.com
**Hadley Rood** (*Pro hac vice*)
hrood@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210
Facsimile: (415) 276-1808

**Marissa R. Benavides** (*Pro hac vice*)
Benavides@braunhagey.com
BRAUNHAGEY & BORDEN LLP
200 Madison Ave., 23rd Floor
New York, NY 10016
Telephone: (646) 829-9403
Facsimile: (646) 403-4089

REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

**Kimberly S. Hutchison** (*Pro hac vice*)
khutchison@singletonschreiber.com
**Taylor Marrinan** (*Pro hac vice*)
tmarrinan@singletonschreiber.com
**Liam Barrett** (*Pro hac vice*)
lbarrett@singletonschrieber.com
SINGLETON SCHREIBER LLP
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
Telephone: (619) 771-3473
Facsimile: (619) 255-1515

**Zach Pangares**
zpangares@singletonschreiber.com
SINGLETON SCHREIBER LLP
1050 SW 6th Avenue, Suite 1100
Portland, OR 97204
Telephone: (619) 486-1608
Facsimile: (619) 255-1515

REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(PORTLAND DIVISION)

| | |
|---|---|
| JACK DICKINSON, a.k.a. "the Portland Chicken," LAURIE ECKMAN, RICHARD ECKMAN, MASON LAKE, and HUGO RIOS, *on behalf of themselves and those similarly situated,*<br><br>            Plaintiffs,<br><br>       v.<br><br>DONALD J. TRUMP, President of the United States, *in his official capacity*; KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS) *in her official capacity*; U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>            Defendants. | Civil No. 3:25-cv-02170-SI<br><br>**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

INTRODUCTION ................................................................................................................6

ARGUMENT .....................................................................................................................8

I.     PLAINTIFFS HAVE STANDING.................................................................................8

II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR
FIRST AMENDMENT RETALIATION CLAIM ............................................................9

    A.    Defendants fail to rebut any of the declarations or videos submitted with
the moving papers .........................................................................................9

    B.    Defendants' Generalized Description of Protests Being "Violent" Is Not a
Valid Justification for Repeatedly Attacking Class Members, Including
Plaintiffs .....................................................................................................10

    C.    Defendants Did Not Discipline Any of Their Agents for Their Undisputed
and Wrongful Conduct..................................................................................11

    D.    Defendants' Descriptions of the Events in Question Only Support Finding
Retaliatory Intent .........................................................................................13

        1.    September 1, 2025 ........................................................................13

        2.    September 13, 2025 ......................................................................14

        3.    October 4, 2025............................................................................14

        4.    October 18, 2025..........................................................................15

        5.    January 19, 2026 ..........................................................................16

        **6.**    January 24, 2026 ..........................................................................17

        **7.**    January 25, 2026 ..........................................................................19

        8.    January 31, 2026 ..........................................................................20

        9.    February 1, 2026 ..........................................................................22

    E.    Expedited discovery further illuminates Defendants' pattern of retaliation..........22

        1.    DHS Trains Its Agents to Unnecessarily Harm Protesters........................23

            a.    DHS Teaches Its Agents to Violate DHS's Own Written
Policies............................................................................23

|  |  | b. | Defendants Are Trained on Weapons Use, Rather than Public Order Policing....................................................................26 |
|  | 2. |  | Defendants Operate Under Unified Command...........................................26 |
|  | 3. |  | DHS agents' reports demonstrate animus ..................................................27 |

III. DEFENDANTS FAIL TO DISPUTE THAT PLAINTIFFS WILL SUFFER IRREPARABLE HARM .........................................................................................28

IV. THE INJUNCTION IS SAFE AND WORKABLE ............................................................28

A. The injunction tracks Defendants' written policies and ensures that they cannot use force to deprive non-threatening protesters of their First Amendment rights...................................................................................................29

B. Other courts have issued similar injunctions with no documented harm to law enforcement...................................................................................................31

C. Defendants Cite No Evidence That the TRO or Similar Injunctions Have Ever Caused Any Harm to Law Enforcement .........................................................31

V. THE INJUNCTION DOES NOT CONTRAVENE *CASA*...............................................32

VI. THE COURT SHOULD NOT REQUIRE PLAINTIFFS TO POST SECURITY...........32

VII. IF AN INJUNCTION IS GRANTED, PLAINTIFFS REQUEST THE OPPORTUNITY TO BE HEARD ON ANY STAY MOTION........................................33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

*A.A.R.P. v. Trump*,
    605 U.S. 91 (2025)............................................................................................32

*Allied Concrete & Supply Co. v. Brown*,
    No. 2:16-cv-04830-RGK-FFM, 2017 WL 2713731 (C.D. Cal. Mar. 6, 2017),
    *rev'd and remanded on other grounds, Allied Concrete & Supply Co. v.*
    *Baker*, 904 F.3d 1053 (9th Cir. 2018)..........................................................33

*Anti Police-Terror Project v. City of Oakland*,
    477 F. Supp. 3d 1066 (N.D. Cal. 2020) ........................................................31

*Barahona-Gomez v. Reno*,
    167 F.3d 1228 (9th Cir. 1999) ......................................................................32

*Berg v. Cnty. of Los Angeles*,
    No. CV 20-7870 WL 4691154 (C.D. Cal. May 28, 2021) ...........................31

*Black Lives Matter Los Angeles v. City of Los Angeles*,
    No. CV 20-5027 (C.D. Cal. May 10, 2021).................................................31

*Castro v. Cty. of Los Angeles*,
    833 F.3d 1060 (9th Cir. 2016) ......................................................................22

*Collins v. Jordan*,
    110 F.3d 1363 (9th Cir. 2025) ......................................................................30

*Cox v. Louisiana*,
    379 US 536 (1965)........................................................................................ 30

*Gomez v. Vernon*,
    255 F.3d 1118 (9th Cir. 2001) ......................................................................12

*Index Newspapers LLC v. United States Marshals Serv.*,
    977 F.3d 817 (9th Cir. 2020) .............................................................7, 8, 10

*Johnson v. Couturier*,
    572 F.3d 1067 (9th Cir. 2009) ......................................................................32

*Jorgensen v. Cassiday*,
    320 F.3d 906 (9th Cir. 2003) ........................................................................32

*LA Press Club v. Noem*,
    Case No. 2:25-cv-05563 (C.D. Cal. Sept. 10, 2025) ............................................31

*Larez v. City of Los Angeles*,
    946 F2d 630 (9th Cir. 1991) ...........................................................................12

*Marks v. United States*,
    430 U.S. 188 (1977)...........................................................................................9

*McRorie v. Shimoda*,
    795 F.2d 780 (9th Cir. 1986) .........................................................................12

*Menotti v. City of Seattle*,
    409 F.3d 1113 (9th Cir. 2005) .......................................................................11

*Nelson v. City of Davis*,
    685 F.3d 867 (9th Cir. 2012) ....................................................................10, 29

*Noem v. Vasquez Perdomo*,
    61 US 95, 146 S Ct 1 (1983)............................................................................9

*Oregon v. Trump*,
    Case No. 3:25-cv-01756-IM (Oct. 4, 2025)................................................7, 11

*Puente v. City of Phoenix*,
    123 F.4th 1035 (9th Cir. 2024) .............................................................7, 10, 11

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) .......................................................................32

*Sanderlin v. Dwyer*,
    116 F.4th 905 (9th Cir. 2024) ...................................................................10, 29

## Federal Rules

Fed. R. Civ. P. 62(d) ...................................................................................................33

## Statutes

Cal. Pen. Code § 13652(b), (d) ...................................................................................31

## Other Authorities

https://www.washingtonpost.com/investigations/2025/10/29/trump-
    administration-misleading-videos/...............................................................................7

https://www.nbcnews.com/news/us-news/trump-dhs-immigration-protests-injuries-less-lethal-weapons-force-rcna258388 (last accessed February 20, 2026), https://perma.cc/6QB9-A55S ..................................................................13

https://www.usatoday.com/story/news/nation/2026/02/23/ice-is-teaching-cadets-to-violate-the-constitution-former-dhs-attorney-testifies/88834696007/ (last accessed February 23, 2026)....................................................................................25

John Schuppe and Natasha Korecki, *Broken bones, burning eyes: How Trump's DHS deploys 'less lethal' weapons on protesters* ....................................13

Michael Loria, *ICE teaches cadets to 'violate the Constitution,' ex-DHS attorney testifies*, USA Today (February 23, 2026) ..............................................25

Sheera Frenkel and Mike Isaac, "Homeland Security Wants Social Media Sites to Expose Anti-ICE Accounts," NYTimes (Feb. 13, 2026), *available at* https://www.nytimes.com/2026/02/13/technology/dhs-anti-ice-social-media.html?partner=slack&smid=sl-share. ..........................................27

Statement of Ryan Schwank before the Democratic Joint Congressional Forum, *Our Values at Stake Pt. III: Terrorizing Communities Without Warrants and No Restraint*, February 23, 2026, available at https://www.youtube.com/watch?v=o_o4mOs-WUU ..........................................25

**INTRODUCTION**

Defendants' opposition fails to explain why they repeatedly attacked people who were exercising their First Amendment rights, including Plaintiffs. It offers nothing contradicting any of the evidence in the moving papers, which shows that DHS agents committed hundreds of acts of unnecessary, indiscriminate and excessive violence against nonviolent people protesting against DHS. Defendants offer generalized accounts of the protests by Roberto Cantu and Timothy Sullivan, two largely non-percipient witnesses, who summarize reports authored by the same DHS agents who engaged in the violence at issue. Defendants do not claim they investigated any of the misconduct in the record and admit that they have not disciplined the agents who did it. They offer no explanation, other than retaliation, for why they repeatedly violated their own written policies and do not say they will stop. Defendants assert that people like Ms. Eckman—who has already been shot in the head with a munition—must risk being maimed or killed if they want to exercise their First Amendment right to attend a protest and someone in the crowd commits even a minor trespass. Opp'n at 21-22. That is blatant suppression of speech.

Expedited discovery has further revealed Defendants' pattern of retaliation. Defendants' use-of-force reports, which they claim justify their conduct, show that they repeatedly violated their own written policies and have been untruthful about it. ████████████████ ████████████████████████████████████████ ████████████████████████████████████ ██ ██ ████████████████████████████████ ████████████████████████ This rhetoric permeates Defendants' briefing, which calls protesters "organized rioters" and "violent agitators" and attributes violent motives to entire crowds. These portrayals, which pervade Defendants' agents' reports as well,

---

[1] For the Court's ease, Plaintiffs have paginated non-declaration, non-deposition exhibits in red. All exhibit page citations refer to this pagination.

track the agency's public animus toward protests at the Portland ICE Building, including a doctored video on its social media account[2] and many other false statements about the building being "under siege"—a claim Judge Immergut found to be "untethered from the facts." *See Oregon v. Trump*, Case No. 3:25-cv-01756-IM, Dkt. 56 at p. 23 (Oct. 4, 2025).

Thus, contrary to Defendants' assertion that they have not engaged in a pattern of retaliation, Opp'n at 21-27, their public statements and their own internal reports show that they repeatedly attacked non-violent individuals when they were distant from any threatening activity and posed no threat themselves. As the Ninth Circuit held in *Index Newspapers*, this provides "exceptionally strong evidentiary support" for Plaintiffs' retaliation claim. 977 F.3d at 829.

Defendants' remaining arguments also fail. Their lead argument is the same standing theory that this Court rejected in *Index Newspapers*, the Ninth Circuit affirmed this Court for rejecting in *Index Newspapers*, and this Court again rejected in issuing the TRO. Opp'n at 17. This argument fails here for the same reasons, and Defendants make no effort to address or distinguish *Index Newspapers*.

Citing *Puente v. City of Phoenix*, 123 F.4th 1035 (9th Cir. 2024), Defendants also argue that "nothing in the First Amendment" prohibits their use of chemical munitions. Opp'n at 1. In *Puente*, the Ninth Circuit affirmed the district court's finding that plaintiffs failed to prove retaliatory intent where the police had done all the things Defendants have not done here (e.g., met with protesters beforehand, made a plan, and gave warnings) in a one-time protest where police used chemical munitions to prevent people from breaching a barricade protecting where the presidential motorcade was about to pass. *Id.* at 1063-64. It has nothing to do with the repeated wanton violence at issue here or whether it would deter a person of ordinary resolve from protesting.

---

[2] https://www.washingtonpost.com/investigations/2025/10/29/trump-administration-misleading-videos/.

Defendants' arguments about workability and the scope of relief also fail. Opp'n at 27. The requested relief, which tracks injunctions issued by other courts, does not prohibit Defendants from ever using crowd control devices. Plaintiffs only seek to bind Defendants to their own written policies and stop Defendants from responding to largely peaceful protests with overwhelming force—the mechanism that they have used to retaliate against Plaintiffs and putative class members for expressing opposition to Defendants' policies.

Finally, Defendants argue that the TRO constitutes a "universal injunction." Opp at 8. For the reasons given at the TRO stage, that is not so. Moreover, the pattern of conduct Plaintiffs have now established warrants at least provisional class treatment for this matter.

Accordingly, the Court should grant Plaintiffs' motion for a preliminary injunction.

## ARGUMENT

Defendants offer three main arguments: (A) that Plaintiffs lack standing; (B) that Plaintiffs cannot show retaliatory intent, and (C) that the scope of relief Plaintiffs seek is improper. As shown below, these arguments fail. Plaintiffs have standing for the reasons already given by the Court at the TRO stage. They have offered overwhelming proof of retaliatory intent—an extensive pattern of unnecessary violence condoned and ratified by the agency. The relief Plaintiffs seek is workable, safe and necessary. It is also the only way to offer Plaintiffs complete relief. In any event, given the pattern of conduct at issue, provisional class wide relief is warranted. The Court should not require Plaintiffs to post security for their preliminary injunction. Finally, if the Court were to issue an injunction, Plaintiffs would like the usual opportunity to be heard on Defendants' motion for a stay.

## I.    PLAINTIFFS HAVE STANDING

For the reasons the Court articulated in its TRO, Plaintiffs have standing in this matter. TRO at 8, Dkt. No. 68 ("TRO"). First, DHS's oppressive force has "'chilled' the exercise of [their] First Amendment rights, and … this First Amendment injury is ongoing." *Index*, 977 F.3d at 826. "[A] chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury" that establishes standing. *Id*. Second, as in *Index*, the same Plaintiffs were

PAGE 8 – REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

"injured by the … Defendants more than once," and Plaintiffs provide evidence of an "ongoing, sustained pattern of conduct." *Id*. These ongoing harms differentiate Plaintiffs here from plaintiffs in *City of Los Angeles v. Lyons* and *Noem v. Vasquez Perdomo*, where plaintiffs were each subject to a single arrest with no basis to suspect they would be re-arrested. 61 U.S. 95, 105 (1983);146 S. Ct. 1, 2 (Kavanaugh, J., concurring).[3]

## II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT RETALIATION CLAIM

In their opposition, Defendants do not contest the first two elements of a retaliation claim. Instead, they primarily rely on restating official policy to deny retaliatory intent. This approach fails for several reasons. First, Defendants fail to rebut the evidence that Plaintiffs have put forth of their pattern and policy of retaliation. Second, Defendants are legally incorrect that a protest being "violent" gives them carte blanche to use force against nonviolent people who are there. Third, Defendants do not dispute that they have never disciplined anyone for the unrefuted conduct in the record, thereby ratifying it. Fourth, Defendants' own reports of the events on September 1, September 13, October 4, October 18, January 19, January 24, January 25, January 31 and February 1 only underscore that they have a policy of retaliation., Fifth, the expedited discovery that Plaintiffs have been able to obtain further confirms Defendants' ongoing pattern of retaliation against nonviolent protesters and journalists at the Portland ICE building.

### A.    Defendants fail to rebut any of the declarations or videos submitted with the moving papers

In their motion, Plaintiffs submitted dozens of declarations and videos, which show that Defendants repeatedly attacked non-violent protesters who were not near anyone doing anything that posed a threat to law enforcement or federal property. In their Opposition, Defendants do not offer any explanation for any of these assaults. Instead, they offer generalized summaries of hearsay reports that are not even accurate (see Section II.D below), which do not address, much

---

[3] The concurrence Defendants cite is not binding or persuasive. *See Marks v. United States*, 430 U.S. 188, 193–94 (1977) (explaining when concurrences carry precedential value).

less refute, any of Plaintiffs' and other declarants' sworn testimony and videos showing that federal agents attacked them without provocation when they were not doing anything to threaten law enforcement and were not near anyone doing anything threatening. Mot. for PI at 11, Dkt. 94 ("PI Mot.").

> ### B. Defendants' Generalized Description of Protests Being "Violent" Is Not a Valid Justification for Repeatedly Attacking Class Members, Including Plaintiffs

The premise of Defendants' brief appears to be that if anyone steps over the blue line onto federal property, if anyone passively fails to heed an instruction, or someone in a crowd throws something and hides—all of which happen with some regularity—Defendants are free to bombard any protester with chemical munitions and/or fire projectiles into crowds, even if they hit children, seniors and families. Opp'n at 22-23. That position is legally incorrect for the reasons explained in the moving papers, and unaddressed by Defendants. Mot. at 17-18, 22-23, 27. *Nelson* and *Sanderlin* prohibit using force against non-threatening or nonviolent people engaged in passive resistance like refusing to comply with orders or minor offenses. *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) (officer not entitled to qualified immunity for using pepper balls for trespassing and failure to follow dispersal order); *Sanderlin v. Dwyer*, 116 F.4th 905, 917 (9th Cir. 2024) (if unexplained, shooting nonthreatening protester even though "a chaotic scene was unfolding around him" would demonstrate retaliatory intent).

Defendants cite dicta from *Puente* as a safe harbor from the First Amendment. *See* Opp'n at 25 (quoting *Puente,* 123 F.4th at 1063, for the proposition that "a conventional First Amendment retaliation framework, with its focus on subjective causation, is a poor fit for the crowd-dispersal context"). However, *Puente* did not purport to overrule *Nelson*, nor did it negate the Ninth Circuit's holding in *Index Newspapers* that a pattern of unnecessary violence was "exceptionally strong" proof of First Amendment retaliation. *Puente* upheld a finding that a single crowd on a single day devolved into a scenario that presented a "clear and present danger of an immediate threat to public safety, peace, or order" and declined to rely on "later-occurring conduct by individual officers" as a basis for finding retaliatory intent. 123 F.4th at 1063. Here,

however, Plaintiffs have documented a months-long pattern of incidents where no such clear and present danger existed, and have identified statements from the highest levels overseeing Operation Skip Jack indicating an intent to retaliate *before* incidents of violence have occurred. In any event, *Puente* says nothing about cases involving a policy of retaliation resulting in a months-long pattern of retaliation as Plaintiffs have described. If anything, *Puente* could be instructive to Defendants about how to better respond to speech by attempting to deescalate, engaging in protest planning, and issuing regular and clear warnings.

Similarly, Defendants also argue that *Menotti* allows them to expose entire crowds to indiscriminate force when protests become chaotic. Opp'n at 25. However, *Menotti* did not examine use of force at all; it involved a challenge to a time, place, and manner restriction that closed certain areas of Seattle to speech entirely.[4] Additionally, Defendants' own citations highlight that *Menotti* involved a "pattern of chaotic violence." Opp'n at 25; 409 F.3d at 1134. Defendants have not and cannot establish a like pattern of violence at protests at the Portland ICE Building. *See, e.g., Oregon v. Trump*, Findings of Fact and Conclusions of Law, (Nov. 7, 2025) ("the protests outside the Portland ICE facility have been predominately peaceful, with only isolated and sporadic instances of relatively low-level violence, largely between protesters and counter-protesters").

### C.    Defendants Did Not Discipline Any of Their Agents for Their Undisputed and Wrongful Conduct

As discussed in Plaintiffs' Motion, the federal agencies present at the Portland ICE Building provided interrogatory responses admitting that they have failed to hold their agents accountable for violence against protesters or violations of their use of force policies. PI Mot. at 26–27 (citing Exhibit 15 at 13–18). In their opposition, Defendants do not dispute that they failed to discipline any agents who violated written use of force policies, nor do they offer any legal argument in response. Defendants' repeated failure to discipline constitutes ratification of

---

[4] More to the point of the instant case, *Menotti* also held that multiple incidents of suppression of speech on same day was indicative of an official unconstitutional policy. 409 F.3d at 1148.

those agents' misconduct. "A policy or custom may be found either in an affirmative proclamation of policy or in the failure of an official 'to take any remedial steps after the violations.'" *Gomez*, 255 F.3d at 1127 (quoting *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir.1991)) (*Monell* liability). "Policy or custom may be inferred if, after [a violation] … , officials took no steps to reprimand or discharge the [violators], or if they otherwise failed to admit the [violators'] conduct was in error." *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986).

As a result, agents have stated that they would not change their behavior.



5 Cites to depositions refer to the internal pagination and lineation therein.

PAGE 12 – REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

**D.    Defendants' Descriptions of the Events in Question Only Support Finding Retaliatory Intent**[6]

Defendants' portrayal of the events in question only underscores that they have repeatedly retaliated against non-violent individuals protesting their conduct. Defendants cite their own press releases to support the argument that there is some nationwide pattern of persecution against them that requires this violent response to protests. Opp'n at 6. These releases do not address any of the evidence in the record of their misconduct and are consistent with a broader pattern of trying to shift blame for their retaliatory conduct onto the victims. *See*, *e.g.*, John Schuppe and Natasha Korecki, *Broken bones, burning eyes: How Trump's DHS deploys 'less lethal' weapons on protesters*, NBC NEWS (February 14, 2026), *available at* https://www.nbcnews.com/news/us-news/trump-dhs-immigration-protests-injuries-less-lethal-weapons-force-rcna258388 (last accessed February 20, 2026)[7] ("DHS has blamed local politicians and activists for inciting violence …. The agency did not answer questions about specific instances of federal officers using less lethal force on protesters."). Defendants also cite their own use-of-force reports, which only demonstrate a pattern of retaliation on the exemplary dates: 9/1/2025, 9/13/2025, 10/4/2025, 10/18/2025, 1/19/2026, 1/24/2026, 1/25/2026, and 1/31/2026, 2/1/2026. ████████████████████████████████

**1.    September 1, 2025**

On September 1, 2025, protesters demonstrated in front of the Portland ICE Building beginning in mid-afternoon and lasting into the night. Declaration of Aaron Smith ("Smith Dec.") ¶ 13, Dkt. No. 21; Declaration of Hugo Rios ("Rios Dec.") ¶¶ 3–4, Dkt. No. 20. The crowd remained peaceful, dancing and chanting with a DJ playing music. Rios Dec. ¶¶ 4–5. At one point in the night, protesters rolled a fake guillotine to the front of the building and played music while "dancing a cha-cha" line around it. Smith Dec. ¶ 14; ████████████████

---

[6] At the time of the filing of this brief, seven FPS officers/inspectors have been deposed. Some of their testimony is about the dates described below and will be presented at the hearing on March 2-4.

[7] https://perma.cc/6QB9-A55S.

███████████████████████████████████████████████████████████████

████████ At around 10:24, P.M., "while people were still dancing, the driveway gate opened and

DHS officers started to walk towards the crowd" where they proceeded to "shoot[] at protestors

and throw[]tear gas canisters" without warning. Rios Dec. ¶ 5; Smith Dec. ¶ 15.

Defendants admit that they deployed excessive force by used chemical weapons on

protesters merely for failure to disperse. *See, e.g.*, Opp'n at 8. ("Eventually, after the crowd

failed to respond to additional warnings, officers deployed hand-thrown chemical munitions and

pepper balls to disperse the unlawful crowd."). This is borne out by their own evidence. *See, e.g.*,

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████

### 2.    September 13, 2025

Defendants admit that on September 13, they used excessive force by deploying pepper

balls on nonviolent individuals "[a]fter multiple warnings were ignored." Opp'n at 9. ████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

### 3.    October 4, 2025

On October 4, 2025, federal agents subjected the Eckmans, and others, to tear gas and

munitions in the early afternoon. Declaration of Laurie Eckman ("L. Eckman Dec.") ¶¶10–26,

Dkt. No. 13; Declaration of Richard Eckman ("R. Eckman Dec.") ¶¶ 9–22, Dkt. No. 14. This

included use of munitions that engulfed the crowd in tear gas. *See* R. Eckman Dec ¶ 15–17.

In their exhibits, Defendants offer little insight into the justification for the volume of

munitions the Eckmans experienced on the afternoon of October 4, 2025, and admit that they

used excessive force by teargassing passive individuals. █████████████████████████████████

██████████████████████████████████████████████████████████

PAGE 14 –REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION



####     4.     October 18, 2025

On October 18, 2025, protesters gathered by the Portland ICE Building following the
"No Kings" march. At or around 4:31 pm, federal agents launched a tear gas cannister from the
roof of the ICE Building towards the open window of a car stopped in traffic, in which a
passenger was holding a protest sign and yelling towards the federal agents. Edwards Dec. ¶ 5,
Dkt. No. 94-7. Other agents then deployed gas and pepper spray. *Id.* ¶ 6. That day, federal agents
deployed pepper balls and tear gas on protesters on several occasions. Declaration of Jed
Vankrieken ("Vankrieken Dec.") ¶¶ 15-16, Dkt. No. 18; Declaration of Rigoberto Martinez, ¶¶
4-6 ("Martinez Dec."), Dkt. No. 22 (DHS "threw flash-bangs and sprayed a huge amount of tear
gas onto the crowd" without warning). Declaration of Anna Shepherd ("Shepherd Dec.") ¶¶ 3, 9–
12, Dkt. No. 23; Declaration of Mason Thomas ("Thomas Dec.") ¶¶ 3–10, Dkt. No. 15;
Declaration of Calley Ekberg ("Ekberg Dec.") ¶¶ 2–6, Dkt. No. 19 ("Without any warning or
audible instruction from officers, tear gas was launched from the roof of the ICE facility. The gas
rapidly encircled me, leaving no viable route to avoid exposure.").

In *Oregon, et al. v. Trump, et al*, No. 3:25-cv-01756-IM (D. Or.), Portland Police Bureau
Commander Franz Schoening testified that he reviewed video showing a federal agent shoot a
munition from what appeared to be a 0.40-millimeter launcher that

> skipped off of the driveway in front of the ICE facility and went up
> onto the roof of the ICE facility where there were federal officers
> standing, and those federal officers immediately started launching
> crowd control munitions into the crowd. So we didn't see any
> violent conduct or behavior that would have otherwise precipitated
> that use of force. It appeared to be triggered by the federal officer's
> deployment [of] ammunition.

No. 3:25-cv-01756-IM, Declaration of Ashlee Albies, Ex. H,, (Testimony of Commander

Schoening, Tr. 86:6 –14); *see also* Albies Ex D, E (videos); Albies Ex. F (PPB officer report).

PPB "officers were in close proximity and were struck by federal munitions." Albies Ex. H (Tr.

86:15-16.)

In their submissions, Defendants admit to using excessive force based on the "crowd's

actions" and "obstructing movement," none of which appeared to have been violent. For

example, Mr. Sullivan states: "Members of the crowd pressed forward toward the BPAs and

CBPOs, attempting to thwart law enforcement efforts by interfering with operations and

obstructing movement. The crowd's actions, including verbal threats and physical intimidation,

posed an immediate risk to the safety of law enforcement personnel and the integrity of the

mission to protect the Portland ICE Facility. BPAs and CBPOs utilized the following less lethal

devices and munitions: Compressed Air Launchers and hand thrown munitions." Sullivan Decl.

¶ 25. ██████████████████████████████████

████████████████████████████████████

██████████████████████████████ Witnesses from the

event describe the crowd as peaceful, with "people playing music, dancing, holding signs,

crocheting, sharing food, and talking" before agents released pepper balls and munitions.

Thomas Dec. ¶¶ 4, 7; Shepherd Dec. ¶ 9; Ekberg Dec. ¶ 11.

## 5.     January 19, 2026

On January 19, 2026, Martin Luther King Day, approximately 20 protesters engaged in a

sit-in on Portland ICE Building driveway. *See* Dickinson Dec. ¶¶22–25, Dkt. 26; ██████

████████████████████ They entered on federal property but remained peaceful and did

not block the vehicle pathway into/out of the building. Dickinson Dec. ¶¶ 22, 25. In response, federal agents issued an announcement that the sit-in protesters were to move off federal property or be arrested. *Id.* ¶ 24. The announcement did not, however, indicate that protesters would be subject to use of pepper spray, tear gas, or pepper balls if they refused to move. *Id.* ¶ 24; *see also* P.I. Mot. Exhibit 17 (under seal). Officers did in fact shoot dozens of pepper balls above the protesters heads and at the protesters feet, leaving markings across the driveway and on the walls of the ICE building. *See* Dkt. No. 16, Angell-Atchison Dec., Ex. A; Dkt. No. 27, Foster Dec. Ex. A. They also pepper sprayed seated protesters, including spraying Plaintiff Dickinson directly in the face at point blank range. ██████████████████████████ ██████████████████████████████████████████████ ██████████████

Defendants do not contest Plaintiffs' version of events, admitting that pepper balls and pepper spray were used on the sit-in protesters for failing to comply. Opp'n at 12. ████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████ ██████████████

### 6.     January 24, 2026

On January 24, 2026, agents again fired tear gas indiscriminately into crowds. Dickinson Dec.¶¶ 35–43. For example, at around 8:15 P.M., agents deployed tear gas into the crowd despite the fact that protesters had already cleared off federal property. *Id.* ¶ 36–37; Shepherd Dec. ¶ 28. At several points through the night, agents shot indiscriminately into protesters, regardless of

---

[8] Plaintiffs refer to video exhibits' internal timestamps, where available.

whether they were behaving lawfully. Shepherd Dec. ¶¶ 28–32; Exhibit 7 ("Edwards Dec.") ¶ 14

("Agents also fired gas deeper into the crowd than I have seen before. Though I was behind most

of the crowd, one canister skimmed my leg as it passed by, and another almost hit me on the

head."). While at some point some protesters had moved a dumpster and scooters onto the

Portland ICE Building driveway, the gassing appeared unconnected. Edwards Dec. ¶ 14.

      Defendants claim that the decision to deploy tear gas was made when the protesters

attempted to "penetrate into the building." Opp'n at 12. ██████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

      Mr. Sullivan offered the following explanation, which shows that Defendants' attacks

were based on speech they did not like: "Members of the crowd pressed forward toward the

BPAs and CBPOs, attempting to thwart law enforcement efforts by interfering with operations

and obstructing movement. The crowd's actions, including verbal threats and physical

intimidation, posed an immediate risk to the safety of law enforcement personnel and the

integrity of the mission to protect the Portland ICE Facility. BPAs and CBPOs utilized the

following less lethal devices and munitions: Compressed Air Launchers and hand thrown

munitions." Sullivan Decl. ¶ 26.



Yelling, cursing and donning protective wear (especially given Defendants' pattern of violence) is not riotous, a threat or otherwise a justification for use of force.

### 7.    January 25, 2026

Defendants admit to excessive force because they claim that they used pepper balls "to disperse individuals from the driveway." Opp'n at 13. Defendants' reports again reveal animus.



████████████████████████████

████████████████  In their briefing, Defendants cite threatening language, strobe lights, and nondescript "physical aggress[ion]" as their rational for deploying munitions on protesters. Opp'n at 13.

### 8.    January 31, 2026

Witnesses describe at length the protests at the Portland ICE Building on January 31, 2026 where thousands of union members and supporters, church members, bike riders and others marched past, near, and to the ICE building in what was expected to be a family-friendly event. *See, e.g.,* Edwards Dec. ¶ 17; Dkt. No. 58; Supplemental Declaration of Jack Dickinson ("Supp. Dickinson Dec.") ¶ 4; Supplemental Declaration of Laurie Eckman ("Supp. L. Eckman Dec.") ¶ 3–4; Declaration of Kathleen Minde ¶ 4 ("Minde Dec."), Exhibit 1 ("There were teachers, children, elderly, and many union members present."); Declaration of Teresa Roque ("Roque Dec.") ¶ 4, Exhibit 2 ("Everyone was protesting peacefully, Prior to the demonstration our group even discussed our intentions of remaining nonconfrontational. No one was violent. There were elderly people, kids, people in wheelchairs, and pets among protesters.").

On this day, unsuspecting marchers were left retching, vomiting, and crying, including children, families, and elderly protesters. Declaration of Ana Edelman ("Edelman Dec.") ¶¶ 7–11, Exhibit 3; L. Eckman Supp. Dec. ¶ 7; Declaration of Casey Baker ("Baker Dec.") ¶5, Exhibit 4 ("I saw many people, including myself, starting to have difficulty breathing and seeing, and developing running noses. I also saw several small children who had been badly affected by the tear gas."); Declaration of Heather Hellman ¶ 9, Exhibit 5 ("I was standing at the blue line in front of the federal building when agents released a flash bang grenade. A small dumpster had been rolled into the driveway, but no protesters had crossed the line themselves. The flash bang exploded at my feet and caused concussion symptoms that have persisted since."); Roque Dec. ¶

PAGE 20 –REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

5 ("Suddenly, smoke hit me and I was instantly gasping for air….I have asthma and I lost the ability to breathe. It felt like I was drowning. I was terrified and I could not run because I could not breathe. I thought I was going to die."); Minde Dec. ¶ 7 ("People, including children, were frantically running…I noticed several people with walkers who had also been impacted by the munitions that the federal agents deployed on the crowd…and saw many more elderly people and children inside [a lobby] coughing.").



Yet Defendants admit to using chemical munitions on the crowd. Sullivan Decl. ¶ 29 ("The crowd was damaging and trespassing on federal property. BPAs and CBPOs attempted to push back the crowd, and utilized the following less lethal devices and munitions to try to get the crowd to back away without further incident: Compressed Air Launchers, Munition Launchers, and hand thrown munitions").

### 9.    February 1, 2026

Defendants used excessive, indiscriminate and unnecessary force here, too.[9] █████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████

### E.    Expedited discovery further illuminates Defendants' pattern of retaliation

The expedited discovery that Plaintiffs have been able to obtain also demonstrates that Defendants are retaliating against protesters who disagree with them. Specifically, discovery has revealed that: (1) DHS line agents routinely are taught to use excessive force in ways that violate DHS's written policies; (2) the agents engaged in the retaliation are under unified command, (3) DHS agents mischaracterize protest activity in their reports after the fact to justify their uses of force. This evidence further shows that Defendants' written policies are *pro forma*. *Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) ("[A] plaintiff can show a custom or practice of violating a written policy.").

---

[9] During expedited discovery conferrals, the parties agreed to focus discovery on the following nine dates: 9/1/25, 9/13/25, 10/4/25, 10/18/25, 11/14/24, 1/19/25, 1/24/26, 1/25/26, and 1/31/26. However, Defendants have chosen to discuss 2/1/26 instead of 11/14/26.

1.     **DHS Trains Its Agents to Unnecessarily Harm Protesters**

Consistent with its public animus to protests and protesters at the Portland ICE Building, DHS has trained its agents to violate the agency's written policies so as to use unnecessary and excessive force in policing protests. Testimony from the FPS officer in charge of Operation Skip Jack, Roberto Cantu— ███████████████████████████████████████████

███████████████████ [10] ██████████████████████████████████

█████████████████ By placing such an individual in charge of the operation, and teaching its agents to use excessive, indiscriminate and unnecessary violence in violation of DHS's own policies, Defendants guaranteed that any protester who wants to express views criticizing DHS will be exposed to the possibility that they will suffer serious harm or even death, no matter how peaceful, young, old, or vulnerable they are.

a.  **DHS Teaches Its Agents to Violate DHS's Own Written Policies**



---

[10] Mr. Cantu's deposition was conducted on February 25, 2026, and no official transcript is yet available. These representations are based on counsel's best recollection and review of the rough transcript. The official transcript will be provided before the close of the hearing on the preliminary injunction.



The record now shows a pattern of DHS agents repeatedly violating their own policies in several other ways:

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████ For example, agents shot Ms. Eckman in the head, Mr. Dickinson in the face, and Mr. Hawkins in the eye. Hawkins Dec.; *see* Declaration of Laurie Eckman ("L. Eckman Dec.") ¶¶ 18–26, Dkt. No. 13; Dickinson Dec. at ¶ 9 (Dkt. 26).

████████████████████████████████████████████
████████████████████ *See, e.g.,* Dickinson Dec. ¶ (describing that on November 14, 2025, agents "shot chemical munitions from the roof into the crowd, some hitting the ground and others directly hitting protesters"); Dkt. No. 30, Declaration of Mason Lake ("Lake Dec.") ¶ 5, 16 (describing DHS "indiscriminately deploying tear gas beyond the driveway" at an event in June 2025 and again "indiscriminately deploying tear gas and shooting less lethal munitions into the crowd" on September 13, 2025); Dkt. No. 50, Laurie Eckman Suppl. Dec. ¶ 6 ("tear gas was being deployed repeatedly overhead of the crowd).

████████████████████████████████████████████
████████████ ████████████████████████████
████████ *See, e.g.*, Dkt. No. 19, Declaration of  Calley Ekberg ("Ekberg Dec.") ¶¶ 2–6 ("Without any warning or audible instruction from officers, tear gas was launched from the roof of the ICE facility. The gas rapidly encircled me, leaving no viable route to avoid exposure."); P.I. Mtn. Exhibit 9 ("Bartkowski Dec.") ¶ 26  (observing "federal officers escalating situations

by taunting protesters, issuing arbitrary commands, deploying munitions without warning, and reacting aggressively to verbal criticism. . . ."); Martinez Dec, ¶ 6 (On October 18, 2025,"Later that night, without any warning whatsoever, when DHS came out on the building, they threw flash-bangs and sprayed a huge amount of tear gas onto the crowd. I recall pepper balls being shot as well.")

████████████████████████████████

█████████████  ██████████████████

*See, e.g.* L. Eckman Dec.; R. Eckman Dec.; , Dkt. No. 188 Corrected Mark Remy Dec. Ex. A (video); Laurie Eckman Suppl. Dec. ¶¶ 3-4, 10; Dkt. No. 32, Stephen Hall Dec. ¶¶ 7, 11; Baker Dec. ¶ 5 ("I also saw several small children who had been badly affected by the tear gas."); *See generally* Exhibit 8, Declaration of Brian Rudiger ("Rudiger Dec."); *see generally* P.I. Mtn. Exhibit 13, Ades Dec.; Dkt. No. 22, Martinez Dec. ¶ 6 (On October 18, 2025, after DHS deployed multiple canisters of tear gas and pepper balls, "I had to vacate the immediate area and push an older gentleman in a power chair who was choking on the gas to safety.").

Even as briefing on the Motion was ongoing, new evidence came to light that ICE trains officers to violate constitutional protections and has removed training on requirements for protecting and respecting constitutional rights. *See* Michael Loria, *ICE teaches cadets to 'violate the Constitution,' ex-DHS attorney testifies*, USA Today (February 23, 2026), *available at* https://www.usatoday.com/story/news/nation/2026/02/23/ice-is-teaching-cadets-to-violate-the-constitution-former-dhs-attorney-testifies/88834696007/ (last accessed February 23, 2026). According to a former attorney for ICE, "[f]or example, [ICE] ceased all of the legal instructions regarding use of force." Statement of Ryan Schwank before the Democratic Joint Congressional Forum, *Our Values at Stake Pt. III: Terrorizing Communities Without Warrants and No Restraint*, February 23, 2026, available at https://www.youtube.com/watch?v=o_o4mOs-WUU (22:00–23:30).

b. **Defendants Are Trained on Weapons Use, Rather than Public Order Policing**



2. **Defendants Operate Under Unified Command**

The retaliatory unwritten policies carried out by Defendants are directed through a unified command structure. DHS, under the direction and control of Defendants Donald Trump and Kristi Noem, has been conducting Operation Skip Jack in Portland, Oregon since at least June of 2025. The three DHS components that are involved in the operation are FPS, ICE, and CPB. ████████████████████████████████████



### 3.    DHS agents' reports demonstrate animus[12]

Defendants' animus can be seen by their mischaracterizations of protest events in their own reports. For example, as noted above, the Incident Commander on January 19, 2026, entered a report that described a sit-in as "violent", even though 

---

[11] ███████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████

[12] New reporting has revealed that Defendants are making great efforts to identify individuals who have expressed disapproval of DHS actions, further demonstrating animus. Sheera Frenkel and Mike Isaac, "Homeland Security Wants Social Media Sites to Expose Anti-ICE Accounts," NYTimes (Feb. 13, 2026), *available at* https://www.nytimes.com/2026/02/13/technology/dhs-anti-ice-social-media.html?partner=slack&smid=sl-share.

PAGE 27 – REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

██████████████████████████████████████████████████████

████████████████████████████████████

DHS agents' reports in Operation Skip Jack also echo the rhetoric of animus used by DHS's high-ranking officials. ███████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

██████████████████████████████████████████

██████████████████

## III.     DEFENDANTS FAIL TO DISPUTE THAT PLAINTIFFS WILL SUFFER IRREPARABLE HARM

In their opposition, Defendants do not dispute that Plaintiffs will suffer irreparable harm. because "[t]heir legal injury is a complete loss of their First Amendment freedom to protest and report news." Order Granting TRO at 16-17.

## IV.     THE INJUNCTION IS SAFE AND WORKABLE

Defendants argue that the injunction is "unworkable and dangerous" exclusively based on the declarations of Messrs. Cantu and Sullivan. Opp'n at 31. These arguments are incorrect. Neither of Defendants' declarants is an expert on protest policing, ██████████████████████ ████████████████████████████████████████████ and their arguments are simply

speculation about what might happen. Exhibit 23, Supplemental Declaration of Gil Kerlikowske ("Kerlikowske Supp. Decl.") ¶ 29. They criticize Plaintiffs' expert, Mr. Kerlikowske, for not having "firsthand knowledge" of the relevant events. Opp'n at 33. But they, themselves, lack personal knowledge and base their views, instead, upon hearsay reports from line officers. Moreover, Defendants had not given Mr. Kerlikowske access to the use-of-force reports they cite at the time he prepared his initial declaration. As detailed in Mr. Kerlikowske's supplemental declaration, the evidence Defendants now chose to produce only further supports Mr. Kerlikowske's conclusions.

A.     **The injunction tracks Defendants' written policies and ensures that they cannot use force to deprive non-threatening protesters of their First Amendment rights**

The proposed injunction prohibits using less lethal weapons on people who "are not themselves posing a threat of imminent threat of harm to a law enforcement officer or another person" and firing such weapons at identified targets if doing so would result in harm to people who are not posing an imminent threat to law enforcement or others, "unless such force is necessary to stop an immediate and serious threat of physical harm to a person."

Defendants' position that they can use crowd control weapons to disperse or push back crowds of people engaged in speech they want to suppress explains why injunctive relief is appropriate. *See Nelson*, 685 F.3d 867; *Sanderlin*, 116 F.4th at 915 (firing "a projectile that risked causing serious harm, in the direction of non-threatening individuals who had committed at most minor misdemeanors" constitutes unreasonable force) (citation omitted). ████████

████████████████████████████████

████████████████████████████████

████████████████████████████

████████████████████████████████

████████████████████

████████████████████████████████

███████████████████████████

███

"The generally accepted way of dealing with unlawful conduct that may be intertwined with First Amendment activity is to punish it after it occurs, rather than to prevent the First Amendment activity from occurring in order to obviate the possible unlawful conduct." *Collins v. Jordan*, 110 F.3d 1363, 1371-72 (9th Cir. 2025). "The courts have held that the proper response to potential and actual violence is for the government to ensure an adequate police presence, and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure." *Id*. at 1372 (citing *Cox v. Louisiana*, 379 U.S. 536, 551 (1965)).

Mr. Cantu states that "The inability to use less lethal munitions for trespassing or refusal to disperse removes key tools for deterring escalation before threats become imminent, potentially allowing breaches or violence to occur that could have been otherwise prevented." Cantu Decl. ¶ 26, Dkt. 116-1. But this is using force to suppress legitimate First Amendment conduct as a prophylactic measure. In policing, "force is not supposed to be preventative; it addresses threats, rather than risks." Supp. Kerlikowske Decl. ¶ 26. "In the context of protests, there is a risk that some people may throw objects or do other things to endanger officers." *Id.* "Good risk mitigation techniques include the ones described by Commander Schoening, such as meeting with protesters, stakeholders and community groups, behaving fairly toward protesters, and de-escalation. Training officers to respect free expression, planning, good communication, and having sufficient officers present also help eliminate, but do not extinguish risk. Using crowd control weapons to eliminate the rights of people like the Eckmans is not an appropriate form of risk management, which is why it is precluded by use of force policies." *Id.* ¶ 27. Defendants are also incorrect that teargassing crowds is "de-escalation." Sullivan Decl. ¶ 31, Dkt. 116-2. As Commander Schoening and Mr. Kerlikowske both explain, this tactic by Defendants has escalated conflicts and made the community less safe. Supp. Kerlikowske Decl. ¶ 28.

PAGE 30 –REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

**B.     Other courts have issued similar injunctions with no documented harm to law enforcement**

Other courts and other cases also provide proof that the injunction Plaintiffs seek is workable. District courts in several jurisdictions have issued similar injunctions. For example, since September 10, 2025, DHS has been under an even broader injunction in *LA Press Club v. Noem*, Case No. 2:25-cv-05563-HDV-E (C.D. Cal. Sept. 10, 2025), Dkt. 55, and cannot show any injury to law enforcement caused there. *See also Berg v. Cnty. of Los Angeles*, No. CV 20-7870 DMG (PDX), 2021 WL 4691154, at *15–16 (C.D. Cal. May 28, 2021) (enjoining Los Angeles Sheriffs' Department from using less-lethal weapons from being "indiscriminately fired," "deliberately aimed to strike individuals," and without warning); *Black Lives Matter Los Angeles v. City of Los Angeles*, No. CV 20-5027 CBM(ASX), 2021 WL 3163309, at *2, 6 (C.D. Cal. May 10, 2021) (enjoining "Defendants from aiming and deploying the 37 mm less-lethal launchers within five feet and at the upper bodies of demonstrators, from deploying a 40 mm except when faced with an 'imminent serious threat of serious bodily injury' and from deploying a 40 mm at suspects who are not engaged in threatening conduct"); *Anti Police-Terror Project v. City of Oakland*, 477 F. Supp. 3d 1066, 1091 (N.D. Cal. 2020) (prohibiting outright the use of stinger grenades, rubber or rubber coated bullets, pepper balls, and similar munitions).

California, in fact, wrote similar restrictions to those Plaintiffs request into statute. Cal. Pen. Code § 13652(b), (d) (limiting use of kinetic energy projectiles, tear gas, and other less lethal munitions to when it is "objectively reasonable to defend against a threat to life or serious bodily injury to any individual, including any peace officer, or to bring an objectively dangerous and unlawful situation safely and effectively under control"). Many other police policies expressly track the language of the injunctive relief Plaintiffs are seeking. This proves that what Plaintiffs ask is reasonable, safe, and workable.

**C.     Defendants Cite No Evidence That the TRO or Similar Injunctions Have Ever Caused Any Harm to Law Enforcement**

Finally, the TRO's ongoing success demonstrates that a preliminary injunction with the same requirements is safe and workable. Since the Court issued its TRO, protests have remained

peaceful without the use of munitions on the crowd. *See, e.g.*, Declaration of Heather Hellman ("Hellman Dec.") ¶ 11; ████████████████ Defendants never argue that any law enforcement officer has ever been injured as a result of the Court's TRO or the identical injunctions and policies in other jurisdictions. They provide no examples of actual, concrete issues caused by the TRO, instead arguing hypotheticals and imagining scenarios that they believe *could* occur.

## V. THE INJUNCTION DOES NOT CONTRAVENE *CASA*

Defendants are incorrect that the requested relief would violate *Trump v. CASA*. Opp'n at 28 for at least two reasons. First, as the Court already held (TRO at 18–19), the Supreme Court has confirmed that a district court may grant preliminary injunctive relief to a putative class before class certification. *A.A.R.P. v. Trump,* 605 U.S. 91, 98 (2025).

Second, Plaintiffs intend to provisionally certify a class. As the Supreme Court stated in *CASA*, an injunction set forth to protect a defined class is well within the federal court's equitable powers, and explicitly not a universal injunction. 606 U.S. 831, 849–50 (2025).

## VI. THE COURT SHOULD NOT REQUIRE PLAINTIFFS TO POST SECURITY

As it found before, the interests of justice dictate that the Court should waive the requirement for Plaintiffs to post a security for their requested relief. TRO at 21. Federal Rule of Civil Procedure 65 provides the Court discretion to determine the amount of security required for a preliminary junction, or to waive the requirement entirely. *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009); *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999), *supplemented* 236 F.3d 1115 (9th Cir. 2001). "The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). As courts routinely hold, the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). The preliminary injunction here requires Defendants to end an unlawful practice, and there is minimal harm in

enjoining them, as the TRO's success already demonstrates. As such, the Court should waive any requirement that Plaintiffs post security.

## VII.   IF AN INJUNCTION IS GRANTED, PLAINTIFFS REQUEST THE OPPORTUNITY TO BE HEARD ON ANY STAY MOTION

Defendants' attempt to stay a preliminary injunction that has not even been granted is premature. A motion to stay proceedings pending appeal is premature where "an appeal … has not been filed." *Allied Concrete & Supply Co. v. Brown,* No. 2:16-cv-04830-RGK-FFM, 2017 WL 2713731, at *6 (C.D. Cal. Mar. 6, 2017), *rev'd and remanded on other grounds sub nom. Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053 (9th Cir. 2018). The plain language of Federal Rule of Civil Procedure 62 makes this clear, allowing the Court to "suspend, modify, restore, or grant" an injunction "*while an appeal is pending* from an interlocutory order." Fed. R. Civ. P. 62(d) (emphasis added). Thus, the Court should decline to rule on Defendants' request that it stay whatever injunction it may issue until such time as (1) Defendants appeal and (2) Plaintiffs have been given the opportunity to respond to Defendants' motion.

Respectfully Submitted,

Dated: February 26, 2026

SINGLETON SCHREIBER, LLP
*s/ Kimberly S. Hutchison*
Email: khutchison@singletonschreiber.com
*Pro Hac Vice*

ACLU FOUNDATION OF OREGON
Kelly Simon, OSB No. 154213
Email: -ksimon@aclu-or.org
Eri Andriola, OSB No. 246500
Email: eandriola@aclu--or.org

ALBIES & STARK LLC
J. Ashlee Albies, OSB NO. 051846
email: ashlee@albiesstark.com

PEOPLE'S LAW PROJECT
Jane L Moisan, OSB NO. 181864
Email: Jane@Pdxplp.com

PAGE 33 –REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

BRAUNHAGEY & BORDEN LLP
Matthew Borden
borden@braunhagey.com
Hadley Rood
hrood@braunhagey.com
*Pro hac vice*


*Counsel for Plaintiffs*